E-FILED
Tuesday, 16 October, 2012  03:59:48 PM
Clerk, U.S. District Court, ILCD

**IN THE CIRCUIT COURT OF NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

Date of Sentence _____March 6, 2006_____
Date of Birth _____4/3/65_____
(Defendant)

PEOPLE OF THE STATE OF ILLINOIS

vs.

05CF1661

David Armato
_____Defendant_____

Date of Birth _____
(Victim)

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | | MSR |
|-------|-----------------|-------------------|----------|-------|----------|-----|-----|
| 1 | 5/7/2005 | Theft | 720 5/16-1(a)(1)(A) | 3 | 10 Yrs | Mo | Yr |

and said sentence shall run (☑ concurrent with)(☐ consecutive to) the sentence imposed on: _____05CF5015_____

_____ and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ Yrs ___ Mo ___ Yr

_____ and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ Yrs ___ Mo ___ Yr

_____ and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ Yrs ___ Mo ___ Yr

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a **Class X** offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the defendant is entitled to receive credit for time actually served in custody (of _____days as of the date of this order) from (specify dates) _____

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in **great bodily harm** to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the **Impact Incarceration** program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program. Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve   ☐ 85%   ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☑ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☑ IT IS FURTHER ORDERED that  Defendant shall receive credit for time served in the Lake County Jail and while awaiting transport to the
Department of Corrections - Defendant shall receive good time credit as administered by the Department of Corrections

This order is (☑ effective immediately) (☐ stayed until _____).

DATE: _____March 6, 2006_____

ENTER: ___ s/ James K. Booras ___
_____James K. Booras_____
(PLEASE PRINT JUDGE'S NAME HERE)

Form approved by the Conference of Chief Judges
Effective March 18, 2005

171-39C4 (04/05)

**DEFENDANT'S EXHIBIT**
A

## IN THE CIRCUIT COURT OF NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

2 CASES

PEOPLE OF THE STATE OF ILLINOIS

Date of Sentence _____ March 6, 2006
Date of Birth _____ 4/3/65

vs.

MAR 0 0 2006

05CF5015                    (Defendant)

David Armato

Defendant

Date of Birth _____
(Victim)

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

X191995

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | | | MSR |
|-------|----------------|-------------------|----------|-------|----------|--|--|-----|
| 1 | 12/30/2005 | Theft | 720 ILCS 5/19-1(a) | 3 | 10 | Yrs | ___ Mo | ___ Yr |

and said sentence shall run (☒ concurrent with)(☐ consecutive to) the sentence imposed on: _____ 05CF1661

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ ___ Yrs ___ Mo ___ Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ ___ Yrs ___ Mo ___ Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ ___ Yrs ___ Mo ___ Yr

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a **Class X** offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the defendant is entitled to receive credit for time actually served in custody (of _____ days as of the date of this order) from (specify dates) _____

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in **great bodily harm** to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the **impact incarceration** program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program. Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve  ☐ 85%  ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☒ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☒ IT IS FURTHER ORDERED that Defendant shall receive credit for time served in the Lake County Jail and while awaiting transport to the Department of Corrections - Defendant shall receive good time credit as administered by the Department of Corrections

This order is (☒ effective immediately) (☐ stayed until _____ ).

DATE: _____ March 6, 2006 _____

ENTER: s/ James K. Booras

James K. Booras
(PLEASE PRINT JUDGE'S NAME HERE)

Form approved by the Conference of Chief Judges
Effective March 18, 2005

171-39C4 (04/

DEFENDANT'S EXHIBIT
B
tabbies

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
CENTRAL DIVISION

DAVID ARMATO,                        )
                                     )
          Plaintiff,                 )
                                     )
            -vs-                     )  NO. 11-CV-3023
                                     )
RANDY GROUNDS, MICHELE LITTLE-      )
JOHN, GLENN JACKSON, and DION       )
DIXON, all in their individual      )
capacities,                          )
                                     )
          Defendants.                )

DISCOVERY DEPOSITION OF MICHELE LITTLEJOHN
March 5, 2012

--------------------------------------------------
Donna R. Maninfior, CSR, RPR
# 84-2991
MANINFIOR COURT REPORTING, P.C.
Certified Shorthand Reporter
1612 Lafayette Avenue
P. O. Box 1036
Mattoon, IL 61938-1036
(217) 235-1127

MANINFIOR COURT REPORTING, P.C.
1-800-346-2986



DEFENDANT'S
EXHIBIT
C

2

STIPULATION

1
2
3    IT IS HEREBY STIPULATED AND AGREED by and
4    between the parties that the deposition of
5    **MICHELE LITTLEJOHN**, may be taken on March 5, 2012,
6    at the Robinson Correctional Center, 13423 East
7    1150th Avenue, Robinson, Illinois, pursuant to the
8    Rules of the Federal Court and the Rules of Federal
9    Procedure governing said depositions.
10
11    It is further stipulated that the
12    signature is waived.
13
14    It is further stipulated that the
15    necessity for calling the Court Reporter for
16    impeachment purposes is waived.
17
18
19
20
21
22
23
24

3

1    APPEARANCES:

2        DENNIS J. DeCARO
         Attorney at Law
3        Law Offices of Kupets & DeCaro, PC
         30 N. LaSalle Street, Suite 4020
4        Chicago, IL  60602
             On behalf of the Plaintiff.
5
         ROBERT FANNING
6        Attorney at Law
         Illinois Assistant Attorney General
7        500 S. Second Street
         Springfield, IL  62706
8            On behalf of the  Defendants.

9

10

11

12

13                        INDEX

14   Examination by:                        Page

15       Mr. DeCaro                        4, 56
         Mr. Fanning                          50
16

17       Exhibits:                          Page

18       Littlejohn Exhibit 1                  9
         Littlejohn Exhibit 2                 15
19       Littlejohn Exhibit 3                 17
         Littlejohn Exhibit 4                 18
20       Littlejohn Exhibit 5                 31

21

22           (Exhibit 2 retained by counsel)

23

24

4

<pre>
 1                    MICHELE LITTLEJOHN,

 2    called as a witness herein, having been duly sworn

 3    upon oath, testified as follows:

 4                    DIRECT EXAMINATION

 5    BY:  DENNIS J. DeCARO

 6        Q    Will you please state your full name and

 7    spell your last name for the court reporter.

 8        A    Michele, and that's with one L, R.,

 9    Littlejohn, L-i-t-t-l-e-j-o-h-n.

10        Q    Okay, Ms. Littlejohn, have you ever given

11    a deposition before?

12        A    No.

13        Q    Okay, so all it is, the four of us in the

14    room here -- I represent David Armato.  I am going

15    to ask you some questions regarding -- I am sure

16    you are aware of the situation, his release date,

17    and the no MSR, and confusion that that may or may

18    not have caused.  The court reporter is going to

19    take everything down.  A few things when we are

20    doing a deposition, let me get my full question

21    out, because I may ask some similar questions with

22    different endings, so don't start speaking until I

23    am done.  It's hard for the reporter to take two

24    people down speaking at the same time; and, second,
</pre>

5

1   you need to answer everything orally, verbally.

2   You can nod or shrug, but the court reporter can

3   put down nodding, but when we read it six months

4   from now, we don't know if you nodded yes or no.

5       A   Okay.

6       Q   Typically one of us will say something if

7   that starts occurring.  What I am going to do is

8   ask you some background questions, very briefly,

9   and then we are going to talk about David Armato.

10  Do you live in the area?

11      A   Yes.

12      Q   What town?

13          MR. FANNING:  Uh --

14      Q   Just the town, I am not going to ask her

15  her address.

16      A   Well, it's a very small town.

17      Q   Okay, let me ask you this.

18      A   It wouldn't be hard to find me.

19      Q   So if you were to leave here to move, just

20  assure me that you will stay in touch with Mr.

21  Fanning, so if we go to trial we can find you?

22      A   Oh, yes, yes.

23      Q   How about .your date of birth?

24      A   4/3/67.

6

Q    Okay, any plans on moving?

A    No.

Q    Okay, what is your highest level of
education?

A    High school.

Q    You are currently employed at the Robinson
Correctional Center, correct?

A    Yes.

Q    When did you start here?

A    February 5, 1992.

Q    All right, why don't you just tell me in
your own words what position you were hired for and
then where you are at now.

A    I was hired as an office assistant in the
records office, and do you want all the different
positions I have been promoted to or just where I
am now?

Q    Well, the office assistant, what -- is
that secretarial?  Is that filing?  What is office
assistant in records?

A    There is a lot of different aspects to it
in the records office.  You are not just a
secretary.

Q    Were you calculating out dates?

1    A    Yes.

2    Q    Okay, so that started as far back as 1992.

3 Who trained you on how to do that?

4    A    My supervisor at the time, Vicky Bennett.

5    Q    Is she still here?

6    A    No, she is retired.

7    Q    And then after -- from when to when were

8 you the assistant office assistant?

9    A    I don't remember the exact date, but in

10 the records office I was office assistant, then

11 promoted to office associate, and then promoted to

12 office coordinator.

13    Q    And why don't you just tell me generally

14 what the difference of those three positions was.

15    A    Basically just more responsibility, that

16 you are more in charge when the supervisor is gone

17 as the office coordinator.  Then I was temporarily

18 assigned as the Executive II which is the records

19 office supervisor.

20    Q    Was that during the time when David Armato

21 was here?

22    A    Yes.

23    Q    So we will be talking about February

24 through May of 2010?

8

1     **A**    Yes.   I just recently about six months ago

2   took my promotion as Office Administrative

3   Specialist which is now out of records, so I was in

4   records the whole time during my career until

5   August of 2011.

6     **Q**   Okay, what do you do now?

7     **A**   I am now over the computer system in terms

8   of the system at this institution.

9     **Q**   Okay, great!  Can you tell me generally

10   when a new inmate gets here, as far as in the

11   records department, what occurs there in the

12   records department?  Where I am going with that is

13   when a new inmate gets here, and you get their

14   documents for their file, is that when you

15   calculate their out date?

16     **A**    That's at one point, but, of course, it's

17   already been calculated before he gets here, but

18   then you double-check the calculation at that time.

19     **Q**    Who initially calculates it?  You say it

20   was done before he gets here.  Who does that?

21     **A**    Like when they were brought in to the

22   reception center throughout the state, it's

23   calculated there, and then each time the offender

24   transfers it's to be recalculated.

9

1      Q    So we will talk about David Armato.   Once

2  he got here, I want to say March of 2006, the

3  specific date we will find out, his out date is

4  recalculated?

5      A    It should have been.

6      Q    And then if he gets some good time while

7  he is here, it's recalculated again?

8      A    Right.

9      Q    So prisoners' out dates can be

10  recalculated many times?

11      A    Yes, sir.

12      Q    Okay, do you happen to know from your

13  documents what date David Armato arrived here?

14      A    I will have to check -- November 28, 2007,

15  is when he arrived at Robinson.

16      Q    Does it show where he was before then?

17      A    Some institutions don't list it.   The last

18  one listed here was Logan.  They received him March

19  28, 2006.

20      Q    Okay, let me show you what we will mark as

21  Littlejohn Exhibit 1.

22               (Whereupon Littlejohn Exhibit 1 was

23               marked for identification.)

24      Q    I am handing you what we have marked as

10

1    Littlejohn Exhibit 1.  That is a document that

2    calculates the out dates, correct?

3        A    Yes.

4        Q    What do we call this document?

5        A    Calculation sheet.

6        Q    Okay, can you tell from this sheet where

7    this calculation was done, by any chance?

8        A    The only reason I am guessing it would

9    have been done at Logan is because of the date.

10   Well, no, I guess I take that back.  That's March

11   20, 2006.  He didn't arrive at Logan until March

12   28, 2006, so I would think that would have been

13   done at the reception center.

14       Q    Okay, and this gives him the out date of

15   May 9, 2010, right?

16       A    Yes.

17       Q    Okay, and this does not have any credit

18   for time served or any good time, correct?

19       A    I think the credit for time served is

20   included in the calculation sheet.

21       Q    Okay, where at?

22       A    Where it says new custody date here, it

23   lists jail credit sheet which indicates to me that

24   they are taking this from the jail, from the jail

11

1   certification from the sheriff.

2      Q   Okay, so they are using May 5 -- sorry,

3   they are using May 9, 2005 --

4      A   Yes.

5      Q   -- as his custody date?

6      A   Yes.

7      Q   And my understanding from reading all this

8   stuff, that was sort of a problem here.  Between

9   you and Mr. Jackson, you didn't know whether to use

10   that May 5, 2005, date, or the March 6, 2006, date

11   as the starting date, correct?

12      A   Well, we knew the May 9, 2005, was

13   incorrect, so we knew we couldn't use it.

14      Q   Okay, so just so we are all on the same

15   page, my understanding from reading your e-mails

16   and things like that is the reason why you knew

17   that wasn't -- the May 9, 2005, date wasn't correct

18   was because he was charged with another crime in

19   December of 2009, correct?

20      A   Yes.

21      Q   And then there was some talk about

22   periodic imprisonment, but there wasn't any clear

23   documentation regarding that.

24      A   Correct.

1    Q    Okay, we will get to that, though.   It

2    looks like from your e-mails, though, that it was

3    pretty clear.  You have got confirmation from a

4    couple places that he was remanded back to the

5    county sheriff each time after December 31, 2009,

6    it looks like?

7    A    Yes.

8    Q    Did you ever use that date as a beginning

9    calculation date?

10   A    No, because I was informed from Glenn

11   Jackson that we don't -- basically things that we

12   have gotten from court dockets we can't use as jail

13   verification.  We use sentencing orders or we use

14   jail verifications from the sheriff.

15   Q    So in this case you didn't have the jail

16   verification?

17   A    Correct.  We had the incorrect jail

18   verification is the only one.

19   Q    The only thing you had for sure were those

20   two orders from February 18, 2010, which gave him

21   373 days of credit and they also said specifically

22   no MSR.

23   A    Correct.

24   Q    But even with those he wasn't let out.

13

1      **A**   Correct.

2      **Q**   Why in your opinion was that?  Why

3 couldn't you use those orders to do a calculation

4 and let him out?

5      **A**   I was following orders from my supervisor

6 in Springfield, Glenn Jackson, who was in contact

7 with legal, that from my understanding they were

8 going to pursue the no MSR term on the sentencing

9 order.

10     **Q**   That never was pursued, though, was it?

11     **A**   I can't answer that.  I don't know.

12     **Q**   When he ultimately was let out here on May

13 21, 2010, it was without an MSR, correct?

14     **A**   Correct.

15     **Q**   And do you have any information that

16 anybody went after him and has changed that since

17 he has been released in May?

18     **A**   No.

19     **Q**   Okay, between -- I think you received

20 those February 18, 2010, orders on February 22,

21 2010, or around there, and between February 22,

22 2010, and May 21, 2010, are you aware of any

23 investigations that anybody did, Mr. Jackson,

24 legal, or anything into this situation other than

14

1    communication between you and Mr. Jackson?

2         A    I am not aware of anything.  I was not

3    given that information.  I just would contact Mr.

4    Jackson on the status and that's the only part I

5    know.

6         Q    So you were never called to Springfield

7    for a hearing, or anything like that?

8         A    No.

9         Q    Were you ever contacted by anybody from

10   legal?

11        A    No.

12        Q    Did you forward any documents from the

13   master file to Glenn Jackson regarding this case?

14        A    That I don't recall.  He may have had

15   me -- I know back when we were dealing with the

16   jail credit, he had me send him some information on

17   that, but as far as the new sentencing orders, I

18   believe I probably faxed him copies of the new

19   sentencing orders, but other than that that was

20   just back when we received them.

21        Q    Would that be part of the file if you

22   faxed something to him?

23        A    Could be.

24        Q    Okay, maybe later we can look for that.

15

1  Do you have an independent recollection of faxing

2  him those orders?

3      **A**    I don't exactly remember doing it, but any

4  time we get in sentencing orders that's kind of out

5  of the ordinary, he will have us fax some copies.

6      **Q**    Other than -- let's put Mr. Jackson aside.

7  Did you ever fax or e-mail or send any person from

8  any legal department for the state, or anyone that

9  Mr. Jackson told you to, any documents from Mr.

10  Armato's file?

11      **A**    No, I don't believe so.

12      **Q**    All right, I am going to hand you -- I am

13  going to show you some documents that I don't think

14  were Bates stamped that I had, that I just want to

15  ask you about.

16                  (Whereupon Littlejohn Exhibit 2 was

17                  marked for identification.)

18      **Q**    I have handed you what we have marked as

19  Littlejohn Exhibit 2.  Can you tell me what this

20  document is?

21      **A**    It is a good time calculation sheet where

22  he received 90 days of good time.

23      **Q**    Okay, can we tell from this document where

24  this would have been from, which facility?

16

**A**    Doesn't say a facility.  It was calculated May 11, 2007.

**Q**    Right, so he wouldn't have been here yet, though, right?

**A**    No.

**Q**    This document somehow gets forwarded -- this stays with his file, though, I am assuming?

**A**    Yes.

**Q**    So you would have had this.  Do you know when you were calculating his out date back in February of 2010, were you giving him six months good time?

**A**    I would have to refer to the file.  At this point he only received three months, but he maybe later received another three months.

**Q**    That's the next one I am going to show you, so this is basically from whatever facility he was in, on May 11, 2007, he was given 90 days time off of his sentence for -- which they called good time?

**A**    Correct.

**Q**    Why does somebody receive good time?  Is there a variety of reasons?

**A**    Basically if they haven't been in lots of

17

1  trouble, they will give it to them.  Of course, if

2  they are in lots of trouble, from here they are

3  going to transfer them.

4     Q   So this adjusted projected out date as of

5  May 11, 2007, was February 9, 2010, correct?

6     A   Correct.

7     Q   And I am assuming someone in a similar

8  position at whatever facility Mr. Armato was at in

9  May of '07 filled this out?

10     A   Yes.

11     Q   Similar position that you were here?

12     A   Yes.

13     Q   Great!  I am going to mark this as

14  Littlejohn Exhibit 3.

15          (Whereupon Littlejohn Exhibit 3 was

16          marked for identification.)

17     Q   I am going to show you what's marked as

18  Littlejohn Exhibit 3, and this is similarly another

19  recalculation adding in some good time?

20     A   Yes.

21     Q   Okay, and this one would have been done

22  here, I am assuming, because it's August 15, '08?

23     A   Yes, sir.

24     Q   Do you know whose signature it looks like?

18

1    It says "VB"?

2         A    Yes, that's Vicky Bennett.

3         Q    So someone here would have figured this

4    out, correct?

5         A    Yes.

6              And so in addition to the 90 days he

7    received at the other location for good time, he

8    received another -- I am assuming this is three

9    months good time?

10        A    Yes.

11        Q    Okay, so based on Fickle's calculation on

12   August 15, 2008, his good time is adjusted, and

13   projected out date as of August of '08 was November

14   9, 2009, correct?

15        A    Yes.

16        Q    These documents are kept in the master

17   file so that when you are calculating the final out

18   date you can review these and use them?

19        A    Right.

20        Q    Okay, all right, I am going to hand you

21   what we will mark as Littlejohn Exhibit 4.

22              (Whereupon Littlejohn Exhibit 4 was

23              marked for identification.)

24        Q    I am handing you what we have marked as

19

1   Littlejohn Exhibit 4.  Is that your initials on the

2   bottom here for calculated by?

3       A   Yes.

4       Q   So you would have calculated this

5   document?

6       A   Right.

7       Q   Okay, so this is a February 22, 2010,

8   document.  This is his calculation sheet for his

9   out date?

10      A   Right.

11      Q   And at that time you had received -- well,

12  let me ask you.  I don't want to be testifying for

13  you.  Did you prepare this document after you

14  received the two February 8, 2010, court orders?

15      A   Yes.

16      Q   Is there anything on this document,

17  putting aside the MSR, is this document still

18  accurate?

19      A   Yes.

20      Q   Okay.

21      A   As far as the calculation figures.

22      Q   So based on the most recent court orders

23  regarding David Armato's sentencing in this case,

24  his out -- projected out date should have been

20

1    August 23, 2009?

2        A    Correct.

3        Q    Okay, what I am saying, after you received

4    those two court orders in February of 2010, was the

5    reason he wasn't let out immediately or shortly

6    thereafter, was it solely the MSR problem?

7        A    My understanding, yes.

8        Q    So in your mind it wasn't they had

9    miscalculated the credit or the good time or

10   anything like that?

11       A    No.

12       Q    So had the Judge not put on that order no

13   MSR, would Mr. Armato have been let out sometime in

14   February of 2010 with mandatory supervised release?

15       A    I believe so.

16       Q    Okay.

17       A    If he had the approved host site.  There

18   are other conditions for a sex offender, registered

19   offender to be released.

20       Q    Even if he doesn't have mandatory --

21   that's why I am a little confused, so I hope

22   you can explain it to me.  If he can -- he is a sex

23   offender.

24       A    Correct.

21

1       **Q**    So if the Judge puts No Mandatory

2    Supervised Release, and if that was allowable, can

3    he just walk out of here without a host site or

4    anything?

5       **A**    No.

6       **Q**    So even if he met all the qualifications

7    for walking out after you got those orders, he

8    still couldn't have gone because he didn't have a

9    host site?

10      **A**    Correct.

11      **Q**    Explain to me what that is, the host site.

12      **A**    Well, there is certain requirements, which

13   I don't work in that area, but finding a host site,

14   a sex offender can be more difficult to find an

15   approved host site for, because they can't live in

16   certain areas, and they have electronic monitoring.

17   There is just very few places in the state that are

18   approved for that, so then we do what they call

19   violate them at the door, where they stay until

20   they can find them an approved host site or their

21   discharge date comes.

22      **Q**    So when he left on May 21, 2010, did he

23   have an approved host site?

24      **A**    No, because we discharged him so he didn't

22

1    have to have an approved host site.

2        Q    That's where I am confused.  If you can

3    straighten that out for me.

4        A    Okay.

5        Q    From what you had answered previously, it

6    sounds like it -- maybe here's the easier way.  Why

7    didn't he need the host site in May?

8        A    Because they then told us to discharge him

9    with no MSR term.  If you have an MSR term, then

10   you have to have an approved host site.

11       Q    That's where we got the confusion, I

12   think, so if no one questioned those May 18, 2010,

13   orders, and you did this calculation and you found

14   his release date with this new credit time, I

15   understand you didn't have this credit time until

16   May 18, 2010, is that right?

17       A    Until February 22.

18       Q    February, you are right, February 22,

19   2010.  That's the first time you knew he had 373

20   days of credit.

21       A    Yes.

22       Q    Had you followed those orders, he

23   certainly could have gotten out, because based on

24   your calculations, he should have gotten out in

1    August of 2009?

2        **A**    Correct.

3        **Q**    And if you followed those orders and did

4    not question the MSR, and the Judge said no MSR,

5    then he could have just walked out.  He didn't need

6    the host site, correct?

7        **A**    Correct.

8        **Q**    That's all I wanted to get out.  Okay, so

9    the problem really was the no MSR.

10        **A**    Correct.

11        **Q**    Mr. Jackson never questioned your

12    calculations?

13        **A**    No.

14        **Q**    Okay, all right, what -- in your own

15    words, what was the problem with the no MSR, as far

16    as you understood it?

17        **A**    To my understanding, by Illinois statute,

18    you are supposed to have an MSR term, so it was

19    basically against the law to not have an MSR term.

20        **Q**    Had that in your years since -- would you

21    know when that became the law?

22        **A**    No.  As long as I have worked here

23    everyone has had the MSR term.

24        **Q**    Has that ever come up before, someone

24

1    having no MSR?

2         **A**    Not to my knowledge.

3         **Q**    Okay, you have never experienced that

4    before?

5         **A**    No.

6         **Q**    You have never seen an order like that?

7         **A**    No.

8         **Q**    Do you have any training regarding if an

9    order comes in with no MSR what to do?

10        **A**    No, other than we always -- if we have

11   something out of the ordinary, we have to contact

12   our supervisor Glenn Jackson.

13        **Q**    Is that the protocol?

14        **A**    Yes.

15        **Q**    If that order didn't say no MSR, and Mr.

16   Armato had a host site, you probably would have let

17   him go and never contacted Mr. Jackson?

18        **A**    No, any time you get an order that's going

19   to release an inmate immediately, and there is a

20   drastic change such as that, we still have to

21   verify through Glenn Jackson that it's okay to

22   release him.

23        **Q**    Do you have any understanding -- does Mr.

24   Jackson then make these decisions on his own, or

1   does he have to go through the committee, or does

2   he contact legal, if you know?

3      A   I don't know.

4      Q   In your years here, has there ever been

5   any problems with people's release date or is this

6   the first one?

7      A   This is the first one.

8      Q   Really?

9      A   Yes.

10      Q   I thought for sure you were going to say

11   "No, we have them all the time".

12      A   No.

13      Q   Was the problem -- let me ask you this:  I

14   see from your e-mails that in about September of

15   2009 you started contacting the Lake County

16   sheriff, the Lake County state's attorney's office

17   trying to figure out his credits?

18      A   Correct.

19      Q   Why?  What was the delay?  Why when he got

20   here in November of '07 wasn't that determined?

21      A   Just because human error.  At that time in

22   September I was doing what we call approving

23   checklists, basically verifying everything in the

24   file including the calculations and out date, and I

1    noticed that the jail verification was incorrect

2    where before we had been relying on the jail

3    verification.

4        Q    Okay, is that the norm?  Once they get

5    here you do the calculation and then you might do

6    the recalculation if they have good time, but then

7    you are not really looking at their out date until

8    you are doing the pre-release paperwork?

9        A    Correct.

10       Q    We have been talking about these February

11   18 orders.  I just want to make sure that we are

12   all talking about the same thing.  They are in

13   Grounds Exhibit 2 there, that large exhibit

14   starting with page 724, I believe.  If you look at

15   pages 785 and 786, I want to make sure that those

16   were the two February 18, 2010, court orders we

17   have been talking about.

18       A    Yes.

19       Q    Okay, those are for his two cases,

20   05-CF-1661 and 05-CF-5015, correct?

21       A    Yes.

22       Q    And are these the actual documents that

23   you get from the Court that you used then to

24   prepare his out dates?

1    **A**   The sheets, yes.

2    **Q**   And any other documents you rely on

3    typically?

4    **A**   No.

5    **Q**   Okay, any others you relied on in this

6    case?

7    **A**   No.

8    **Q**   If you look at that Grounds Exhibit 2, I

9    just want to verify this is your handwriting, pages

10   840 and 841.  There is two pages there with some

11   handwriting and some narrative at specific dates.

12   Is that your handwriting?

13   **A**   Yes, all except the December 8, '09.

14   **Q**   You know whose handwriting that might be?

15   **A**   "RB" initials is Robin Bergen.

16   **Q**   So we don't need to -- if you want to read

17   through there, you can, if you don't have a

18   recollection of these events, but from my reading

19   they are basically what I had asked you about

20   before, that when you were preparing his release

21   documents the credit -- it became a credit issue,

22   and you started contacting Lake County sheriff,

23   Lake County state's attorney's office and these are

24   your notes from those conversations and things that

28

1   you did.

2       **A**   Correct.

3       **Q**   Okay, one thing I don't know is, from your

4   perspective anyway, one of these out dates was

5   November of '09, and I am assuming that that's the

6   one you were working with when you started in

7   September of '09 to start figuring out these

8   credits.

9       **A**   Yes.

10      **Q**   Why wasn't he out in November of '09?  Why

11   wasn't he released then?

12      **A**   Because I knew the jail verification was

13   incorrect.  I called, made all these calls trying

14   to get the correct jail verification, but they did

15   not agree, so my boss Glenn Jackson advised me to

16   use the date of sentencing, since we knew that the

17   jail credit was incorrect.

18      **Q**   And then -- I may have a document using

19   that date of sentence.  Do you know when he would

20   have been released using the day of sentence?

21      **A**   I can check the master file and see what

22   calculation that was.

23      **Q**   Sure.

24      **A**   October 19, 2009, I recalculated it.  The

29

1    out date became September 6, 2010.

2        Q    Okay, so I am sorry, what date did you

3    recalculate that on?

4        A    October 19, 2009.

5        Q    Okay, would it be fair to say that prior

6    to February 18, 2010, you were not able to

7    determine what credit to give Mr. Armato?

8        A    Correct.

9        Q    Is that why he filed his own motion?

10       A    Yes.

11       Q    So from my understanding, you were trying

12   to work with him --

13       A    Yes.

14       Q    -- to figure this out?

15       A    Yes.

16       Q    Okay, all right, if you look at page 838

17   of Grounds Exhibit 2, that is a calculation that

18   you performed on February 23, 2010, correct?

19       A    Per release check list where we also do

20   the calculation.

21       Q    So it's the release check list that was

22   performed on February 23, 2010?

23       A    Yes.

24       Q    And you also came up with a projected

1    release date on that day of August 23, 2009?

2        A    Yes.

3        Q    Okay, and if you look, the calculation's

4    there on the side, correct?

5        A    Yes.

6        Q    And there you started with the March 6,

7    2006, date?

8        A    Yes.

9        Q    Okay, and then you took into consideration

10   his 373 days of credit?

11       A    Yes, sir.

12       Q    Then you cut the sentence in half?

13       A    Yes.

14       Q    Okay, then you gave him his six months of

15   good time?

16       A    Yes.

17       Q    Okay, that's how you came to August 23,

18   2009?

19       A    Correct.

20       Q    And then this release check list, what is

21   the purpose of this document?

22       A    To double-check everything in the file

23   including the calculation to make sure that

24   everything is correct.

31

1      Q    Okay, let me show you something.  This was

2    one section of the document that was earlier -- we

3    will mark this as Littlejohn Exhibit 5.

4                    (Whereupon Littlejohn Exhibit 5 was

5                    marked for identification.)

6      Q    It's basically -- have you ever seen this

7    document before, the record office training manual,

8    Johnson decision?

9      A    Yes.

10     Q    Okay, and this Exhibit 5 is page 105 and

11   106, and it talks about U.S. versus Johnson

12   decision regarding mandatory supervised release,

13   and Step 3 there talks about record office staff

14   will comply with all Court orders.  If the Court

15   order states to discharge with no MSR, staff will

16   contact the chief record officer, and that's what

17   you did in this case?

18     A    Yes.

19     Q    Okay, I know you said that that has never

20   occurred in your career, but somebody had

21   contemplated that you might get an order that says

22   no MSR, it's telling you what to do.

23     A    Correct.

24     Q    Were you trained with these materials?

1     **A**    When I was initially trained we didn't

2   have these manuals yet, but they were created

3   during my career here.

4     **Q**    Who did the training, do you know?

5     **A**    We would just read through the manual.

6     **Q**    Do you ever have any occasion from '92 to

7   the present when there is a problem regarding

8   someone's out time, or credit, things like that, do

9   you ever talk to the Warden about it?

10    **A**    Very rarely, just because we have always

11  been instructed to contact Glenn Jackson, and he

12  makes the decision whether to release or not to

13  release.

14    **Q**    Okay, and the way you said that, very

15  rarely, sounds like there is one or two occasions

16  over the years.

17    **A**    If the offender maybe had written a

18  question specific to the Warden and they called and

19  asked me about it, then I would discuss it with

20  him.

21    **Q**    Have you only been working here with

22  Warden Grounds?

23    **A**    No, there has been several wardens.

24    **Q**    Has Warden Grounds, say, if there was an

1   emergency grievance regarding someone's out date

2   that you saw, has he ever called you and asked you

3   about it?

4       A   I am sure that he has.

5       Q   Did he ever contact you regarding David

6   Armato's situation?

7       A   No.

8       Q   Did he ever come down to the records

9   office to try and investigate what was going on

10   with Mr. Armato?

11       A   No.

12       Q   Did anyone ever come to the records office

13   investigating what was going on with Mr. Armato?

14       A   No, I spoke with his counselor at the

15   time, Ron Sutton, several times, just to keep him

16   updated, because I saw Mr. Armato more than he did.

17       Q   Okay, if you look at -- I am not going to

18   ask you about all these e-mails, but I do want to

19   verify that they were yours.  They are sort of in

20   reverse order, but if you look at pages 865 through

21   871, and they start with the latest date of October

22   28, '09, and as you go further into the pages, they

23   go back beginning on September 24, '09, so if you

24   sort of look at them backwards, it's more helpful,

34

1    so first of all, are those e-mails or are those --

2    I saw somewhere Outlook messages?

3        A    Well, our program that we use for e-mail

4    is Outlook, but it's an e-mail message.

5        Q    So these -- that's what we have at our

6    office.  We send e-mails through Outlook.  I would

7    consider this an e-mail, so September 24, 2009, you

8    wrote an e-mail and then you had sent it, and you

9    were sending it to Glenn Jackson?

10       A    Yeah.

11       Q    Okay, so is it fair to say, if you want to

12   look through these if you haven't already, on these

13   six pages, these are basically regarding the

14   situation we talked about before when you are

15   telling Mr. Jackson you can't determine Mr.

16   Armato's credit and these are the things you have

17   done to determine his credit?

18       A    Correct.

19       Q    Okay, it seems like Lake County sheriff,

20   or somebody up there, the state's attorney had

21   changed their computer program and they lost his

22   information?

23       A    Yes.

24       Q    In that situation, what do you do when you

1  can't determine somebody's credit?

2      A    Well, then that's why Glenn advised for us

3  to take the date of sentence because we didn't know

4  the correct jail credit.

5      Q    Just ask you a little bit about that.

6  What was it -- it seemed to me that you were pretty

7  clear in your mind.  If you look at October 16,

8  2009, it's on page 868, if you look at your e-mails

9  on October 16, 2009, there in the middle of the

10  page, it looks like you got confirmation.  I don't

11  know if it was orally or written, but from -- I

12  don't know if Rebecca is the court clerk.  Looks to

13  me there somebody verified that as of 12/31/05 he

14  kept being remanded back to the county lockup until

15  March 6, '06.

16      A    Yes, according to the court records he was

17  remanded back but we have never taken that to use

18  as a jail credit.

19      Q    Okay, and then if you look at the e-mail

20  at the top of 867, said "I received paperwork now

21  from the clerk's office and the state's attorney's

22  office showing the case was filed on 12/31/05, and

23  each time he appeared in court it shows remand

24  through the sentence of 3/6/06," so there you

36

received verification from the clerk and the
state's attorney, but that wasn't sufficient?

     A    Right, since we have always used jail
verification or a sentencing order, Glenn was not
comfortable using the docket sheet since we had no
way to prove that the sheriff didn't release him
after he was taken back to their custody.

     Q    All right, so these are your e-mails.  Do
they also show -- and they also show some e-mails
from Glenn Jackson to you during this same time
period, correct?

     A    Yes.

     Q    Is that primarily how you and Mr. Jackson
communicated?

     A    Yes.

     Q    Okay, if you had faxed him or had an
attachment to an e-mail, would you put it somewhere
in the narrative of your e-mail, like "see the
attachment," or "I faxed you something yesterday"?

     A    I could have mentioned it, or if there was
an attachment it would show on there that there was
an attachment.

     Q    Okay, let me just ask you quickly, page
1134, it might be the last page there.  What is

37

1    this document?

2        A    It's basically a movement chart from our

3    computer screen.

4        Q    This is a document created here at

5    Robinson regarding Mr. Armato that somebody puts

6    this information into the computer?

7        A    Correct, when they are dropped from count

8    for some reason, returned to count, it

9    automatically puts this on the computer screen.

10        Q    And both you and the Warden explained to

11    me what VAD is, violated at the door.  What I don't

12    know is why it was actually occurring.  I see on

13    February 23, 2010, Mr. Armato was violated at the

14    door, and then on April 29, 2010, he again is

15    violated at the door.  Why is someone who we know

16    is not going to be released, why can they be

17    violated at the door?

18        A    Basically the initial time is because they

19    don't have an approved host site, so we violate

20    them at the door.  Then once they have been

21    violated at the door, that's considered a parole

22    violation.  Then the prison review board comes down

23    here monthly to hear all the violators, so they in

24    turn hear these violators and then find them not to

1  be violated, but we can't release them because they

2  still don't have a host site, so we have to violate

3  them again.

4      **Q**   Okay, so I guess the part I don't

5  understand is why do you violate them, and what the

6  significance of that is?

7      **A**   Basically because in our computer system

8  it shows that they should have already been

9  released, because their out date is past, but if

10  there is a reason for some reason that we can't,

11  then we have to have them heard by the prison

12  review board, and the computer program, we have to

13  have dropped them again from count and add them

14  back on.

15      **Q**   So is it the person actually walks up to

16  the door like he is leaving and they say no, or

17  just a computer thing and a paperwork thing?

18      **A**   Just paperwork and computer entries.

19      **Q**   Okay, and if you look at a couple pages

20  before here, 1131, this is another inmate -- it's

21  entitled inmate overview, same kind of computer

22  printout, correct?

23      **A**   Yes.

24      **Q**   This one has him being discharged on

39

1    August 23, '09, and this was printed out, it looks

2    like, October 21, 2011, correct?

3        A    No, actually August 23, 2009, is just the

4    date that calculated his MSR date.  The actual

5    court order discharge date is shown on the left

6    side as 2/18/10 as the effective date.

7        Q    Okay, but does it have anywhere on here --

8    it does have 5/21/10 down here.  Is that the actual

9    day they discharge you or what?

10       A    Yes.

11       Q    Okay, what is this document used for?

12       A    Basically it's just for information

13   purposes.

14       Q    Okay, here at the facility?

15       A    Yes.

16       Q    Okay, all right, let me ask you on page

17   929, sheriff -- or Warden Grounds, Exhibit 2 there.

18   Do you know what this document is?

19       A    It's a jail verification from the Lake

20   County sheriff.

21       Q    What are these used for?

22       A    Typically used to calculate the sentence

23   for an offender if it's not ordered on the

24   sentencing order.

40

1     **Q**   Okay, so this is something -- this

2  actually might be the document that sort of got you

3  curious as to what was going on, because you knew

4  he was arrested in December, 2005?

5     **A**   Yes.

6     **Q**   Okay, so you knew this document could not

7  be correct.

8     **A**   Right.

9     **Q**   Okay, what was the -- did you ever find

10  out the deal with this periodic imprisonment?

11  Could anybody ever explain that to you?

12     **A**   No one could ever give me the dates.

13     **Q**   That was -- I know it's in your document

14  somewhere -- who had changed the computer system,

15  the county sheriff?

16     **A**   Yes.

17     **Q**   And they had destroyed their prior

18  records, was that your understanding?

19     **A**   That's my understanding, because they told

20  me they weren't able to locate that information.

21     **Q**   Okay, now if you look at pages 1059

22  through 1064, and page 1070, so you have 1059

23  through 1064, plus page 1070?

24     **A**   Okay.

41

Q    Let me tell you the order we need to put them in, though, so this makes sense, 1063 first. Then 1062, 1061, 1060, 1059, then 1064, and then 1070, and then they should be in chronological order, so the first one you are looking at is 1063?

A    Okay.

Q    Okay, so these are again e-mails between you and Glenn Jackson?

A    Yes.

Q    And they start from you on February 22, 2010, on page 1063, correct?

A    Yes.

Q    Okay, and then the last one I have, the last one I wanted to talk to you about anyway is May 21, 2010, on page 1070, that one is from Edward Huntley to Glenn Jackson just saying basically release Mr. Armato, correct?

A    Yes.

Q    Is that an e-mail that you received also?

A    Mr. Jackson forwarded me the e-mail.  I don't remember this last e-mail at the top.

Q    Which one are you talking about, the one that says, "Has the AG's office given you a decision on the case yet"?

1    **A**    No, the last one from Mr. Huntley to

2  Glenn.  I don't remember that wording, but I could

3  have received it.

4    **Q**    Let me ask you:  Do you have an

5  independent recollection of how you found out we

6  should let David out?

7    **A**    Yes, I remember Glenn Jackson forwarded

8  me a note that said, "see below," but I don't

9  remember exactly who that was from, Mr. Huntley or

10  someone else.

11    **Q**    Who is Mr. Huntley?

12    **A**    He is over the legal department, chief

13  legal.

14    **Q**    Okay, I think -- I forget if I asked you

15  this or Warden Grounds.  If I asked you just let me

16  know, I won't ask you again.  Are you aware of any

17  investigation that Mr. Jackson did once you gave

18  him the information?

19    **A**    I believe you asked me that but, no, I am

20  not.

21    **Q**    Okay, I did.  If we go back to page 1063,

22  it talks about on Monday, February 22, 2010, at

23  2:13 p.m. you wrote an e-mail to Glenn Jackson

24  saying that you had spoken to Assistant State's

1    Attorney Eric Kalata, K-a-l-a-t-a, and he was

2    telling you the Judge's intent for no MSR term,

3    correct?

4        A    Yes.

5        Q    Was there anything you were going to be

6    able to do on your own or your investigation that

7    was going to convince Mr. Jackson to let David out,

8    or was that something legal was going to have to

9    figure out?

10       A    That was something he was going to have to

11   hear from legal.

12       Q    Okay.

13       A    We are just supposed to verify the court

14   orders which is what I was doing at that point.

15       Q    Okay, and then the next e-mail down there,

16   same date, February 22, at 12:33, the third to last

17   line of the e-mail, "if I calc'd it this way, this

18   would have released him August '09 with no MSR

19   term."  Is that the August date we have been

20   talking about?

21       A    Correct.

22       Q    Okay, did Mr. Jackson ever talk to you,

23   either through e-mails or call you with that August

24   date?  Did he ever have a problem with the August

1  '09 date?

2      A    No.

3      Q    It seems like you were pretty diligent in

4  e-mailing Mr. Jackson to find out if he ever made a

5  decision, or if legal made a decision?

6      A    Yes, I just kept wanting to remind them we

7  were waiting on an answer.

8      Q    If you look at page 1061, the March 19,

9  2010, e-mail at 8:20 a.m.

10      A    Which one?

11      Q    The March 19 at 8:28, said "a reminder on

12  this, and I wanted to let you know the inmate is

13  filing a grievance on this that will be sent to the

14  ARB."  What is the ARB?

15      A    Administrative Review Board, the ARB.

16      Q    Is that here?

17      A    No, it's in Springfield.

18      Q    Okay, and what authority do they have?

19  Let me ask you this:  Let's say it went to the

20  Administrative Review Board, and they said let Mr.

21  Armato out.  Would you have, or would Glenn Jackson

22  still have to say, "Let Mr. Armato out"?

23      A    It would still have to be Glenn Jackson.

24      Q    So really the grievance procedure that Mr.

45

1  Armato was following, even if it was successful,

2  wasn't going to gain his release, was it?

3     **A**   Not unless someone from the Administrative

4  Review Board contacted Glenn.  I am not sure how

5  that part works, you know, if they make contact

6  with him or not.

7     **Q**   Okay, if you look at the April 8, 2010,

8  e-mail you sent to Glenn on page 1060, that is the

9  Parole Review Board?

10    **A**   Prisoner Review Board.

11    **Q**   So they heard this and found him not to be

12  a violator.  That's what you said happens anyway.

13    **A**   Yes.

14    **Q**   But this last line here, it said "the

15  PROBE said to find him not a violator, and let DOC

16  handle it, but they thought Armato had a lawsuit."

17  Who told you that, or how did that come up?

18    **A**   I believe it was Mr. Althoff from the

19  Prison Review Board called me that day when he was

20  hearing Mr. Armato to find out the details of what

21  was happening with his case.

22    **Q**   And did he think he had a lawsuit because

23  you weren't letting him out?

24    **A**   He didn't explain that to me.  That's just

46

1    his comments that he had made.

2        Q    And on April 23, on 1059 here, April 23,

3    2010, you say yourself to Glenn, "I know there will

4    be a lawsuit coming on it."  Did you at some point

5    figure that if they don't let this guy out at some

6    point he was going to sue us?

7        A    I know he was unhappy with being held, and

8    I had kept in correspondence with him and with his

9    counselor, and in contact, so I knew he was unhappy

10   with being held.

11       Q    Yeah, I know your protocol is you have to

12   contact Mr. Jackson and he does whatever he does.

13   Does Mr. Jackson have greater authority over

14   releasing someone here than the Warden does?

15       A    Yes.

16       Q    Okay, and does Mr. Jackson have that same

17   authority at other --

18       A    Yes, every prison in the state.

19       Q    So regarding overseeing the release of

20   prisoners, Mr. Jackson is the man?

21       A    Yes.

22       Q    Even above the Warden?

23       A    Correct.

24       Q    Okay, after this has occurred, it's been a

1  couple years now, have you ever gotten another

2  order with no MSR?

3      A    No, I have not been in records for six

4  months but, no, I didn't as long as I was there.

5      Q    And your recollection prior to this one

6  with Mr. Armato, this is the first and only one?

7      A    As far as I know at this institution.

8      Q    While I am looking through here, maybe you

9  could look to verify one way or the other whether

10  you sent any documents to Mr. Jackson during this

11  period from February 22, 2010, to May 21, 2010.

12      A    My note in the note sheet, February 22, I

13  just made a note where the chief records officer

14  supervisor said, "Fax order to him and wait to hear

15  from him.  Do not release today".

16      Q    So according to your note, you would have

17  faxed the two February 8, 2010, orders to Mr.

18  Jackson?

19      A    Yes, on February 22.

20      Q    February 22, and anything else other than

21  those orders?

22      A    I haven't seen anything yet.

23      Q    Really, those are the basis of your

24  calculations anyway, correct?

1      **A**    Yes.   That's the only thing I see, other

2   than the faxed order also to Tim Clevinger at

3   Northern RFC at Stateville, because they were

4   actually the ones doing the first violation out the

5   door, so I had to have a copy of them.

6      **Q**    Is there a final document when Mr. Armato

7   walks out that is prepared?   Is that another

8   release checklist?

9      **A**    Yeah, I have to do another checklist.

10     **Q**    Have we looked at that one yet?   Did I

11  give you that as an exhibit?

12     **A**    I don't believe so.

13     **Q**    Do you have it here?

14     **A**    Yes.

15     **Q**    Can I take a quick look, make sure I have

16  seen it.   Yes, I have seen this.

17         MR. FANNING:   What page was that on?

18     **Q**    It is 757.   We might as well look at it,

19  so this is the final release checklist for Mr.

20  Armato that was prepared on May 21, 2010?

21     **A**    Yes.

22     **Q**    Okay, are there any other discharge

23  documents that you prepared?

24     **A**    Not in my department.   Field services just

1  has a couple of release papers that they sign, but

2  I mean just basic ones that all discharges sign.

3      Q    So let me just look at this real quick.

4  So basically what ultimately -- after several

5  months they basically -- Mr. Armato was released

6  with Mr. Jackson's approval in compliance with

7  those February 18, 2010, orders, correct?

8      A    Yes.

9      Q    Do you get involved at all with the

10  grievance procedures?

11      A    No, that's through the counselors and

12  Clinical Services.

13      Q    Do those documents ultimately come to the

14  records department, though?

15      A    Just for filing in the master file.

16      Q    Okay, so you would have no involvement at

17  all, unless you saw them?

18      A    Only if the counselor asked me about their

19  calculations and their response to the grievance.

20      Q    Did that occur in this case?

21      A    I would have to look at the grievance.  I

22  don't remember.

23      Q    Okay, we have showed them to the Warden,

24  so we have them handy.  This is Warden Exhibit 1,

1    and then there were pages --

2         MR. FANNING:   781 through 784.

3      **A**   Yes, she did say she spoke with Michele

4    Littlejohn, at the records office supervisor, so

5    she did refer.

6      **Q**   That's all I have.  The only thing I would

7    ask is if I could look through the master file when

8    we are done just to make sure I have seen

9    everything.

10                    **CROSS EXAMINATION**

11   **BY:  ROBERT FANNING**

12     **Q**   Just a couple, so when was he originally

13   set to be released that started the pre-checkout

14   list?

15     **A**   The first one when I changed the

16   calculations?

17     **Q**   Yes.

18     **A**   According to the master file, it was

19   November 9, 2009.

20     **Q**   So in September of 2009 you started the

21   checklist?

22     **A**   Yes.

23     **Q**   And that's the pre-release checklist?

24     **A**   Yes.

Q    And that's when you noticed there was an issue with his jail time credit?

A    Correct.

Q    What was the issue specifically?

A    The jail verification included times that he was in custody when he committed his second offense, so I knew that it was incorrect, because they were showing that he was in custody when he was not.

Q    Okay, and as a result, you contacted Glenn Jackson?

A    Yes.

Q    Why did you contact him at that time?

A    Just because it's in our procedure.  In doing the pre-checklist, if you are going to change someone's out date by a substantial amount of time, you need to contact Glenn to go through this office to get it approved.

Q    Did you speak to the plaintiff, Mr. Armato, before you changed -- let's take that back. You used the sentence date instead?

A    Correct.

Q    Okay, and that pushed him back almost a year for his out date, right?

1        **A**    Yes.

2        **Q**    And then did you speak to Mr. Armato in

3   between the time that you determined his jail

4   credits were incorrect and the recalculation that

5   pushed back the out dates?

6        **A**    Whenever I changed inmate calculation by

7   that amount of time, I called them up to our

8   control area and met with them and explained to

9   them what's happening and why.

10       **Q**    Do you recall that conversation with Mr.

11  Armato?

12       **A**    Yes, and I recall telling him that if he

13  got a correct sentencing order that we would then

14  give him his jail credit, but I couldn't verify it

15  through the sheriff's department.

16       **Q**    Do you recall anything that he said to you

17  in that particular meeting?

18       **A**    No.

19       **Q**    Anything specific?

20       **A**    No, I don't recall anything specific.

21       **Q**    Okay, do you recall how he reacted to his

22  information?

23       **A**    Well, he was upset with it, he still felt

24  like he had an avenue, you know, to try to get a

53

1    corrected order.

2        Q    So you instructed him he should go back to

3    the circuit court?

4        A    I told him that that was an option that he

5    had was to contact the county and try to get a

6    corrected order.

7        Q    Do you know if that was how -- is that

8    what led to the order they eventually received on

9    February 18?

10       A    I believe so, because when he went on the

11   court writ we got a sentencing order in the mail.

12       Q    Okay, and after you received the

13   sentencing order, you did the calculation again,

14   correct?

15       A    Right.

16       Q    And then as a result you were required to

17   call Glenn Jackson?

18       A    Right.

19       Q    Did you stay in touch with Mr. Jackson

20   periodically?  Weekly?

21       A    I tried to weekly.  I am not sure if it

22   was every week, but to just send a reminder note.

23       Q    Is it fair to say that your communications

24   with Mr. Jackson are documented by e-mails, or

54

1    would you have had phone conversations also?

2         A    If there were phone conversations, they

3    were very few.  It was mainly by e-mail.

4         Q    Okay.

5         A    There is a note sheet on here that if we

6    had have a conversation, if it was important I

7    would have noted it on the note sheet.

8         Q    So the note sheet would also indicate any

9    phone calls you may have had?

10        A    Yes.

11        Q    And then is there any other steps that you

12   took other than -- other than speaking with Mr.

13   Jackson regarding this scenario?

14        A    No.

15        Q    Mr. Jackson is your supervisor?

16        A    Yes.

17        Q    Do you have the authority to overrule Mr.

18   Jackson's decision?

19        A·   No.

20        Q    Where did the previous records office

21   supervisor go?

22        A    She was temporarily assigned as Assistant

23   Warden at Lawrence Correctional Center at the time.

24        Q    That's Vicky Bennett?

55

1      A    No, that was Jeannie Campanella.

2      Q    Okay, who was "VB"?

3      A    Initially when I began my career, and she

4    trained me, my supervisor was Vicky Bennett, but at

5    the time of all of this, Jeannie Campanella would

6    have been the records office supervisor, but I was

7    temporarily assigned in her position because she

8    was temporarily assigned as Assistant Warden at

9    Lawrence Correctional Center.

10     Q    Okay, there was one question about whether

11   or not you have ever spoken to Warden Grounds about

12   sentence calculations as a result of an emergency

13   grievance filed.  Do you, as you sit here today,

14   recall speaking to Mr. Grounds about sentence

15   calculations as they relate to grievances?

16     A    He has called me in the past, but on this

17   case I did not speak to Mr. Grounds.

18     Q    Do you know the difference between an

19   emergency grievance or a regular grievance?

20     A    All I know is what I have heard the

21   counselors discuss, that they are different.  I am

22   not sure what the circumstances can be to make them

23   different.

24     Q    Would you know which type of grievance Mr.

56

1    Grounds would have called you on?

2        **A**    No, I don't have anything.

3                    **REDIRECT EXAMINATION**

4    BY:  **DENNIS J. DeCARO**

5        **Q**    I just have a couple of quick follow-ups.

6    We talked about Mr. Jackson making the decisions

7    about the using the March 6, 2006, date, because he

8    wasn't satisfied with the information you provided

9    about the jail credit.

10       **A**    Correct.

11       **Q**    Okay, and you said what is it he wanted?

12   He wanted records from the jail?

13       **A**    Correct.

14       **Q**    Okay, is that -- is that a policy that you

15   can show me the prisons follow or a guideline or a

16   regulation, or is that just something Glenn Jackson

17   decided that's what he wants in this particular

18   situation?

19       **A**    Well, I am guessing it may be in the

20   record office manual, or I am not sure, but either

21   we have to take it from a court document, it either

22   has to be a sentencing order or jail verification

23   to give them the jail credit.

24       **Q**    Okay, because you couldn't get the jail

1  verification, you suggested to David that he go

2  back and get the court document amended?

3       A    Correct.

4       Q    Okay, you are not sure where you get those

5  requirements from?  I can understand the court

6  order, but you are not sure where you get the jail

7  verification requirement from?

8       A    Correct, I mean that's how we have always

9  calculated it.  That's how I was trained.  Either

10  you use the sentencing order, unless it doesn't

11  give you the jail credit, then you can use the jail

12  verification.

13       Q    Okay, and had you had the jail

14  verification, or if Mr. Jackson allowed you to use

15  the information given to you by the Lake County

16  clerk and the Lake County state's attorney's

17  office, Mr. Armato would have been released on

18  November 9, 2009, with an MSR if he had a host

19  site?

20       A    The November 9 date was previous to

21  discovering that the jail verification was

22  incorrect.

23       Q    Right, part of my question is if you had a

24  jail verification, if you had everything you needed

58

1  before November 9, '09, he would have been released

2  November 9 with an MSR if he had a host site, and

3  if you had the jail verification.  I am not saying

4  you did.  I am just saying assume that for -- this

5  is a hypothetical.

6      A    It wouldn't have been November 9, because

7  we know that was incorrect.  Had I been able to use

8  the date that I could verify, his custody date

9  would have been in December instead of whatever

10 initial date we were using, because we could verify

11 December Of '05.

12     Q    So using the December -- let's say he was

13 in custody December 31, '05, to March 6, '06, his

14 out date would have been what?

15     A    I have never calculated it.  I can if you

16 would like me to.

17     Q    Sure.

18     A    Was that December 30th or the 31st?

19     Q    I think ultimately it was the 31st.

20     A    Of '95?

21     Q    Of '05.

22     A    And then he would have been in jail -- I

23 think what the state's attorney's office and the

24 clerk were saying, he was remanded each time from

1  that day, December 31, through March 6, '06, so

2  whatever that credit is, so with the custody date

3  of December 31, 2005, his MSR date would have been

4  June 30, 2010.

5  **Q**   Okay, so let me take a quick look.

6  **A**   With half of his sentence minus his six

7  months of jail good time that he had received.

8  **Q**   So the November 9, 2009, date, how did we

9  calculate that?

10  **A**   That was from the jail verification.  It

11  was incorrect.

12  **Q**   This was with 303 days or whatever?  Here

13  I will show you.  This is page 950, I think, is the

14  November 9.

15  **A**   Okay.

16  **Q**   So how did you -- there is some -- there

17  is an explanation on some of your calculations.

18  Can you make that out?

19  **A**   Yes, this is from the jail verification.

20  I think he came in for one day on May 9, 2005, and

21  then they are showing that he came back in on May

22  10, 2005, so --

23  **Q**   I see, so you were using -- you were still

24  using the May 2005 --

1    A    2005.

2    Q    -- 2005 date.  That's why that was off so

3    much.

4    A    Right.

5    Q    Okay, that's all I wanted to know.

6    Thanks.

7    A    I also have a request slip that Mr. Armato

8    had sent me from the master file, if you are

9    interested, where he was thanking me for my

10   assistance.

11   Q    And he was very grateful to you.  He said

12   you were very helpful.  You were very nice to him.

13   A    Okay.

14        MR. FANNING:  We will waive signature, and

15   I don't think we said it on the previous one.  We

16   will waive signature for that one.  I will take a

17   regular-sized with index, and I am going to print

18   my own of these off.

19        MR. DeCARO:  Yeah, it's on the disk you

20   gave me, so why don't we give her these and not

21   give her Exhibit 2.

22        MR. FANNING:  That sounds good.

23

24             (DEPOSITION CONCLUDED)

61

## CERTIFIED SHORTHAND REPORTER'S CERTIFICATION

I, Donna R. Maninfior, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public for the State of Illinois, DO HEREBY CERTIFY that pursuant to agreement between Counsel there appeared before me on March 5, 2012, at the Robinson Correctional Center, 13423 E. 1150th Avenue, Robinson, Illinois, **MICHELE LITTLEJOHN**, who was first duly sworn by me to testify to the whole truth of her knowledge touching upon the matter in controversy aforesaid so far as she could be interrogated concerning the same; that I did take stenographic notes of the questions propounded to said witness and her answers thereto, and that said notes were transcribed upon the computer under my direction and supervision; that signature is waived and said deposition is herewith returned.

I do further certify that I am not related in any way to any of the parties involved in this action and have no interest in the outcome thereof.

Dated at Mattoon, Illinois, this 19th day of March, A.D., 2012, and given under my hand and seal.

s/ Donna R. Maninfior

Donna R. Maninfior, CSR, RPR
Notary Public

**MICHELE LITTLEJOHN**          CondenseIt™          # - calculation

| | | |
|---|---|---|
| # [1]   1:21 | 27:8   29:17   39:17 | 30:10 |
| '05 [3]   58:11   58:13 | 42:23   60:21 | 4 [5]   3:15   3:19 |
| 58:21 | 2/18/10 [1]   39:6 | 18:21   18:22   19:1 |
| '06 [3]   35:15   58:13 | 20 [2]   10:11   44:9 | 4/3/67 [1]   5:24 |
| 59:1 | 2005 [1]   11:3 | 4020 [1] 3:3 |
| '07 [2]   17:9   25:20 | 11:10   11:12   11:17 | 5 [10]   1:15   2:5 |
| '08 [2]   17:22   18:13 | 40:4   59:3   59:20 | 3:20   6:10   11:2 |
| '09 [10]   27:13   28:5 | 59:22   59:24   60:1 | 11:10   31:3   31:4 |
| 28:7   28:10   33:22 | 60:2 | 31:10   61:4 |
| 33:23   39:1   43:18 | 2006 [7] 9:2   9:19 | 5/21/10 [1]   39:8 |
| 44:1   58:1 | 10:11   10:12   11:10 | 50 [1]   3:15 |
| '92 [1]   32:6 | 30:7   56:7 | 500 [1]   3:7 |
| '95 [1]   58:20 | 2007 [3] 9:14   16:2 | 56 [1]   3:15 |
| -vs [1]   1:7 | 16:18   17:5 | 6 [7]   11:10   29:1 |
| 05-CF-1661 [1] | 2008 [1] 18:12 | 30:6   35:15   56:7 |
| 26:20 | 2009 [18]   11:19 | 58:13   59:1 |
| 05-CF-5015 [1] | 12:5   18:14   20:1 | 60602 [1]   3:4 |
| 26:20 | 23:1   25:15   28:24 | 61938-1036 [1] |
| 1 [5]   3:18   9:21 | 29:4   30:1   30:18 | 1:23 |
| 9:22   10:1   49:24 | 34:7   35:8   35:9 | 62706 [1]   3:7 |
| 10 [1]   59:22 | 39:3   50:19   50:20 | 724 [1]   26:14 |
| 1036 [1] 1:23 | 57:18   59:8 | 757 [1]   48:18 |
| 105 [1]   31:10 | 2010 [37]   7:13 | 781 [1]   50:2 |
| 1059 [4] 40:21   40:22 | 10:15   12:20   13:24 | 784 [1]   50:2 |
| 41:3   46:2 | 13:20   13:21   13:22 | 785 [1]   26:15 |
| 106 [1]   31:11 | 13:22   16:11   17:5 | 786 [1]   26:15 |
| 1060 [2] 41:3   45:8 | 19:7   19:14   20:4 | 8 [6]   19:14   27:13 |
| 1061 [2] 41:3   44:8 | 20:14   21:22   22:12 | 44:9   44:11   45:7 |
| 1062 [1] 41:3 | 22:16   22:19   26:16 | 47:17 |
| 1063 [4] 41:2   41:5 | 29:1   29:6   29:18 | 838 [1]   29:16 |
| 41:11   42:21 | 29:22   37:13   37:14 | 84-2991 [1]   1:21 |
| 1064 [3] 40:22   40:23 | 41:11   41:15   42:22 | 840 [1]   27:10 |
| 41:3 | 44:9   45:7   46:3 | 841 [1]   27:10 |
| 1070 [4] 40:22   40:23 | 47:11   47:11   47:17 | 865 [1]   33:20 |
| 41:4   41:15 | 48:20   49:7   59:4 | 867 [1]   35:20 |
| 11 [3]   16:2   16:18 | 2011 [2] 8:5   39:2 | 868 [1]   35:8 |
| 17:5 | 61:4   61:13 | 871 [1]   33:21 |
| 11-CV-3023 [1] | 21 [7]   13:13   13:22 | 9 [16]   8:18   10:15 |
| 1:7 | 21:22   39:2   41:15 | 11:3   11:12   11:17 |
| 1131 [1] 38:20 | 47:11   48:20 | 17:5   18:14   50:19 |
| 1134 [1] 36:24 | 217 [1]   1:24 | 57:18   57:20   58:1 |
| 1150th [2]   2:7 | 22 [12]   13:20   13:21 | 58:2   58:6   59:8 |
| 61:4 | 19:7   22:17   22:18 | 59:14   59:20 |
| 12 [1]   43:16 | 41:10   42:22   43:16 | 90 [3]   15:22   16:18 |
| 12/31/05 [2]   35:13 | 47:11   47:12   47:19 | 18:6 |
| 35:22 | 47:20 | 929 [1]   39:17 |
| 13 [1]   42:23 | 23 [10]   20:1   29:18 | 950 [1]   59:13 |
| 13423 [2]   2:6 | 29:22   30:1   30:17 | A.D [1]   61:13 |
| 61:4 | 37:13   39:1   39:3 | a.m [1]   44:9 |
| 15 [3]   3:18   17:22 | 46:2   46:2 | above [1]   46:22 |
| 18:12 | 235-1127 [1]   1:24 | according [3]   35:16 |
| 16 [2]   35:7   35:9 | 24 [2]   33:23   34:7 | 47:16   50:18 |
| 1612 [1] 1:22 | 28 [5]   9:14   9:19 | accurate [1]   19:18 |
| 17 [1]   3:19 | 10:12   33:22   44:11 | action [1]   61:11 |
| 18 [10]   3:19   12:20 | 29 [1]   37:14 | actual [3]   26:22 |
| 13:20   22:12   22:16 | 3 [5]   3:19   17:14 | 39:4   39:8 |
| 26:11   26:16   29:6 | 17:15   17:18   31:13 | add [1]   38:13 |
| 49:7   53:9 | 3/6/06 [1]   35:24 | adding [1]   17:19 |
| 19 [4]   28:24   29:4 | 30 [2]   3:3   59:4 | addition [1]   18:6 |
| 44:8   44:11 | 303 [1]   59:12 | address [1]   5:15 |
| 1992 [2] 6:10   7:2 | 30th [1] 58:18 | adjusted [2]   17:4 |
| 19th [1]   61:12 | 31 [5]   3:20   12:5 | 18:12 |
| 2 [10]   3:18   3:22 | 58:13   59:1   59:3 | |
| 15:16   15:19   26:13 | 31st [2]   58:18   58:19 | |
| | 33 [1]   43:16 | |
| | 373 [3]   12:21   22:19 | |

| | | |
|---|---|---|
| Administrative [4] | assuming [5]   16:7 |
| 8:2   44:15   44:20 | 17:7   17:22   18:8 |
| 45:3 | 28:5 |
| advised [2]   28:15 | assure [1]   5:20 |
| 35:2 | attachment [4]   36:17 |
| aforesaid [1]   61:6 | 36:19   36:21   36:22 |
| AG's [1]   41:23 | attorney [6]   3:2 |
| against [1]   23:19 | 3:6   3:6   34:20 |
| agreement [1]   61:3 | 36:2   43:1 |
| allowable [1]   21:2 | attorney's [5]   25:16 |
| allowed [1]   57:14 | 27:23   35:21   57:16 |
| Althoff [1]   45:18 | 58:23 |
| amended [1]   57:2 | August [14]   8:5 |
| amount [2]   51:16 | 17:22   18:12   18:13 |
| 52:7 | 20:1   23:1   30:1 |
| answer [1]   5:1 | 30:17   39:1   39:3 |
| 13:11   44:7 | 43:18   43:19   43:23 |
| answered [1]   22:5 | 43:24 |
| answers [1]   61:8 | authority [4]   44:18 |
| anyway [1]   28:4 | 46:13   46:17   54:17 |
| 41:14   45:12   47:24 | automatically [1] |
| APPEARANCES [1] | 37:9 |
| 3:1 | avenue [1]   1:22 |
| appeared [2]   35:23 | 2:7   52:24   61:5 |
| 61:4 | aware [1]   4:16 |
| approval [1]   49:6 | 13:22   14:2   42:16 |
| approved [9]   20:17 | background [1] 5:8 |
| 21:15   21:18   21:20 | backwards [1]   33:24 |
| 21:23   22:1   22:10 | based [3]   18:11 |
| 37:19   51:18 | 19:22   22:23 |
| approving [1]   25:22 | basic [1] 49:2 |
| April [4]   37:14 | basis [1] 47:23 |
| 45:7   46:2   46:2 | Bates [1]   15:14 |
| ARB [3] 44:14   44:14 | began [1]   55:3 |
| 44:15 | beginning [2]   12:8 |
| area [3]   5:10   21:13 | 33:23 |
| 52:8 | below [1]   42:8 |
| areas [1] 21:16 | Bennett [1]   7:4 |
| Armato [30]   1:5 | 18:2   54:24   55:4 |
| 4:14   5:9   7:20 | Bergen [1]   27:15 |
| 9:1   9:13   17:8 | birth [1] 5:23 |
| 20:13   24:16   29:7 | bit [1]   35:5 |
| 33:10   33:13   33:16 | board [8]   37:22 |
| 37:5   37:13   41:17 | 38:18   44:15   44:20 |
| 44:21   44:22   45:1 | 45:4   45:9   45:10 |
| 45:16   45:20   47:6 | 45:19 |
| 48:6   48:20   49:5 | boss [1]   28:15 |
| 51:20   52:2   52:11 | bottom [1]   19:2 |
| 57:17   60:7 | Box [1]   1:23 |
| Armato's [4]   15:10 | briefly [1]   5:8 |
| 19:23   33:6   34:16 | brought [1]   8:21 |
| arrested [1]   40:4 | C [1]   1:21 |
| arrive [1]   10:11 | calc'd [1]   43:17 |
| arrived [2]   9:13 | calculate [3]   8:15 |
| 9:15 | 39:22   59:9 |
| aspects [1]   6:21 | calculated [8]   8:17 |
| assigned [4]   7:18 | 8:23   16:1   19:2 |
| 54:22   55:7   55:8 | 19:4   39:4   57:9 |
| assistance [1]   60:10 | 58:15 |
| assistant [10]   3:6 | calculates [2]   8:19 |
| 6:14   6:18   6:20 | 10:2 |
| 7:8   7:8   7:10 | calculating [3]   6:24 |
| 42:24   54:22   55:8 | 16:10   18:17 |
| associate [1]   7:11 | calculation [18] 8:18 |
| assume [1]   58:4 | 10:5   10:7   10:20 |

MANINFIOR COURT REPORTING SERVICE, P.C.          Index Page 1

**MICHELE LITTLEJOHN**          CondenseIt™          **calculation's - casicr**

| | |
|---|---|
| 12:9    13:3    15:21 | |
| 18:11    19:8    19:21 | |
| 22:13    26:5    28:22 | |
| 29:17    29:20    30:23 | |
| 52:6    53:13 | |
| **calculation's** [1] | |
| 30:3 | |
| **calculations** [9] | |
| 22:24    23:12    25:24 | |
| 47:24    49:19    50:16 | |
| 55:12    55:15    59:17 | |
| **calls** [2] 28:13    54:9 | |
| **Campanella** [2] 55:1 | |
| 55:5 | |
| **capacities** [1]    1:9 | |
| **career** [4]    8:4 | |
| 31:20    32:3    55:3 | |
| **cases** [1] 26:19 | |
| **caused** [1]    4:18 | |
| **center** [7]    2:6 | |
| 6:7    8:22    10:13 | |
| 54:23    55:9    61:4 | |
| **CENTRAL** [1]    1:2 | |
| **certain** [2]    21:12 | |
| 21:16 | |
| **certainly** [1]    22:23 | |
| **certification** [2] | |
| 11:1    61:1 | |
| **Certified** [3]    1:22 | |
| 61:1    61:2 | |
| **certify** [2]    61:3 | |
| 61:10 | |
| **chance** [1]    10:7 | |
| **change** [2]    24:20 | |
| 51:15 | |
| **changed** [6]    13:16 | |
| 34:21    40:14    50:15 | |
| 51:20    52:6 | |
| **charge** [1]    7:16 | |
| **charged** [1]    11:18 | |
| **chart** [1] 37:2 | |
| **check** [5]    9:14 | |
| 28:21    29:19    29:21 | |
| 30:20 | |
| **checklist** [5]    48:8 | |
| 48:9    48:19    50:21 | |
| 50:23 | |
| **checklists** [1]    25:23 | |
| **Chicago** [1]    3:4 | |
| **chief** [3] 31:16    42:12 | |
| 47:13 | |
| **chronological** [1] | |
| 41:4 | |
| **circuit** [1]    53:3 | |
| **circumstances** [1] | |
| 55:22 | |
| **clear** [3] 11:22    12:3 | |
| 35:7 | |
| **clerk** [4] 35:12    36:1 | |
| 57:16    58:24 | |
| **clerk's** [1]    35:21 | |
| **Clevinger** [1]    1:9 | |
| **Clinical** [1]    49:12 | |
| **comfortable** [1] 36:5 | |
| **comments** [1]    46:1 | |

| | |
|---|---|
| **committed** [1]    51:6 | |
| **committee** [1]    25:1 | |
| **communicated** [1] | |
| 36:14 | |
| **communication** [1] | |
| 14:1 | |
| **communications** [1] | |
| 53:23 | |
| **compliance** [1] 49:6 | |
| **comply** [1]    31:14 | |
| **computer** [1]    8:7 | |
| 34:21    37:3    37:6 | |
| 37:9    38:7    38:12 | |
| 38:17    38:18    38:21 | |
| 40:14    61:8 | |
| **concerning** [1] 61:7 | |
| **CONCLUDED** [1] | |
| 60:24 | |
| **conditions** [1]    20:18 | |
| **confirmation** [2] | |
| 12:3    35:10 | |
| **confused** [2]    20:21 | |
| 22:2 | |
| **confusion** [2]    4:17 | |
| 22:11 | |
| **consider** [1]    34:7 | |
| **consideration** [1] | |
| 30:9 | |
| **considered** [1]    37:21 | |
| **contact** [13]    13:6 | |
| 14:3    24:11    25:2 | |
| 31:16    32:11    33:5 | |
| 45:5    46:9    46:12 | |
| 51:13    51:17    53:5 | |
| **contacted** [4]    14:9 | |
| 24:17    45:4    51:10 | |
| **contacting** [2]    25:15 | |
| 27:22 | |
| **contemplated** [1] | |
| 31:21 | |
| **control** [1]    52:8 | |
| **controversy** [1] 61:6 | |
| **conversation** [2] | |
| 52:10    54:6 | |
| **conversations** [3] | |
| 27:24    54:1    54:2 | |
| **convince** [1]    43:7 | |
| **coordinator** [2] 7:12 | |
| 7:17 | |
| **copies** [2]    14:18 | |
| 15:5 | |
| **copy** [1] 48:5 | |
| **correct** [57]    6:7 | |
| 10:2    10:18    11:11 | |
| 11:17    11:19    11:24 | |
| 12:17    12:23    13:1 | |
| 13:13    13:14    16:21 | |
| 17:5    17:6    18:4 | |
| 18:14    20:2    20:24 | |
| 21:10    23:2    23:6 | |
| 23:7    23:10    25:18 | |
| 26:9    26:20    28:2 | |
| 28:14    29:8    29:18 | |
| 30:4    30:19    30:24 | |
| 31:23    34:18    35:4 | |
| 36:11    37:7    38:22 | |
| 39:2    40:7    41:11 | |

| | |
|---|---|
| 41:17    43:3    43:21 | |
| 46:23    47:24    49:7 | |
| 51:3    51:22    52:13 | |
| 53:14    56:10    56:13 | |
| 57:3    57:8 | |
| **corrected** [2]    53:1 | |
| 53:6 | |
| **Correctional** [5] | |
| 2:6    6:7    54:23 | |
| 55:9    61:4 | |
| **correspondence** [1] | |
| 46:8 | |
| **counsel** [2]    3:22 | |
| 61:3 | |
| **counselor** [3]    33:14 | |
| 46:9    49:18 | |
| **counselors** [2] 49:11 | |
| 55:21 | |
| **count** [3]    37:7 | |
| 37:8    38:13 | |
| **county** [1]    12:5 | |
| 25:15    25:16    27:22 | |
| 27:23    34:19    35:14 | |
| 39:20    40:15    53:5 | |
| 57:15    57:16 | |
| **couple** [1]    12:4 | |
| 38:19    47:1    49:1 | |
| 50:12    56:5 | |
| **course** [2]    8:16 | |
| 17:1 | |
| **court** [24]    1:1 | |
| 2:8    2:15    4:7 | |
| 4:18    5:2    12:12 | |
| 19:14    19:22    20:4 | |
| 26:16    26:23    31:14 | |
| 31:14    35:12    35:16 | |
| 35:23    39:5    43:13 | |
| 53:3    53:11    56:21 | |
| 57:2    57:5 | |
| **created** [2]    32:2 | |
| 37:4 | |
| **credit** [26]    10:17 | |
| 10:19    10:23    12:21 | |
| 14:16    20:9    22:14 | |
| 22:15    22:20    27:21 | |
| 27:21    28:17    29:7 | |
| 30:10    32:8    34:16 | |
| 34:17    35:1    35:4 | |
| 35:18    51:2    52:14 | |
| 56:9    56:23    57:11 | |
| 59:2 | |
| **credits** [3]    25:17 | |
| 28:8    52:4 | |
| **crime** [1]    11:18 | |
| **CROSS** [1]    50:10 | |
| **CSR** [1] 1:20    61:17 | |
| **curious** [1]    40:3 | |
| **custody** [8]    10:22 | |
| 11:5    36:7    51:6 | |
| 51:8    58:8    58:13 | |
| 59:2 | |
| **cut** [1]    30:12 | |
| **date** [59] 4:16    5:23 | |
| 7:9    8:15    9:3 | |
| 9:3    9:13    10:9 | |
| 10:14    10:22    11:5 | |
| 11:10    11:10    11:11 | |
| 11:17    12:8    12:9 | |
| 16:10    17:4    18:13 | |

| | |
|---|---|
| 18:18    19:9    19:24 | |
| 21:21    22:14    25:5 | |
| 25:24    26:7    28:16 | |
| 28:19    29:1    29:2 | |
| 30:1    30:7    33:1 | |
| 33:21    35:3    38:9 | |
| 39:4    39:4    39:5 | |
| 39:6    43:16    43:19 | |
| 43:24    44:1    51:16 | |
| 51:21    51:24    56:7 | |
| 57:20    58:8    58:8 | |
| 58:10    58:14    59:2 | |
| 59:3    59:8    60:2 | |
| **Dated** [1]    61:12 | |
| **dates** [8] 6:24    9:9 | |
| 10:2    26:24    27:11 | |
| 28:4    40:12    52:5 | |
| **David** [11]    1:5 | |
| 4:14    5:9    7:20 | |
| 9:1    9:13    19:23 | |
| 33:5    42:6    43:7 | |
| 57:1 | |
| **days** [7] 12:21    15:22 | |
| 16:18    18:6    22:20 | |
| 30:10    59:12 | |
| **deal** [1] 40:10 | |
| **dealing** [1]    14:15 | |
| **DeCaro** [6]    3:2 | |
| 3:3    3:15    4:5 | |
| 56:4    60:19 | |
| **December** [11]    11:19 | |
| 12:5    27:13    40:4 | |
| 58:9    58:11    58:12 | |
| 58:13    58:18    59:1 | |
| 59:3 | |
| **decided** [1]    56:17 | |
| **decision** [7]    31:8 | |
| 31:12    32:12    41:24 | |
| 44:5    44:5    54:18 | |
| **decisions** [2]    24:24 | |
| 56:6 | |
| **Defendants** [2] 1:10 | |
| 3:8 | |
| **delay** [1]    25:19 | |
| **DENNIS** [3]    3:2 | |
| 4:5    56:4 | |
| **department** [7]    8:11 | |
| 8:12    15:8    42:12 | |
| 48:24    49:14    52:15 | |
| **deposition** [6]    1:15 | |
| 2:4    4:11    4:20 | |
| 60:24    61:9 | |
| **depositions** [1] 2:9 | |
| **destroyed** [1]    40:17 | |
| **details** [1]    45:20 | |
| **determine** [4]    29:7 | |
| 34:15    34:17    35:1 | |
| **determined** [1]    25:20 | |
| 52:3 | |
| **difference** [2]    7:14 | |
| 55:18 | |
| **different** [5]    4:22 | |
| 6:15    6:21    55:21 | |
| 55:23 | |
| **difficult** [1]    21:14 | |
| **diligent** [1]    44:3 | |
| **DION** [1]    1:8 | |

| | |
|---|---|
| **DIRECT** [1]    4:4 | |
| **direction** [1]    61:9 | |
| **discharge** [6]    21:21 | |
| 22:8    31:15    39:5 | |
| 39:9    48:22 | |
| **discharged** [2]    21:24 | |
| 38:24 | |
| **discharges** [1]    49:2 | |
| **discovering** [1] 57:21 | |
| **DISCOVERY** [1] | |
| 1:15 | |
| **discuss** [2]    32:19 | |
| 55:21 | |
| **disk** [1] 60:19 | |
| **DISTRICT** [2]    1:1 | |
| 1:1 | |
| **DIVISION** [1]    1:2 | |
| **DIXON** [1]    1:9 | |
| **DOC** [1] 45:15 | |
| **docket** [1]    36:5 | |
| **dockets** [1]    36:5 | |
| **document** [24]    10:1 | |
| 10:4    15:20    15:23 | |
| 16:6    19:5    19:8 | |
| 19:13    19:16    19:17 | |
| 28:18    30:21    31:2 | |
| 31:7    37:1    37:4 | |
| 39:11    39:18    40:2 | |
| 40:6    40:13    48:6 | |
| 56:21    57:2 | |
| **documentation** [1] | |
| 11:23 | |
| **documented** [1] 53:24 | |
| **documents** [12]    8:14 | |
| 9:13    14:12    15:9 | |
| 15:13    18:16    26:22 | |
| 27:2    27:21    47:10 | |
| 48:23    49:13 | |
| **Donna** [3]    1:20 | |
| 61:2    61:17 | |
| **door** [9]    21:19    37:11 | |
| 37:14    37:15    37:17 | |
| 37:20    37:21    38:16 | |
| 48:5 | |
| **double-check** [2] | |
| 8:18    30:22 | |
| **drastic** [1]    24:20 | |
| **dropped** [2]    37:7 | |
| 38:13 | |
| **during** [5]    7:20 | |
| 8:4    32:3    36:10 | |
| 47:10 | |
| **E** [2]    1:21    61:4 | |
| **e-mail** [17]    15:7 | |
| 34:3    34:4    34:7 | |
| 34:8    35:19    36:17 | |
| 36:18    41:19    41:20 | |
| 41:21    42:23    43:15 | |
| 43:17    44:9    45:8 | |
| 54:3 | |
| **e-mailing** [1]    44:4 | |
| **e-mails** [12]    11:15 | |
| 12:2    25:14    33:18 | |
| 34:1    34:6    35:8 | |
| 36:8    36:9    41:7 | |
| 43:23    53:24 | |
| **casicr** [2]    22:6 | |

**MICHELE LITTLEJOHN**   CondenseIt™   **East - Mattoon**

East [1] 2:6
education [1]  6:4
Edward [1]  41:15
effective [1]  39:6
either [4]  43:23
  56:20  56:21  57:9
electronic [1]  21:16
emergency [3]  33:1
  55:12  55:19
employed [1]  6:6
endings [1]  4:22
entitled [1]  38:21
entries [1]  38:18
Eric [1]  43:1
error [1] 25:21
events [1]  27:18
eventually [1]  53:8
Examination [4]
  3:14  4:4  50:10
  56:3
Executive [1]  7:18
exhibit [28]  3:18
  3:18  3:19  3:19
  3:20  3:22  9:21
  9:22  10:1  15:16
  15:19  17:14  17:15
  17:18  18:21  18:22
  19:1  26:13  26:13
  27:8  29:17  31:3
  31:4  31:10  39:17
  48:11  49:24  60:21
Exhibits [1]  3:17
experienced [1] 24:3
explained [2]  37:10
  52:8
explanation [1] 59:17
F [1]  1:21
facility [5]  15:24
  16:1  16:17  17:8
  39:14
Fanning [9]  3:5
  3:15  5:13  5:21
  48:17  50:2  50:11
  60:14  60:22
fax [3]  15:5  15:7
  47:14
faxed [6]  14:18
  14:22  36:16  36:19
  47:17  48:2
faxing [1]  15:1
February [31]  6:10
  7:23  13:20  13:20
  13:20  13:21  16:11
  17:5  19:7  19:14
  20:4  20:14  22:17
  22:18  22:18  26:10
  26:16  29:6  29:18
  29:22  37:13  41:10
  42:22  43:16  47:11
  47:12  47:17  47:19
  47:20  49:7  53:9
Federal [2]  2:8
  2:8
Fickle's [1]  18:11
Field [1] 48:24
figure [4]  25:17

29:14  43:9  46:5
figured [1]  18:3
figures [1]  19:21
figuring [1]  28:7
file [14]  8:14  14:13
  14:21  15:10  16:7
  16:13  18:17  25:24
  28:21  30:22  49:15
  50:7  50:18  60:8
filed [3] 29:9  35:22
  55:13
filing [3]  6:19
  44:13  49:15
filled [1]  17:9
finding [1]  21:13
follow-ups [1]  56:5
followed [2]  22:22
  23:3
forwarded [3]  16:6
  41:20  42:7
four [1]  4:13
G [1]  1:21
gain [1]  45:2
General [1]  3:6
generally [2]  7:13
  8:9
giving [1]  16:11
Glenn [26]  1:8
  12:10  13:6  14:13
  24:12  24:21  28:15
  32:11  34:9  35:2
  36:4  36:10  41:8
  41:16  42:2  42:7
  42:23  44:21  44:23
  45:4  45:8  46:3
  51:10  51:17  53:17
  56:16
governing [1]  2:9
grateful [1]  60:11
greater [1]  46:13
grievance [10]  33:1
  44:13  44:24  49:10
  49:19  49:21  55:13
  55:19  55:19  55:24
grievances [1]  55:15
Grounds [12]  1:8
  26:13  27:8  29:17
  32:22  32:24  39:17
  42:15  55:11  55:14
  55:17  56:1
guideline [1]  56:15
half [2]  30:12  59:6
hand [3] 15:12  18:20
  61:13
handed [1]  15:18
handing [2]  9:24
  18:24
handle [1]  45:16
handwriting [4] 27:9
  27:11  27:12  27:14
handy [1]  49:24
happening [1]  45:21
  52:9
hard [2]  4:23  5:18
hearing [2]  14:7

45:20
HEREBY [2]  2:3
  61:3
hired [2] 6:12  6:14
host [17] 20:17  21:3
  21:9  21:11  21:13
  21:15  21:20  21:23
  22:1  22:7  22:10
  23:6  24:16  37:19
  38:2  57:18  58:2
human [1]  25:21
Huntley [4]  41:16
  42:1  42:9  42:11
hypothetical [1]
  58:5
identification [5]
  9:23  15:17  17:16
  18:23  31:5
II [1]  7:18
IL [3]  1:23  3:4
  3:7
Illinois [7]  1:1
  2:7  3:6  23:17
  61:3  61:5  61:12
immediately [2]
  20:5  24:19
impeachment [1]
  2:16
important [1]  54:6
imprisonment [2]
  11:22  40:10
included [2]  10:20
  51:5
including [2]  25:24
  30:23
incorrect [10]  11:13
  12:17  26:1  28:13
  28:17  51:7  52:4
  57:22  58:7  59:11
independent [2]
  15:1  42:5
index [2]  3:13
  60:17
indicate [1]  54:8
indicates [1]  10:23
individual [1]  1:9
information [11]
  13:15  14:3  14:16
  34:22  37:6  39:12
  40:20  42:18  52:22
  56:8  57:15
informed [1]  12:10
initial [1]  37:18
  58:10
initials [2]  19:1
  27:15
inmate [7]  8:10
  8:13  24:19  38:20
  38:21  44:12  52:6
instead [2]  51:21
  58:9
institution [2]  8:8
  47:7
institutions [1] 9:17
instructed [2]  32:11
  53:2

intent [1]  43:2
interrogated [1]61:7
investigate [1]  33:9
investigating [1]
  33:13
investigation [2]
  42:17  43:6
investigations [1]
  13:23
involvement [1]
  49:16
J [3]  3:2  4:5
  56:4
Jackson [47]  1:8
  11:9  12:11  13:6
  13:23  14:1  14:4
  14:13  15:6  15:9
  23:11  24:12  24:17
  24:21  24:24  28:15
  32:11  34:9  34:15
  36:10  36:13  41:8
  41:16  41:20  42:7
  42:17  42:23  43:7
  43:22  44:4  44:21
  44:23  46:12  46:13
  46:16  46:20  47:10
  47:18  51:11  53:17
  53:19  53:24  54:13
  54:15  56:6  56:16
  57:14
Jackson's [2]  49:6
  54:18
jail [37]  10:23  10:24
  10:24  12:12  12:14
  12:15  12:17  14:16
  26:1  26:2  28:12
  28:14  28:17  35:4
  35:18  36:3  39:19
  51:2  51:5  52:3
  52:14  56:9  56:12
  56:22  56:23  56:24
  57:6  57:11  57:11
  57:13  57:21  57:24
  58:3  58:22  59:7
  59:10  59:19
Jeannie [1]  55:1
  55:5
JOHN [1]  1:8
Johnson [2]  31:8
  31:11
Judge [3]  20:12
  21:1  23:4
Judge's [1]  43:2
June [1]  59:4
K-a-l-a-t-a [1]  43:1
Kalata [1]  43:1
knowledge [2]  24:2
  61:6
Kupets [1]  3:3
L [1]  4:8
L-i-t-t-l-e-j-o-h-n [1]
  4:9
Lafayette [1]  1:22
Lake [8] 25:15  25:16
  27:22  27:23  34:19
  39:19  57:15  57:16
large [1] 26:13

LaSalle [1]  3:3
last [9]  4:7  9:17
  36:24  41:13  41:14
  41:21  42:1  43:16
  45:14
latest [1]  33:21
law [5]  3:2  3:3
  3:6  23:19  23:21
Lawrence [1]  54:23
  55:9
lawsuit [3]  45:16
  45:22  46:4
leave [1] 5:19
leaving [1]  38:16
lcd [1]  53:8
left [2]  21:22  39:5
legal [10]  13:7
  13:24  14:10  15:8
  25:2  42:12  42:13
  43:8  43:11  44:5
letting [1]  45:23
level [1] 6:3
line [3]  43:17  45:14
list [5]  9:17  29:19
  29:21  30:20  50:14
listed [1]  9:18
lists [1]  10:23
Littlejohn [25]  1:15
  2:5  3:18  3:18
  3:19  3:19  3:20
  4:1  4:9  4:10
  9:21  9:22  10:1
  15:16  15:19  17:14
  17:15  17:18  18:21
  18:22  19:1  31:3
  31:4  50:4  61:5
live [2]  5:10  21:15
locate [1]  40:20
location [1]  18:7
lockup [1]  35:14
Logan [3]  9:18
  10:9  10:11
lost [1]  34:21
lots [2]  16:24  17:2
M [1]  1:21
mail [1]  53:11
man [1]  46:20
mandatory [4]  20:14
  20:20  21:1  31:12
Maninfior [3]  1:20
  61:2  61:17
manual [3]  31:7
  32:5  56:20
manuals [1]  32:2
March [16]  1:15
  2:5  9:2  9:18
  10:10  10:11  11:10
  30:6  35:15  44:8
  44:11  56:7  58:13
  59:1  61:4  61:13
master [7]  14:13
  18:16  28:21  49:15
  50:7  50:18  60:8
materials [1]  31:24
Mattoon [2]  1:23

**MICHELE LITTLEJOHN** CondenseIt™ meeting - Robin

61:12

meeting [1] 52:17
message [1] 34:4
messages [1] 34:2
Michele [7] 1:8
1:15 2:5 4:1
4:8 50:3 61:5
middle [1] 35:9
minus [1] 59:6
miscalculated [1] 20:9
Monday [1] 42:22
monitoring [1] 21:16
monthly [1] 37:23
months [10] 5:3
8:1 16:11 16:14
16:15 18:9 30:14
47:4 49:5 59:7
motion [1] 29:9
movement [1] 37:2
moving [1] 6:1
Ms [1] 4:10
MSR [28] 4:17
12:22 13:8 13:13
19:17 20:6 20:13
22:9 22:9 23:4
23:4 23:9 23:15
23:18 23:19 23:23
24:1 24:9 24:15
31:15 31:22 39:4
43:2 43:18 47:2
57:18 58:2 59:3
N [4] 1:21 1:21
1:21 3:3
name [2] 4:6 4:7
narrative [2] 27:11
36:18
necessity [1] 2:15
nice [1] 60:12
nod [1] 5:2
nodded [1] 5:4
norm [1] 26:4
Northern [2] 1:1
48:3
Notary [2] 61:3
61:17
note [9] 42:8 47:12
47:12 47:13 47:16
53:22 54:5 54:7
54:8
noted [1] 54:7
notes [3] 27:24 61:7
61:8
noticed [2] 26:1
51:1
November [13] 9:14
18:13 25:20 28:5
28:10 50:19 57:18
57:20 58:1 58:2
58:6 59:8 59:14
O [4] 1:21 1:21
1:21 1:23
oath [1] 4:3
occasion [1] 32:6
occasions [1] 32:15

October [6] 28:24
29:4 33:21 35:7
35:9 39:2
offender [7] 8:23
20:18 20:19 20:23
21:14 32:17 39:23
offense [1] 51:7
office [30] 6:14
6:15 6:18 6:19
6:22 7:8 7:10
7:10 7:11 7:12
7:17 7:19 8:2
25:16 27:23 31:7
31:13 33:9 33:12
34:6 35:21 35:22
41:23 50:4 51:17
54:20 55:6 56:20
57:17 58:23
officer [2] 31:16
47:13
Offices [1] 3:3
opinion [1] 13:2
option [1] 53:4
orally [2] 5:1
35:11
orders [23] 12:13
12:20 13:3 13:5
13:20 14:17 14:19
15:2 15:4 19:14
19:22 20:4 21:7
22:13 22:22 23:3
26:11 26:16 31:14
43:14 47:17 47:21
49:7
ordinary [2] 15:5
24:11
originally [1] 50:12
outcome [1] 61:11
Outlook [3] 34:2
34:4 34:6
overrule [1] 54:17
overseeing [1] 46:19
overview [1] 38:21
own [6] 6:12 23:14
24:24 29:9 43:6
60:18
P [2] 1:21 1:23
P.C [1] 1:21
p.m [1] 42:23
pages [9] 26:15
27:9 27:10 33:20
33:22 34:13 38:19
40:21 50:1
papers [1] 49:1
paperwork [4] 26:8
35:20 38:17 38:18
parole [2] 37:21
45:9
PC [1] 3:3
people's [1] 25:5
performed [2] 29:18
29:22
period [1] 36:11
47:11
periodic [2] 11:22
40:10

periodically [1] 53:20
person [2] 15:7
38:15
perspective [1] 28:4
phone [3] 54:1
54:2 54:9
plaintiff [3] 1:6
3:4 51:19
plans [1] 6:1
plus [1] 40:23
point [5] 8:16 16:14
43:14 46:4 46:6
policy [1] 56:14
position [4] 6:12
17:8 17:11 55:7
positions [2] 6:16
7:14
pre-checklist [1]
51:15
pre-checkout [1]
50:13
pre-release [2] 26:8
50:23
prepare [2] 19:13
26:24
prepared [3] 48:7
48:20 48:23
preparing [1] 27:20
previous [3] 54:20
57:20 60:15
previously [1] 22:5
primarily [1] 36:13
print [1] 60:17
printed [1] 39:1
printout [1] 38:22
prison [4] 37:22
38:11 45:19 46:18
Prisoner [1] 45:10
prisoners [1] 46:20
prisoners' [1] 9:9
prisons [1] 56:15
PROBE [1] 45:15
problem [7] 11:8
20:6 23:9 23:15
25:13 32:7 43:24
problems [1] 25:5
procedure [3] 2:9
44:24 51:14
procedures [1] 49:10
Professional [1]
61:2
program [3] 34:3
34:21 38:12
projected [3] 17:4
18:13 19:24 29:24
promoted [3] 6:16
7:11 7:11
promotion [1] 8:2
propounded [1] 61:7
protocol [2] 24:13
46:11
prove [1] 36:6
provided [1] 56:8

Public [2] 61:3
61:17
purpose [1] 30:21
purposes [2] 2:16
39:13
pursuant [2] 2:7
61:3
pursue [1] 13:8
pursued [1] 13:10
pushed [2] 51:23
52:5
qualifications [1]
21:6
questioned [2] 22:12
23:11
questions [4] 4:15
4:21 5:8 61:7
R [8] 1:20 1:21
1:21 1:21 1:21
4:8 61:2 61:17
RANDY [1] 1:8
rarely [2] 32:10
32:15
RB [1] 27:15
reacted [1] 52:21
read [3] 5:3 27:16
32:5
reading [3] 11:7
11:15 27:18
reason [6] 10:8
11:16 20:5 37:8
38:10 38:10
reasons [1] 16:23
Rebecca [1] 35:12
recalculate [1] 29:3
recalculated [5]
8:24 9:4 9:7
9:10 28:24
recalculation [3]
17:19 26:6 52:4
receive [1] 61:1
received [18] 9:18
13:19 14:20 15:22
16:14 16:15 18:7
18:8 19:11 19:14
20:3 35:20 36:1
41:19 42:3 53:8
53:12 59:7
recent [1] 19:22
recently [1] 8:1
reception [2] 8:22
10:13
recollection [4] 15:1
27:18 42:5 47:5
record [4] 31:7
31:13 31:16 56:20
records [20] 6:15
6:20 6:22 7:10
7:18 8:3 8:4
8:11 8:12 15:22
33:12 35:16 40:18
47:3 47:13 49:14
50:4 54:20 55:6
56:12
REDIRECT [1] 56:3
refer [2] 16:13 50:5

regarding [13] 4:15
11:23 14:13 19:23
24:8 31:12 32:7
33:1 33:5 34:13
37:5 46:19 54:13
registered [1] 20:18
61:2
regular [1] 55:19
regular-sized [1]
60:17
regulation [1] 56:16
relate [1] 55:15
related [1] 61:10
release [24] 4:16
20:14 22:12 22:14
24:19 24:22 25:5
27:20 29:19 29:21
30:1 30:20 31:12
32:12 32:13 36:6
38:1 41:17 45:2
46:19 47:15 48:8
48:19 49:1
released [1] 13:17
20:19 28:11 28:20
37:16 38:9 43:18
49:5 50:13 57:17
58:1
releasing [1] 46:14
relied [1] 27:5
rely [1] 27:2
relying [1] 26:2
remand [1] 35:23
remanded [4] 12:4
35:14 35:17 58:24
reminder [2] 44:11
53:22
reporter [1] 1:22
2:15 4:7 4:18
4:23 5:2 61:2
61:2
REPORTER'S [1]
61:1
represent [1] 4:14
request [1] 60:7
required [1] 53:16
requirement [1] 57:7
requirements [2]
21:12 57:5
response [1] 49:19
responsibility [1]
7:15
result [3] 51:10
53:16 55:12
retained [1] 3:22
retired [1] 7:6
returned [1] 37:8
61:9
reverse [1] 33:20
review [9] 18:18
37:22 38:12 44:15
44:20 45:4 45:9
45:10 45:19
RFC [1] 48:3
ROBERT [2] 3:5
50:11
Robin [1] 27:15

**MICHELE LITTLEJOHN**  CondenseIt™  Robinson - yesterday

Robinson [7]   2:6
2:7      6:6      9:15
37:5    61:4    61:5
Ron [1]   33:15
RPR [2]   1:20      61:17
Rules [2]   2:8
2:8
S [1]     3:7
satisfied [1]   56:8
scenario [1]   54:13
school [1]   6:5
screen [2]   37:3
37:9
seal [1]   61:13
second [3]   3:7
4:24    51:6
secretarial [1]   6:19
secretary [1]   6:23
section [1]   31:2
send [4] 14:16    15:7
34:6    53:22
sending [1]   34:9
sense [1]   41:2
sent [5] 34:8    44:13
45:8    47:10    60:8
sentence [11]   16:19
28:19    28:20    30:12
35:3    35:24    39:22
51:21    55:12    55:14
59:6
sentencing [14] 12:13
13:8    14:17    14:19
15:4    19:23    28:16
36:4    39:24    52:13
53:11    53:13    56:22
57:10
September [7]   25:14
25:22    28:7    29:1
33:23    34:7    50:20
served [2]   10:18
10:19
services [2]   48:24
49:12
several [3]   32:23
33:15    49:4
sex [3]   20:18    20:22
21:14
sheet [11]   10:5
10:6    10:20    10:23
15:21    19:8    36:5
47:12    54:5    54:7
54:8
sheets [1]   27:1
sheriff [10]   11:1
12:5    12:14    25:16
27:22    34:19    36:6
39:17    39:20    40:15
sheriff's [1]   52:15
Shorthand [1]   1:22
61:1    61:2
shortly [1]   20:5
show [11]   9:16
9:20    15:13    16:16
17:17    31:1    36:9
36:9    36:21    56:15
59:13

showed [1]   49:23
showing [3]   35:22
51:8    59:21
shown [1]   39:5
shows [1]   35:23
38:8
shrug [1]   5:2
side [2] 30:4    39:6
sign [2] 49:1    49:2
signature [5]   2:12
17:24    60:14    60:16
61:9
significance [1]
38:6
similar [3]   4:21
17:7    17:11
similarly [1]   17:18
site [17] 20:17    21:3
21:9    21:11    21:13
21:15    21:20    21:23
22:1    22:7    22:10
23:6    24:16    37:19
38:2    57:19    58:2
situation [6]   4:16
13:24    33:6    34:14
34:24    56:18
six [7]   5:3    8:1
16:11    30:14    34:13
47:3    59:6
slip [1]   60:7
small [1]   5:16
solely [1]   20:6
someone [7]   17:7
18:3    23:24    37:15
42:10    45:3    46:14
sorry [2] 11:2    29:2
sort [4]   11:8    33:19
33:24    40:2
sounds [2]   22:6
32:15    60:22
speak [3]   51:19
52:2    55:17
speaking [4]   4:22
4:24    54:12    55:14
Specialist [1]   8:3
specific [5]   9:3
27:11    32:18    52:19
52:20
specifically [2] 12:21
51:4
spell [1]   4:7
spoke [2]   33:14
50:3
spoken [2]   42:24
55:11
Springfield [4]   3:7
13:6    14:6    44:17
staff [2] 31:13    31:15
stamped [1]   15:14
start [5] 4:22    6:9
28:7    33:21    41:10
started [7]   7:2
25:15    27:22    28:6
30:6    50:13    50:20
starting [2]   11:11

26:14
starts [1]   5:7
state [6] 4:6    8:22
15:8    21:17    46:18
61:3
state's [8]   25:16
27:23    34:20    35:21
36:2    42:24    57:16
58:23
states [2]   1:1
31:15
Stateville [1]   48:3
status [1]   14:4
statute [1]   23:17
stenographic [1]
61:7
Step [1] 31:13
steps [1] 54:11
stipulated [3]   2:3
2:11    2:14
STIPULATION [1]
2:1
straighten [1]   22:3
Street [2]   3:3
3:7
stuff [1] 11:8
substantial [1] 51:16
successful [1]   45:1
sue [1]   46:6
sufficient [1]   36:2
suggested [1]   57:1
Suite [1] 3:3
supervised [3]   20:14
21:2    31:12
supervision [1] 61:9
supervisor [11]   7:4
7:16    7:19    13:5
24:12    47:14    50:4
54:15    54:21    55:4
55:6
supposed [2]   23:18
43:17
Sutton [1]   33:15
sworn [2]   4:2
61:5
system [4]   8:7
8:8    38:7    40:14
T [2]   1:21    1:21
talks [3] 31:11    31:13
42:22
temporarily [1] 7:17
54:22    55:7    55:8
term [8] 13:8    22:9
22:9    23:18    23:19
23:23    43:2    43:19
terms [1]   8:7
testified [1]   4:3
testify [1]   61:5
testifying [1]   19:12
thanking [1]   60:9
Thanks [1]   60:6
thereafter [1]   20:6
thereof [1]   61:11
thereto [1]   61:8

third [1] 43:16
three [4] 7:14    16:14
16:15    18:8
throughout [1]   8:22
Tim [1]   48:2
times [3]     9:10
33:15    51:5
top [2]   35:20    41:21
touch [2]     5:20
53:19
touching [1]   61:6
town [3] 5:12    5:14
5:16
trained [5]     7:3
31:24    32:1    55:4
57:9
training [3]   24:8
31:7    32:4
transcribed [1] 61:8
transfer [1]   17:3
transfers [1]   8:24
trial [1]   5:21
trouble [2]     17:1
17:2
two [9]   4:23    12:20
19:14    20:4    26:16
26:19    27:10    32:15
type [1] 55:24
typically [3]     5:6
27:3    39:22
U [1]   1:21
U.S [1]   31:11
ultimately [4]   13:12
49:4    49:13    58:13
unhappy [2]   46:7
46:9
UNITED [1]   1:1
updated [1]   33:16
upset [1]   52:23
VAD [1]37:11
variety [1]   16:23
VB [2]   18:1    55:2
verbally [1]   5:1
verification [21]
12:13    12:16    12:18
26:1    26:3    28:12
28:14    36:1    36:4
39:19    51:5    56:22
57:1    57:7    57:12
57:14    57:21    57:24
58:3    59:10    59:19
verifications [1]
12:14
verified [1]   35:13
verify [8]     24:21
27:9    33:19    43:13
47:9    52:14    58:8
58:10
verifying [1]   25:23
versus [1]   31:11
Vicky [2]     7:4
18:2    54:24    55:4
violate [4]     21:19
37:19    38:2    38:5

violated [6]     37:11
37:13    37:15    37:17
37:21    38:1
violation [2]   37:22
48:4
violator [2]   45:12
45:15
violators [2]   37:23
37:24
waiting [1]   44:7
waive [2]   60:14
60:16
waived [2]     2:12
2:16    61:9
walk [1] 21:3
walked [1]     23:5
walking [1]   21:7
walks [2]   38:15
48:7
wanting [1]   44:6
wants [1]   56:17
Warden [14]   32:9
32:18    32:22    32:24
37:10    39:17    42:15
46:14    46:22    49:23
49:24    54:23    55:8
55:11
wardens [1]   32:23
week [1] 53:22
weekly [2]   53:20
53:21
whole [2]     8:4
61:5
without [2]   13:13
21:3
witness [2]   4:2
61:8
wording [1]   42:2
words [2]   6:12
23:15
worked [1]   23:22
works [1]   45:5
writ [1] 53:11
written [2]   32:17
35:11
wrote [1]   34:8
42:23
year [1] 51:24
years [4] 23:20    25:4
32:16    47:1
yesterday [1]   36:19

**MANINFIOR COURT REPORTING SERVICE, P.C.**


EXHIBIT NO. *1*

D. MANINFIOR

DC·1321

## SINGLE OR CONCURRENT DETERMINATE SENTENCES UNDER 1978 LAW AND JAIL CREDIT

NAME *David Armato*    NUMBER *N91995*    DATE *3-20-06*

**(STEP 1) (A)**

Yr. Mo. Day

|  |  |  |
|---|---|---|
| - | | (Rel. on Bond, Etc.) |
| - | | (Arrest Date) |
|  | | (Jail Credits) |
| + | 1 | (Add 1 Day) |
|  | | (Jail Credits) |

**(STEP 2)**

Yr. Mo. Day    *10 yrs*

|  |  |  |
|---|---|---|
| + | | (Jail Credits-A) |
| + | | (Jail Credits-B) |
| + | | (Jail Credits-C) |
| + | | (Jail Credits-D) |
|  | | (Total Jail Credits) |

**STEP 1) (B)**

Yr. Mo. Day

|  |  |  |
|---|---|---|
| - | | (Rel. on Bond, Etc.) |
| - | | (Arrest Date) |
|  | | (Jail Credits) |
| + | 1 | (Add 1 Day) |
|  | | (Jail Credits) |

**(STEP 3)**

Yr. Mo. Day

|  |  |  |
|---|---|---|
|  | | (Old Custody/ Sentence Date) |
|  | | (Total Jail Credits) |
|  | | (New Custody Date) |

*05CF5015*
**(STEP 4)** MITTIMUS NO. *05CF1661*

PROJECTED OUT DATE

Yr. Mo. Day    *Jail credit Sheet*
*05  5  9*    (New Custody Date)
*5*    (Sentence Less) GCC)
*2010  5  9*    (Projected Out Date)
    (Previous Time Lost/Awarded)
+ or -    (Adj.Proj.Out Date)

**STEP 1) (C)**

Yr. Mo. Day

|  |  |  |
|---|---|---|
| - | | (Rel. on Bond, Etc.) |
| - | | (Arrest Date) |
|  | | (Jail Credits) |
| + | 1 | (Add 1 Day) |
|  | | (Jail Credits) |

**STEP 1) (D)**

Yr. Mo. Day

|  |  |  |
|---|---|---|
| - | | (Rel. on Bond, Etc.) |
| - | | (Arrest Date) |
|  | | (Jail Credits) |
| + | 1 | (Add 1 Day) |
|  | | (Jail Credits) |

**(STEP 5)**

MANDATORY OUT DATE

Yr. Mo. Day
*05  5  9*    (New Custody Date)
+ *10*    (Sentence)
*2015  5  9*    (Mandatory OutDate)

---

Adj. Proj. Out Date  *5-9-2010*    Terminal Operator  _____
Mandatory Out Date  *5-9-2015*    Date Entered  *3/21/06*
Calculated By  *M. M.*

DC 1321 (Rev 10/98 )
IL 426-00521

 

### ILLINOIS DEPARTMENT of CORRECTIONS
## MERITORIOUS GOOD TIME WORKSHEET

10-N-17

**MERITORIOUS GOOD TIME WHEN SENTENCE IS DETERMINATE UNDER 1978 LAW**

NAME _Armato, David_  NUMBER _N91995_ DATE _5-11-07_

**STEP 1**

YR. MO. DAY

_90 mgt_   (MERITORIOUS GOOD TIME AWARDED BY THE DIRECTOR ON _5-10-07_)

**STEP 2**  (MITTIMUS NUMBER _05CF1661_
_05CF5015_
_05CF_

PROJECTED OUT DATE

YR. MO. DAY

| 05 | 5 | 9 | (CUSTODY DATE) (SENTENCE LESS G.C.C.) |
| 10 | 5 | 9 | (PROJECTED OUT DATE or PRB PROJECTED OUT DATE) (PREVIOUS TIME LOST/AWARDED) |
| 10 | 3 | 9 | (PROJECTED OUT DATE) (MERITORIOUS GOOD TIME) |
| 10 | 2 | 9 | (ADJUSTED PROJECTED OUT DATE) |

**NOTATION**

YR. MO. DAY

| | | | (RECUSTODY DATE) (BOND, ESCAPE,ETC.) |
| | | | (TIME LOST) |

ADJ. PROJECTED OUT DATE _2-9-10_  TERMINAL OPERATOR _fw_

CALCULATED BY _fw_  DATE ENTERED _5-11-07_

DC 1329 (Rev. 12/02)
IL 426-00529

_11-39-07_       _11-39-07_

EXHIBIT NO. 2
D. MANINFIOR

**MERITORIOUS GOOD TIME WHEN SENTENCE IS DETERMINATE UNDER 1978 LAW**

NAME _Daniel Armato_ NUMBER _N 91995_ DATE _8·15·08_



**(STEP 1)**

Yr. Mo. Day

_S msT_

_3_    (Meritorious Good Time Awarded
By The Director On _8·14·08_ )

**(STEP 2)** (MITTIMUS NUMBER _05CY 1661_ )

PROJECTED OUT DATE _05CY 5015_

Yr. Mo. Day

_05 5 9_    (Custody Date)
+ _5_    (Sentence Less G.C.C.)
_2010 5 9_    (Projected Out Date or PRB Projected out Date)
+or- _3_    (Previous Time – Lost/Awarded)
_2010 2 9_    (Projected Out Date)
- _3_    (Meritorious Good Time
_09 11 9_    (Adjusted Projected Out Date)

EXHIBIT NO. 3
D. MANINFIOR

**(NOTATION)**

Yr. Mo. Day

-    (Recustody Date)
(Bond, Escape, Etc.)
(Time Lost)

Adj. Proj. Out Date _11· 9·09_     Terminal Operator _PB_
Calculated By _JS_     Date Entered _8/15/08_

DC 1329 (Rev. 10/96)
IL 426-00529

 

**SINGLE OR CONCURRENT DETERMINATE SENTENCES UNDER 1978 LAW AND JAIL CREDIT**

NAME __David Armato__   NUMBER __N91995__   DATE __2-22-10__

**(STEP 1) (A)**

Yr. Mo. Day

| | | |
|---|---|---|
| - | | (Rel. on Bond, Etc.) |
| | | (Arrest Date) |
| | | (Jail Credits) |
| + | 1 | (Add 1 Day) |
| | | (Jail Credits) |

**STEP 1) (B)**

Yr. Mo. Day

| | | |
|---|---|---|
| - | | (Rel. on Bond, Etc.) |
| | | (Arrest Date) |
| | | (Jail Credits) |
| + | 1 | (Add 1 Day) |
| | | (Jail Credits) |

**(STEP 1) (C)**

Yr. Mo. Day

| | | |
|---|---|---|
| - | | (Rel. on Bond, Etc.) |
| | | (Arrest Date) |
| | | (Jail Credits) |
| + | 1 | (Add 1 Day) |
| | | (Jail Credits) |

**(STEP 1) (D)**

Yr. Mo. Day

| | | |
|---|---|---|
| - | | (Rel. on Bond, Etc.) |
| | | (Arrest Date) |
| | | (Jail Credits) |
| + | 1 | (Add 1 Day) |
| | | (Jail Credits) |

received corrected orders

**(STEP 2)**

Yr. Mo. Day

| | | |
|---|---|---|
| + | | (Jail Credits-A) |
| + | | (Jail Credits-B) |
| + | | (Jail Credits-C) |
| + | | (Jail Credits-D) |
| | | (Total Jail Credits) |

**(STEP 3)**   373 days

Yr. Mo. Day

| | | | |
|---|---|---|---|
| 06 | 3 | 6 | (Old Custody/ Sentence Date) |
| 1 | | 13 | (Total Jail Credits) |
| 05 | 2 | 23 | (New Custody Date) |

**(STEP 4)** MITTIMUS NO. __05CF1661__
__05CF5015__
PROJECTED OUT DATE

Yr. Mo. Day

| | | | |
|---|---|---|---|
| 05 | 2 | 23 | (New Custody Date) |
| + 5 | | | (Sentence Less GCC) |
| 10 | 2 | 23 | (Projected Out Date) |
| + or - | | 6 | (Previous Time Lost/Awarded) |
| 09 | 8 | 23 | (Adj.Proj.Out Date) |

**(STEP 5)**

MANDATORY OUT DATE

Yr. Mo. Day

| | | | |
|---|---|---|---|
| 05 | 2 | 23 | (New Custody Date) |
| + 10 | | | (Sentence) |
| 15 | 2 | 23 | (Mandatory Out Date) |

Adj. Proj. Out Date __8-23-09__
Mandatory Out Date __2-23-15__   Terminal Operator _____
Calculated By _____   Date Entered __2-22-10__

DC 1321 (Rev 10/98)
IL 426-00521

EXHIBIT NO. 4
D. MANNIFOR

# Record Office Training Manual

## Johnson Decision

| | |
|---|---|
| **Last Revision Date:** October, 2006 | **Reference: U.S VS. JOHNSON** 120 S. CT. 1114 |
| **Necessary Forms:** | **Volume IA** |

**Subject Area: Johnson Decision**

The U.S. Supreme Court in U.S. vs. Johnson issued a ruling that parole terms for offenders released on parole/mandatory supervised release (MSR) begins upon the actual release date from prison. Therefore, effective March 1, 2001, the Illinois Department of Corrections will follow this ruling by ensuring that offender's parole/MSR term begins the date of release from the institution or transition center.

**Steps:**

1. An offender with Earned Good Conduct Credits will only be awarded the number of days that result in his release on parole/MSR. Restoration of Good Conduct Credits will be awarded in full. A date over entry will be required.

2. When awarding Meritorious Good Time and Supplemental Meritorious Good Time the amount of days that would result in an immediate release on parole/MSR is all that will be awarded. In circumstances where the violation term holds longer than the new case no Meritorious Good Time or Supplemental Meritorious Good Time is to be awarded to the new sentence.

3. Record office staff will comply with all court orders. If the court order states to discharge with no MSR, staff will contact the Chief Record Officer.

4. Those individuals who are received in Reception and Classification Centers and whose calculation results in an immediate release, the MSR term will begin immediately.

5. The same procedure will be used for offenders who are released on court writs and return from court with a reduced sentence, which results in an immediate release.

6. In those instances where the violation term sentence holds for release from custody and there is a new sentence that has already been satisfied, staff will discharge the violation term on the applicable day and start the MSR period on the actual date of release from custody.

Page 1 of 5

EXHIBIT NO. 5

D. MANINFIOR

000105

7. When the release date falls on a Saturday, Sunday, or a holiday, the MSR term will remain as calculated.  (see example)

8. Effective with releases on or after March 1, 2001, the record office will record the actual release date on the face sheet in the lower left hand corner under the parole/MSR period. This will be of assistance if the offender returns as a parole/MSR violator.

9. **A DATEOVER** transaction must be done on OTS when an offender's release date calculates out to a date in the past, due to the following circumstances.

   a) Offender receives additional jail credit
   b) Offender receives sentence reduction
   c) Offender receives mandate for time considered served
   d) Offender receives GCC restoration which calculates out to a date in the past.
   e) R&C turnarounds, which are Offenders that are received at an R&C and have enough jail credit that they are an immediate release.
   f) Offenders back jacket (violation sentence) holds him/her in the institution longer than the front jacket (new sentence).
   g) Offenders who have a non-controlling sentence with a longer MSR term than the controlling sentence for which they are held in the institution. Example: Controlling sentence in the institution is a Class 4, and non-holding sentence is a Class 2.
   h) Offender receives a court ordered discharge on the controlling sentence and the non-controlling sentence becomes the controlling, resulting in an immediate release.
   i) Offender is bonded out on the controlling sentence and the non-controlling sentence becomes the controlling, resulting in an immediate release.

10. If the offender's non-controlling sentence controls for their MSR term, the user needs to change the non-controlling sentence to be the controlling sentence in the Offender Tracking System.

11. Once the appropriate changes have been made, a sentence calculation must be done in the Offender Tracking System to make sure the inmate's out dates on OTS match the dates on the paper calculation sheet.  It is imperative that this is done, as it is a double check to make sure the paper calculation is correct.

> *Note:  If the offender receives Jail Credit and the MSR date is in the past, the user needs to change the custody date in the Offender Tracking System to the new custody date.*
>
> *Note:  If the offender receives a reduction in sentence and after calculation the MSR date is in the past, the user needs to change the sentence length in the Offender Tracking System.*

000106

N91995

**IN THE** ~~IT~~ COURT OF THE NINETEENTH ~~CIAL~~ CIRCUIT
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | FEB 18 2010  Date of Sentence <u>March 6,2006</u> |
| vs. | ) Case No. <u>05CF5015</u> | Date of Birth <u>04/03/65</u> |
| David Armato N91995 | ) | (Defendant) |
| | ) | Year of Birth _____ |
| Defendant | ) | (Victim) |

CIRCUIT CLERK

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | MSR |
|---|---|---|---|---|---|---|
| 1 | 12/30/05 | Theft | 720 5/16-1(a)(1)(A) | 3 | 10 Yrs __Mo | __Yr |

and said sentence shall run (☑ concurrent with)(☐ consecutive to) the sentence imposed on: _____05CF1661_____

____ ____ ____ _____ _____ ___Yrs __Mo __Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____

____ ____ ____ _____ _____ ___Yrs __Mo __Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____

____ ____ ____ _____ _____ ___Yrs __Mo __Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a **Class X** offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☑ The Court finds that the defendant is entitled to receive credit for time actually served in custody from ___373 days___ [specify date(s)]
to _____ from _____ to _____ from _____ to _____

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in **great bodily harm** to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the **Impact Incarceration** program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program. Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve  ☐ 75%  ☐ 85%  ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☑ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☑ IT IS FURTHER ORDERED that <u>With credit for 373 days served in the Lake County Jail - credit for time awaiting transport to the Department of Corrections - good time credit as administered by the Department of Corrections - def to be released from the Department of Corrections without a term of Mandatory Supervised Release.</u>

This order is (☑ effective immediately) (☐ stayed until _____ ).

DATE: <u>February 18, 2010</u>

ENTER: s/ Theodore Potkonjak
_____
Theodore S. Potkonjak
**(PLEASE PRINT JUDGE'S NAME HERE)**

Form approved by the Conference of Chief Judges
Effective January 18, 2008



**DEFENDANT'S EXHIBIT**
D

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS )
vs. )
David Armato N91995 )
Defendant )

Case No. 05CF1661

FEB 18 2010

Date of Sentence March 6, 2006
Date of Birth 04/03/65
(Defendant)
Year of Birth _____
(Victim)

CIRCUIT CLERK

# JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | MSR |
|---|---|---|---|---|---|---|
| 1 | 05/07/05 | Theft | 720 5/16-1(a)(1)(A) | 3 | 10 Yrs __Mo | __Yr |

and said sentence shall run (☒ concurrent with)(☐ consecutive to) the sentence imposed on: _____ 05CF5015

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ Yrs __Mo __Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ Yrs __Mo __Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ Yrs __Mo __Yr

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a **Class X** offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☒ The Court finds that the defendant is entitled to receive credit for time actually served in custody from ___373 days___ [specify date(s)]
to _____ from _____ to _____ from _____ to _____.

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in **great bodily harm** to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the **impact incarceration** program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program. Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve ☐ 75% ☐ 85% ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☒ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☒ IT IS FURTHER ORDERED that With credit for 373 days served in the Lake County Jail - credit for time awaiting transport to the Department of Corrections - good time credit as administered by the Department of Corrections - def to be released from the Department of Corrections without a term of Mandatory Supervised Release.

This order is (☒ effective immediately) (☐ stayed until _____).

DATE: February 18, 2010

ENTER: s/ Theodore S. Potkonjak
Theodore S. Potkonjak
(PLEASE PRINT JUDGE'S NAME HERE)

Form approved by the Conference of Chief Judges
Effective January 18, 2008

**DEFENDANT'S EXHIBIT E**

GLENN JACKSON 4/3/2012

Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    CENTRAL DIVISION
 3
 4    DAVID ARMATO,                    )
                                       )
 5          Plaintiff,                 )
                                       )
 6          vs.                        ) No. 11 cv 3023
                                       )
 7    RANDY GROUNDS, MICHELE LITTLEJOHN,  )
      GLENN JACKSON, and DION DIXON,   )
 8    all in their individual capacities, )
                                       )
 9          Defendants.                )
10
11
12
13
14            DEPOSITION OF GLENN JACKSON
15         TAKEN ON BEHALF OF THE PLAINTIFF
16                  APRIL 3, 2012
17
18
19
20
21              COPY
22
23
24
```

DEFENDANT'S
EXHIBIT
tabbies
F

GLENN JACKSON 4/3/2012

Page 2

1              I N D E X

                                    PAGE

2    Examination by Mr. DeCaro          5

3

4

5

6

7

             (NO EXHIBITS MARKED)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

GLENN JACKSON 4/3/2012

Page 3

```
1                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                     CENTRAL DIVISION
3
4    DAVID ARMATO,                    )
                                      )
5           Plaintiff,                )
                                      )
6           vs.                       ) No. 11 cv 3023
                                      )
7    RANDY GROUNDS, MICHELE LITTLEJOHN, )
     GLENN JACKSON, and DION DIXON,   )
8    all in their individual capacities, )
                                      )
9           Defendants.               )
10              DEPOSITION OF GLENN JACKSON, produced,
11   sworn and examined on APRIL 3, 2012, between the hours
12   of 9:00 o'clock in the forenoon and 10:10 o'clock in
13   the forenoon of that day, at the Illinois Department
14   of Corrections, 1301 Concordia Court, Conkle Hall,
15   Springfield, Illinois 62794, before Rhonda Rhodes
16   Bentley, a Certified Shorthand Reporter (IL),
17   Certified Court Reporter (MO), Registered Professional
18   Reporter, in a certain cause now pending in the United
19   States District Court, Northern District of Illinois,
20   Central Division, between David Armato, Plaintiff, vs.
21   Randy Grounds, Michele Littlejohn, Glenn Jackson, and
22   Dion Dixon, all in their individual capacities,
23   Defendants; on behalf of the Plaintiff.
24
```

GLENN JACKSON 4/3/2012

Page 4

```
1              A P P E A R A N C E S
2
        For the Plaintiff: (Via videoconference)
3
             Mr. Dennis J. DeCaro
4            Law Offices of Kupets & DeCaro, P.C.
              30 N. LaSalle Street, Suite 4020
5             Chicago, IL 60602
              (312)372-4444
6             ddecaro@kupetsdecaro.com
7       For the Defendants:
8             Mr. Robert Fanning
              Illinois Assistant Attorney General
9              500 Sound Second Street
               Springfield, IL 62706
10             (217)782-9029
11
12
13
    Court Reporter:
14  Rhonda Rhodes Bentley, CSR/CCR/RPR
    Illinois CSR #084-002706
15  Missouri CCR #1313
    Midwest Litigation Services
16  711 North Eleventh Street
    St. Louis, Missouri 63101
17  (314) 644-2191
    1-800-280-3376
18
19
20
21
22
23
24
```

GLENN JACKSON 4/3/2012

Page 5

1              IT IS HEREBY STIPULATED AND AGREED by and

2    between counsel for the Plaintiff and counsel for the

3    Defendants that this deposition may be taken in

4    shorthand by Rhonda Rhodes Bentley, CSR/CCR/RPR, a

5    Certified Shorthand Reporter, Certified Court

6    Reporter, and Registered Professional Reporter, and

7    afterwards transcribed into typewriting; and the

8    signature of the witness is expressly waived.

9                    *    *    *    *    *

10                   GLENN JACKSON,

11   of lawful age, produced, sworn and examined on behalf

12   of the PLAINTIFF, deposes and says:

13      (Starting time of the deposition:  9:00 a.m.)

14                     EXAMINATION

15   QUESTIONS BY MR. DeCARO:

16      Q.   Mr. Jackson -- I'm assuming, Robert, you've

17   got Grounds Exhibit 2 there?

18           MR. FANNING:  Yes.

19   BY MR. DeCARO:

20      Q.   Okay.  Great.  I'm going to be referring to

21   some of those e-mails between yourself and Ms.

22   Littlejohn, and I'll give you the page numbers.

23   They're all Bates stamped, but before we do that, Mr.

24   Jackson, I'd like to ask you a little background

Page 6

1    information.  What'S your highest level of education?

2        A.   Bachelor's degree in science.

3        Q.   All right.  Okay.  Where was that from?

4        A.   Illinois State University.

5        Q.   And when did you get that?

6        A.   1989.

7        Q.·  Okay.  And I'd like to talk a little bit

8    about your employment history working backwards.  What

9    is your current position?

10        A.   I'm the Chief Record Officer for the

11   Illinois Department of Corrections.

12        Q.   Okay.  When did you start that position?

13        A.   Oh, 2004.

14        Q.   Okay.  What -- Can you tell me what you do

15   on a daily basis?  Just give me a little bit of a job

16   description.

17        A.   Basically on a daily basis I handle

18   inquiries from the courts, state's attorney's,

19   attorneys, the staff that we have throughout the 27

20   adult institutions and six juvenile institutions.

21   Kind of serve as a liaison between us and the courts

22   and work with my legal staff to deal with sentence

23   computation issues and Record Office matters.

24        Q.   Okay.  Prior to 2004 what did you do for

GLENN JACKSON 4/3/2012

Page 7

1    employment?

2         A.    2004 back to 2003 I was the warden at

3    Lincoln Correctional Center.

4         Q.    Okay.  And prior to 2003?

5         A.    From 1999 to 2003 I was the assistant

6    director of the Senate Appropriations Committee.

7         Q.    Okay.  And what did that entail?

8         A.    Basically analyzing, you know,

9    appropriations bill for the Senate, and providing

10   budget analysis for the Senate members.

11        Q.    Okay.  And why don't you generally tell me

12   what you did before 1999?

13        A.    In generic form I was -- from 1999 back to

14   1992, I was an administrative assistant to the warden

15   and a correctional counselor and an officer for the

16   Department of Corrections.

17        Q.    Okay.  When you were assistant

18   administrator to the warden, did you have to do

19   sentencing calculations?

20        A.    No.

21        Q.    Okay.  When you were the warden at Lincoln

22   Correctional, did you have to do any type of

23   sentencing calculations?

24        A.    No.

Page 8

1        Q.    Okay.  Tell me generally how you learned --

2    You know, you were the warden up to '04, and then '04

3    you became the Chief Records Officer, tell me about

4    that transition of how you gained your expertise in

5    this sentencing area.

6        A.    Okay.  I mean when you date back and you

7    take me back to my time as a counselor, one of the

8    things that as a counselor you have to be familiar

9    with the sentence calculation and understand how the

10   sentence calculation process work.  So from -- let me

11   see -- trying to remember the dates from 1992.  1993

12   to 1997 or so, as a counselor I dealt with sentence

13   calculations and dealt with issues that would relate

14   to the sentence structure for offenders, knowing what

15   they would be eligible for as far as earned good

16   conduct credits and meritorious and supplemental

17   meritorious times.

18       Q.    Okay.  And just so we're all on the same

19   page, in this case, Mr. Armato, when he thought he was

20   being held too long, he filed a grievance, and then

21   that grievance goes to a counselor?

22       A.    Yes.

23       Q.    Is that the type of counselor we're talking

24   about?

GLENN JACKSON 4/3/2012

Page 9

```
1        A.   Yes.

2        Q.   Okay.  I forget Ms. Littlejohn's exact

3   title during this period, but were you ever in a

4   position where you actually did the prisoner's

5   calculations before becoming the Chief Records

6   Officer?

7        A.   No.

8        Q.   Do you have -- When you became the Chief

9   Records Officer, did you receive any legal training

10  from any source?

11       A.   Well, I mean I served in various

12  capacities.  When I was the administrative assistant

13  at Dwight, I was the litigation coordinator.  I almost

14  have to think back to that.  Yes, I was the litigation

15  coordinator at Dwight Correctional Center.

16       Q.   Okay.

17       A.   And we had training allotted for us for

18  various different issues.

19       Q.   Okay.  And are you familiar -- I'm assuming

20  you spoke with your attorney about this situation, and

21  I don't know if you have an independent recollection

22  of Mr. Armato's situation.  Are you familiar with --

23  Do you recall what happened here in this situation?

24       A.   I have a general idea of what happened,
```

GLENN JACKSON 4/3/2012

Page 10

1    yes.

2         Q.   Okay.  Are there -- In your position when

3    there are calculation problems or problems with an

4    order, is there a policy or manual or procedure manual

5    that you refer to about each situation, or is it just

6    you investigating trying to find the right thing to

7    do?

8         A.   Well, we do have a training manual that has

9    been established for our overall operation.  Each one

10   of our facilities have a copy of it as well as it is

11   on our share point site for our staff to utilize as a

12   training tool and a familiarization of our policies

13   and procedure.

14        Q.   Okay.  Does that -- I'm assuming -- Ms.

15   Littlejohn told us that her procedure is when she has

16   a problem like this is to call you or e-mail you?

17        A.   Okay.

18        Q.   When you -- Let's talk about this specific

19   problem.  My understanding of this specific problem

20   was there was no MSR in Mr. Armato's two court orders

21   from February 18, 2010; is that your recollection?

22        A.   Yes.

23        Q.   Okay.  When that occurs, is there a

24   document -- and I'm just trying to find out if we

GLENN JACKSON 4/3/2012

Page 11

1    should be looking at some documents, or if you make

2    these decisions unilaterally when that situation

3    occurs, and Ms. Littlejohn said it's not a common

4    situation.  Is there a document that you would refer

5    to for an order that has no MSR, or is that something

6    you have to figure out what to do with?

7         A.   No, I mean in situations where something

8    violates the statute or it doesn't meet the statutory

9    requirement, my automatic response is for staff -- is

10   to inform me so that I can advise our legal staff so

11   that they can give us guidance as to what to do.  That

12   is similar to what this situation is.  Ms. Littlejohn

13   contacted me, I immediately contacted our -- I believe

14   at the time he was our chief legal counsel and advised

15   him for guidance as to how to handle the situation,

16   and that was basically due to the sentence not meeting

17   statutory requirement to have an MSR term.

18        Q.   Okay.  And is that -- and it sounds like

19   that's something that is unwritten, that's just your

20   internal policy --

21        A.   Well --

22        Q.   -- or is that written somewhere?

23        A.   Well, we have it as part of our Inmate

24   Record Office Training Manual.  It's a notation in

Page 12

1   there that say -- and I can't remember off the top of

2   my head exactly what it says, but it says to contact

3   our office if an MSR term is not given to an offender,

4   something similar to that.

5          Q.   Right.  And once that occurs, is there

6   additional instruction in the training manual as to

7   what you would do at that point?

8          A.   I mean like I indicated before, to advise

9   Legal because --

10         Q.   Okay.

11         A.   -- the past practice has been to refer

12   those matters over to the AG's office to review, and

13   from that point it's out of my hands.

14         Q.   Okay.  And I don't want to belabor the

15   point, but it sounds like that what you do is not a

16   written policy, that's something you just decide to do

17   to call Legal?  There's no document that says once

18   Chief Record Officer gets this problem, he calls

19   Legal, or is there?

20         A.   Well, I mean that is my protocol because

21   I'm not an attorney, and to seek legal guidance is one

22   of the things that I do on all -- on things that are

23   -- particularly has to be handled from a legal

24   standpoint.

GLENN JACKSON 4/3/2012

Page 13

1      Q.   Okay.  I got you.  So again there's no

2  written policy that says to do that, or is there?

3      A.   No, I guess there's no legal -- I mean no

4  written policy to say for me to call Legal if that's

5  what you're looking for.

6      Q.   Yeah.  Yeah.  And when you say Legal, is

7  that the Attorney General's office?

8      A.   No, the Department of Corrections have

9  their own set of legal counsel, which I work closely

10  with to make determinations on matters that relate to

11  the Record Office.

12      Q.   Okay.  And I saw in the e-mails that you

13  e-mailed an Ed Huntley --

14      A.   That would be correct.

15      Q.   -- at some point?

16      A.   Yes.

17      Q.   What is his position?

18      A.   At this point I don't know what his

19  official title.  I just know that he's a Department of

20  Corrections attorney.  At that particular time and --

21  excuse me -- I think he was our chief legal counsel,

22  which --

23      Q.   Okay.

24      A.   -- that would have been the direct person I

GLENN JACKSON 4/3/2012

Page 14

1   would have contacted for such issues.

2           Q.   Okay.  And also there was a Joel Diers, is

3   it?

4           A.   Diers.

5           Q.   Diers.  D -- let's see -- D-i-e-r-s?

6           A.   That is correct.

7           Q.   Who is he or back then?

8           A.   Back then and he is still our -- he's our

9   direct legal counsel for Inmate Records.

10          Q.   Okay.  And then you also contacted Alyssa

11  Williams-Schafer at some point.  Who is she?

12          A.   She is -- She's a -- I don't want to say a

13  sex expert.  She is our sex offender manager that

14  deals with sex offenders, and determining their

15  placement, whether it's going to be sexually violent

16  or sexually dangerous person.  So she's the person

17  that heads up that area.

18          Q.   Okay.  And when I -- Strike that.  Just a

19  few things I want to get off of my mind before we move

20  on.  When I spoke to Warden Grounds at Robinson, he

21  was saying that he -- in a situation like this, he

22  would wait to hear what your decision was, and he

23  would rely on your decision, and he wouldn't release

24  an inmate in this situation until you gave him a

Page 15

1   decision.  Is that your understanding that you -- when

2   an issue like this comes up regarding prisoner

3   calculations, that your authority supersedes the

4   warden's authority at a given facility when there's a

5   problem regarding a release date?

6         A.    That would be correct.

7         Q.    Okay.  Are you the ultimate decision maker

8   in this situation?

9         A.    No.

10        Q.    If -- Go ahead.

11        A.    No, I'll let you finish.

12        Q.    Yeah.  Sure.  When you received this

13   information from Ms. Littlejohn, could you have

14   decided to release Mr. Armato without going to Legal?

15        A.    In this case I would not have rendered a

16   decision without the express opinion of our legal

17   staff as to what to do with it.

18        Q.    Could you have though?  I mean would that

19   have been an abuse of your authority or something you

20   would have gotten in trouble for doing that, or is

21   that something you could have done?  I understand you

22   didn't.  I understand what you did.  I'm just

23   wondering if you have the authority to do that.

24        A.    I have -- In matters where there is some

GLENN JACKSON 4/3/2012

Page 16

1   legal interpretation to be decided on, I am to refer

2   and have my legal counsel give me directions as to how

3   to proceed.  So therefore I would not have rendered a

4   decision without having the legal support of my staff

5   and perhaps even the AG's office before I rendered the

6   decision or given directions.

7         Q.   Okay.  How long would you reasonably wait

8   for a decision?  In this case we waited from February

9   until May 21st, but let's say it was February of 2011.

10   At some point do you make a decision, or do you just

11   keep waiting for the legal decision?

12         A.   I am going to wait until our legal counsel

13   give us clarification as to how to properly respond to

14   situations such as that.

15         Q.   Okay.  In this case --

16         A.   Now --

17         Q.   Go ahead.  I'm sorry.

18         A.   I mean I will continuously contact them to

19   let them know that this is ongoing, so that it doesn't

20   appear that we're not doing everything possible to

21   properly release or hold a person to their proper term

22   of incarceration, but I am going to constantly seek

23   legal counsel to find out what guidance we -- I mean

24   what direction we should take in these proceedings.

GLENN JACKSON 4/3/2012

Page 17

1          Q.   Okay.  And who is the ultimate -- who would

2   you -- Back in 2010, during these relevant months, who

3   would you have accepted the opinion from?  Who was

4   your decision maker?  You know, you were seeking from

5   Ed Huntley and Joel Diers.  If Joel Diers said release

6   him, would you have released him?  If Ed said release

7   him, would you have released him?  Who were you

8   waiting for an opinion from specifically?

9          A.   Ed Huntley.

10         Q.   Okay.  Okay.  Was there anything that Mr.

11  Armato could have done administratively through the

12  procedures at Robinson that would have gained his

13  release before Ed Huntley gave you an opinion to

14  release him?

15         A.   I don't know.  Administratively besides

16  having the sentencing order state the MSR, no, I don't

17  believe there would have been anything he could have

18  done, and that was the reason why we wanted to seek

19  legal clarification as to how to proceed with this

20  particular sentencing order because, if I remember

21  correctly, the fact was that it did not have an

22  MSR term, and we were referring to state statute

23  saying that all felony convictions must have an

24  MSR term.

GLENN JACKSON 4/3/2012

Page 18

1      Q.    Okay.  And is that still your understanding

2    that every felony conviction must have an MSR term?

3      A.    Yes.

4      Q.    Okay.  And what is the problem -- Well, are

5    you violating state statute by releasing someone

6    without an MSR term?

7      A.    Well, yes, I mean looking at the sentence

8    and then knowing that a person is supposed to serve a

9    set MSR term based on the class of offense that they

10   have, it would show that we had no supervision of that

11   offender doing his time of not being -- being outside

12   the walls of the institution.

13     Q.    Okay.  And in this case they released him

14   without an MSR term?

15     A.    Yes, eventually they did.

16     Q.    Okay.  Right.  Was one of the alternatives

17   for an attorney to go into court and seek

18   clarification regarding these orders?

19     A.    I believe that was the direct -- I mean

20   that was at least from my side asking Mr. Huntley as

21   to how, you know, would they seek clarification with

22   the AG's office as to whether or not they would go to

23   court to see if they can see how the court was making

24   their decision as far as the MSR term.

GLENN JACKSON 4/3/2012

Page 19

1        Q.   Okay.  Okay.  Thank you.  I'm going to --

2    We'll go through a few e-mails.  I'm going to start on

3    the Bates stamp of 1063 and we'll just go.  I just

4    want to get a timeline with these e-mails, and just

5    let me know when you find that page.

6        A.   Okay.

7        Q.   Okay.  I believe from speaking with Ms.

8    Littlejohn this February 22nd, 2010, e-mail at 12:33

9    p.m., from her to you, would have been your first

10   notice that Mr. Armato came back to Robinson with

11   these new February 18th orders.  You want to take a

12   second and read that and let me know if that's

13   accurate.

14       A.   Okay.

15       Q.   Okay.  Is that -- Is that your recollection

16   that that was the first e-mail you received regarding

17   this situation from Ms. Littlejohn?

18       A.    I mean I couldn't tell you if -- if this

19   was the first e-mail, but it might be probably the

20   earliest that I can recall.

21       Q.   Okay.  Great.  And in that e-mail she tells

22   you if we follow the court's orders, he should have

23   been released in August of '09 with no MSR term,

24   correct?

GLENN JACKSON 4/3/2012

Page 20

1          A.    Yes, I mean that's what she states in the

2     e-mail.

3          Q.    Okay.   Now, I mean I understand your

4     position and your job and everything, but if you could

5     explain to me the -- if you had a legal basis back on

6     February 22nd, 2010, when an order is -- a sentencing

7     order is given and it's clear and unambiguous on its

8     face, is there any legal authority that prevents you

9     from releasing the prisoner?  Do you understand what

10    I'm asking?  Do you have a legal basis when you fail

11    to release him?

12         MR. FANNING:   I'm going to object on

13    foundational purposes, but go ahead and answer.

14         A.    Okay.   I mean basically when we're looking

15    at an order, I mean I always tell my staff that we are

16    to -- to follow the order, count based on the order,

17    but also if it's something that appears to be wrong

18    with the order, we need to let -- they need to let me

19    know so that I can advise Legal to see exactly how we

20    can address the issue.  Our ultimate goal and our

21    purpose is to insure public safety, and that's why we

22    are constantly seeking legal guidance as to how to

23    proceed with certain orders that are questionable.

24

Page 21

1    BY MR. DeCARO:

2        Q.   Okay.

3        A.   Because judges do make mistakes as well.

4        Q.   Right.  Right.  Would you agree with me

5    though the most prudent thing to have done in this

6    case would have been to as quickly as possible go back

7    to court and try and address it with the judge?

8             MR. FANNING:  I'll again place an objection

9    for speculation.

10        A.   Do I answer?

11            MR. FANNING:  Yes.

12        A.   I mean in this case it looks like from the

13    e-mail from Michelle, she's saying that she's been in

14    contact with Lake County and she's waiting for a

15    response from them.  So we are still in communication

16    with Lake County.

17    BY MR. DeCARO:

18        Q.   Okay.  Was one option -- and you may have

19    answered this earlier, but after Michelle e-mails you

20    this and provides you with the order, is it your

21    recollection that at some point she faxed you over one

22    or both of the February 18 orders?

23        A.   I really couldn't tell you that.  I don't

24    know.

GLENN JACKSON 4/3/2012

Page 22

1          Q.    Okay.   Okay.   I think somewhere down

2    further down the e-mails it addresses that, but was

3    one option that you had at this point, once you had

4    this information, could you have said okay, let's

5    follow the order and release Mr. Armato?

6          A.    In this case, I believe I stated before,

7    that since there was no MSR term, we were looking to

8    see -- get clarification and then also seek whether or

9    not the AG's office would take this case up.

10         Q.    Okay.  And what type of clarification would

11   you have needed to make a decision?

12         A.    I think the e-mail points out that I was

13   seeking clarification from Ed Huntley.

14         Q.    Okay.  But if we look at the next e-mail

15   from Ms. Littlejohn to you, the one right above that

16   at -- on February 22nd, 2010, at 2:13 p.m., she had

17   talked to the Assistant State's Attorney, Eric Kalata,

18   K-a-l-a-t-a, and he told her what the intent of the

19   court was.  She put, "The judge said there was no

20   mention of an MSR term given to him previously, so

21   there will be no MSR term, and they were not clear on

22   the days served, so they gave him all his credit.  The

23   judge didn't want to appeal the case -- didn't want

24   him to appeal the case and then have to go through it

Page 23

1    all over again per ASA."  And then she asks, "Is it

2    okay to release him as a discharge?"  So am I correct

3    that she informed you on that date and time as to the

4    intent of the judge according to this state's

5    attorney?

6            A.    Okay.  Yes.  According to this e-mail, yes.

7            Q.    Okay.  And then -- And then you, I believe,

8    respond to her saying, "Give me a call in the morning

9    to discuss"?

10           A.    Correct.

11           Q.    Do you see that at the top?

12           A.    Yes, I do.

13           Q.    Okay.  Okay.  And if we jump -- I'm going

14   to jump a little bit around because these e-mails move

15   around.  All of your e-mails are on different pages

16   than Ms. Littlejohn's, so they're sort of cut and

17   pasted.  So if you go to page 1124, I think that is an

18   e-mail at the top there from you to Ed Huntley and

19   Joel Diers.  If you look at 1124 and 1123, 24's got

20   the body of the e-mail and 23 has the caption.

21           A.    Okay.

22           Q.    Okay.  Would that be your first contact

23   with Ed Huntley and Joel Diers and you CC Alyssa

24   Williams-Schafer at 4:11 p.m. on February 22nd.  Would

GLENN JACKSON 4/3/2012

Page 24

1    that be your first forwarding of this information to

2    them?

3         A.    By e-mail?

4         Q.    Yeah.

5         A.    I take it that would have been.  I'm not

6    exactly sure, but --

7         Q.    Sure.  And I understand you're only looking

8    at these that I'm directing you to, but do you recall

9    calling Mr. Huntley prior to e-mailing him regarding

10   this?

11        A.    I can't tell you I did.  I don't know.

12        Q.    Okay.  So let me just read the e-mail.  I

13   have a few questions.  It says, "I think this is one

14   we need to have a look at before discharging.  Our

15   Record Office just received the order today.  Alyssa,

16   please check to see -- check to see if eligible for

17   SPV review."  What does SPV review mean?

18        A.    Sexually violent person.

19        Q.    Okay.  Then it goes on, "He had two prior

20   offenses for ag crim assault.  I have a copy -- I have

21   a fax copy of the order for your review.  Thanks."  So

22   from the statement I have a fax copy of the order for

23   your review, I'm assuming that Ms. Littlejohn faxed a

24   copy of the order to you and that you -- you were able

Page 25

1    to fax it on to Ed and Joel?

2           A.    I take it that was the case, yes.

3           Q.    Okay.  And then if you look at page 1123,

4    at 4:14 p.m., about three minutes later on February

5    22nd, Alyssa Williams-Schafer e-mails you, Mr. Diers,

6    and Mr. Huntley, "The SVP offenses have discharged and

7    do not run consecutively or concurrently with another

8    offense or parole term."  What does that mean?

9           A.    I can't speak to exactly what she was

10   speaking to at that point.  So I'm not sure if I had a

11   latter conversation with her that -- to get

12   clarification as to her statement.

13          Q.    Okay.  But if the SVP offenses had been

14   discharged, was that -- Well, strike that.  If the SVP

15   offenses had not been discharged, is that another

16   basis for not discharging him on February 22nd?  Is

17   that an independent basis other than no MSR?

18          A.    Okay.  I mean if -- if I'm looking at

19   Alyssa's statement, the two subsequent offenses he's

20   probably -- and if I'm thinking this out through her

21   part, if those two particular offenses were already

22   discharged, then she would not have been able to go

23   back and do an SVP review.  So therefore that would

24   have been a moot issue.  So that would not have been

Page 26

1    something that we could have done to turn him over to

2    Rushville as a possible sexually violent person.

3        Q.    Okay.  All right.  Then at 4:19, the next

4    -- the next e-mail up from Mr. Diers to you at 4:19

5    p.m., on February 22nd, 2010, it says, "Glenn, the

6    court in my opinion cannot legally sentence this

7    offender without a term of MSR.  Unless we challenge

8    the order through the AG's office, I think we are

9    bound to follow the order."  Do you remember getting

10   that e-mail?

11       A.    I remember this e-mail.  I don't remember

12   getting it.

13       Q.    Right.

14       A.    But no, I see the e-mail, and I recall the

15   e-mail.

16       Q.    Yes.  You know, I'm just going through

17   these e-mails.  If we look up on the next e-mail at

18   4:33 p.m., it's got your e-mail as

19   glenn.jackson@doc.illinois.gov.  Was that your e-mail

20   address back in February of 2010?

21       A.    Yes.

22       Q.    Okay.  So I was given these documents from

23   your counsel.  So I'm assuming that these are e-mails

24   that you've sent and received during this relevant

GLENN JACKSON 4/3/2012

Page 27

1    time period.  Is that a fair assumption for me to

2    make?

3         A.   Oh, yes.

4         Q.   Okay.  Okay.  Okay.  On February 22nd at

5    4:19, Mr. Diers says, "We need the AG's office to take

6    a look at this."  Is that something that you have

7    control over?  Do you contact the Attorney General's

8    office, and ask them to look at it, or is this

9    something Mr. Diers does, is it something Mr. Huntley

10   does?

11        A.   Okay.  I mean it's almost a chain of

12   command sort of, you know, process.  I make contact

13   with Joel Diers, Joel Diers in turn would make contact

14   with Ed Huntley as to how they will proceed with this,

15   and Ed Huntley would have been the ultimate person to

16   get in contact with the AG's office to determine

17   whether or not they were going to follow through with

18   that.

19        Q.   Okay.  Do you -- During this period do you

20   recall ever having any conversations or e-mails with

21   anyone from the Attorney General's office --

22        A.   Not.

23        Q.   -- regarding Mr. Armato?

24        A.   Not I.  No.

GLENN JACKSON 4/3/2012

Page 28

1       Q.   Okay.  So your contact was either Mr. Diers

2   or Mr. Huntley?

3       A.   Yes.

4       Q.   Okay.  And then if we look at the next

5   e-mail up at 4:33 p.m. on February 22nd, this is from

6   you to Mr. Diers, Ms. Williams-Schafer, and Mr.

7   Huntley.  It says, "After speaking with Ken Dupy,

8   D-u-p-y, the PRB Legal, he thinks this case should be

9   challenged too.  Thanks."  Who is Ken Dupy?

10      A.   Tupy.

11      Q.   Tupy.  Sorry.

12      A.   Ken Tupy is the Prisoner Review Board legal

13  counsel.

14      Q.   Okay.  Why was he contacted?

15      A.   Because this was related to the MSR term,

16  and the Prisoner Review Board are the ones to make the

17  determination as to the conditions of parole term.

18      Q.   Okay.  But he wasn't in a position to

19  challenge this, it's still -- when he's saying that he

20  thinks the case should be challenged, does that mean

21  the Attorney General's office should challenge it?

22      A.   I take it as that was the case, yes.

23      Q.   Okay.  And I have no idea, is the Attorney

24  General's attorneys, are they to your understanding

Page 29

1  the appropriate attorneys who would go into court when

2  there is a sentencing order that needs to be

3  challenged, or is there another set of attorneys that

4  can possibly do that?

5          MR. FANNING:  I'm going to object on

6  foundation, but go ahead.

7  BY MR. DeCARO:

8          Q.   If you know.

9          A.   Well, it's my understanding that any

10  matters outside of the AG -- I mean out of the Records

11  Office -- I mean out of the Department of Corrections

12  will be represented by the Attorney General's office.

13          Q.   Okay.  Are you aware or has Mr. Huntley or

14  an Attorney General or anyone informed you that there

15  is some legal authority that allows you not to follow

16  a court order?

17          A.   I don't know.

18          Q.   And just so I fully understand the

19  situation, the sentencing orders are the very basis of

20  what allows the State to hold the inmate; is that

21  correct?  Is that what you go off of to hold the

22  inmate?

23          MR. FANNING:  Object on foundation.

24  BY MR. DeCARO:

GLENN JACKSON 4/3/2012

Page 30

1      Q.   Well, let me ask it a different way.  An

2   inmate comes to a prison in Illinois.  What document

3   do the prisons look to to determine whether this

4   person should be in jail or not?

5      A.   The mittimus.

6      Q.   Yes.  So those are the documents you look

7   to to hold the person, correct?

8      A.   That is correct.

9      Q.   Okay.  And those are also the documents you

10  look to to release the person?

11     A.   Yes.

12     Q.   Okay.  One of the problems, I take it, in

13  this situation was that Ms. Littlejohn came across

14  what she believed to be an error in the credit days

15  when she was starting to prepare for Mr. Armato's

16  release; is that your understanding?

17     A.   Yes, according to the e-mails, yes.

18     Q.   Okay.  Is that the procedure at all of the

19  penitentiaries that you review the credit time close

20  in time to the prisoner's release, or is that --

21  Strike that.  Is that the policy that a month or two

22  or three before the prisoner's about to be released

23  we're going to review the mittimus?

24     A.   Well, no.  There are several stages of when

GLENN JACKSON 4/3/2012

Page 31

1    the sentencing order is reviewed.  If an inmate is

2    transferred from one institution to another, the

3    intaking institution or facility will review the

4    calculation to make sure that it's accurate and

5    correct.  So there's a review of the calculation

6    there.  There is a review of the calculation

7    approximately 30 days prior to the person's scheduled

8    MSR discharge, and that is what they're supposed to do

9    as well, but there is several different layers in

10   which the calculation is constantly reviewed for

11   accuracy.

12        Q.   Do you have an opinion one way or another

13   that if in May of 2010, if Mr. Huntley had called you

14   and said don't release Mr. Armato, continue to hold

15   him, would the order have at some point -- if you were

16   going to continue to hold Mr. Armato in the

17   penitentiary, would the 2/18/2010 orders have to have

18   been amended at some point if you were going to

19   continue to hold him?

20        MR. FANNING:  I'm going to object to the

21   form of the question.  Go ahead.

22        A.   Well, I mean I would imagine that

23   eventually they would have had to have gotten

24   something to -- for us to continue to hold him, and

Page 32

1  that is the reason why I was consistently trying to

2  get the directions from Legal as to how to proceed

3  with his term, you know, holding him in our custody.

4  BY MR. DeCARO:

5      Q.  Right.  And if -- if the order -- the last

6  sentencing order that he had, that said no MSR, if

7  that order were followed, he didn't need a host family

8  when he was released, correct?

9      A.  That is correct.

10     Q.  All right.  And what -- what, if you have

11  an independent basis, if that order were followed,

12  what was the basis for holding him after February

13  22nd, 2010, when you found out about this, and if you

14  were to have followed that order, he had to be

15  released, what was the basis if there was a legal

16  basis, what was your basis in your mind for holding

17  him beyond that date?

18     A.  I think I mentioned earlier, that according

19  to the statute, that all offenses, all DOC offenders

20  are to have an MSR term, and based on that, that was

21  the rationale behind questioning the order as it was

22  given -- as it was written in this particular case.

23     Q.  Okay .  I think we left off -- Go back to

24  the e-mails.  We left off at February 22nd, 2010, at

Page 33

1  4:33 p.m.  We skipped ahead by three minutes.  If you

2  could look at page 1125, the top e-mail there.

3       A.   All right.

4       Q.   That is an e-mail from you at 4:30 p.m. on

5  February 22nd, to Alyssa Williams-Schafer.  It says,

6  "I know but for some reason I feel I have to CYA,

7  thanks."  What is CYA?

8       A.   For lack of better words, cover my butt.

9       Q.   Okay.  Okay.  And when you say "I know," is

10  that in response to her e-mail talking about the SVP

11  offenses --

12       A.   Yes.

13       Q.   -- have discharged?

14       A.   Right.

15       Q.   Okay.  All right.  Then on page 1118, I

16  think is the next e-mail up on the top there, have it?

17  It's from you on February 23rd, 2010, at 9:47, to Mr.

18  Huntley.  It says, "The below offender is to be

19  released today.  I need directions as to MSR him or

20  discharge per the mittimus.  If your directions are to

21  MSR him, he will have -- he will be a VAD."  Is that

22  violated at the door?

23       A.   That's correct.

24       Q.   Okay.  "Since he has no host site.  If we

Page 34

1    follow the order, he will discharge today.  Your

2    prompt response to this matter will be greatly

3    appreciated.  He is not SVP eligible, but he is a sex

4    offender.  Thanks."  I'm a little -- if you could just

5    explain to me one more time.  I'm still unclear as to

6    what the SVP eligible.  So the fact that he is not

7    SVP eligible means what?

8         A.   That he is not eligible to go over to the

9    civil commitment, which is sexually violent person,

10   meaning that he is not eligible to be -- to be shipped

11   or transferred over to Rushville.

12        Q.   Okay.  Okay.  You told me that.  Thank you.

13   And so in your -- in your words on this day, if you

14   follow that February 18, 2010 -- and there were two

15   orders.  If you follow those orders, Mr. Armato should

16   have been released on February 23rd, 2010?

17        A.   I believe whatever date that was, yes,

18   whatever the date that she gave.

19        Q.   Well, in your e-mail, it says, "If we

20   follow the order, he will be discharged today."

21        A.   Right.

22        Q.   So maybe that was the first day he could

23   have been discharged?

24        A.   I'm not exactly if that would have been the

GLENN JACKSON 4/3/2012

Page 35

1   first day, but according to the e-mail it's saying he

2   will discharge today, yes.

3       Q.   Okay.  The e-mail we just talked about

4   February 23rd at 9:47.  If you look at page 1062,

5   there's several e-mails from Ms. Littlejohn to you,

6   and I just want to --

7       A.   Oh, 10 --

8       Q.   1062, yeah.

9       A.   Okay.

10      Q.   Okay.  So is February 23rd now, you had

11  some e-mails with Mr. Huntley and Diers on February

12  22nd.  Do you recall having any phone conversations

13  with them, or was the majority of your contact with

14  them regarding this matter through e-mail?

15      A.   I can't tell you exactly, you know, dates

16  and times that I would have had conversations, but I

17  know with Mr. Diers, since his office is right around

18  the, you know, corridor from me, I would have had --

19  had some conversations with him as I always do.

20      Q.   Okay.  Okay.  And so if you look at 1062,

21  it looks like Ms. Littlejohn e-mailed you on February

22  23rd a couple times at 8:30, 9, and at 2:08, just

23  checking on the matter.  Then she e-mailed you

24  February 26th at 9:47 asking if you're still waiting

Page 36

1    on Legal, and then you responded, the time is on page

2    1061, on February 26 at 10:02 a.m., informing her,

3    "Yes, I'm still waiting for a response from Legal."

4    And is that what you were doing during those days

5    after being informed about this situation, basically

6    waiting to hear from Legal as to what to do?

7          A.   Yes.

8          Q.   Then we go to -- if you're still on page

9    1062, on March 5th, 2010, at 8:48, Ms. Littlejohn

10   e-mails you and says, "Just a reminder on this.

11   Thanks."  And I'm assuming she's referring to the

12   subject line, possible release of David Armato, then

13   the next e-mail that I found was on page 1112, if you

14   want to take a look at that, it's one from you to Mr.

15   Huntley.  The top.

16         A.   Yes.

17         Q.   Okay.  So that is on March 5th also at

18   9:12, you e-mailed Mr. Huntley, stating, "This is the

19   case I called, e-mailed, and provided you the mittimus

20   on.  Thanks."  Was that e-mail prompted by a call from

21   him saying, you know, what is the Armato case about,

22   or why did you e-mail him that?

23         A.   I don't know.  I mean I can't tell you

24   exactly why I sent him that particular e-mail, but --

Page 37

1   but perhaps, you know, looking -- Let me see how many

2   -- almost -- well, yeah, two years later, as a

3   reminder to him, that we needed a response to it, and

4   I think if you look at some of the subsequent e-mails

5   even with the response that I gave to Michelle as to

6   still waiting for a legal response, I put high

7   importance on those particular e-mails.

8          Q.   Right.

9          A.   So again this is a reminder.

10         Q.   And so that is on March 5th, and then if

11   you look back at page 1061, seven days later, on March

12   12th at 8 a.m., Ms. Littlejohn e-mails you again

13   checking on the case again, correct, on page 1061?

14         A.   Okay.

15         Q.   Okay.  March 12 at 8 a.m., and then if you

16   look at -- I'm sorry to go back and forth, but these

17   weren't in order, but after you received that e-mail,

18   if you look at page 1109 on the top there at 8:42 a.m.

19   on March 12, you again e-mail Ed Huntley saying, "Mr.

20   Huntley, this is the case I called and e-mailed you

21   on.  As mentioned before, Joel and Ken (PRB) suggested

22   that the case be referred to AG's office.  Please let

23   me know how you wish to proceed.  Please let me --

24   please let me how you wish for us to proceed."

Page 38

1      A.    Yeah, I know.

2      Q.    Period.  Thanks.  Strike that.  So as of

3   March 12th had Mr. Huntley contacted the AG's office

4   yet, had he e-mailed you or called you and said I've

5   spoken to the AG, I'm going to forward this to the AG,

6   or was this case still in limbo?

7      A.    As far as my recollection, I was always

8   under the impression that this was something -- as

9   through my e-mails, that this is something that was

10  being referred to or being dealt with through the AG's

11  office.  Did I have any personal contact with that?

12  No.

13     Q.    Is there anyone -- At that time was there

14  anybody over Mr. Huntley that you could speak to, or

15  he was the highest authority you could go to regarding

16  this matter?

17     A.    As far as I can go to, the highest

18  authority I can go to was my chief legal counsel.

19     Q.    And that was Mr. Huntley?

20     A.    Yes.

21     Q.    Okay.  What is Mr. Huntley doing today?  Is

22  he your chief legal counsel?

23     A.    No.

24     Q.    Do you know where he's employed now?

Page 39

1       A.    Yes, he's with the Illinois Department of

2    Corrections.

3             Q.    In what capacity?

4       A.    He's DOC Legal, he's attorney.  He's not in

5    the capacity of the chief legal counsel.

6             Q.    Okay.  Okay.  All right.  Then if you look

7    back on page 1061, Ms. Littlejohn e-mails you a

8    reminder on March 19th, and then you -- at 8:28, you

9    e-mail her back at 10 a.m. saying, "The AG's office

10   has been contacted, and we're waiting for a response."

11            Then if we look at page 1060, the next

12   e-mail from Ms. Littlejohn is on March 26th at 8:07.

13   Do you have that page?

14       A.    Uh-huh.

15            Q.    Okay.  And she tells you at that time that

16   the Prisoner Review Board will be seeing him on his

17   violation on April 7 when they are here.  What is the

18   significance of him being seen by the Prisoner Review

19   Board, if any?

20       A.    Well, I mean basically it would be just

21   saying that he's going through the proceeding of the

22   Prisoner Review Board to determine his parole

23   violation status.

24            Q.    Okay.  And does their opinion -- Ultimately

Page 40

1  he's found not to be a violator, do you recall that?

2       A.   No, I don't recall that.

3       Q.   It will come up later in the e-mails, but

4  that has no bearing on whether he's going to be

5  released or not, did it?

6       A.   No.

7       Q.   All right.  Then the next e-mail from Ms.

8  Littlejohn is April 2nd at 8:04, another reminder.

9  Then the next e-mail I have from you to Mr. Huntley is

10  on page 1101 up at the top.

11      A.   Yes.

12      Q.   Okay.  It says to Mr. Huntley, "Offender

13  Armato is scheduled to be heard by the PRB on April 7.

14  This is the case where the judge ordered no MSR term,

15  and you referred it to the AG's office.  The PRB could

16  decline to hear his case because he has no MSR."  That

17  last sentence there that the PRB could decline to hear

18  the case, is that of any significance in this

19  scenario?  I mean what is the purpose of informing Mr.

20  Huntley of that?

21      A.   Basically that the hearing date was coming

22  up, and because there's no set MSR term, the PRB may

23  decline to hear the case.  So I just wanted him to

24  know all the facts to the situation.

Page 41

1       Q.   Okay.  And basically that they could say,

2   you know, he's not on parole, we don't really need to

3   hear a case for a guy who is not on parole because we

4   have jurisdiction over guys on parole?

5       A.   Yes.

6       Q.   Okay.  All right.  Then back on page 1060,

7   April 8, 2010, 8:36, Ms. Littlejohn tells you that,

8   "PRB heard the case.  Mr. Altoff called me about his

9   situation while he was hearing him.  He then called

10  the PRB's attorney to see what to do.  The PRB said to

11  find him not a violator and to let DOC handle it, but

12  they thought Mr. Armato had a lawsuit."  So when they

13  say let DOC handle it, that would be you and Mr.

14  Huntley, you would be -- Well, strike that.  It's a

15  bad question.  You probably don't know what Mr. Altoff

16  was thinking.  But Mr. Althoff, I'm assuming, is one

17  of the PRB people?

18      A.   Yes.

19      Q.   And again the fact that they found him not

20  to be a violator didn't come into play in your

21  decision making at all or whether to release him?

22      A.   As I've stated before, once I turned it

23  over into the hands of our legal staff, our legal

24  counsel, I was following the directions by them and

GLENN JACKSON 4/3/2012

Page 42

1   was seeking clarification and directions as to how to

2   proceed with this, and from throughout I think you see

3   my chain of e-mails is constantly saying -- asking him

4   how we're going to deal with this matter, we see the

5   question at hand, and I'm thinking that this is in the

6   AG's office, you know, to contest the particular order

7   that was written.

8        Q.   Okay.  And that's fair enough.  Let me just

9   ask you some specific questions about some specific

10  e-mails.  If you look at page 1076.  In the middle

11  e-mail there is April 23rd at 11:08 a.m., to Ed, I'm

12  assuming that's Ed Huntley?

13       A.   Yes.

14       Q.   Okay.  And also it was to Joel Diers and

15  cc'd Joseph Rose.  Who is Joseph Rose?

16       A.   And I'm not exactly sure how this timeline

17  -- I mean, you know, the timeline goes with this.  I

18  believe at this particular point Joe Rose was coming

19  in as the interim chief legal counsel, and so now I am

20  including him in this chain of e-mails.

21       Q.   And this one is addressed Ed, you're asking

22  him, "Has a decision been made on how to proceed with

23  this situation?  Michelle is sending me weekly

24  reminders dating back to February."  By Michelle, you

GLENN JACKSON 4/3/2012

Page 43

1    mean Michelle Littlejohn, right?

2         A.   Yes.

3         Q.   Okay.  And it says, "Not to mention, she is

4    documenting all her contacts in the master file."

5    What did you mean by that?

6         A.   Okay.  As I tell all the staff, that when

7    we have issues going on, we need to document it and

8    send to the master file.  So she was directed to

9    document all of her conversations, all the different

10   contacts she's made with me, and, you know, my

11   different responses.  So she was documenting it, and I

12   wanted the legal staff to know that everything is

13   being documented.

14        Q.   And why was it important for them to know

15   that?

16        A.   Well, I wanted them to know so that we

17   can -- I guess maybe I was looking to expedite an

18   answer.

19        Q.   Okay.  Now, you've been the Chief Records

20   Officer for the last eight years or so.  Is this the

21   first time you've come across an order where the judge

22   ordered no MSR?

23        A.   I don't think so.  No, I believe that we

24   had one before.

Page 44

1    Q.    Okay.  Prior to Mr. Armato?

2    A.    Yes.

3    Q.    And what did you do in that situation?

4    A.    We referred it to the AG's office, I

5    believe.

6    Q.    Okay.  And what -- do you recall what they

7    did?

8    A.    If I recall -- and I can't remember a

9    particular case or anything -- but I believe that they

10   were able to get it, you know, the order rewritten or

11   however.  I can't remember the exact details.  And it

12   might have been right at the point that I was stepping

13   into the position where something like that would have

14   happened with my Assistant Chief Record Officer.

15   Q.    Okay.  Thanks.  Then if we look at page

16   1070, the top e-mail there on Friday, May 21st at

17   12:05 p.m. from Mr. Huntley to you.  Basically --

18   Well, let me read it.  "Glenn, the AG's office has

19   declined to pursue a request to the court that the

20   sentencing orders be modified or otherwise move for

21   leave to intervene on behalf of the Department in this

22   case.  That being so, I believe we have exhausted the

23   potential alternatives and will have to let Mr. --

24   will have to let Armato go as a discharge.  I suppose

GLENN JACKSON 4/3/2012

Page 45

1   we should show it as a court-ordered discharge as that

2   is exactly what it is.  Let me know if you need

3   anything further."  So that was the information you

4   were waiting for from Mr. Huntley to say let him go?

5       A.   I mean not just let him go.  Just to give

6   us an answer as to what to do, whether it was let him

7   go or that they had gone to court and gotten a

8   different remedy.

9       Q.   Okay.  So they basically said we are not

10  going to go to court so our only alternative is follow

11  the order and let him out?

12      A.   That's correct.

13      Q.   Okay.  And when he says, "I suppose we

14  should show it as a court-ordered discharge as that is

15  exactly what it is," what does that mean, show it as

16  in the computer or what?

17      A.   Yes.

18      Q.   Okay.  And then he was discharged -- Mr.

19  Armato was discharged with no MSR, correct?

20      A.   Yes.

21      Q.   Okay.  And then I'm assuming, I did not see

22  an e-mail and Ms. Littlejohn didn't recall, do you

23  recall whether you called her or e-mailed her and said

24  discharge Mr. Armato?  I didn't find an e-mail.

Page 46

1          A.    No, I probably would have called her.

2          Q.    Okay.  Give me one second.  I want to read

3   over a few notes.  As this incident -- situation

4   arisen and Chief Grounds got -- Chief Grounds --

5   Warden Grounds got involved, does the warden have the

6   authority to release a prisoner without contacting you

7   when there's a dispute regarding calculations?

8          A.    Does a warden have the discretion to

9   release an offender when there's questionable issues?

10         Q.    Yes.

11         A.    I mean if he does, then I would say that

12  most wardens would not take that liberty because they

13  don't know the process of dealing with sentence

14  calculations.  So I don't believe most or any of the

15  wardens would take that liberty, and they refer to

16  different people based on their job experience and

17  their knowledge of the particular area or function of

18  the area.

19         Q.    Does the warden -- I guess that was a bad

20  question.  Does the warden have the statutory

21  authority to do that to release a prisoner?

22         A.    I don't know what the statutory

23  requirements are for the wardens.  I haven't looked

24  that up as far as the statutory requirements.

GLENN JACKSON 4/3/2012

Page 47

1      Q.   Sure.  And the fact that he may or may not

2    defer to your office, is there any policy, procedure,

3    or statute that would tell us that your office has

4    authority over the warden or vice-versa, or is that

5    just unwritten?

6      A.   I -- It was probably unwritten, but --

7      Q.   It's just --

8      A.   It's just like the chain of command in any

9    other organization.  You set up departments, and all

10   departments based on their experience and expertise in

11   certain areas, and you refer to those areas to get

12   recommendations and directions as to how to work.

13     Q.   Okay.  And I know you said that this MSR

14   problem came up one other time.  I'm assuming there

15   are other calculations that come up.  I know in this

16   situation Ms. Littlejohn was having a problem getting

17   the verification of his credit because the jail had

18   switched over their computer system and lost some

19   data, I believe.  I'm assuming that occurs.  Since

20   this incident with Mr. Armato, have you changed in

21   your department any policies or procedures on how you

22   would handle another situation like this?

23     A.   No.

24     Q.   Or if this occurred today, you would follow

Page 48

1   the same chain, you called Mr. Huntley and so on?

2       A.   No, it would not be the same chain. The

3   chain has changed.

4       Q.   Right. Mr. Huntley is gone, right?

5       A.   He's still with our agency, but he's not in

6   my chain of command any longer.

7       Q.   Okay. But with changing the name of the

8   attorney, you'd follow the same procedure?

9       A.   Yes.

10      Q.   I know you told me earlier that you had

11   left it up to Mr. Huntley in this particular situation

12   to give you a legal opinion, but back in February of

13   2010, based on your job description and your

14   experience, would you have been -- would you have had

15   the authority to tell Ms. Littlejohn whether to

16   release Mr. Armato or not on February 22nd once she

17   provided you with the court orders?

18      A.   Well, I mean I certainly could have

19   probably given her an answer, but without -- I think

20   it would have been negligence on my part to not seek

21   legal clarification because if in some way someone

22   would have came back and said that he should have been

23   serving an MSR term and I did not seek legal guidance

24   on this, then it would have come back on me.

Page 49

1       Q.   Okay.  So it sounds like you're saying you

2  have the authority to make those decisions, but you

3  needed more information before making the decision?

4       A.   I have authority to make calculations --

5  Let me see.  Let me correct that.  I have the

6  authority to say the person is set to release today,

7  but once I took it to Legal to get clarification, then

8  they supersede my authority as to the release, and

9  apparently in this case Mr. Huntley had directed me to

10  hold on the release of this offender until we get

11  legal clarification, and that was the directions that

12  I was following.

13       Q.   Okay.  Now, I didn't see -- I didn't see

14  any e-mails where Mr. Huntley -- and correct me if I'm

15  wrong -- you look at those e-mails where Mr. Huntley

16  e-mailed you back, saying don't discharge this

17  individual until we give you an opinion; is that

18  something he told you over the phone?

19       A.   It would have been something that would

20  have come over the telephone or -- and I -- like I

21  said, I can't remember particular dates and times that

22  I would have had personal conversations with either

23  Joel Diers or Mr. Huntley, but the directions came

24  from there -- from them or one of the two as to how to

GLENN JACKSON 4/3/2012

Page 50

1    deal with this situation, and I think that's why you

2    find in my e-mails I'm constantly asking them how to

3    proceed based on what they had already told me.

4                MR. DeCARO:  That's all I have.  Thank you.

5                THE WITNESS:  All right.  Thank you.

6                MR. FANNING:  I don't have anything.  We'll

7    waive signature.  I'll take a regular size with an

8    index.

9                THE COURT REPORTER:  Are you ordering, Mr.

10   DeCaro?

11               MR. DeCARO:  Yeah, an e-mail -- Just give

12   me a mini with a word index.

13         (WHEREIN, the deposition was concluded at 10:10

14   a.m.)

15

16

17

18

19

20

21

22

23

24

GLENN JACKSON 4/3/2012

Page 51

1                    CERTIFICATE OF REPORTER

2

    STATE OF ILLINOIS   )

3                       )

    COUNTY OF SANGAMON )

4

5              I, Rhonda Rhodes Bentley, CSR, CCR, RPR, a

6    Certified Shorthand Reporter (IL), Certified Court

7    Reporter (MO), Registered Professional Reporter, do

8    hereby certify that the witness whose testimony

9    appears in the foregoing deposition was duly sworn by

10   me; that the testimony of said witness was taken by me

11   to the best of my ability and thereafter reduced to

12   typewriting under my direction; that I am neither

13   counsel for, related to, nor employed by any of the

14   parties to the action in which this deposition was

15   taken, and further that I am not a relative or

16   employee of any attorney or counsel employed by the

17   parties thereto, nor financially or otherwise

18   interested in the outcome of the action.

19

20          _____

            Rhonda Rhodes Bentley, CSR, CCR, RPR

21          CSR# 084-002706, CCR# 1313

22

23

24

GLENN JACKSON  4/3/2012

**A**

ability 51:11
able 24:24 25:22
  44:10
about 6:8 8:3,24
  9:20 10:5,18
  25:4 30:22
  32:13 33:10
  35:3 36:5,21
  41:8 42:9
above 22:15
abuse 15:19
accepted 17:3
according 23:4,6
  30:17 32:18
  35:1
accuracy 31:11
accurate 19:13
  31:4
across 30:13
  43:21
action 51:14,18
actually 9:4
additional 12:6
address 20:20
  21:7 26:20
addressed 42:21
addresses 22:2
administrative
  7:14 9:12
administrative...
  17:11,15
administrator
  7:18
adult 6:20
advise 11:10
  12:8 20:19
advised 11:14
after 21:19 28:7
  32:12 36:5
  37:17
afterwards 5:7
ag 24:20 29:10
  38:5,5
again 13:1 21:8
  23:1 37:9,12
  37:13,19 41:19

age 5:11
agency 48:5
agree 21:4
**AGREED** 5:1
AG's 12:12 16:5
  18:22 22:9
  26:8 27:5,16
  37:22 38:3,10
  39:9 40:15
  42:6 44:4,18
ahead 15:10
  16:17 20:13
  29:6 31:21
  33:1
allotted 9:17
allows 29:15,20
almost 9:13
  27:11 37:2
already 25:21
  50:3
alternative
  45:10
alternatives
  18:16 44:23
Althoff 41:16
Altoff 41:8,15
always 20:15
  35:19 38:7
Alyssa 14:10
  23:23 24:15
  25:5 33:5
Alyssa's 25:19
amended 31:18
analysis 7:10
analyzing 7:8
another 25:7,15
  29:3 31:2,12
  40:8 47:22
answer 20:13
  21:10 43:18
  45:6 48:19
answered 21:19
anybody 38:14
anyone 27:21
  29:14 38:13
anything 17:10
  17:17 44:9

45:3 50:6
apparently 49:9
appeal 22:23,24
appear 16:20
appears 20:17
  51:9
appreciated
  34:3
appropriate
  29:1
appropriations
  7:6,9
approximately
  31:7
April 1:16 3:11
  39:17 40:8,13
  41:7 42:11
area 8:5 14:17
  46:17,18
areas 47:11,11
arisen 46:4
Armato 1:4 3:4
  3:20 8:19
  15:14 17:11
  19:10 22:5
  27:23 31:14,16
  34:15 36:12,21
  40:13 41:12
  44:1,24 45:19
  45:24 47:20
  48:16
Armato's 9:22
  10:20 30:15
around 23:14,15
  35:17
ASA 23:1
asking 18:20
  20:10 35:24
  42:3,21 50:2
asks 23:1
assault 24:20
assistant 4:8 7:5
  7:14,17 9:12
  22:17 44:14
assuming 5:16
  9:19 10:14
  24:23 26:23

36:11 41:16
  42:12 45:21
  47:14,19
assumption 27:1
attorney 4:8
  9:20 12:21
  13:7,20 18:17
  22:17 23:5
  27:7,21 28:21
  28:23 29:12,14
  39:4 41:10
  48:8 51:16
attorneys 6:19
  28:24 29:1,3
attorney's 6:18
August 19:23
authority 15:3,4
  15:19,23 20:8
  29:15 38:15,18
  46:6,21 47:4
  48:15 49:2,4,6
  49:8
automatic 11:9
aware 29:13
a.m 5:13 36:2
  37:12,15,18
  39:9 42:11
  50:14

**B**

Bachelor 6:2
back 7:2,13 8:6
  8:7 9:14 14:7,8
  17:2 19:10
  20:5 21:6
  25:23 26:20
  32:23 37:11,16
  39:7,9 41:6
  42:24 48:12,22
  48:24 49:16
background
  5:24
backwards 6:8
bad 41:15 46:19
based 18:9 20:16
  32:20 46:16
  47:10 48:13

50:3
basically 6:17
  7:8 11:16
  20:14 36:5
  39:20 40:21
  41:1 44:17
  45:9
basis 6:15,17
  20:5,10 25:16
  25:17 29:19
  32:11,12,15,16
  32:16
Bates 5:23 19:3
bearing 40:4
became 8:3 9:8
becoming 9:5
before 3:15 5:23
  7:12 9:5 12:8
  14:19 16:5
  17:13 22:6
  24:14 30:22
  37:21 41:22
  43:24 49:3
behalf 1:15 3:23
  5:11 44:21
behind 32:21
being 8:20 18:11
  18:11 36:5
  38:10,10 39:18
  43:13 44:22
belabor 12:14
believe 11:13
  17:17 18:19
  19:7 22:6 23:7
  34:17 42:18
  43:23 44:5,9
  44:22 46:14
  47:19
believed 30:14
below 33:18
Bentley 3:16
  4:14 5:4 51:5
  51:20
besides 17:15
best 51:11
better 33:8
between 3:11,20

GLENN JACKSON 4/3/2012

Page 53

5:2,21 6:21
**beyond** 32:17
**bill** 7:9
**bit** 6:7,15 23:14
**Board** 28:12,16
  39:16,19,22
**body** 23:20
**both** 21:22
**bound** 26:9
**budget** 7:10
**butt** 33:8

_____ **C** _____
**C** 4:1
**calculation** 8:9
  8:10 10:3 31:4
  31:5,6,10
**calculations**
  7:19,23 8:13
  9:5 15:3 46:7
  46:14 47:15
  49:4
**call** 10:16 12:17
  13:4 23:8
  36:20
**called** 31:13
  36:19 37:20
  38:4 41:8,9
  45:23 46:1
  48:1
**calling** 24:9
**calls** 12:18
**came** 19:10
  30:13 47:14
  48:22 49:23
**capacities** 1:8
  3:8,22 9:12
**capacity** 39:3,5
**caption** 23:20
**case** 8:19 15:15
  16:8,15 18:13
  21:6,12 22:6,9
  22:23,24 25:2
  28:8,20,22
  32:22 36:19,21
  37:13,20,22
  38:6 40:14,16

40:18,23 41:3
  41:8 44:9,22
  49:9
**cause** 3:18
**CC** 23:23
**CCR** 4:15 51:5
  51:20,21
**cc'd** 42:15
**Center** 7:3 9:15
**Central** 1:2 3:2
  3:20
**certain** 3:18
  20:23 47:11
**certainly** 48:18
**CERTIFICATE**
  51:1
**Certified** 3:16
  3:17 5:5,5 51:6
  51:6
**certify** 51:8
**chain** 27:11 42:3
  42:20 47:8
  48:1,2,3,6
**challenge** 26:7
  28:19,21
**challenged** 28:9
  28:20 29:3
**changed** 47:20
  48:3
**changing** 48:7
**check** 24:16,16
**checking** 35:23
  37:13
**Chicago** 4:5
**chief** 6:10 8:3
  9:5,8 11:14
  12:18 13:21
  38:18,22 39:5
  42:19 43:19
  44:14 46:4,4
**civil** 34:9
**clarification**
  16:13 17:19
  18:18,21 22:8
  22:10,13 25:12
  42:1 48:21
  49:7,11

**class** 18:9
**clear** 20:7 22:21
**close** 30:19
**closely** 13:9
**come** 40:3 41:20
  43:21 47:15
  48:24 49:20
**comes** 15:2 30:2
**coming** 40:21
  42:18
**command** 27:12
  47:8 48:6
**commitment**
  34:9
**Committee** 7:6
**common** 11:3
**communication**
  21:15
**computation**
  6:23
**computer** 45:16
  47:18
**concluded** 50:13
**Concordia** 3:14
**concurrently**
  25:7
**conditions** 28:17
**conduct** 8:16
**Conkle** 3:14
**consecutively**
  25:7
**consistently** 32:1
**constantly** 16:22
  20:22 31:10
  42:3 50:2
**contact** 12:2
  16:18 21:14
  23:22 27:7,12
  27:13,16 28:1
  35:13 38:11
**contacted** 11:13
  11:13 14:1,10
  28:14 38:3
  39:10
**contacting** 46:6
**contacts** 43:4,10
**contest** 42:6

**continue** 31:14
  31:16,19,24
**continuously**
  16:18
**control** 27:7
**conversation**
  25:11
**conversations**
  27:20 35:12,16
  35:19 43:9
  49:22
**conviction** 18:2
**convictions**
  17:23
**coordinator**
  9:13,15
**copy** 10:10
  24:20,21,22,24
**correct** 13:14
  14:6 15:6
  19:24 23:2,10
  29:21 30:7,8
  31:5 32:8,9
  33:23 37:13
  45:12,19 49:5
  49:14
**correctional** 7:3
  7:15,22 9:15
**Corrections**
  3:14 6:11 7:16
  13:8,20 29:11
  39:2
**correctly** 17:21
**corridor** 35:18
**counsel** 5:2,2
  11:14 13:9,21
  14:9 16:2,12
  16:23 26:23
  28:13 38:18,22
  39:5 41:24
  42:19 51:13,16
**counselor** 7:15
  8:7,8,12,21,23
**count** 20:16
**County** 21:14,16
  51:3
**couple** 35:22

**court** 1:1 3:1,14
  3:17,19 4:13
  5:5 10:20
  18:17,23,23
  21:7 22:19
  26:6 29:1,16
  44:19 45:7,10
  48:17 50:9
  51:6
**courts** 6:18,21
**court's** 19:22
**court-ordered**
  45:1,14
**cover** 33:8
**credit** 22:22
  30:14,19 47:17
**credits** 8:16
**crim** 24:20
**CSR** 4:14 51:5
  51:20,21
**CSR/CCR/RPR**
  4:14 5:4
**current** 6:9
**custody** 32:3
**cut** 23:16
**cv** 1:6 3:6
**CYA** 33:6,7

_____ **D** _____
**D** 2:1 14:5
**daily** 6:15,17
**dangerous** 14:16
**data** 47:19
**date** 8:6 15:5
  23:3 32:17
  34:17,18 40:21
**dates** 8:11 35:15
  49:21
**dating** 42:24
**David** 1:4 3:4,20
  36:12
**day** 3:13 34:13
  34:22 35:1
**days** 22:22 30:14
  31:7 36:4
  37:11
**ddecaro@kup...**

GLENN JACKSON 4/3/2012

Page 54

| | | | | |
|---|---|---|---|---|
| 4:6 | 28:17 | **Division** 1:2 3:2 | 49:22 | **expressly** 5:8 |
| **deal** 6:22 42:4 | **determinations** | 3:20 | **Eleventh** 4:16 | **e-mail** 10:16 |
| 50:1 | 13:10 | **Dixon** 1:7 3:7,22 | **eligible** 8:15 | 19:8,16,19,21 |
| **dealing** 46:13 | **determine** 27:16 | **DOC** 32:19 39:4 | 24:16 34:3,6,7 | 20:2 21:13 |
| **deals** 14:14 | 30:3 39:22 | 41:1,13 | 34:8,10 | 22:12,14 23:6 |
| **dealt** 8:12,13 | **determining** | **document** 10:24 | **employed** 38:24 | 23:18,20 24:3 |
| 38:10 | 14:14 | 11:4 12:17 | 51:13,16 | 24:12 26:4,10 |
| **DeCaro** 2:2 4:3 | **Diers** 14:2,4,5 | 30:2 43:7,9 | **employee** 51:16 | 26:11,14,15,17 |
| 4:4 5:15,19 | 17:5,5 23:19 | **documented** | **employment** 6:8 | 26:18,19 28:5 |
| 21:1,17 29:7 | 23:23 25:5 | 43:13 | 7:1 | 33:2,4,10,16 |
| 29:24 32:4 | 26:4 27:5,9,13 | **documenting** | **enough** 42:8 | 34:19 35:1,3 |
| 50:4,10,11 | 27:13 28:1,6 | 43:4,11 | **entail** 7:7 | 35:14 36:13,20 |
| **decide** 12:16 | 35:11,17 42:14 | **documents** 11:1 | **Eric** 22:17 | 36:22,24 37:17 |
| **decided** 15:14 | 49:23 | 26:22 30:6,9 | **error** 30:14 | 37:19 39:9,12 |
| 16:1 | **different** 9:18 | **doing** 15:20 | **established** 10:9 | 40:7,9 42:11 |
| **decision** 14:22 | 23:15 30:1 | 16:20 18:11 | **even** 16:5 37:5 | 44:16 45:22,24 |
| 14:23 15:1,7 | 31:9 43:9,11 | 36:4 38:21 | **eventually** 18:15 | 50:11 |
| 15:16 16:4,6,8 | 45:8 46:16 | **done** 15:21 | 31:23 | **e-mailed** 13:13 |
| 16:10,11 17:4 | **Dion** 1:7 3:7,22 | 17:11,18 21:5 | **ever** 9:3 27:20 | 35:21,23 36:18 |
| 18:24 22:11 | **direct** 13:24 | 26:1 | **every** 18:2 | 36:19 37:20 |
| 41:21 42:22 | 14:9 18:19 | **door** 33:22 | **everything** | 38:4 45:23 |
| 49:3 | **directed** 43:8 | **down** 22:1,2 | 16:20 20:4 | 49:16 |
| **decisions** 11:2 | 49:9 | **due** 11:16 | 43:12 | **e-mailing** 24:9 |
| 49:2 | **directing** 24:8 | **duly** 51:9 | **exact** 9:2 44:11 | **e-mails** 5:21 |
| **decline** 40:16,17 | **direction** 16:24 | **Dupy** 28:7,9 | **exactly** 12:2 | 13:12 19:2,4 |
| 40:23 | 51:12 | **during** 9:3 17:2 | 20:19 24:6 | 21:19 22:2 |
| **declined** 44:19 | **directions** 16:2,6 | 26:24 27:19 | 25:9 34:24 | 23:14,15 25:5 |
| **Defendants** 1:9 | 32:2 33:19,20 | 36:4 | 35:15 36:24 | 26:17,23 27:20 |
| 3:9,23 4:7 5:3 | 41:24 42:1 | **Dwight** 9:13,15 | 42:16 45:2,15 | 30:17 32:24 |
| **defer** 47:2 | 47:12 49:11,23 | **D-i-e-r-s** 14:5 | **Examination** 2:2 | 35:5,11 36:10 |
| **degree** 6:2 | **director** 7:6 | **D-u-p-y** 28:8 | 5:14 | 37:4,7,12 38:9 |
| **Dennis** 4:3 | **discharge** 23:2 | | **examined** 3:11 | 39:7 40:3 42:3 |
| **department** 3:13 | 31:8 33:20 | **E** | 5:11 | 42:10,20 49:14 |
| 6:11 7:16 13:8 | 34:1 35:2 | **E** 2:1 4:1,1 | **excuse** 13:21 | 49:15 50:2 |
| 13:19 29:11 | 44:24 45:1,14 | **each** 10:5,9 | **exhausted** 44:22 | |
| 39:1 44:21 | 45:24 49:16 | **earlier** 21:19 | **Exhibit** 5:17 | **F** |
| 47:21 | **discharged** 25:6 | 32:18 48:10 | **EXHIBITS** 2:7 | **face** 20:8 |
| **departments** | 25:14,15,22 | **earliest** 19:20 | **expedite** 43:17 | **facilities** 10:10 |
| 47:9,10 | 33:13 34:20,23 | **earned** 8:15 | **experience** | **facility** 15:4 31:3 |
| **deposes** 5:12 | 45:18,19 | **Ed** 13:13 17:5,6 | 46:16 47:10 | **fact** 17:21 34:6 |
| **deposition** 1:14 | **discharging** | 17:9,13 22:13 | 48:14 | 41:19 47:1 |
| 3:10 5:3,13 | 24:14 25:16 | 23:18,23 25:1 | **expert** 14:13 | **facts** 40:24 |
| 50:13 51:9,14 | **discretion** 46:8 | 27:14,15 37:19 | **expertise** 8:4 | **fail** 20:10 |
| **description** 6:16 | **discuss** 23:9 | 42:11,12,21 | 47:10 | **fair** 27:1 42:8 |
| 48:13 | **dispute** 46:7 | **education** 6:1 | **explain** 20:5 | **familiar** 8:8 9:19 |
| **details** 44:11 | **District** 1:1,1 3:1 | **eight** 43:20 | 34:5 | 9:22 |
| **determination** | 3:1,19,19 | **either** 28:1 | **express** 15:16 | **familiarization** |

GLENN JACKSON 4/3/2012

**family** 32:7
**Fanning** 4:8
  5:18 20:12
  21:8,11 29:5
  29:23 31:20
  50:6
**far** 8:15 18:24
  38:7,17 46:24
**fax** 24:21,22
  25:1
**faxed** 21:21
  24:23
**February** 10:21
  16:8,9 19:8,11
  20:6 21:22
  22:16 23:24
  25:4,16 26:5
  26:20 27:4
  28:5 32:12,24
  33:5,17 34:14
  34:16 35:4,10
  35:11,21,24
  36:2 42:24
  48:12,16
**feel** 33:6
**felony** 17:23
  18:2
**few** 14:19 19:2
  24:13 46:3
**figure** 11:6
**file** 43:4,8
**filed** 8:20
**financially**
  51:17
**find** 10:6,24
  16:23 19:5
  41:11 45:24
  50:2
**finish** 15:11
**first** 19:9,16,19
  23:22 24:1
  34:22 35:1
  43:21
**follow** 19:22
  20:16 22:5
  26:9 27:17
  29:15 34:1,14

34:15,20 45:10
  47:24 48:8
**followed** 32:7,11
  32:14
**following** 41:24
  49:12
**foregoing** 51:9
**forenoon** 3:12
  3:13
**forget** 9:2
**form** 7:13 31:21
**forth** 37:16
**forward** 38:5
**forwarding** 24:1
**found** 32:13
  36:13 40:1
  41:19
**foundation** 29:6
  29:23
**foundational**
  20:13
**Friday** 44:16
**from** 6:3,18 7:5
  7:13 8:10,11
  9:10 10:21
  12:13,23 15:13
  16:8 17:3,4,8
  18:20 19:7,9
  19:17 20:9
  21:12,13,15
  22:13,15 23:18
  24:22 26:4,22
  27:21 28:5
  31:2 32:2 33:4
  33:17 35:5,18
  36:3,6,14,20
  39:12 40:7,9
  42:2 44:17
  45:4 49:24,24
**fully** 29:18
**function** 46:17
**further** 22:2
  45:3 51:15

— G —
**gained** 8:4 17:12
**gave** 14:24 17:13

22:22 34:18
  37:5
**general** 4:8 9:24
  29:14
**generally** 7:11
  8:1
**General's** 13:7
  27:7,21 28:21
  28:24 29:12
**generic** 7:13
**gets** 12:18
**getting** 26:9,12
  47:16
**give** 5:22 6:15
  11:11 16:2,13
  23:8 45:5 46:2
  48:12 49:17
  50:11
**given** 12:3 15:4
  16:6 20:7
  22:20 26:22
  32:22 48:19
**Glenn** 1:7,14 3:7
  3:10,21 5:10
  26:5 44:18
**glenn.jackson...**
  26:19
**go** 15:10 16:17
  18:17,22 19:2
  19:3 20:13
  21:6 22:24
  23:17 25:22
  29:1,6,21
  31:21 32:23
  34:8 36:8
  37:16 38:15,17
  38:18 44:24
  45:4,5,7,10
**goal** 20:20
**goes** 8:21 24:19
  42:17
**going** 5:20 14:15
  15:14 16:12,22
  19:1,2 20:12
  23:13 26:16
  27:17 29:5
  30:23 31:16,18

31:20 38:5
  39:21 40:4
  42:4 43:7
  45:10
**gone** 45:7 48:4
**good** 8:15
**gotten** 15:20
  31:23 45:7
**Great** 5:20
  19:21
**greatly** 34:2
**grievance** 8:20
  8:21
**Grounds** 1:7 3:7
  3:21 5:17
  14:20 46:4,4,5
**guess** 13:3 43:17
  46:19
**guidance** 11:11
  11:15 12:21
  16:23 20:22
  48:23
**guy** 41:3
**guys** 41:4

— H —
**Hall** 3:14
**hand** 42:5
**handle** 6:17
  11:15 41:11,13
  47:22
**handled** 12:23
**hands** 12:13
  41:23
**happened** 9:23
  9:24 44:14
**having** 16:4
  17:16 27:20
  35:12 47:16
**head** 12:2
**heads** 14:17
**hear** 14:22 36:6
  40:16,17,23
  41:3
**heard** 40:13
  41:8
**hearing** 40:21

41:9
**held** 8:20
**her** 10:15 19:9
  22:18 23:8
  25:11,12,20
  33:10 36:2
  39:9 43:4,9
  45:23,23 46:1
  48:19
**high** 37:6
**highest** 6:1
  38:15,17
**him** 11:15 14:24
  17:6,6,7,7,14
  18:13 20:11
  22:20,22,24
  23:2 24:9
  25:16 26:1
  31:15,19,24
  32:3,12,17
  33:19,21 35:19
  36:21,22,24
  37:3 39:16,18
  40:23 41:9,11
  41:19,21 42:3
  42:20,22 45:4
  45:5,6,11
**history** 6:8
**hold** 16:21 29:20
  29:21 30:7
  31:14,16,19,24
  49:10
**holding** 32:3,12
  32:16
**host** 32:7 33:24
**hours** 3:11
**Huntley** 13:13
  17:5,9,13
  18:20 22:13
  23:18,23 24:9
  25:6 27:9,14
  27:15 28:2,7
  29:13 31:13
  33:18 35:11
  36:15,18 37:19
  37:20 38:3,14
  38:19,21 40:9

GLENN JACKSON 4/3/2012

40:12,20 41:14
42:12 44:17
45:4 48:1,4,11
49:9,14,15,23

_____ I _____

idea 9:24 28:23
IL 3:16 4:5,9
51:6
Illinois 1:1 3:1
3:13,15,19 4:8
4:14 6:4,11
30:2 39:1 51:2
imagine 31:22
immediately
11:13
importance 37:7
important 43:14
impression 38:8
incarceration
16:22
incident 46:3
47:20
including 42:20
independent
9:21 25:17
32:11
index 50:8,12
indicated 12:8
individual 1:8
3:8,22 49:17
inform 11:10
information 6:1
15:13 22:4
24:1 45:3 49:3
informed 23:3
29:14 36:5
informing 36:2
40:19
inmate 11:23
14:9,24 29:20
29:22 30:2
31:1
inquiries 6:18
institution 18:12
31:2,3
institutions 6:20

6:20
instruction 12:6
insure 20:21
intaking 31:3
intent 22:18
23:4
interested 51:18
interim 42:19
internal 11:20
interpretation
16:1
intervene 44:21
investigating
10:6
involved 46:5
issue 15:2 20:20
25:24
issues 6:23 8:13
9:18 14:1 43:7
46:9

_____ J _____

J 4:3
Jackson 1:7,14
3:7,10,21 5:10
5:16,24
jail 30:4 47:17
job 6:15 20:4
46:16 48:13
Joe 42:18
Joel 14:2 17:5,5
23:19,23 25:1
27:13,13 37:21
42:14 49:23
Joseph 42:15,15
judge 21:7 22:19
22:23 23:4
40:14 43:21
judges 21:3
jump 23:13,14
jurisdiction 41:4
just 6:15 8:18
10:5,24 11:19
12:16 13:19
14:18 15:22
16:10 19:3,3,4
24:12,15 26:16

29:18 34:4
35:3,6,22
36:10 39:20
40:23 42:8
45:5,5 47:5,7,8
50:11
juvenile 6:20

_____ K _____

Kalata 22:17
keep 16:11
Ken 28:7,9,12
37:21
Kind 6:21
know 7:8 8:2
9:21 13:18,19
16:19 17:4,15
18:21 19:5,12
20:19 21:24
24:11 26:16
27:12 29:8,17
32:3 33:6,9
35:15,17,18
36:21,23 37:1
37:23 38:1,24
40:24 41:2,15
42:6,17 43:10
43:12,14,16
44:10 45:2
46:13,22 47:13
47:15 48:10
knowing 8:14
18:8
knowledge
46:17
Kupets 4:4
K-a-l-a-t-a
22:18

_____ L _____

lack 33:8
Lake 21:14,16
LaSalle 4:4
last 32:5 40:17
43:20
later 25:4 37:2
37:11 40:3

latter 25:11
Law 4:4
lawful 5:11
lawsuit 41:12
layers 31:9
learned 8:1
least 18:20
leave 44:21
left 32:23,24
48:11
legal 6:22 9:9
11:10,14 12:9
12:17,19,21,23
13:3,4,6,9,21
14:9 15:14,16
16:1,2,4,11,12
16:23 17:19
20:5,8,10,19
20:22 28:8,12
29:15 32:2,15
36:1,3,6 37:6
38:18,22 39:4
39:5 41:23,23
42:19 43:12
48:12,21,23
49:7,11
legally 26:6
let 8:10 15:11
16:19 19:5,12
20:18,18 24:12
30:1 37:1,22
37:23,24 41:11
41:13 42:8
44:18,23,24
45:2,4,5,6,11
49:5,5
let's 10:18 14:5
16:9 22:4
level 6:1
liaison 6:21
liberty 46:12,15
like 5:24 6:7
10:16 11:18
12:8,15 14:21
15:2 21:12
35:21 44:13
47:8,22 49:1

49:20
limbo 38:6
Lincoln 7:3,21
line 36:12
litigation 4:15
9:13,14
little 5:24 6:7,15
23:14 34:4
Littlejohn 1:7
3:7,21 5:22
10:15 11:3,12
15:13 19:8,17
22:15 24:23
30:13 35:5,21
36:9 37:12
39:7,12 40:8
41:7 43:1
45:22 47:16
48:15
Littlejohn's 9:2
23:16
long 8:20 16:7
longer 48:6
look 22:14 23:19
24:14 25:3
26:17 27:6,8
28:4 30:3,6,10
33:2 35:4,20
36:14 37:4,11
37:16,18 39:6
39:11 42:10
44:15 49:15
looked 46:23
looking 11:1
13:5 18:7
20:14 22:7
24:7 25:18
37:1 43:17
looks 21:12
35:21
lost 47:18
Louis 4:16

_____ M _____

made 42:22
43:10
majority 35:13

GLENN JACKSON  4/3/2012

make 11:1 13:10
16:10 21:3
22:11 27:2,12
27:13 28:16
31:4 49:2,4
maker 15:7 17:4
making 18:23
41:21 49:3
manager 14:13
manual 10:4,4,8
11:24 12:6
many 37:1
March 36:9,17
37:10,11,15,19
38:3 39:8,12
MARKED 2:7
master 43:4,8
matter 34:2
35:14,23 38:16
42:4
matters 6:23
12:12 13:10
15:24 29:10
may 5:3 16:9
21:18 31:13
40:22 44:16
47:1,1
maybe 34:22
43:17
mean 8:6 9:11
11:7 12:8,20
13:3 15:18
16:18,23 18:7
18:19 19:18
20:1,3,14,15
21:12 24:17
25:8,18 27:11
28:20 29:10,11
31:22 36:23
39:20 40:19
42:17 43:1,5
45:5,15 46:11
48:18
meaning 34:10
means 34:7
meet 11:8
meeting 11:16

members 7:10
mention 22:20
43:3
mentioned 32:18
37:21
meritorious 8:16
8:17
Michele 1:7 3:7
3:21
Michelle 21:13
21:19 37:5
42:23,24 43:1
middle 42:10
Midwest 4:15
might 19:19
44:12
mind 14:19
32:16
mini 50:12
minutes 25:4
33:1
Missouri 4:15
4:16
mistakes 21:3
mittimus 30:5
30:23 33:20
36:19
MO 3:17 51:7
modified 44:20
month 30:21
months 17:2
moot 25:24
more 34:5 49:3
morning 23:8
most 21:5 46:12
46:14
move 14:19
23:14 44:20
MSR 10:20 11:5
11:17 12:3
17:16,22,24
18:2,6,9,14,24
19:23 22:7,20
22:21 25:17
26:7 28:15
31:8 32:6,20
33:19,21 40:14

40:16,22 43:22
45:19 47:13
48:23
must 17:23 18:2
———
N
N 2:1 4:1,4
name 48:7
need 20:18,18
24:14 27:5
32:7 33:19
41:2 43:7 45:2
needed 22:11
37:3 49:3
needs 29:2
negligence 48:20
neither 51:12
new 19:11
next 22:14 26:3
26:4,17 28:4
33:16 36:13
39:11 40:7,9
North 4:16
Northern 1:1
3:1,19
notation 11:24
notes 46:3
notice 19:10
numbers 5:22
———
O
object 20:12
29:5,23 31:20
objection 21:8
occurred 47:24
occurs 10:23
11:3 12:5
47:19
off 12:1 14:19
29:21 32:23,24
offender 12:3
14:13 18:11
26:7 33:18
34:4 40:12
46:9 49:10
offenders 8:14
14:14 32:19

offense 18:9
25:8
offenses 24:20
25:6,13,15,19
25:21 32:19
33:11
office 6:23 11:24
12:3,12 13:7
13:11 16:5
18:22 22:9
24:15 26:8
27:5,8,16,21
28:21 29:11,12
35:17 37:22
38:3,11 39:9
40:15 42:6
44:4,18 47:2,3
officer 6:10 7:15
8:3 9:6,9 12:18
43:20 44:14
Offices 4:4
official 13:19
Oh 6:13 27:3
35:7
okay 5:20 6:3,7
6:12,14,24 7:4
7:7,11,17,21
8:1,6,18 9:2,16
9:19 10:2,14
10:17,23 11:18
12:10,14 13:1
13:12,23 14:2
14:10,18 15:7
16:7,15 17:1
17:10,10 18:1
18:4,13,16
19:1,1,6,7,14
19:15,21 20:3
20:14 21:2,18
22:1,1,4,10,14
23:2,6,7,13,13
23:21,22 24:12
24:19 25:3,13
25:18 26:3,22
27:4,4,4,11,19
28:1,4,14,18
28:23 29:13

30:9,12,18
32:23 33:9,9
33:15,24 34:12
34:12 35:3,9
35:10,20,20
36:17 37:14,15
38:21 39:6,6
39:15,24 40:12
41:1,6 42:8,14
43:3,6,19 44:1
44:6,15 45:9
45:13,18,21
46:2 47:13
48:7 49:1,13
once 12:5,17
22:3 41:22
48:16 49:7
one 8:7 10:9
12:21 18:16
21:18,21 22:3
22:15 24:13
30:12 31:2,12
34:5 36:14
41:16 42:21
43:24 46:2
47:14 49:24
ones 28:16
ongoing 16:19
only 24:7 45:10
operation 10:9
opinion 15:16
17:3,8,13 26:6
31:12 39:24
48:12 49:17
option 21:18
22:3
order 10:4 11:5
17:16,20 20:6
20:7,15,16,16
20:18 21:20
22:5 24:15,21
24:22,24 26:8
26:9 29:2,16
31:1,15 32:5,6
32:7,11,14,21
34:1,20 37:17
42:6 43:21

GLENN JACKSON 4/3/2012

Page 58

44:10 45:11
ordered 40:14
  43:22
ordering 50:9
orders 10:20
  18:18 19:11,22
  20:23 21:22
  29:19 31:17
  34:15,15 44:20
  48:17
organization
  47:9
other 25:17 47:9
  47:14,15
otherwise 44:20
  51:17
out 10:24 11:6
  12:13 16:23
  22:12 25:20
  29:10,11 32:13
  45:11
outcome 51:18
outside 18:11
  29:10
over 12:12 21:21
  23:1 26:1 27:7
  34:8,11 38:14
  41:4,23 46:3
  47:4,18 49:18
  49:20
overall 10:9
own 13:9
o'clock 3:12,12

**P**
P 4:1,1
page 2:1 5:22
  8:19 19:5
  23:17 25:3
  33:2,15 35:4
  36:1,8,13
  37:11,13,18
  39:7,11,13
  40:10 41:6
  42:10 44:15
pages 23:15
parole 25:8

28:17 39:22
  41:2,3,4
part 11:23 25:21
  48:20
particular 13:20
  17:20 25:21
  32:22 36:24
  37:7 42:6,18
  44:9 46:17
  48:11 49:21
particularly
  12:23
parties 51:14,17
past 12:11
pasted 23:17
pending 3:18
penitentiaries
  30:19
penitentiary
  31:17
people 41:17
  46:16
per 23:1 33:20
perhaps 16:5
  37:1
period 9:3 27:1
  27:19 38:2
person 13:24
  14:16,16 16:21
  18:8 24:18
  26:2 27:15
  30:4,7,10 34:9
  49:6
personal 38:11
  49:22
person's 31:7
phone 35:12
  49:18
place 21:8
placement 14:15
Plaintiff 1:5,15
  3:5,20,23 4:2
  5:2,12
play 41:20
please 24:16
  37:22,23,24
point 10:11 12:7

12:13,15 13:15
  13:18 14:11
  16:10 21:21
  22:3 25:10
  31:15,18 42:18
  44:12
points 22:12
policies 10:12
  47:21
policy 10:4
  11:20 12:16
  13:2,4 30:21
  47:2
position 6:9,12
  9:4 10:2 13:17
  20:4 28:18
  44:13
possible 16:20
  21:6 26:2
  36:12
possibly 29:4
potential 44:23
practice 12:11
PRB 28:8 37:21
  40:13,15,17,22
  41:8,10,17
PRB's 41:10
prepare 30:15
prevents 20:8
previously 22:20
prior 6:24 7:4
  24:9,19 31:7
  44:1
prison 30:2
prisoner 15:2
  20:9 28:12,16
  39:16,18,22
  46:6,21
prisoner's 9:4
  30:20,22
prisons 30:3
probably 19:19
  25:20 41:15
  46:1 47:6
  48:19
problem 10:16
  10:19,19 12:18

15:5 18:4
  47:14,16
problems 10:3,3
  30:12
procedure 10:4
  10:13,15 30:18
  47:2 48:8
procedures
  17:12 47:21
proceed 16:3
  17:19 20:23
  27:14 32:2
  37:23,24 42:2
  42:22 50:3
proceeding
  39:21
proceedings
  16:24
process 8:10
  27:12 46:13
produced 3:10
  5:11
Professional
  3:17 5:6 51:7
prompt 34:2
prompted 36:20
proper 16:21
properly 16:13
  16:21
protocol 12:20
provided 36:19
  48:17
provides 21:20
providing 7:9
prudent 21:5
public 20:21
purpose 20:21
  40:19
purposes 20:13
pursue 44:19
put 22:19 37:6
P.C 4:4
p.m 19:9 22:16
  23:24 25:4
  26:5,18 28:5
  33:1,4 44:17

**Q**
question 31:21
  41:15 42:5
  46:20
questionable
  20:23 46:9
questioning
  32:21
questions 5:15
  24:13 42:9
quickly 21:6

**R**
R 4:1
Randy 1:7 3:7
  3:21
rationale 32:21
read 19:12 24:12
  44:18 46:2
really 21:23 41:2
reason 17:18
  32:1 33:6
reasonably 16:7
recall 9:23 19:20
  24:8 26:14
  27:20 35:12
  40:1,2 44:6,8
  45:22,23
receive 9:9
received 15:12
  19:16 24:15
  26:24 37:17
recollection 9:21
  10:21 19:15
  21:21 38:7
recommendati...
  47:12
Record 6:10,23
  11:24 12:18
  13:11 24:15
  44:14
Records 8:3 9:5
  9:9 14:9 29:10
  43:19
reduced 51:11
refer 10:5 11:4
  12:11 16:1

GLENN JACKSON 4/3/2012

Page 59

46:15 47:11
referred 37:22
  38:10 40:15
  44:4
referring 5:20
  17:22 36:11
regarding 15:2,5
  18:18 19:16
  24:9 27:23
  35:14 38:15
  46:7
Registered 3:17
  5:6 51:7
regular 50:7
relate 8:13 13:10
related 28:15
  51:13
relative 51:15
release 14:23
  15:5,14 16:21
  17:5,6,13,14
  20:11 22:5
  23:2 30:10,16
  30:20 31:14
  36:12 41:21
  46:6,9,21
  48:16 49:6,8
  49:10
released 17:6,7
  18:13 19:23
  30:22 32:8,15
  33:19 34:16
  40:5
releasing 18:5
  20:9
relevant 17:2
  26:24
rely 14:23
remedy 45:8
remember 8:11
  12:1 17:20
  26:9,11,11
  44:8,11 49:21
reminder 36:10
  37:3,9 39:8
  40:8
reminders 42:24

rendered 15:15
  16:3,5
Reporter 3:16
  3:17,18 4:13
  5:5,6,6 50:9
  51:1,6,7,7
represented
  29:12
request 44:19
requirement
  11:9,17
requirements
  46:23,24
respond 16:13
  23:8
responded 36:1
response 11:9
  21:15 33:10
  34:2 36:3 37:3
  37:5,6 39:10
responses 43:11
review 12:12
  24:17,17,21,23
  25:23 28:12,16
  30:19,23 31:3
  31:5,6 39:16
  39:18,22
reviewed 31:1
  31:10
rewritten 44:10
Rhodes 3:15
  4:14 5:4 51:5
  51:20
Rhonda 3:15
  4:14 5:4 51:5
  51:20
right 6:3 10:6
  12:5 18:16
  21:4,4 22:15
  26:3,13 32:5
  32:10 33:3,14
  33:15 34:21
  35:17 37:8
  39:6 40:7 41:6
  43:1 44:12
  48:4,4 50:5
Robert 4:8 5:16

Robinson 14:20
  17:12 19:10
Rose 42:15,15
  42:18
RPR 51:5,20
run 25:7
Rushville 26:2
  34:11

_____ S _____

S 4:1
safety 20:21
same 8:18 48:1,2
  48:8
SANGAMON
  51:3
saw 13:12
saying 14:21
  17:23 21:13
  23:8 28:19
  35:1 36:21
  37:19 39:9,21
  42:3 49:1,16
says 5:12 12:2,2
  12:17 13:2
  24:13 26:5
  27:5 28:7 33:5
  33:18 34:19
  36:10 40:12
  43:3 45:13
scenario 40:19
scheduled 31:7
  40:13
science 6:2
second 4:9 19:12
  46:2
see 8:11 14:5
  18:23,23 20:19
  22:8 23:11
  24:16,16 26:14
  37:1 41:10
  42:2,4 45:21
  49:5,13,13
seeing 39:16
seek 12:21 16:22
  17:18 18:17,21
  22:8 48:20,23

seeking 17:4
  20:22 22:13
  42:1
seen 39:18
Senate 7:6,9,10
send 43:8
sending 42:23
sent 26:24 36:24
sentence 6:22
  8:9,10,12,14
  11:16 18:7
  26:6 40:17
  46:13
sentencing 7:19
  7:23 8:5 17:16
  17:20 20:6
  29:2,19 31:1
  32:6 44:20
serve 6:21 18:8
served 9:11
  22:22
Services 4:15
serving 48:23
set 13:9 18:9
  29:3 40:22
  47:9 49:6
seven 37:11
several 30:24
  31:9 35:5
sex 14:13,13,14
  34:3
sexually 14:15
  14:16 24:18
  26:2 34:9
share 10:11
shipped 34:10
shorthand 3:16
  5:4,5 51:6
show 18:10 45:1
  45:14,15
side 18:20
signature 5:8
  50:7
significance
  39:18 40:18
similar 11:12
  12:4

since 22:7 33:24
  35:17 47:19
site 10:11 33:24
situation 9:20,22
  9:23 10:5 11:2
  11:4,12,15
  14:21,24 15:8
  19:17 29:19
  30:13 36:5
  40:24 41:9
  42:23 44:3
  46:3 47:16,22
  48:11 50:1
situations 11:7
  16:14
six 6:20
size 50:7
skipped 33:1
some 5:21 11:1
  13:15 14:11
  15:24 16:10
  21:21 29:15
  31:15,18 33:6
  35:11,19 37:4
  42:9,9 47:18
  48:21
someone 18:5
  48:21
something 11:5
  11:7,19 12:4
  12:16 15:19,21
  20:17 26:1
  27:6,9,9 31:24
  38:8,9 44:13
  49:18,19
somewhere
  11:22 22:1
sorry 16:17
  28:11 37:16
sort 23:16 27:12
Sound 4:9
sounds 11:18
  12:15 49:1
source 9:10
speak 25:9 38:14
speaking 19:7
  25:10 28:7

GLENN JACKSON  4/3/2012

Page 60

specific 10:18,19
  42:9,9
specifically 17:8
speculation 21:9
spoke 9:20 14:20
spoken 38:5
Springfield 3:15
  4:9
SPV 24:17,17
St 4:16
staff 6:19,22
  10:11 11:9,10
  15:17 16:4
  20:15 41:23
  43:6,12
stages 30:24
stamp 19:3
stamped 5:23
standpoint
  12:24
start 6:12 19:2
starting 5:13
  30:15
state 6:4 17:16
  17:22 18:5
  29:20 51:2
stated 22:6
  41:22
statement 24:22
  25:12,19
states 1:1 3:1,19
  20:1
state's 6:18
  22:17 23:4
stating 36:18
status 39:23
statute 11:8
  17:22 18:5
  32:19 47:3
statutory 11:8
  11:17 46:20,22
  46:24
stepping 44:12
still 14:8 18:1
  21:15 28:19
  34:5 35:24
  36:3,8 37:6

38:6 48:5
STIPULATED
  5:1
Street 4:4,9,16
strike 14:18
  25:14 30:21
  38:2 41:14
structure 8:14
subject 36:12
subsequent
  25:19 37:4
suggested 37:21
Suite 4:4
supersede 49:8
supersedes 15:3
supervision
  18:10
supplemental
  8:16
support 16:4
suppose 44:24
  45:13
supposed 18:8
  31:8
sure 15:12 24:6
  24:7 25:10
  31:4 42:16
  47:1
SVP 25:6,13,14
  25:23 33:10
  34:3,6,7
switched 47:18
sworn 3:11 5:11
  51:9
system 47:18

_____

**T**

take 8:7 16:24
  19:11 22:9
  24:5 25:2 27:5
  28:22 30:12
  36:14 46:12,15
  50:7
taken 1:15 5:3
  51:10,15
talk 6:7 10:18
talked 22:17

35:3
talking 8:23
  33:10
telephone 49:20
tell 6:14 7:11 8:1
  8:3 19:18
  20:15 21:23
  24:11 35:15
  36:23 43:6
  47:3 48:15
tells 19:21 39:15
  41:7
term 11:17 12:3
  16:21 17:22,24
  18:2,6,9,14,24
  19:23 22:7,20
  22:21 25:8
  26:7 28:15,17
  32:3,20 40:14
  40:22 48:23
testimony 51:8
  51:10
Thank 19:1
  34:12 50:4,5
thanks 24:21
  28:9 33:7 34:4
  36:11,20 38:2
  44:15
their 1:8 3:8,22
  13:9 14:14
  16:21 18:24
  39:24 46:16,17
  47:10,18
thereto 51:17
thing 10:6 21:5
things 8:8 12:22
  12:22 14:19
think 9:14 13:21
  22:1,12 23:17
  24:13 26:8
  32:18,23 33:16
  37:4 42:2
  43:23 48:19
  50:1
thinking 25:20
  41:16 42:5
thinks 28:8,20

though 15:18
  21:5
thought 8:19
  41:12
three 25:4 30:22
  33:1
through 17:11
  19:2 22:24
  25:20 26:8,16
  27:17 35:14
  38:9,10 39:21
  throughout 6:19
  42:2
time 5:13 8:7
  11:14 13:20
  18:11 23:3
  27:1 30:19,20
  34:5 36:1
  38:13 39:15
  43:21 47:14
timeline 19:4
  42:16,17
times 8:17 35:16
  35:22 49:21
title 9:3 13:19
today 24:15
  33:19 34:1,20
  35:2 38:21
  47:24 49:6
told 10:15 22:18
  34:12 48:10
  49:18 50:3
tool 10:12
top 12:1 23:11
  23:18 33:2,16
  36:15 37:18
  40:10 44:16
training 9:9,17
  10:8,12 11:24
  12:6
transcribed 5:7
transferred 31:2
  34:11
transition 8:4
trouble 15:20
try 21:7
trying 8:11 10:6

10:24 32:1
Tupy 28:10,11
  28:12
turn 26:1 27:13
turned 41:22
two 10:20 24:19
  25:19,21 30:21
  34:14 37:2
  49:24
type 7:22 8:23
  22:10
typewriting 5:7
  51:12

_____

**U**

Uh-huh 39:14
ultimate 15:7
  17:1 20:20
  27:15
Ultimately 39:24
unambiguous
  20:7
unclear 34:5
under 38:8
  51:12
understand 8:9
  15:21,22 20:3
  20:9 24:7
  29:18
understanding
  10:19 15:1
  18:1 28:24
  29:9 30:16
unilaterally 11:2
United 1:1 3:1
  3:18
University 6:4
Unless 26:7
until 14:24 16:9
  16:12 49:10,17
unwritten 11:19
  47:5,6
utilize 10:11

_____

**V**

VAD 33:21
various 9:11,18

GLENN JACKSON 4/3/2012

Page 61

| | | | | |
|---|---|---|---|---|
| **verification** 47:17 | 48:21 | **X** | **12:33** 19:8 | **3** |
| **very** 29:19 | **weekly** 42:23 | X 2:1 | **1301** 3:14 | **3** 1:16 3:11 |
| **Via** 4:2 | **well** 9:11 10:8 | | **1313** 51:21 | **30** 4:4 31:7 |
| **vice-versa** 47:4 | 10:10 11:21,23 | **Y** | **18** 10:21 21:22 | **3023** 1:6 3:6 |
| **videoconference** 4:2 | 12:20 18:4,7 | **yeah** 13:6,6 | 34:14 | **312)372-4444** 4:5 |
| **violated** 33:22 | 21:3 25:14 | 15:12 24:4 | **18th** 19:11 | **314** 4:17 |
| **violates** 11:8 | 29:9 30:1,24 | 35:8 37:2 38:1 | **19th** 39:8 | |
| **violating** 18:5 | 31:9,22 34:19 | 50:11 | **1989** 6:6 | **4** |
| **violation** 39:17 | 37:2 39:20 | **years** 37:2 43:20 | **1992** 7:14 8:11 | **4:11** 23:24 |
| 39:23 | 41:14 43:16 | | **1993** 8:11 | **4:14** 25:4 |
| **violator** 40:1 | 44:18 48:18 | **#** | **1997** 8:12 | **4:19** 26:3,4 27:5 |
| 41:11,20 | **were** 7:17,21 8:2 | **#084-002706** 4:14 | **1999** 7:5,12,13 | **4:30** 33:4 |
| **violent** 14:15 | 9:3 17:4,7,22 | **#1313** 4:15 | | **4:33** 26:18 28:5 |
| 24:18 26:2 | 22:7,21 24:24 | | **2** | 33:1 |
| 34:9 | 25:21 27:17 | **0** | **2** 5:17 | **4020** 4:4 |
| **vs** 1:6 3:6,20 | 31:15,18 32:7 | **04** 8:2,2 | **2nd** 40:8 | |
| | 32:11,14 34:14 | **084-002706** 51:21 | **2/18/2010** 31:17 | **5** |
| **W** | 36:4 44:10 | **09** 19:23 | **2:08** 35:22 | **5** 2:2 |
| **wait** 14:22 16:7 | 45:4 | | **2:13** 22:16 | **5th** 36:9,17 |
| 16:12 | **weren't** 37:17 | **1** | **2003** 7:2,4,5 | 37:10 |
| **waited** 16:8 | **we'll** 19:2,3 50:6 | **1-800-280-3376** 4:17 | **2004** 6:13,24 7:2 | **500** 4:9 |
| **waiting** 16:11 | **we're** 8:18,23 | **10** 35:7 39:9 | **2010** 10:21 17:2 | |
| 17:8 21:14 | 16:20 20:14 | **10:02** 36:2 | 19:8 20:6 | **6** |
| 35:24 36:3,6 | 30:23 39:10 | **10:10** 3:12 50:13 | 22:16 26:5,20 | **60602** 4:5 |
| 37:6 39:10 | 42:4 | **1060** 39:11 41:6 | 31:13 32:13,24 | **62706** 4:9 |
| 45:4 | **while** 41:9 | **1061** 36:2 37:11 | 33:17 34:14,16 | **62794** 3:15 |
| **waive** 50:7 | **Williams-Sch...** | 37:13 39:7 | 36:9 41:7 | **63101** 4:16 |
| **waived** 5:8 | 14:11 23:24 | **1062** 35:4,8,20 | 48:13 | **644-2191** 4:17 |
| **walls** 18:12 | 25:5 28:6 33:5 | 36:9 | **2011** 16:9 | |
| **want** 12:14 | **wish** 37:23,24 | **1063** 19:3 | **2012** 1:16 3:11 | **7** |
| 14:12,19 19:4 | **witness** 5:8 50:5 | **1070** 44:16 | **21st** 16:9 44:16 | **7** 39:17 40:13 |
| 19:11 22:23,23 | 51:8,10 | **1076** 42:10 | **217)782-9029** 4:10 | **711** 4:16 |
| 35:6 36:14 | **wondering** 15:23 | **11** 1:6 3:6 | **22nd** 19:8 20:6 | |
| 46:2 | **word** 50:12 | **11:08** 42:11 | 22:16 23:24 | **8** |
| **wanted** 17:18 | **words** 33:8 | **1101** 40:10 | 25:5,16 26:5 | **8** 37:12,15 41:7 |
| 40:23 43:12,16 | 34:13 | **1109** 37:18 | 27:4 28:5 | **8:04** 40:8 |
| **warden** 7:2,14 | **work** 6:22 8:10 | **1112** 36:13 | 32:13,24 33:5 | **8:07** 39:12 |
| 7:18,21 8:2 | 13:9 47:12 | **1118** 33:15 | 35:12 48:16 | **8:28** 39:8 |
| 14:20 46:5,5,8 | **working** 6:8 | **1123** 23:19 25:3 | **23** 23:20 | **8:30** 35:22 |
| 46:19,20 47:4 | **wouldn't** 14:23 | **1124** 23:17,19 | **23rd** 33:17 | **8:36** 41:7 |
| **wardens** 46:12 | **written** 11:22 | **1125** 33:2 | 34:16 35:4,10 | **8:42** 37:18 |
| 46:15,23 | 12:16 13:2,4 | **12** 37:15,19 | 35:22 42:11 | **8:48** 36:9 |
| **warden's** 15:4 | 32:22 42:7 | **12th** 37:12 38:3 | **24's** 23:19 | |
| **wasn't** 28:18 | **wrong** 20:17 | **12:05** 44:17 | **26** 36:2 | **9** |
| **way** 30:1 31:12 | 49:15 | | **26th** 35:24 39:12 | **9** 35:22 |
| | | | **27** 6:19 | **9:00** 3:12 5:13 |
| | | | | **9:12** 36:18 |

GLENN JACKSON  4/3/2012

| | | | | |
|---|---|---|---|---|
| **9:47** 33:17 35:4 35:24 | | | | |