E-FILED
Tuesday, 16 October, 2012  03:59:48 PM
Clerk, U.S. District Court, ILCD

Huntley

Page 1

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DAVID ARMATO,

     Plaintiff,

       vs.                 No. 11 CV 3023

RANDY GROUNDS, MICHELE LITTLEJOHN,
GLENN JACKSON, and DION DIXON,
all in their individual capacities,

     Defendants.

COPY

     The deposition of EDWARD W. HUNTLEY, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Kristin M. Ashenhurst, Certified Shorthand Reporter for the State of Illinois, at 3000 Montvale Drive, Springfield, Illinois, on September 24th, 2012, at the hour of 1:51 p.m.

REPORTED BY:  Kristin M. Ashenhurst, CSR, RDR, CRR
LICENSE NO:  084-002090
JOB NO.:  2729

www.krusereporters.com   Kruse & Associates, Ltd.

DEFENDANT'S
EXHIBIT
G

Huntley

Page 2

```
 1    APPEARANCES:

 2
        KUPETS & DeCARO, by
 3      MR. DENNIS DeCARO
        77 W. Washington Street
 4      20th Floor
        Chicago, Illinois  60602
 5      (312) 372-4444
        ddecaro@kupetsdecaro.com
 6
            Representing the Plaintiff;
 7

 8      OFFICE OF THE ATTORNEY GENERAL, by
        MR. ROBERT FANNING
 9      ASSISTANT ATTORNEY GENERAL
        500 S. Second
10      Springfield,  Illinois  62706-1771
        (217) 782-7955
11
            Representing the Defendants.
12

13

14

15

16

17

18

19

20

21

22

23

24
```

Huntley

Page 3

1                          INDEX

2    WITNESS                              EXAMINATION

3    EDWARD W. HUNTLEY                         3

4       Direct Examination

5

6

7

8

9                         EXHIBITS

10   NUMBER                            MARKED FOR ID

11   Exhibit B          Order              12

12   Exhibit C          Order              12

13   Group Exhibit D    Group of E-Mails   27

14   Group Exhibit E    Chief Legal Counsel    4
                    Job Description; and
15                  Special Litigation
                    Counsel Job Description
16   PREVIOUSLY MARKED              FIRST REFERRED TO

17

18

19

20

21

22

23

24

Huntley

Page 4

1                    (Witness administered an oath.)

2                    EDWARD HUNTLEY,

3    having been first administered an oath, was examined

4    and testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. DeCARO:

7        Q.    Would you please state your full name and

8    spell your last name for the court reporter.

9        A.    Edward W. Huntley, H-u-n-t-l-e-y.

10       Q.    Mr. Huntley, I am just going to ask you a few

11   background questions and then we will get into the meat

12   of the matter.  I saw you brought your job description

13   back -- looks like prior to February of 2010, which

14   would have been the position that you were hired at

15   during that time -- what was your position during that

16   period of time?

17       A.    I was the Chief Legal Counsel for the Illinois

18   Department of Corrections.

19       Q.    And it looks -- I just quickly looked at it.

20   It looks like there is two job descriptions that you

21   brought pursuant to my Rider?

22       A.    Two -- I am sorry.

23       Q.    Go ahead.

24       A.    Two position descriptions from the Department

Huntley

Page 5

1    of Central Management Services, yes.

2                              (Whereupon, Huntley Group

3                              Exhibit E was marked for

4                              identification.)

5    BY MR. DeCARO:

6        Q.   Were either one of these the position you were

7    holding between February 2010 and May of 2010 -- and we

8    have marked it as Huntley Group Exhibit E if you want

9    to take a look at that?

10       A.   I was in both of these positions at varying

11   points during that period of time.

12       Q.   During -- between February and May of 2010?

13       A.   Yes.

14       Q.   And so these job descriptions would cover both

15   of the positions you were in during that time?

16       A.   Correct.

17       Q.   Which position were you in first?

18       A.   Chief Legal Counsel.

19       Q.   And then what did you go to?

20       A.   Special Litigation Counsel.

21       Q.   When did you make that transition?

22       A.   I think the official date was April 1st of

23   2010.

24       Q.   What's your date of birth?

Huntley

Page 6

1     A.    October 24, 1951.

2     Q.    Have you reviewed any documents prior to the

3     deposition today in preparation for the deposition?

4     A.    Yes.

5     Q.    Could you tell me what those were?

6     A.    I looked at the two position descriptions we

7     were just talking about.  I have looked at the amended

8     complaint which was filed, I think, in the spring of

9     this year.  I looked at a series of E-mails that were

10    exchanged among different employees of the Department

11    of Corrections.  I glanced at a couple orders -- I

12    think it was two orders that were entered, I believe,

13    in February of 2010.  I may have looked -- I don't

14    remember looking at an earlier Sentencing Order, but I

15    may have.  Oh -- and I looked at the transcript of the

16    deposition of Glenn Jackson.

17    Q.    And that's really why you are sitting here

18    today.  Mr. Jackson's testimony to me was a little

19    unclear as to who had the ultimate authority in

20    releasing or detaining Mr. Armato.  At some point it

21    reads as though he had asked you for some guidance and

22    directions, and then at other points he said you were

23    the ultimate decision maker.  So that's what I really

24    want to ask you about.

Huntley

Page 7

1          But before we get to those questions, what's

2     your highest level of education?

3        A.    My law degree.

4        Q.    Where did you get that?

5        A.    University of Pennsylvania.

6        Q.    What year?

7        A.    1976.

8        Q.    Any other postgraduate degrees?

9        A.    No.

10        Q.    What is your current position -- employment?

11        A.    Special Litigation Counsel for the Illinois

12     Department of Corrections.

13        Q.    That's the same job you started April 1st of

14     2010?

15        A.    Correct, yes.

16        Q.    And you want to tell me just generally what

17     you do day to day?

18        A.    I try to supervise the litigation that's

19     pending against the Department and its employees, most

20     of which is handled -- at least in court -- by various

21     lawyers with the Attorney General's office.

22        Q.    So are you employed by the Illinois Department

23     of Corrections?

24        A.    Yes.

Huntley

1     Q.   But you do have some supervisory control over

2  the attorney general attorneys?

3     A.   Not over the lawyers themselves I would say,

4  so much as the way that the cases are being handled.  I

5  think -- and I can't speak for them -- but it's my

6  impression that they think of me oftentimes as the

7  client or the representative of the client.  I fill

8  that role for them.

9     Q.   Back in -- well, when you had these two

10  positions either as Chief Legal Counsel or Special

11  Litigation -- is it Special Litigation Counsel?

12     A.   That's the title on the position description,

13  so that's what we've been using, yes.

14     Q.   Did Glenn Jackson report to you under either

15  of those titles?

16     A.   There were points while I was Chief Legal

17  Counsel when, according to the Department's

18  organizational chart, Glenn reported to me.  I believe

19  there were other points when he had a different chain

20  of command.

21     Q.   Would -- you know, in my business I sort of

22  may have a different view of how the relationship

23  between a client and the attorney is from the public

24  sector.  What I am trying to determine here today is

Huntley

Page 9

1    during the period when Mr. Armato was going through

2    this dispute over his out-date, which began with the

3    February 18th, 2010 orders, and ended approximately

4    May 21st, 2010, during that period were you advising

5    Mr. Jackson on whether to release Mr. Armato or was it

6    your decision to release him or keep him incarcerated?

7        A.    Frankly, I don't know that we were making fine

8    distinctions of that nature.  The client was, and

9    always is and has been, the Illinois Department of

10   Corrections.  We were trying to do, I think, what we

11   thought was in the best interests of our client, the

12   Illinois Department of Corrections.  From reading

13   Glenn's deposition transcript, I know that there was

14   conversation about this topic during his deposition,

15   and I think what he was trying to say was that his

16   office would look to legal services -- and to me as the

17   Chief Legal Counsel -- for direction, if I can put it

18   that way, as to how to handle this particular

19   situation.

20       Q.    Right.  And that's what I got throughout most

21   of -- re-reading most of his deposition.  So would that

22   be your understanding, that you were giving him legal

23   advice on Mr. Armato's situation?

24       A.    Again, I don't know that I -- well, clearly I

Huntley

Page 10

1    was giving him legal advice.

2        Q.    Let me ask you this:  As part of your job back

3    then, either as Chief Legal Counsel or Special

4    Litigation Counsel, were you making determinations

5    whether to -- whether to release certain prisoners or

6    to keep them detained?  Was that part of your job?

7            If there was a dispute, say the prison would

8    call you -- the records office -- and say, "We've got

9    this problem," and would you personally determine

10   whether someone remained incarcerated or released?  Or

11   would you review the situation and give legal advice to

12   those people making those decisions?

13       A.    I guess I would say I thought I was giving

14   legal advice.  They may have taken it as a decision.  I

15   don't know, again, that we were breaking it down quite

16   so finely in terms of making that distinction, so much

17   as we were trying to address a question or an issue

18   that had been presented to us as, you know, for

19   example, the order in this case.

20       Q.    Sure, and we will get to that, but I jumped

21   off your employment history for a little bit.  So you

22   ceased being Chief Legal Counsel March 31st of 2010.

23   When did you start doing that?

24       A.    Middle of April of 2005.

Huntley

Page 11

1    Q.   And what were your duties as Chief Legal

2.   Counsel as contrasted with special litigation?

3    A.   They included a fair amount of what I am doing

4    now as Special Litigation Counsel, but over and above

5    that I spent time advising the director, personally, in

6    his capacity as the director, and a number of other

7    senior staff members of the department.  I guess you

8    could say that I was a member of the senior management

9    team may be the easiest way to explain that.

10    Q.   Prior to mid-April of '05, what was your

11   position?

12    A.   I had spent about 25-and-a-half years in

13   private practice before joining the Department.

14    Q.   Doing what type of litigation?

15    A.   Mostly civil trial work.

16    Q.   Plaintiffs?  Defendants?

17    A.   Mostly defense, although there were some

18   plaintiff's cases as well.

19    Q.   Did you handle civil rights defense?

20    A.   No -- well, I take that back.  I probably had

21   a smattering of -- a handful of civil rights cases over

22   the years.

23    Q.   Were you employed by any municipalities during

24   those years?

Huntley

Page 12

1      A.   Not other than -- not on a regular basis.  I

2   handled some cases.  Again, primarily it would have

3   been through insurance carriers to represent

4   municipalities on occasion.

5      Q.   And I am going to ask you your e-mail address

6   during February 22nd, 2010 to May 21st, 2010, and we

7   can go off the record if you want or -- if you mind

8   whether your e-mail address is on the record?

9      A.   I think it's -- no, it doesn't matter to me.

10   It's -- I believe it's the same as it is -- it was the

11   same as it is now, which is Edward.Huntley@doc.Illinois

12   -- spelled out in full -- .gov.

13      Q.   Okay.

14      A.   It has changed during my tenure at the

15   Department, but I think that change preceded this

16   period of time.

17      Q.   You told me what you reviewed today.  Do you

18   have an independent recollection of this situation, and

19   by situation, do you understand what I am talking

20   about?

21      A.   Yes.  You are talking about the David Armato

22   situation with respect to the orders that we received

23   sometime in February of 2010.

24      Q.   Right.

Huntley

Page 13

1     A.    And his ultimate discharge from the Department

2   about three months later.

3     Q.    Do you have independent recollection what was

4   going on?

5     A.    Yes, I have an independent recollection, yes.

6     Q.    Great.  Here's my understanding, and tell me

7   if this is yours.  My understanding is that perhaps the

8   sole reason he wasn't discharged was that the two

9   February 18, 2010 orders specifically stated that he

10  was to be released with no mandatory supervised release

11  period; is that your understanding?

12    A.    That was the primary problem, yes.

13                      (Plaintiff's Exhibits B and C

14                      were marked for

15                      identification.)

16    Q.    Since I have marked these exhibits, we might

17  as well use them.  I have marked the two orders that

18  we'll be talking about as Huntley Exhibit B and Exhibit

19  C.

20          Do you have your copy?  Here's a copy.

21          MR. FANNING:  Thanks.

22  BY MR. DeCARO:

23    Q.    So are those the two orders that you recall

24  being the points of dispute?

Huntley

1        A.    They appear to be.

2        Q.    And my reading of the E-mails that were going

3    back between Michele Littlejohn, Glenn Jackson and

4    yourself, somewhere in there Mr. Jackson, I believe

5    states that he had forwarded those orders to you?

6        A.    I don't recall if I got them from Glenn or I

7    got them from Joel Diers, but I did have copies of at

8    least one of them.  I mean, if you had asked me last

9    week how many orders there were, I probably would have

10   said there was an order, but it appears there were two.

11       Q.    So other than the MSR problem, was there any

12   other problems with these orders that either your

13   office or the Attorney General's office was having a

14   problem with?

15       A.    Not with the orders themselves, that I recall.

16       Q.    And I am not a criminal defense attorney and

17   Mr. Jackson called it the mittimus, but are these the

18   documents -- these two orders, B and C, basically the

19   documents that the Illinois Department of Correction

20   relies upon in determining a prisoner's release date?

21       A.    Generally, yes.  I mean, these would be,

22   certainly, among the important documents that the

23   Department would rely upon.

24       Q.    And here is -- here's my -- the thing I don't

Huntley

1    understand.  Reading the E-mails -- to me the only

2    options, if there was a problem with these orders,

3    would have been to go back to the Circuit Court of Lake

4    County and try and modify these orders, correct?

5         A.   That's certainly one of the options, yes.

6         Q.   I mean, the Illinois Department of Corrections

7    or the Attorney General's office could not just

8    unilaterally disregard these orders, could they?

9         A.   It would not be a good idea to do that.

10        Q.   And that was never done.  Am I correct that no

11   attorney for either the Illinois Department of

12   Corrections or the Attorney General's office ever went

13   to go modify these orders?

14        A.   That's -- it's correct in the sense that no

15   one went to court to modify them.

16        Q.   Okay.

17        A.   It implies that we didn't take any steps in

18   that direction, which is not correct.

19        Q.   That's another area I wanted to ask you about.

20   Why don't you tell me what steps your office took or

21   the Attorney General's office?

22        A.   Well, we had a process, which I think was

23   alluded to in Glenn Jackson's deposition, and probably

24   came out -- I didn't read the transcript of Michelle

Huntley

1    Littlejohn's dep, but may well have come out in her's

2    as well. and I recall Glenn referencing the records

3    office training manual at one point.

4         When an order that is out of the ordinary in

5    its terms -- such as these -- would come in, the

6    records office personnel at the local facility would

7    certainly bring it to the attention of either

8    Mr. Jackson or -- or he had an assistant chief records

9    officer at the time -- bring it to their attention.

10        They also would reach out to -- generally the

11   local prosecutor, -- to find out if it was simply an

12   oversight, a mistake, something of that nature, or was

13   it actually what had been intended by the parties, and

14   regardless of the answer to that question would then

15   ask if there was some willingness to modify the order

16   in a fashion that, you know, to our view would bring it

17   into compliance with the statutes.

18        My understanding -- my recollection and my

19   understanding from reviewing the E-mails was that

20   Michelle did that, that is, she reached out to an

21   Assistant State's Attorney and I think one of her

22   E-mails summarizes her conversation with -- I think it

23   was a him -- -- the gist of which, as I recall, was this

24   is what the judge intended to do. He is concerned

Huntley

1    about an appeal.  He doesn't want this guy taking the

2    appeal.  He doesn't want, basically, there having to be

3    a retrial if, in fact, it's discovered that he was not

4    initially admonished as to an MSR term.

5         The next step would then be that which Glenn

6    took, which was sort of to bring the matter to my

7    attention for purposes of saying, okay, is it something

8    that, you know, we want to seek representation from the

9    Attorney General on, or is it something that, you know,

10   we're just at that point going to say, okay, let's

11   just -- we'll -- we'll implement the Judge's Order

12   and -- go ahead.

13       Q.   I didn't want to interrupt you.  Is that the

14   extent of the procedure?

15       A.   No, because then we would, you know, if we

16   decided internally that it was something that merited

17   going to the Attorney General's office, then we would

18   reach out to them and ask them to review the matter and

19   let us know if they were willing to file some pleading

20   seeking either -- again, depending upon the terms of

21   the order -- either have an order vacated or modified,

22   or in some fashion changed, so that, again, it

23   would -- to our view it would comply with the State

24   statutes governing sentencing.

Huntley

1       Q.    And that appears from the E-mails that that's

2   what took place here?

3       A.   Yes, we followed the process here.

4       Q.   What -- why did it take so long, I guess I am

5   concerned with?  It took -- it looks as though Michelle

6   Littlejohn found out that information -- the initial

7   information -- in February of 2010, but there wasn't a

8   decision by the Attorney General's office not to

9   proceed with attempting to modify the order until May.

10  So what takes approximately 90 days to make this

11  decision, if you know?

12      A.    I can't say that I know.  My recollection is

13  that there were a number of conversations with the

14  Attorney General's office about what their thoughts

15  were and my effort to persuade them to agree to file

16  something on behalf of the Department.  We were finally

17  informed, sometime shortly before the E-mail that I

18  sent to Glenn Jackson in the middle of May, that they

19  weren't going to do that.  And I made my suggestion to

20  him as to how we ought to -- advice -- however you want

21  to phrase it.

22      Q.    Sure.  Sure.

23            Now, I received approximately 1200 pages of

24  documents, and I don't know if I received the records

Huntley

1    of training -- the training manual from the records

2    office -- but is it your understanding that the process

3    that you just told me about is a process that is

4    written down somewhere in the training manual?

5         A.   Part of it.  My understanding is the part that

6    would involve the records office, or certainly the

7    local employees of the records office, is in the

8    manual; that is, if you get an irregular order, an

9    order that doesn't include an MSR term or that says

10   that there's to be no -- we love our acronyms; it

11   stands for mandatory supervised release -- that there's

12   to be no MSR term, then they're to alert, again, as I

13   recall, either Mr. Jackson or his assistant chief

14   records officer.

15        Q.   And then as far as what happens after that,

16   discussing it with you and discussing with the Attorney

17   General's office, is that any form of written policy?

18        A.   I don't think so.  I think that's just been

19   the practice.  Certainly it had been for the five years

20   that I had been the Chief Legal Counsel up to that

21   point.

22        Q.   Is there anything written on how long this

23   procedure can go?  I mean, could this have gone on for

24   six or eight or twelve months?  Or is there a policy as

Huntley

Page 20

1   to we've got to make a determination in 120 days or

2   something like that?

3       A.   There's no definite end period of time that

4   I'm aware of.

5       Q.   The order -- was it your opinion that the

6   order -- the February 18th orders with specific

7   language allowing for the release of Mr. Armato without

8   a term of mandatory supervised release -- did that

9   violate state law, that language?

10      A.   It's contrary to state law, yes.

11      Q.   And the state law being that every felon must

12  have a period of mandatory supervised release?

13      A.   The sentence is to include as though written

14  therein, I think, a term of mandatory supervised

15  release; that's in the Illinois Sentencing Code.

16      Q.   There's no exceptions?

17      A.   Well, it says, "shall." I will leave it to

18  the Illinois Supreme Court to tell us what "shall"

19  means in those circumstances, but I don't believe there

20  are any exceptions.

21      Q.   And he was released based upon the language

22  contained in this order, ultimately?

23      A.   He was. And I guess I left out -- and I

24  apologize for doing that -- that I was describing for

Huntley

1   you the process that we go through, and that

2   was -- that was one of the results of that process;

3   that is, you know, if the State's Attorney says to us

4   when he or she's contacted, "Look it was a mistake

5   We'll go back and get this corrected." They get a

6   corrected order. It ends there, obviously.

7       If they say, as they did in this instance,

8   "No, that was really what everyone intended," then we

9   move on to the next step. If the Attorney General says

10  "yes," we'll go to court and we'll ask the judge to

11  modify the order, or depending, again, upon what it

12  says here, it would have been modified, but if it says

13  something different it could be vacated. If they go to

14  court and the decision -- well, I am sorry. Let me

15  finish. If they don't go to court, then, you know, the

16  end of our process would be okay, we have exhausted the

17  options that are available to us to challenge the court

18  order. Our position at that point was we will abide by

19  the order. It doesn't change our opinion of the order,

20  but we will abide by it. Obviously if the AG goes to

21  court and the judge agrees to modify the order then

22  we're pleased with that result.

23      Q.  Right. Right. During this process, and I'll

24  just say during this time period -- when I say that,

Huntley

1    I'm referring to February 18th of 2010 to May 24st,

2    2010.  Were you ever made aware of when Mr. Armato's

3    out-date was?  I mean, did you have an understanding,

4    well, we have got time, this guys not going to be let

5    out, or did you have an understanding he should be out,

6    we have got to move this?

7        A.    At some point, probably fairly early on -- and

8    I don't know, it may even be captured in the E-mail

9    exchange -- I recall that, you know, with this -- with

10   other information that was contained in the order that

11   we recalculated an out-date.  And my recollection is it

12   preceded February 18th or whatever the -- February 18th

13   by about 6 months.

14       Q.    Thankfully with your answers we are going to

15   go the short route instead of the long route.

16            Is this the first time you have ever come

17   across a court order saying no MSR?

18       A.    No.

19       Q.    And what have you done in the past?

20       A.    Followed the same process that I described for

21   you earlier.

22       Q.    In any of those cases has the Attorney General

23   chosen to go in and attempt to modify the order?

24       A.    I believe so, but understand that there --

Huntley

1    when I say that, it -- there are many different sorts

2    of out-of-the-ordinary orders, or many conditions that

3    could be in an order that we would find unusual. You

4    know, your idea was so you are required to allow this

5    inmate to serve his sentence at X prison. You're

6    ordered to do any number of different things --

7        Q.   Mm-huh.

8        A.   -- and so it's sometimes difficult for me to

9    distinguish the varying conditions in the order that we

10   were going to court on to ask that they be modified.

11            I can tell you in general that the Attorney

12   General has gone to court a number of times and

13   successfully gotten judges to change conditions of the

14   order. I don't have a specific recollection as to

15   whether any of those was in a case in which a judge had

16   ordered that somebody serve no MSR term.

17       Q.   And, believe me, I -- I understand the

18   reasoning behind what we're talking about, so don't

19   take offense with some of these questions, but is

20   there -- I understand the process you've described to

21   me, but is there legal authority that allows the

22   Illinois Department of Corrections to hold a prisoner

23   beyond its out-date when there is a concern about the

24   order? I understand your process, and the manual, and

Huntley

1    then after that your process, but is there any legal

2    authority that allows for that?

3         A.   You know, I have not had occasion to research

4    the issue of void court orders.  I would say I think

5    that if -- if I had felt we weren't on sound legal

6    footing doing what we doing, that I would not have

7    suggested that we engage in that process, but.  I

8    think this may be the first instance in which that

9    question has come up, at least that I can recall right

10   now.

11        Q.   Did you ever speak with Michele Littlejohn

12   regarding this issue?

13        A.   I don't think so.  It's possible that I did,

14   but I don't recall talking with Michelle directly.

15        Q.   How about Gordon Grounds?

16        A.   No.

17        Q.   Have you ever spoken to David Armato?

18        A.   No, not to my knowledge.

19        Q.   Would it be fair to say the

20   only -- well -- strike that.

21             From the E-mails, apparently you spoke with

22   Glenn Jackson directly about it?

23        A.   Yes.

24        Q.   Anyone else from his office?

Huntley

1      A.   No, not that I recall.

2      Q.   Who did you deal with at the Attorney

3   General's office?

4      A.   Kevin Lovellette.  L-o-v-e-l-l-e-t-t-e

5      Q.   Who is he?

6      A.   He's the supervisor of the Prisoner Litigation

7   Unit in the Attorney General's office in Chicago.

8      Q.   And did he ultimately call you and tell you,

9   "We're not going to pursue modification or

10   intervention?"

11      A.   He did tell me that over the phone, whether

12   Kevin called me or I called him, I don't recall.  He

13   and I are frequently on the phone with one another.

14      Q.   When you were the Chief Legal Counsel, were

15   you the top of the food chain -- you know, top of the

16   corporate structure in the Law Department?

17      A.   Yes.

18      Q.   And as your position today as Supervisor of

19   Litigation, is Chief Legal Counsel your superior?

20      A.   Yes; he is my supervisor, yes.

21      MR. DeCARO:  Can we take a break for just two

22   minutes.  I will be right back.

23      THE WITNESS:  Of course.

24          (Whereupon a recess was taken.)

Huntley

1          MR. DeCARO:  So we will go back on the record.

2     It just struck me.

3     BY MR. DeCARO:

4          Q.   So in your position today, are you the one

5     determining how to deal with this case and the civil

6     situation?

7          A.   The Attorney General, I think, is determining

8     how to -- how to deal with it.

9          Q.   Did -- during the time period you were talking

10    about, did any Illinois Department of Correction

11    departments, other than the Legal Department, report to

12    you directly?

13         A.   Yes.

14         Q.   Who were they?

15         A.   Well, as I said earlier, there were -- you

16    know, and I can't recall what Glenn Jackson's reporting

17    structure was at this point in time.  The Office Of

18    Inmate Issues had reported again to the Chief Legal

19    Counsel at one point or another.  You have to

20    understand that changes were being made in reporting

21    structures with the coming on board of a new director

22    in June of 2009.  So it's a little bit difficult to

23    remember exactly when things changed.  You may have

24    noticed that the position description, I think, is

Huntley

1    dated early August of '09, so that had even been

2    changed for the Chief Legal Counsel.

3              The one that I -- my recollection is

4    throughout the time I had served as Chief Legal

5    reported to me -- the other unit, that is -- was the

6    Sex Offender Unit.

7         Q.    If there is -- if there wasn't a dispute with

8    an order or a mittimus or an out-date with a prisoner

9    during the time period we've been talking about, Glenn

10   Jackson could make those decisions whether to release a

11   prisoner or not without consulting with you?

12        A.    Sure.  We release 20,000 inmates a year,

13   approximately.  And, actually, the records office

14   that's in those facilities would be making those

15   determinations, unless there was, again, something

16   irregular to their way of viewing it that would cause

17   them to bring it to his attention.

18        Q.    Again, I don't want to belabor the point, but

19   could Glenn have made the decision -- Mr. Jackson made

20   the decision how to proceed with this matter without

21   consulting with you?

22        A.    I'm sure he could have.  Obviously, he chose

23   not to.  I wouldn't have known about the situation

24   unless he brought it to my attention.

Huntley

Page 28

1      Q.    Right.

2      A.    He wouldn't have known about it unless

3   Michelle had brought it to his attention.  But they

4   both did exactly what they should have done, to my way

5   of thinking, in terms of bringing an unusual situation

6   to somebody higher up in the chain of command.

7                    (Whereupon, Huntley Group

8                     Exhibit D was marked for

9                     identification.)

10     Q.    Let's just look at the E-mails.  I have marked

11   them as Huntley Group Exhibit D.

12           These are a group of E-mails which I have

13   taken out of Grounds Group Exhibit 2, which consisted

14   of hundreds of pages, and I have highlighted for you

15   starting on February 22nd, E-mails that you either

16   received or sent.  If you want to just take a minute to

17   look through these, and let me know your recollection

18   of receiving these and sending these E-mails.

19     A.    I have looked at them.

20     Q.    Do you -- I mean, I don't know if

21   these are -- if these E-mails exhaust all of the

22   E-mails that you would have been involved with or sent

23   or received during this time period.  I only found,

24   going through these records, these E-mails, which were:

Huntley

1    February 22nd, 2010, E-mail from Glenn Jackson to you

2    and Joel Diers, D-i-e-r-s, at 4:11 p.m., and that's

3    Bates-stamped 01119.  And then there's some other

4    E-mails that I found.  February 22nd, 2010, there are

5    several E-mails Bates-stamped 01123; a February 23rd

6    E-mail from Glenn Jackson to you, which is

7    Bates-stamped 01118.  Then there's a little break in

8    the E-mails.  The next E-mail I found was March 5th

9    from Glenn Jackson to you -- strike that -- strike

10   that.

11            There was a February 26th, 2010, 10:02 a.m.

12   E-mail from Glenn Jackson to Michelle Littlejohn where

13   she cc'd you and Mr. Diers.  That's at Bates stamp

14   01112.  Then there's that March 5th E-mail on that same

15   Bates-stamped page.  There's a March 12th E-mail from

16   Glenn Jackson to you on Bates stamp 01109.  An

17   April 2nd, 2010, E-mail from Glenn Jackson to you on

18   Bates stamp 01101.  An April 8th E-mail from Glenn

19   Jackson to you and Mr. Diers, Bates-stamped 01097.

20   Then there is a April 27th, 2010, E-mail from

21   Mr. Jackson -- strike that.  There's an April 26, 2010,

22   E-mail from you to Mr. Jackson, at Bates stamp 01076,

23   and then a return E-mail it looks like on April 27th,

24   from Mr. Jackson to you -- same Bates stamp.

Huntley

1  April 29th an E-mail from Glenn Jackson to you and

2  Mr. Diers at the Bates stamp 01059. And then I have

3  got a May 21, 2010, E-mail from Mr. Jackson to

4  you -- May 21, 2010, 11:31 a.m., at Bates stamp 01064.

5  And, then, finally, May 21, 2010, an E-mail from you to

6  Mr. Jackson at Bates stamp 01070.

7          This might be a bad question, but do those

8  appear to be all of the E-mails you think you were

9  involved in?

10       A.   I have no idea.

11       Q.   Do you recall getting E-mails from Mr. Jackson

12  during this time period?

13       A.   Absolutely.

14       Q.   And you recall E-mailing him some responses?

15       A.   Yes, I do.

16       Q.   Let's look at the last E-mail, the May 21

17  2010, which is the last page there. And I would just

18  like you to explain your thoughts here.

19          The second to the last line before the

20  "thanks."

21          "I suppose we should show it as a

22  court-ordered discharge, as that is exactly what it

23  is."

24          What do you mean by that? What does that

Huntley

1    mean?

2        A.    We have a computer system -- it's called the

3    offender tracking system known, of course, by its

4    initials OTS, and it's my understanding that that is a

5    description acceptable to OTS as to why someone was

6    discharged; that is, by court order.

7        Q.    Okay.

8        A.    And that was just a comment to Glenn, not that

9    he had asked the question even, and not that he

10   wouldn't have known, because he would. I guess I was

11   just thinking out loud. "I suppose we should show it

12   as a court-ordered discharge as that's exactly what it

13   is."

14       Q.    Okay.

15       A.    And that's my recollection that that's how it

16   was entered into the system.

17       Q.    And here in this E-mail you are advising him

18   that the Attorney General's office has declined to

19   pursue either modifying the order or moving for leave

20   to intervene on behalf of the Department of

21   Corrections; correct?

22       A.    Right.

23       Q.    And that's what he was waiting on for that

24   type of decision before he decided whether to release

Huntley

1    Mr. Armato?

2         A.    Well, again, I can't tell you what Glenn was

3    waiting for.  I can't get inside his head and tell you

4    that.  You know, I -- the next sentence, I think,

5    indicates what I thought ought to happen, whether you

6    want to view that as advice or direction.  How Glenn

7    took it, I don't know.  But as I say here, "We have

8    exhausted the potential alternatives."  We had reached

9    the end in our process and without having a

10   favorable -- I don't want to say decision -- but we had

11   nowhere else to go, I don't think, other than to either

12   keep him or let him go.  And as I described the process

13   to you earlier, when all of the alternatives are

14   exhausted without any favorable action to our way of

15   thinking, then we're going to obey the judge's order.

16        Q.    Let me ask you this:  What would have

17   been -- strike that.

18        How would Mr. Armato have been released

19   differently if the order provided for MSR, as opposed

20   to when it provides for no MSR?  And where I'm going

21   with that is, was there ever an alternative of

22   releasing him while you decided on what to do with

23   these orders?  Was that an option?

24        A.    In fact, on paper he was released -- not

Huntley

1   physically -- but on paper. The problem with his

2   release to MSR, is that as a sex offender required to

3   register as a sex offender, he has to have electronic

4   monitoring. And in order to have electronic monitoring,

5   he has to have an acceptable host-site that can

6   maintain the electronic monitoring. And it's my

7   understanding that he didn't, and, hence, we went

8   through the process of what variously is referred to

9   as, you know, "violation at the door" or "cyclical

10  incarceration" or "turnaround," whatever phrase you

11  want to use for it. But there was a parole violation

12  report written and a warrant issued, and he was kept in

13  our custody.

14         The goal here, obviously, was to have

15  Mr. Armato serve a term of mandatory supervised

16  release. I am told by those who know much more than I

17  do, that if there's a group that can benefit from the

18  supervision that's provided during a parole term more

19  than any other group in general, it's sex offenders.

20  And, you know, one of the -- one of the missions, if

21  you will, of the Department is to protect the public.

22  Obviously, one of the groups of people we want to

23  protect the public from is sex offenders, so we wanted

24  him serving a term of mandatory supervised release to

Huntley

1   assist in reintegrating him into free society.

2       Q.   That's something I didn't know.  I thought

3   from the prior deps and from these E-mails that

4   he -- he -- his sex offenses had been discharged

5   somehow and he didn't have to have an ankle bracelet or

6   things like that.  And I got some of that from the

7   first page of the E-mails where Alyssa Williams-Schafer

8   was looking into that, and I thought that they had been

9   discharged and did not run concurrently or --

10  consecutively or concurrently with the other offense or

11  parole term?

12      A.   Her reference was to offenses that might have

13  made him eligible for review and referral as a sexually

14  violent person for commitment -- civil commitment -- as

15  a sexually violent person.  That's something separate

16  and apart from the fact that he still has, I believe,

17  an obligation to register as a sex offender.  And, you

18  know, prior to the release of a person with an

19  obligation to register as a sex offender, the Prisoner

20  Review Board in my experience orders that they be

21  electronically monitored.  And, again, as I said a

22  minute ago, to be electronically monitored you have to

23  have a host-site that can support that electronic

24  monitoring, and it is and was my understanding that he

Huntley

1.   didn't have a host-site of that nature.

2    Q.    If he is released with no MSR and is a prior

3    sex offender, do you still have to have the host-site?

4    A.   No we -- that would be a condition --

5    Q.    I am sorry.

6    A.    -- ordered by the Prisoner Revie Board of his

7    mandatory supervised release term.  So if he had no

8    mandatory supervised release term, there would be no

9    one to have put him on electronic monitoring.

10   Q.   And when he was released, he wasn't put on

11   electronic monitoring as far as you know, because he

12   wouldn't have to?

13   A.   I don't believe he was.

14   Q.   But he still has to register as a sex

15   offender?

16   A.   That's a separate legal obligation that he

17   has, yes, based upon his earlier convictions.

18   Q.   All right.  A few more.

19        Was there anything while your Department and

20   the Attorney General's Department was determining what

21   to do in this situation, was there anything Mr. Armato

22   could have done through the grievance procedure to gain

23   his release?

24   A.    Not through the grievance procedure, but if

Huntley

1   he'd had a host-site, I believe would have been release

2   on MSR.

3       Q.   What — when you say host-site, is that a

4   home?

5       A.   A place to go.  It could be a private home.

6   It could be a group home, yes.

7       Q.   So if he had that, you would have perhaps

8   released him with MSR, while you were determining what

9   to do?

10      A.   Yes, I believe that to be the case.

11      Q.   We didn't look at Exhibit A, which was the

12  notice of dep with the rider.  I believe we looked at B,

13  C, D and E.

14           MR. DeCARO:  And that's all I have.  Thank

15  you.

16           MR. FANNING:  No questions.

17           MR. DeCARO:  Thank you.

18           MR. FANNING:  We're going to reserve.  Is that

19  all right with you?

20           THE WITNESS:  Yes.  Meaning no offense.

21               (Whereupon, the proceedings

22                concluded at 2:40 p.m.)

23

24

Huntley

Page 37

```
 1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3

 4    DAVID ARMATO,

 5        Plaintiff,

 6        vs.                            No. 11 CV 3023

 7    RANDY GROUNDS, MICHELE LITTLEJOHN,
      GLENN JACKSON, and DION DIXON,
 8    all in their individual capacities,

 9        Defendants.

10

11

12        I, EDWARD W. HUNTLEY, being first administered an

13    oath, say that I am the deponent in the aforesaid

14    deposition taken on September 24, 2012, that I have

15    read the foregoing transcript of my deposition, and

16    affix my signature to same.

17

18        _____

19                        EDWARD W. HUNTLEY

20

21    Subscribed and sworn to
      before me this ____ day
22    of _____, 2012.

23

24    _____
      Notary Public
```

Huntley

Page 38

1    STATE OF ILLINOIS
                              SS:
2    COUNTY OF COOK

3        I, Kristin M. Ashenhurst, a Certified

4    Shorthand Reporter within and for the State of

5    Illinois, do hereby certify that heretofore, to-wit, on

6    September 24, 2012, personally appeared before me

7    at 3000 Montvale Drive, Springfield, Illinois,

8    EDWARD W. HUNTLEY, in a cause now pending and

9    undetermined in the United States District Court,

10   Northern District of Illinois, Eastern Division,

11   wherein DAVID ARMATO is the Plaintiff, and RANDY

12   GROUNDS, MICHELLE LITTLEJOHN, GLENN JACKSON, and DION

13   DIXON, are the Defendants.

14       I further certify that the said

15   EDWARD W. HUNTLEY was first administered an oath to

16   testify the truth, the whole truth and nothing

17   but the truth in the cause aforesaid; that the

18   testimony then given by said witness was

19   reported stenographically by me in the presence

20   of the said witness, and afterwards reduced to

21   typewriting by Computer-Aided Transcription, and

22   the foregoing is a true and correct transcript

23   of the testimony so given by said witness as

24   aforesaid.

www.krusereporters.com    Kruse Associates, Ltd.    312.345.1500

Huntley

1   I further certify that the signature to

2 the foregoing deposition was reserved by

3 the witness and that there were present at the

4 deposition the attorneys hereinbefore mentioned.

5   I further certify that I am not counsel

6 for nor in any way related to the parties to

7 this suit, nor am I in any way interested in the

8 outcome thereof.,

9   IN TESTIMONY WHEREOF, I certify to the

10 above facts this 1st day of October, 2012.

11

12

13

14

15   s/ Kristin Ashenhurst

16   Kristin M. Ashenhurst, CSR
    LICENSE NO.: 084-002090.

17

18

19

20

21

22

23

24

Huntley

Page 1

**A**

abide 21:18,20
Absolutely 30:13
acceptable 31:5
   33:5
acronyms 19:10
action 32:14
address 10:17 12:5
   12:8
administered 4:1,3
   37:12 38:15
admonished 17:4
advice 9:23 10:1,11
   10:14 18:20 32:6
advising 9:4 11:5
   31:17
affix 37:16
aforesaid 37:13
   38:17,24
AG 21:20
ago 34:22
agree 18:15
agrees 21:21
ahead 4:23 17:12
alert 19:12
allow 23:4
allowing 20:7
allows 23:21 24:2
alluded 15:23
alternative 32:21
alternatives 32:8
   32:13
Alyssa 34:7
amended 6:7
amount 11:3
ankle 34:5
answer 16:14
answers 22:14
apart 34:16
apologize 20:24
apparently 24:21
appeal 17:1,2
appear 14:1 30:8
APPEARANCES
   2:1
appeared 38:6

appears 14:10 18:1
approximately 9:3
   18:10,23 27:13
April 5:22 7:13
   10:24 29:17,18,20
   29:21,23 30:1
area 15:19
Armato 1:3 6:20
   9:1,5 12:21 20:7
   24:17 32:1,18
   33:15 35:21 37:4
   38:11
Armato's 9:23 22:2
Ashenhurst 1:16
   1:23 38:3 39:15
asked 6:21 14:8
   31:9
assist 34:1
assistant 2:9 16:8
   16:21 19:13
attempt 22:23
attempting 18:9
attention 16:7,9
   17:7 27:17,24
   28:3
attorney 2:8,9 7:21
   8:2,23 14:13,16
   15:7,11,12,21
   16:21 17:9,17
   18:8,14 19:16
   21:3,9 22:22
   23:11 25:2,7 26:7
   31:18 35:20
attorneys 8:2 39:4
August 27:1
authority 6:19
   23:21 24:2
available 21:17
aware 20:4 22:2
a.m 29:11 30:4

**B**

B 3:11 13:13,18
   14:18 36:12
back 4:13 8:9 10:2
   11:20 14:3 15:3

21:5 25:22 26:1
background 4:11
bad 30:7
based 20:21 35:17
basically 14:18
   17:2
basis 12:1
Bates 29:13,16,18
   29:22,24 30:2,4,6
Bates-stamped
   29:3,5,7,15,19
began 9:2
behalf 18:16 31:20
belabor 27:18
believe 6:12 8:18
   12:10 14:4 20:19
   22:24 23:17 34:16
   35:13 36:1,10,12
benefit 33:17
best 9:11
beyond 23:23
birth 5:24
bit 10:21 26:22
board 26:21 34:20
   35:6
bracelet 34:5
break 25:21 29:7
breaking 10:15
bring 16:7,9,16
   17:6 27:17
bringing 28:5
brought 4:12,21
   27:24 28:3
business 8:21

**C**

C 3:12 13:13,19
   14:18 36:13
call 10:8 25:8
called 1:12 14:17
   25:12,12 31:2
capacities 1:7 37:8
capacity 11:6
captured 22:8
carriers 12:3
case 10:19 23:15

26:5 36:10
cases 8:4 11:18,21
   12:2 22:22
cause 27:16 38:8,17
cc'd 29:13
ceased 10:22
Central 5:1
certain 10:5
certainly 14:22
   15:5 16:7 19:6,19
Certified 1:16 38:3
certify 38:5,14 39:1
   39:5,9
chain 8:19 25:15
   28:6
challenge 21:17
change 12:15 21:19
   23:13
changed 12:14
   17:22 26:23 27:2
changes 26:20
chart 8:18
Chicago 2:4 25:7
chief 3:14 4:17 5:18
   8:10,16 9:17 10:3
   10:22 11:1 16:8
   19:13,20 25:14,19
   26:18 27:2,4
chose 27:22
chosen 22:23
Circuit 15:3
circumstances
   20:19
civil 1:13 11:15,19
   11:21 26:5 34:14
clearly 9:24
client 8:7,7,23 9:8
   9:11
Code 20:15
come 16:1,5 22:16
   24:9
coming 26:21
command 8:20
   28:6
comment 31:8
commitment 34:14

34:14
complaint 6:8
compliance 16:17
comply 17:23
computer 31:2
Computer-Aided
   38:21
concern 23:23
concerned 16:24
   18:5
concluded 36:22
concurrently 34:9
   34:10
condition 35:4
conditions 23:2,9
   23:13
consecutively
   34:10
consisted 28:13
consulting 27:11,21
contacted 21:4
contained 20:22
   22:10
contrary 20:10
contrasted 11:2
control 8:1
conversation 9:14
   16:22
conversations
   18:13
convictions 35:17
COOK 38:2
copies 14:7
copy 13:20,20
corporate 25:16
correct 5:16 7:15
   15:4,10,14,18
   31:21 38:22
corrected 21:5,6
Correction 14:19
   26:10
Corrections 4:18
   6:11 7:12,23 9:10
   9:12 15:6,12
   23:22 31:21
counsel 3:14,15

Huntley

4:17 5:18,20 7:11
8:10,11,17 9:17
10:3,4,22 11:2,4
19:20 25:14,19
26:19 27:2 39:5
**County** 15:4 38:2
**couple** 6:11
**course** 25:23 31:3
**court** 1:1 4:8 7:20
15:3,15 20:18
21:10,14,15,17,21
22:17 23:10,12
24:4 31:6 37:1
38:9
**Courts** 1:14
**court-ordered**
30:22 31:12
**cover** 5:14
**criminal** 14:16
**CRR** 1:23
**CSR** 1:23 39:15
**current** 7:10
**custody** 33:13
**CV** 1:5 37:6
**cyclical** 33:9

**D**

**D** 3:13 28:8,11
36:13
**date** 5:22,24 14:20
**dated** 27:1
**David** 1:3 12:21
24:17 37:4 38:11
**day** 7:17,17 37:21
39:10
**days** 18:10 20:1
**ddecaro@kupets...**
2:5
**deal** 25:2 26:5,8
**DeCARO** 2:2,3 4:6
5:5 13:22 25:21
26:1,3 36:14,17
**decided** 17:16
31:24 32:22
**decision** 6:23 9:6
10:14 18:8,11

21:14 27:19,20
31:24 32:10
**decisions** 10:12
27:10
**declined** 31:18
**Defendants** 1:8
2:11 11:16 37:9
38:13
**defense** 11:17,19
14:16
**definite** 20:3
**degree** 7:3
**degrees** 7:8
**DENNIS** 2:3
**dep** 16:1 36:12
**department** 4:18
4:24 6:10 7:12,19
7:22 9:9,12 11:7
11:13 12:15 13:1
14:19,23 15:6,11
18:16 23:22 25:16
26:10,11 31:20
33:21 35:19,20
**departments** 26:11
**Department's** 8:17
**depending** 17:20
21:11
**deponent** 37:13
**deposition** 1:12 6:3
6:3,16 9:13,14,21
15:23 37:14,15
39:2,4
**depositions** 1:15
**deps** 34:3
**described** 22:20
23:20 32:12
**describing** 20:24
**description** 3:14,15
4:12 8:12 26:24
31:5
**descriptions** 4:20
4:24 5:14 6:6
**detained** 10:6
**detaining** 6:20
**determination** 20:1
**determinations**

10:4 27:15
**determine** 8:24
10:9
**determining** 14:20
26:5,7 35:20 36:8
**Diers** 14:7 29:2,13
29:19 30:2
**different** 6:10 8:19
8:22 21:13 23:1,6
**differently** 32:19
**difficult** 23:8 26:22
**DION** 1:6 37:7
38:12
**Direct** 3:4 4:5
**direction** 9:17
15:18 32:6
**directions** 6:22
**directly** 24:14,22
26:12
**director** 11:5,6
26:21
**discharge** 13:1
30:22 31:12
**discharged** 13:8
31:6 34:4,9
**discovered** 17:3
**discussing** 19:16,16
**dispute** 9:2 10:7
13:24 27:7
**disregard** 15:8
**distinction** 10:16
**distinctions** 9:8
**distinguish** 23:9
**District** 1:1,1,14
37:1,1 38:9,10
**Division** 1:2 37:2
38:10
**DIXON** 1:6 37:7
38:13
**documents** 6:2
14:18,19,22 18:24
**doing** 10:23 11:3
11:14 20:24 24:6
24:6
**door** 33:9
**Drive** 1:17 38:7

**duties** 11:1
**D-i-e-r-s** 29:2

**E**

**E** 3:14 5:3,8 36:13
**earlier** 6:14 22:21
26:15 32:13 35:17
**early** 22:7 27:1
**easiest** 11:9
**Eastern** 1:2 37:2
38:10
**education** 7:2
**Edward** 1:12 3:3
4:2,9 37:12,19
38:8,15
**Edward.Huntley...**
12:11
**effort** 18:15
**eight** 19:24
**either** 5:6 8:10,14
10:3 14:12 15:11
16:7 17:20,21
19:13 28:15 31:19
32:11
**electronic** 33:3,4,6
34:23 35:9,11
**electronically**
34:21,22
**eligible** 34:13
**employed** 7:22
11:23
**employees** 6:10
7:19 19:7
**employment** 7:10
10:21
**ended** 9:3
**ends** 21:6
**engage** 24:7
**entered** 6:12 31:16
**exactly** 26:23 28:4
30:22 31:12
**examination** 1:13
3:2,4 4:5
**examined** 4:3
**example** 10:19
**exceptions** 20:16

20:20
**exchange** 22:9
**exchanged** 6:10
**exhaust** 28:21
**exhausted** 21:16
32:8,14
**Exhibit** 3:11,12,13
3:14 5:3,8 13:18
13:18 28:8,11,13
36:11
**exhibits** 3:9 13:13
13:16
**experience** 34:20
**explain** 11:9 30:18
**extent** 17:14
**e-mail** 12:5,8 18:17
22:8 29:1,6,8,12
29:14,15,17,18,20
29:22,23 30:1,3,5
30:16 31:17
**E-mailing** 30:14
**E-Mails** 3:13 6:9
14:2 15:1 16:19
16:22 18:1 24:21
28:10,12,15,18,21
28:22,24 29:4,5,8
30:8,11 34:3,7

**F**

**facilities** 27:14
**facility** 16:6
**fact** 17:3 32:24
34:16
**facts** 39:10
**fair** 11:3 24:19
**fairly** 22:7
**FANNING** 2:8
13:21 36:16,18
**far** 19:15 35:11
**fashion** 16:16
17:22
**favorable** 32:10,14
**February** 4:13 5:7
5:12 6:13 9:3
12:6,23 13:9 18:7
20:6 22:1,12,12

Huntley

Page 3

28:15 29:1,4,5,11
felon 20:11
felt 24:5
file 17:19 18:15
filed 6:8
fill 8:7
finally 18:16 30:5
find 16:11 23:3
fine 9:7
finely 10:16
finish 21:15
first 3:16 4:3 5:17
22:16 24:8 34:7
37:12 38:15
five 19:19
Floor 2:4
followed 18:3
22:20
follows 4:4
food 25:15
footing 24:6
foregoing 37:15
38:22 39:2
form 19:17
forwarded 14:5
found 18:6 28:23
29:4,8
Frankly 9:7
free 34:1
frequently 25:13
full 4:7 12:12
further 38:14 39:1
39:5

**G**

gain 35:22
general 2:8,9 8:2
17:9 21:9 22:22
23:11,12 26:7
33:19
generally 7:16
14:21 16:10
General's 7:21
14:13 15:7,12,21
17:17 18:8,14
19:17 25:3,7

31:18 35:20
getting 30:11
gist 16:23
give 10:11
given 38:18,23
giving 9:22 10:1,13
glanced 6:11
Glenn 1:6 6:16
8:14,18 14:3,6
15:23 16:2 17:5
18:18 24:22 26:16
27:9,19 29:1,6,9
29:12,16,17,18
30:1 31:8 32:2,6
37:7 38:12
Glenn's 9:13
go 4:23 5:19 12:7
15:3,13 17:12
19:23 21:1,5,10
21:13,15 22:15,23
26:1 32:11,12
36:5
goal 33:14
goes 21:20
going 4:10 9:1 12:5
13:4 14:2 17:10
17:17 18:19 22:4
22:14 23:10 25:9
28:24 32:15,20
36:18
good 15:9
Gordon 24:15
gotten 23:13
gov 12:12
governing 17:24
Great 13:6
grievance 35:22,24
Grounds 1:6 24:15
28:13 37:7 38:12
group 3:13,13,14
5:2,8 28:7,11,12
28:13 33:17,19
36:6
groups 33:22
guess 10:13 11:7
18:4 20:23 31:10

guidance 6:21
guy 17:1
guys 22:4

**H**

handful 11:21
handle 9:18 11:19
handled 7:20 8:4
12:2
happen 32:5
happens 19:15
head 32:3
hereinbefore 39:4
heretofore 38:5
her's 16:1
higher 28:6
highest 7:2
highlighted 28:14
hired 4:14
history 10:21
hold 23:22
holding 5:7
home 36:4,5,6
host-site 33:5 34:23
35:1,3 36:1,3
hour 1:18
hundreds 28:14
Huntley 1:12 3:3
4:2,9,10 5:2,8
13:18 28:7,11
37:12,19 38:8,15
H-u-n-t-l-e-y 4:9

**I**

ID 3:10
idea 15:9 23:4
30:10
identification 5:4
13:15 28:9
Illinois 1:1,17,18
2:4,10 4:17 7:11
7:22 9:9,12 14:19
15:6,11 20:15,18
23:22 26:10 37:1
38:1,5,7,10
implement 17:11

implies 15:17
important 14:22
impression 8:6
incarcerated 9:6
10:10
incarceration
33:10
include 19:9 20:13
included 11:3
independent 12:18
13:3,5
INDEX 3:1
indicates 32:5
individual 1:7 37:8
information 18:6,7
22:10
informed 18:17
initial 18:6
initially 17:4
initials 31:4
inmate 23:5 26:18
inmates 27:12
inside 32:3
instance 21:7 24:8
insurance 12:3
intended 16:13,24
21:8
interested 39:7
interests 9:11
internally 17:16
interrupt 17:13
intervene 31:20
intervention 25:10
involve 19:6
involved 28:22 30:9
irregular 19:8
27:16
issue 10:17 24:4,12
issued 33:12
Issues 26:18

**J**

Jackson 1:6 6:16
8:14 9:5 14:3,4,17
16:8 18:18 19:13
24:22 27:10,19

29:1,6,9,12,16,17
29:19,21,22,24
30:1,3,6,11 37:7
38:12
Jackson's 6:18
15:23 26:16
job 1:24 3:14,15
4:12,20 5:14 7:13
10:2,6
Joel 14:7 29:2
joining 11:13
judge 16:24 21:10
21:21 23:15
judges 23:13
judge's 17:11 32:15
jumped 10:20
June 26:22

**K**

keep 9:6 10:6 32:12
kept 33:12
Kevin 25:4,12
know 8:21 9:7,13
9:24 10:15,18
16:16 17:8,9,15
17:19 18:11,12,24
21:3,15 22:8,9
23:4 24:3 25:15
26:16 28:17,20
32:4,7 33:9,16,20
34:2,18 35:11
knowledge 24:18
known 27:23 28:2
31:3,10
Kristin 1:15,23
38:3 39:15
KUPETS 2:2

**L**

Lake 15:3
language 20:7,9,21
law 7:3 20:9,10,11
25:16
lawyers 7:21 8:3
leave 20:17 31:19
left 20:23

Huntley

Page 4

**legal** 3:14 4:17 5:18
  8:10,16 9:16,17
  9:22 10:1,3,11,14
  10:22 11:1 19:20
  23:21 24:1,5
  25:14,19 26:11,18
  27:2,4 35:16
**let's** 17:10 28:10
  30:16
**level** 7:2
**LICENSE** 1:23
  39:16
**line** 30:19
**litigation** 3:15 5:20
  7:11,18 8:11,11
  10:4 11:2,4,14
  25:6,19
**little** 6:18 10:21
  26:22 29:7
**Littlejohn** 1:6 14:3
  18:6 24:11 29:12
  37:7 38:12
**Littlejohn's** 16:1
**local** 16:6,11 19:7
**long** 18:4 19:22
  22:15
**look** 5:9 9:16 21:4
  28:10,17 30:16
  ·36:11
**looked** 4:19 6:6,7,9
  6:13,15 28:19
  36:12
**looking** 6:14 34:8
**looks** 4:13,19,20
  18:5 29:23
**loud** 31:11
**love** 19:10
**Lovellette** 25:4
**L-o-v-e-l-l-e-t-t-e**
  25:4

**M**

**M** 1:15,23 38:3
  39:15
**maintain** 33:6
**maker** 6:23

**making** 9:7 10:4,12
  10:16 27:14
**management** 5:1
  11:8
**mandatory** 13:10
  19:11 20:8,12,14
  33:15,24 35:7,8
**manual** 16:3 19:1,4
  19:8 23:24
**March** 10:22 29:8
  29:14,15
**marked** 3:10,16 5:3
  5:8 13:14,16,17
  28:8,10
**matter** 4:12 12:9
  17:6,18 27:20
**mean** 14:8,21 15:6
  19:23 22:3 28:20
  30:24 31:1
**Meaning** 36:20
**means** 20:19
**meat** 4:11
**member** 11:8
**members** 11:7
**mentioned** 39:4
**merited** 17:16
**Michele** 1:6 14:3
  24:11 37:7
**Michelle** 15:24
  16:20 18:5 24:14
  28:3 29:12 38:12
**middle** 10:24 18:18
**mid-April** 11:10
**mind** 12:7
**minute** 28:16 34:22
**minutes** 25:22
**missions** 33:20
**mistake** 16:12 21:4
**mittimus** 14:17
  27:8
**Mm-huh** 23:7
**modification** 25:9
**modified** 17:21
  21:12 23:10
**modify** 15:4,13,15
  16:15 18:9 21:11

**21:21 22:23**
**modifying** 31:19
**monitored** 34:21
  34:22
**monitoring** 33:4,4
  33:6 34:24 35:9
  35:11
**months** 13:2 19:24
  22:13
**Montvale** 1:17 38:7
**move** 21:9 22:6
**moving** 31:19
**MSR** 14:11 17:4
  19:9,12 22:17
  23:16 32:19,20
  33:2 35:2 36:2,8
**municipalities**
  11:23 12:4

**N**

**name** 4:7,8
**nature** 9:8 16:12
  35:1
**never** 15:10
**new** 26:21
**Northern** 1:1 37:1
  38:10
**Notary** 37:24
**notice** 36:12
**noticed** 26:24
**number** 3:10 11:6
  18:13 23:6,12

**O**

**oath** 4:1,3 37:13
  38:15
**obey** 32:15
**obligation** 34:17,19
  35:16
**obviously** 21:6,20
  27:22 33:14,22
**occasion** 12:4 24:3
**October** 6:1 39:10
**offender** 27:6 31:3
  33:2,3 34:17,19
  35:3,15

**offenders** 33:19,23
**offense** 23:19 34:10
  36:20
**offenses** 34:4,12
**office** 2:8 7:21 9:16
  10:8 14:13,13
  15:7,12,20,21
  16:3,6 17:17 18:8
  18:14 19:2,6,7,17
  24:24 25:3,7
  26:17 27:13 31:18
**officer** 16:9 19:14
**official** 5:22
**oftentimes** 8:6
**Oh** 6:15
**okay** 12:13 15:16
  17:7,10 21:16
  31:7,14
**opinion** 20:5 21:19
**opposed** 32:19
**option** 32:23
**options** 15:2,5
  21:17
**order** 3:11,12 6:14
  10:19 14:10 16:4
  16:15 17:11,21,21
  18:9 19:8,9 20:5,6
  20:22 21:6,11,18
  21:19,19,21 22:10
  22:17,23 23:3,9
  23:14,24 27:8
  31:6,19 32:15,19
  33:4
**ordered** 23:6,16
  35:6
**orders** 6:11,12 9:3
  12:22 13:9,17,23
  14:5,9,12,15,18
  15:2,4,8,13 20:6
  23:2 24:4 32:23
  34:20
**ordinary** 16:4
**organizational**
  8:18
**OTS** 31:4,5
**ought** 18:20 32:5

**outcome** 39:8
**out-date** 9:2 22:3
  22:11 23:23 27:8
**out-of-the-ordin...**
  23:2
**oversight** 16:12

**P**

**page** 29:15 30:17
  34:7
**pages** 18:23 28:14
**paper** 32:24 33:1
**parole** 33:11,18
  34:11
**part** 10:2,6 19:5,5
**particular** 9:18
**parties** 16:13 39:6
**pending** 7:19 38:8
**Pennsylvania** 7:5
**people** 10:12 33:22
**period** 4:16 5:11
  9:1,4 12:16 13:11
  20:3,12 21:24
  26:9 27:9 28:23
  30:12
**person** 34:14,15,18
**personally** 10:9
  11:5 38:6
**personnel** 16:6
**persuade** 18:15
**pertaining** 1:14
**phone** 25:11,13
**phrase** 18:21 33:10
**physically** 33:1
**place** 18:2 36:5
**Plaintiff** 1:4 2:6
  37:5 38:11
**Plaintiffs** 11:16
**plaintiff's** 11:18
  13:13
**pleading** 17:19
**please** 4:7
**pleased** 21:22
**point** 6:20 16:3
  17:10 19:21 21:18
  22:7 26:17,19

Huntley

27:18
points 5:11 6:22
  8:16,19 13:24
policy 19:17,24
position 4:14,15,24
  5:6,17 6:6 7:10
  8:12 11:11 21:18
  25:18 26:4,24
positions 5:10,15
  8:10
possible 24:13
postgraduate 7:8
potential 32:8
practice 11:13
  19:19
preceded 12:15
  22:12
preparation 6:3
presence 38:19
present 39:3
presented 10:18
PREVIOUSLY
  3:16
primarily 12:2
primary 13:12
prior 4:13 6:2
  11:10 34:3,18
  35:2
prison 10:7 23:5
prisoner 23:22 25:6
  27:8,11 34:19
  35:6
prisoners 10:5
prisoner's 14:20
private 11:13 36:5
probably 11:20
  14:9 15:23 22:7
problem 10:9 13:12
  14:11,14 15:2
  33:1
problems 14:12
procedure 1:13
  17:14 19:23 35:22
  35:24
proceed 18:9 27:20
proceedings 36:21

process 15:22 18:3
  19:2,3 21:1,2,16
  21:23 22:20 23:20
  23:24 24:1,7 32:9
  32:12 33:8
prosecutor 16:11
protect 33:21,23
provided 32:19
  33:18
provides 32:20
public 8:23 33:21
  33:23 37:24
purposes 17:7
pursuant 1:13 4:21
pursue 25:9 31:19
put 9:17 35:9,10
p.m 1:19 29:2
  36:22

---

**Q**

question 10:17
  16:14 24:9 30:7
  31:9
questions 4:11 7:1
  23:19 36:16
quickly 4:19
quite 10:15

---

**R**

RANDY 1:6 37:7
  38:11
RDR 1:23 39:15
reach 16:10 17:18
reached 16:20 32:8
read 15:24 37:15
reading 9:12 14:2
  15:1
reads 6:21
really 6:17,23 21:8
reason 13:8
reasoning 23:18
recalculated 22:11
recall 13:23 14:6
  14:15 16:2,23
  19:13 22:9 24:9
  24:14 25:1,12

26:16 30:11,14
received 12:22
  18:23,24 28:16,23
receiving 28:18
recess 25:24
recollection 12:18
  13:3,5 16:18
  18:12 22:11 23:14
  27:3 28:17 31:15
record 12:7,8 26:1
records 10:8 16:2,6
  16:8 18:24 19:1,6
  19:7,14 27:13
  28:24
reduced 38:20
reference 34:12
referencing 16:2
referral 34:13
referred 3:16 33:8
referring 22:1
regarding 24:12
regardless 16:14
register 33:3 34:17
  34:19 35:14
regular 12:1
reintegrating 34:1
related 39:6
relationship 8:22
release 9:5,6 10:5
  13:10 14:20 19:11
  20:7,8,12,15
  27:10,12 31:24
  33:2,16,24 34:18
  35:7,8,23 36:1
released 10:10
  13:10 20:21 32:18
  32:24 35:2,10
  36:8
releasing 6:20
  32:22
relies 14:20
rely 14:23
remained 10:10
remember 6:14
  26:23
report 8:14 26:11

33:12
reported 1:23 8:18
  26:18 27:5 38:19
reporter 1:16 4:8
  38:4
reporting 26:16,20
represent 12:3
representation
  17:8
representative 8:7
Representing 2:6
  2:11
required 23:4 33:2
research 24:3
reserve 36:18
reserved 39:2
respect 12:22
responses 30:14
result 21:22
results 21:2
retrial 17:3
return 29:23
Revie 35:6
review 10:11 17:18
  34:13,20
reviewed 6:2 12:17
reviewing 16:19
re-reading 9:21
rider 4:21 36:12
right 9:20 12:24
  21:23,23 24:9
  25:22 28:1 31:22
  35:18 36:19
rights 11:19,21
ROBERT 2:8
role 8:8
route 22:15,15
Rules 1:13
run 34:9

---

**S**

S 2:9
saw 4:12
saying 17:7 22:17
says 19:9 20:17
  21:3,9,12,12

second 2:9 30:19
sector 8:24
seek 17:8
seeking 17:20
sending 28:18
senior 11:7,8
sense 15:14
sent 18:18 28:16,22
sentence 20:13 23:5
  32:4
sentencing 6:14
  17:24 20:15
separate 34:15
  35:16
September 1:18
  37:14 38:6
series 6:9
serve 23:5,16 33:15
served 27:4
services 5:1 9:16
serving 33:24
sex 27:6 33:2,3,19
  33:23 34:4,17,19
  35:3,14
sexually 34:13,15
short 22:15
Shorthand 1:16
  38:4
shortly 18:17
show 30:21 31:11
signature 37:16
  39:1
simply 16:11
sitting 6:17
situation 9:19,23
  10:11 12:18,19,22
  26:6 27:23 28:5
  35:21
six 19:24
smattering 11:21
society 34:1
sole 13:8
somebody 23:16
  28:6
sorry 4:22 21:14
  35:5

Huntley

Page 6

sort 8:21 17:6
sorts 23:1
sound 24:5
speak 8:5 24:11
special 3:15 5:20
  7:11 8:10,11 10:3
  11:2,4
specific 20:6 23:14
specifically 13:9
spell 4:8
spelled 12:12
spent 11:5,12
spoke 24:21
spoken 24:17
spring 6:8
Springfield 1:17
  2:10 38:7
SS 38:1
staff 11:7
stamp 29:13,16,18
  29:22,24 30:2,4,6
stands 19:11
start 10:23
started 7:13
starting 28:15
state 1:16 4:7 17:23
  20:9,10,11 38:1,4
stated 13:9
states 1:1,14 14:5
  37:1 38:9
State's 16:21 21:3
statutes 16:17
  17:24
stenographically
  38:19
step 17:5 21:9
steps 15:17,20
Street 2:3
strike 24:20 29:9,9
  29:21 32:17
struck 26:2
structure 25:16
  26:17
structures 26:21
Subscribed 37:20
successfully 23:13

suggested 24:7
suggestion 18:19
suit 39:7
summarizes 16:22
superior 25:19
supervise 7:18
supervised 13:10
  19:11 20:8,12,14
  33:15,24 35:7,8
supervision 33:18
supervisor 25:6,18
  25:20
supervisory 8:1
support 34:23
suppose 30:21
  31:11
Supreme 20:18
sure 10:20 18:22,22
  27:12,22
sworn 37:20
system 31:2,3,16

**T**

take 5:9 11:20
  15:17 18:4 23:19
  25:21 28:16
taken 1:15 10:14
  25:24 28:13 37:14
takes 18:10
talking 6:7 12:19
  12:21 13:18 23:18
  24:14 26:9 27:9
team 11:9
tell 6:5 7:16 13:6
  15:20 20:18 23:11
  25:8,11 32:2,3
tenure 12:14
term 17:4 19:9,12
  20:8,14 23:16
  33:15,18,24 34:11
  35:7,8
terms 10:16 16:5
  17:20 28:5
testified 4:4
testify 38:16
testimony 6:18

38:18,23 39:9
Thank 36:14,17
Thankfully 22:14
thanks 13:21 30:20
thereof 39:8
thing 14:24
things 23:6 26:23
  34:6
think 5:22 6:8,12
  8:5,6 9:10,15 12:9
  12:15 15:22 16:21
  16:22 19:18,18
  20:14 24:4,8,13
  26:7,24 30:8 32:4
  32:11
thinking 28:5
  31:11 32:15
thought 9:11 10:13
  32:5 34:2,8
thoughts 18:14
  30:18
three 13:2
time 4:15,16 5:11
  5:15 11:5 12:16
  16:9 20:3 21:24
  22:4,16 26:9,17
  27:4,9 28:23
  30:12
times 23:12
title 8:12
titles 8:15
today 6:3,18 8:24
  12:17 25:18 26:4
told 12:17 19:3
  33:16
top 25:15,15
topic 9:14
to-wit 38:5
tracking 31:3
training 16:3 19:1
  19:1,4
transcript 6:15
  9:13 15:24 37:15
  38:22
Transcription
  38:21

transition 5:21
trial 11:15
true 38:22
truth 38:16,16,17
try 7:18 15:4
trying 8:24 9:10,15
  10:17
turnaround 33:10
twelve 19:24
two 4:20,22,24 6:6
  6:12 8:9 13:8,17
  13:23 14:10,18
  25:21
type 11:14 31:24
typewriting 38:21

**U**

ultimate 6:19,23
  13:1
ultimately 20:22
  25:8
unclear 6:19
understand 12:19
  15:1 22:24 23:17
  23:20,24 26:20
understanding
  9:22 13:6,7,11
  16:18,19 19:2,5
  22:3,5 31:4 33:7
  34:24
undetermined 38:9
unilaterally 15:8
unit 25:7 27:5,6
United 1:1,14 37:1
  38:9
University 7:5
unusual 23:3 28:5
use 13:17 33:11

**V**

vacated 17:21
  21:13
various 7:20
variously 33:8
varying 5:10 23:9
view 8:22 16:16

17:23 32:6
viewing 27:16
violate 20:9
violation 33:9,11
violent 34:14,15
void 24:4
vs 1:5 37:6

**W**

W 1:12 2:3 3:3 4:9
  37:12,19 38:8,15
waiting 31:23 32:3
want 5:8 6:24 7:16
  12:7 17:1,2,8,13
  18:20 27:18 28:16
  32:6,10 33:11,22
wanted 15:19 33:23
warrant 33:12
Washington 2:3
wasn't 13:8 18:7
  27:7 35:10
way 8:4 9:18 11:9
  27:16 28:4 32:14
  39:6,7
week 14:9
went 15:12,15 33:7
weren't 18:19 24:5
we'll 13:18 17:11
  17:11 21:5,10,10
we're 17:10 21:22
  23:18 25:9 32:15
  36:18
we've 8:13 10:8
  20:1 27:9
WHEREOF 39:9
Williams-Schafer
  34:7
willing 17:19
willingness 16:15
witness 3:2 4:1
  25:23 36:20 38:18
  38:20,23 39:3
work 11:15
wouldn't 27:23
  28:2 31:10 35:12
written 19:4,17,22

Huntley

20:13 33:12

**X**

X 23:5

**Y**

year 6:9 7:6 27:12
years 11:12,22,24
19:19

**0**

01059 30:2
01064 30:4
01070 30:6
01076 29:22
01097 29:19
01101 29:18
01109 29:16
01112 29:14
01118 29:7
01119 29:3
01123 29:5
05 11:10
084-002090 1:23
39:16
09 27:1

**1**

1st 5:22 7:13 39:10
1:51 1:18
10:02 29:11
11 1:5 37:6
11:31 30:4
12 3:11,12
12th 29:15
120 20:1
1200 18:23
18 13:9
18th 9:3 20:6 22:1
22:12,12
1951 6:1
1976 7:7

**2**

2 28:13
2nd 29:17
2:40 36:22

**20th** 2:4
20,000 27:12
2005 10:24
2009 26:22
2010 4:13 5:7,7,12
5:23 6:13 7:14
9:3,4 10:22 12:6,6
12:23 13:9 18:7
22:1,2 29:1,4,11
29:17,20,21 30:3
30:4,5,17
2012 1:18 37:14,21
38:6 39:10
21 30:3,4,5,16
21st 9:4 12:6 22:1
217 2:10
22nd 12:6 28:15
29:1,4
23rd 29:5
24 6:1 37:14 38:6
24th 1:18
25-and-a-half
11:12
26 29:21
26th 29:11
27 3:13
27th 29:20,23
2729 1:24
29th 30:1

**3**

3 3:3
3000 1:17 38:7
3023 1:5 37:6
31st 10:22
312 2:5
372-4444 2:5

**4**

4 3:14
4:11 29:2

**5**

5th 29:8,14
500 2:9

**6**

6 22:13
60602 2:4
62706-1771 2:10

**7**

77 2:3
782-7955 2:10

**8**

8th 29:18

**9**

90 18:10

IN THE ___IT COURT OF THE NINETEENTH ___CIAL CIRCUIT
LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
vs. ) Case No. 05CF1861
David Armato N91995 )
_____ )
Defendant

FEB 18 2010

Date of Sentence March 6, 2008
Date of Birth 04/03/65
_____ (Defendant)
___ of Birth _____
(Victim)

_Sigfred Appel_
CIRCUIT CLERK

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | MSR |
|---|---|---|---|---|---|---|
| 1 | 05/07/05 | Theft | 720 5/16-1(a)(1)(A) | 3 | 10 Yrs __Mo __Yr | |

and said sentence shall run (☒ concurrent with)(☐ consecutive to) the sentence imposed on: _____05CF5015_____

_____  _____  _____  _____  ____  _____ Yrs __Mo __Yr
and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____,

_____  _____  _____  _____  ____  _____ Yrs __Mo __Yr
and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____,

_____  _____  _____  _____  ____  _____ Yrs __Mo __Yr
and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____,

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a Class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☒ The Court finds that the defendant is entitled to receive credit for time actually served in custody from _____373 days_____ (specify date(s))
to _____ from _____ to _____ from _____ to _____

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the impact incarceration program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program. Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve   ☐ 75%   ☐ 85%   ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☒ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☒ IT IS FURTHER ORDERED that With credit for 373 days served in the Lake County Jail - credit for time awaiting transport to the Department of Corrections - good time credit as administered by the Department of Corrections - def to be released from the Department of Corrections without a term of Mandatory Supervised Release.

This order is (☒ effective immediately) (☐ stayed until _____

DATE: February 18, 2010

ENTER: _____ s/ Theodore S. Potkonjak
Theodore S. Potkonjak
(PLEASE PRINT JUDGE'S NAME HERE)

Δ π EXHIBIT 13
Deponent _Huntley_
Date 9/27/12 Rptr. _____
WWW.DEPOBOOK.COM

Form approved by the Conference of Chief Judges
Effective January 18, 2008

171-39C4 (R01/08)

000785

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

N91995

PEOPLE OF THE STATE OF ILLINOIS )
vs. ) Case No. 05CF5015
David Armato N91995 )
Defendant

FEB 18 2010

Date of Sentence March 8, 2008
Date of Birth 04/03/85
(Defendant)
Year of Birth
(Victim)

**JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS**

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | MSR |
|---|---|---|---|---|---|---|
| 1 | 12/30/05 | Theft | 720 5/16-1(a)(1)(A) | 3 | 10 Yrs __Mo __Yr | |

and said sentence shall run (☒ concurrent with)(☐ consecutive to) the sentence imposed on: ___05CF1681___.

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____. ___Yrs ___Mo ___Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____. ___Yrs ___Mo ___Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____. ___Yrs ___Mo ___Yr

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a Class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☒ The Court finds that the defendant is entitled to receive credit for time actually served in custody from ___373 days___ [specify date(s)] to _____ from _____ to _____ from _____ to _____.

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the Impact Incarceration program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program. Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve ☐ 75% ☐ 85% ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☒ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☒ IT IS FURTHER ORDERED that With credit for 373 days served in the Lake County Jail - credit for time awaiting transport to the Department of Corrections - good time credit as administered by the Department of Corrections - def to be released from the Department of Corrections without a term of Mandatory Supervised Release.

This order is (☒ effective immediately) (☐ stayed until _____.

DATE: February 18, 2010

ENTER: s/ Theodore S. Potkonjak
Theodore S. Potkonjak
(PLEASE PRINT JUDGE'S NAME HERE)

Form approved by the Conference of Chief Judges
Effective January 18, 2008

Δ π EXHIBIT C
Deponent Huntley
Date 9/24/12 Rptr. Kurb



171-39C4 (R01/08)
000786

**Sent:** Monday, February 22, 2010 4:14 PM
**To:** Jackson, Glenn; Diers, Joel M.; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato

The SVP offenses have discharged and did not run consecutively or concurrently with another offense or parole term.

```
Alyssa Williams-Schafer
Coordinator for Sex Offender Services
Illinois Department of Corrections
1301 Concordia Court
Springfield, IL  62794
(217) 558-2200 ext. 6512
```

---

**From:** Jackson, Glenn
**Sent:** Monday, February 22, 2010 4:11 PM
**To:** Diers, Joel M.; Huntley, Edward
**Cc:** Williams-Schafer, Alyssa
**Subject:** FW: Possible Release N91995 David Armato
**Importance:** High

Ed/Joel,

I think this is one we need to have a look at before discharging. Our record office just received the order today. Alyssa, please check to see if eligible for SVP review. He has two prior offenses for Agg Crim Asslt. I have a fax copy of the order for your review. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Monday, February 22, 2010 2:13 PM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato
**Importance:** High

Update:  I talked with ASA Eric Kalata.  He said it was the intent of the court.  The judge said there was no mention of an msr term given to him previously so there will be no msr term and they were not clear on the days served so they gave him all of this credit.  The judge didn't want him to appeal the case and then have to go through it all over again per ASA. Is it okay to release him as a discharge – he is sex offender registry?  Should we wait until tomorrow?  He is still at NRC after his writ.  Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5859

---

**From:** Littlejohn, Michele
**Sent:** Monday, February 22, 2010 12:33 PM
**To:** Jackson, Glenn
**Subject:** Possible Release N91995 David Armato
**Importance:** High

2

Δπ EXHIBIT D
Deponent Huntley
Date 7/24/12 Rptr. KMA
WWW.DEPOBOOK.COM

: 01119

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Monday, February 22, 2010 4:33 PM |
| **To:** | Diers, Joel M.; Williams-Schafer, Alyssa; Huntley, Edward |
| **Subject:** | RE: Possible Release N91995 David Armato |
| **Importance:** | High |

After speaking with Ken Tupy, PRB Legal, he thinks this case should be challenged too. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Diers, Joel M.
**Sent:** Monday, February 22, 2010 4:19 PM
**To:** Williams-Schafer, Alyssa; Jackson, Glenn; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato

Glenn,

The Court in my opinion cannot legally sentence this offender without a term of MSR. Unless we challenge the Order through the AG's office I think we are bound to follow the Order.

Thanks

Joel M. Diers
Legal Services
Concordia
217-558-2200, x 4110

---

**From:** Williams-Schafer, Alyssa
**Sent:** Monday, February 22, 2010 4:14 PM
**To:** Jackson, Glenn; Diers, Joel M.; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato

The SVP offenses have discharged and did not run consecutively or concurrently with another offense or parole term.

Alyssa Williams-Schafer
Coordinator for Sex Offender Services
Illinois Department of Corrections
1301 Concordia Court
Springfield, IL  62794
(217) 558-2200 ext. 6512

---

**From:** Jackson, Glenn
**Sent:** Monday, February 22, 2010 4:11 PM
**To:** Diers, Joel M.; Huntley, Edward
**Cc:** Williams-Schafer, Alyssa
**Subject:** FW: Possible Release N91995 David Armato
**Importance:** High

1

: 01123

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Tuesday, February 23, 2010 9:47 AM |
| **To:** | Huntley, Edward |
| **Subject:** | FW: Possible Release N91995 David Armato |

**Importance:**      High

Mr. Huntley,

The below offender is to be released today. I need directions as to msr him or discharge per the mittimus. If your directions are to msr him, he will be a VAD, since he has no host site. If we follow the order, he will discharge today. Your prompt response to this matter would be greatly appreciated. He is not SVP eligible, but he is a sex offender. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Jackson, Glenn
**Sent:** Monday, February 22, 2010 4:33 PM
**To:** Diers, Joel M.; Williams-Schafer, Alyssa; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato
**Importance:** High

After speaking with Ken Tupy, PRB Legal, he thinks this case should be challenged too. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Diers, Joel M.
**Sent:** Monday, February 22, 2010 4:19 PM
**To:** Williams-Schafer, Alyssa; Jackson, Glenn; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato

Glenn,

The Court in my opinion cannot legally sentence this offender without a term of MSR. Unless we challenge the Order through the AG's office I think we are bound to follow the Order.

Thanks

Joel M. Diers
Legal Services
Concordia
217-558-2200, x 4110

---

**From:** Williams-Schafer, Alyssa

1

: Ø1118

**Fanning, Robert**

From:              Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov]
Sent:              Friday, March 05, 2010 9:12 AM
To:                Huntley, Edward
Cc:                Diers, Joel M.
Subject:           FW: Possible Release N91995 David Armato

Mr. Huntley,

This is the case I called, emailed and provided you the mittimus on. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

From: Littlejohn, Michele
Sent: Friday, March 05, 2010 8:48 AM
To: Jackson, Glenn
Subject: RE: Possible Release N91995 David Armato

Hi Glenn:

Just a reminder on this - Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

From: Jackson, Glenn
Sent: Friday, February 26, 2010 10:02 AM
To: Littlejohn, Michele
Cc: Huntley, Edward; Diers, Joel M.
Subject: RE: Possible Release N91995 David Armato
Importance: High

M.

I am still waiting for a response from legal. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

From: Littlejohn, Michele
Sent: Friday, February 26, 2010 9:47 AM
To: Jackson, Glenn
Subject: FW: Possible Release N91995 David Armato

1

: 01112

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Friday, March 12, 2010 8:42 AM |
| **To:** | Huntley, Edward |
| **Cc:** | Diers, Joel M. |
| **Subject:** | FW: Possible Release N91995 David Armato |

Mr. Huntley,

This is the case I called and emailed you on. As mentioned before, Joel and Ken (PRB) suggested that the case be referred to the AG's office. Please let me how you wish for us to proceed. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, March 12, 2010 8:05 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Just checking on this one again.  Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Friday, March 05, 2010 8:48 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Hi Glenn:

Just a reminder on this - Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

---

**From:** Jackson, Glenn
**Sent:** Friday, February 26, 2010 10:02 AM
**To:** Littlejohn, Michele
**Cc:** Huntley, Edward; Diers, Joel M.
**Subject:** RE: Possible Release N91995 David Armato
**Importance:** High

M,

1

: 01109

## Fanning, Robert

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Friday, April 02, 2010 11:22 AM |
| **To:** | Huntley, Edward |
| **Cc:** | Rose, Joseph W.; Diers, Joel M. |
| **Subject:** | FW: Possible Release N91995 David Armato |

Mr. Huntley,

Offender Armato is scheduled to be heard by the PRB on April 7. This is the case where the judge ordered no msr term and you referred it to the AG's Office. The PRB could decline to here his case because he has no msr.
Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, April 02, 2010 8:04 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Just a reminder.  Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Friday, March 26, 2010 8:07 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Also on this, the Prisoner Review Board will be seeing him on his violation on April 7 when they are here.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Jackson, Glenn
**Sent:** Friday, March 19, 2010 10:00 AM
**To:** Littlejohn, Michele
**Subject:** RE: Possible Release N91995 David Armato

The AG's Office has been contacted and we are waiting for a response. Thanks

Glenn M. Jackson
Chief Record Officer

1

: 01101

## Fanning, Robert

| | |
|---|---|
| From: | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| Sent: | Thursday, April 08, 2010 8:44 AM |
| To: | Huntley, Edward; Diers, Joel M. |
| Cc: | Rose, Joseph W. |
| Subject: | FW: Possible Release N91995 David Armato |

FYI

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Thursday, April 08, 2010 8:36 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Just a reminder on this. The PRB heard him this week. Mr. Altoff called me about his situation while he was hearing him. He then called the PRB's attorney to see what to do. The PRB said to find him not a violator and let DOC handle it but that they thought Armato had a lawsuit.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Friday, April 02, 2010 8:04 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Just a reminder. Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Friday, March 26, 2010 8:07 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Also on this, the Prisoner Review Board will be seeing him on his violation on April 7 when they are here.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

1

: 01097

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Tuesday, April 27, 2010 9:09 AM |
| **To:** | Huntley, Edward |
| **Subject:** | RE: Possible Release N91995 David Armato |

Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

-----Original Message-----
From: Huntley, Edward
Sent: Monday, April 26, 2010 9:49 AM
To: Jackson, Glenn
Subject: RE: Possible Release N91995 David Armato

Glenn, let me touch base with the AG again.  It has been a while since I have heard from them on this one.  I will keep you posted. Thanks.

Ed

-----Original Message-----
From: "Jackson, Glenn" <GLENN.JACKSON@doc.illinois.gov>
To: "Huntley, Edward" <EDWARD.HUNTLEY@doc.illinois.gov>; "Diers, Joel M."
<JOEL.DIERS@doc.illinois.gov>
Cc: "Rose, Joseph W." <JOSEPH.W.ROSE@doc.illinois.gov>
Sent: 4/23/2010 11:08 AM
Subject: FW: Possible Release N91995 David Armato

Ed,

Has a decision been made on how to proceed with this situation? Michele is sending me weekly reminders dating back to February. Not to mention, she is documenting all her contacts in the master file. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

From: Littlejohn, Michele
Sent: Friday, April 23, 2010 7:55 AM
To: Jackson, Glenn
Subject: FW: Possible Release N91995 David Armato

Is the AG's office still working on this one?  I know there will be a lawsuit coming on it.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center

1

: 01076

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Thursday, April 29, 2010 9:06 AM |
| **To:** | Huntley, Edward; Diers, Joel M. |
| **Cc:** | Rose, Joseph W. |
| **Subject:** | FW: Possible Release N91995 David Armato |
| | |
| **Importance:** | High |

*FYI*

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Thursday, April 29, 2010 8:06 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Just an update – we received the board order on him – found not a violator.  We will violate him at the door again today.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Jackson, Glenn
**Sent:** Friday, April 23, 2010 9:54 AM
**To:** Littlejohn, Michele
**Subject:** RE: Possible Release N91995 David Armato
**Importance:** High

Michele,

It's my understanding the AG's Office is reviewing the matter. I will contact you when I get a decision. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, April 23, 2010 7:55 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Is the AG's office still working on this one?  I know there will be a lawsuit coming on it.

Michele Littlejohn

: 01059

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Friday, May 21, 2010 11:31 AM |
| **To:** | Huntley, Edward |
| **Cc:** | Rose, Joseph W.; Diers, Joel M. |
| **Subject:** | FW: Possible Release N91995 David Armato |

Mr. Huntley,

Has the AG's Office given you a decision on this case yet? This is dating back to February. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, May 21, 2010 8:19 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Checking on this one

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Thursday, May 13, 2010 1:49 PM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Thursday, April 29, 2010 8:06 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Just an update – we received the board order on him – found not a violator.  We will violate him at the door again today.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

: 01064

## Fanning, Robert

| | |
|---|---|
| **From:** | Huntley, Edward [EDWARD.HUNTLEY@doc.illinois.gov] |
| **Sent:** | Friday, May 21, 2010 12:05 PM |
| **To:** | Jackson, Glenn |
| **Cc:** | Rose, Joseph W.; Williams-Schafer, Alyssa; Diers, Joel M. |
| **Subject:** | RE: Possible Release N91995 David Armato |

Glenn, the AG's Office has declined to pursue a request to the court that the sentencing orders be modified or otherwise move for leave to intervene on behalf of the Department in this case. That being so, I believe we have exhausted the potential alternatives and will have to let Armato go as a discharge. I suppose we should show it as a court-ordered discharge as that is exactly what it is. Let me know if you need anything further. Thanks.

Ed

---

**From:** Jackson, Glenn
**Sent:** Friday, May 21, 2010 11:31 AM
**To:** Huntley, Edward
**Cc:** Rose, Joseph W.; Diers, Joel M.
**Subject:** FW: Possible Release N91995 David Armato

Mr. Huntley,

Has the AG's Office given you a decision on this case yet? This is dating back to February. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, May 21, 2010 8:19 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Checking on this one

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Thursday, May 13, 2010 1:49 PM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center

1

: 01070



Illinois Department of
CENTRAL MANAGEMENT SERVICES

POSITION DESCRIPTION

| 1. POSITION TITLE | WORKING TITLE (IF ANY) | Bangual Code | Position Title Option Code | 2 POSITION NUMBER | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Existing Position | | | | | | | | | |
| New/Revised Position<br>Senior Public Service Admin. | Chief Legal Counsel | | 8L | 4007C-29-00-700-00-01 | | | | | |
| 3. AGENCY | 4. BUREAU/ DIVISION | | | 5. EXM'T CODE | 6. WORK COUNTY | 7. A? AUT? | 8 AUDIT | OFFICE USE | |
| Existing Position | Director's Office | | | | | | | | |
| New/Revised Position<br>Corrections | Legal Services | | | 3 | 084 | N | R | | |
| 10. SECTION | 11. UNIT | | | 12 TRANSACTION CODE | | | 13 EFFECTIVE DATE | | |
| Existing Position | | | | | | | 8-1-09 | | |
| New/Revised Position<br>Administration | | | | ☐ MA021 ESTABLISH<br>☐ MC022 EXEMPT CODE CHANGE<br>☐ MC024 POSITION NUMBER CHANGE<br>☒ MC026 CLARIFY<br>☐ MC027 ADDITIONAL IDENTICAL CHANGE<br>☐ MC028 WORK COUNTY CHANGE<br>☐ MC021 ABOLISH<br>☐ MC149 DOWNWARD REALLOCATION<br>☐ MC150 LATERAL REALLOCATION<br>☐ MC158 UPWARD REALLOCATION | | | | | |
| 14. WORK LOCATION | 15 BARGAINING/TERM CODE | | Rutan Exempt | | | | | | |
| Existing Position | | | Y | | | | | | |
| New/Revised Position<br>Sangamon County | EX-000 | | Y | | | | | | |

| % OF TIME | 16. COMPLETE, CURRENT AND ACCURATE STATEMENT OF POSITION ESSENTIAL FUNCTIONS |
|---|---|
| | Subject to management approval of the Assistant Director, plans, organizes and manages the Department of Corrections Legal Services Division; develops and implements policies and procedures; develops and maintains ongoing communications with private and public organizations, officials of other departments, legislature, State and Federal government; monitors activities of all Units; supervises staff. |
| 20% | 1.  Plans, organizes, manages and supervises the Department's Legal Services Division; develops and implements policies and procedures; directs and supervises attorneys and paraprofessional staff; communicates with Judges, Attorneys, employees and legal groups; advises agency administrative officials on legal matters. |
| 15% | 2.  Provides professional consultation and recommendations regarding State and Federal laws, Department policies, rules, regulations and procedures; provides advice regarding State and Federal legislation which would impact on the Department. |
| 15% | 3.  Serves as legal representative for the Department at Ill. State Legislative hearings, inter-agency and intra-agency committees, Governor's Office, etc.; recommends legislative and policy changes; represents the Department in conferences with representatives of other government or private organizations. |
| 10% | 4.  Serves as full line supervisor; assigns and reviews work; provides guidance and training to assigned staff; counsels staff regarding work performance; reassigns staff to meet day-to-day operating needs; establishes annual goals and objectives; approves time off; adjusts first level grievances; effectively recommends and imposes discipline, up to and including discharge; prepares and signs performance evaluations; determines and recommends staffing needs; reviews activity reports. |
| 10% | 5.  Directs the research and drafting of proposed legislation, administrative rules and regulations, contracts, agreements and other legal documents for the Department. |
| 10% | 6.  Coordinates staff engaged in processing and monitoring health and special litigation; serves as the Agency's Chief Ethics Officer. |

| DIRECTOR OF CMS SIGNATURE | IMMEDIATE SUPERVISOR SIGNATURE | AGENCY HEAD SIGNATURE | DATE |
|---|---|---|---|
| s/ CMS Director | | s/ Michael Randle | |

CMS-201 (Rev. 10/94 1, 4?-079?)

Δ π EXHIBIT E Group
Deponent Huntley
Date ____ Rptr. KMB
WWW.DEPOBOOK.COM

16. (CONTINUED)

| % OF TIME | |
|---|---|
| 05% | 7. Serves as Chairperson of the Settlement Review Committee; reviews settlement offers, assessing litigation risks and making recommendations to the Director. |
| 05% | 8. Monitors the research and investigations of the Criminal Code Unit in their research functions gathering and reviewing Criminal Code information for the State of Illinois which impacts the Department of Corrections. |
| 05% | 9. Directs and monitors the activities of the Office of Inmate Issues, Sex Offender Services and Inmate Records; confirms inmate records are kept according to agency policy and procedures. |
| 05% | 10. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. |

17. POSITION TITLE AND NUMBER OF IMMEDIATE SUPERVISOR (Responsible for assigning and reviewing work, preparing, conducting and signing performance evaluations; effectively recommending and imposing disciplinary action and adjusting grievances for the incumbent of this position.)

| | WORKING TITLE (IF ANY) |
|---|---|
| Assistant Director | |

18. CHECK THE APPROPRIATE BOX IF THIS POSITION IS A:

☒ SUPERVISOR    OR    ☐ LEAD WORKER

NOTE: Supervisory or lead worker responsibilities **must** be described in a detailed duty statement(s) with a time percentage(s) allotted.

If box is checked above, list position title, position number, and number of subordinate incumbents or authorized funded headcount:

| Position Title | Position Number | No. of Incumbent or Funded Vacancies |
|---|---|---|
| Public Admin. Intern | 35700-29-00-700-00-01 | 1 |
| ~~Administrative Assistant I~~ | ~~00601-29-00-700-01-02~~ | 1 |
| Administrative Assistant II | 00502-29-00-700-01-01 | 1 |
| Office Admin. Specialist | 29990-29-00-700-01-01 | 1 |
| Paralegal Assistant | 30860-29-00-700-01-01 | 1 |
| Executive Secretary II | 14032-29-00-700-05-01 | 1 |
| Senior Public Service Administrator | 40070-29-00-700-10-01 | 1 |
| Senior Public Service Administrator | 40070-29-00-700-20-01 | 1 |
| Senior Public Service Administrator | 40070-29-00-700-30-01 | 1 |
| Senior Public Service Administrator | 40070-29-00-700-40-01 | 1 |
| Public Service Administrator | 37015-29-00-720-00-01 | 1 |
| Public Service Administrator | 37015-29-00-730-00-01 | 1 |

19. SPECIALIZED KNOWLEDGES, SKILLS, ABILITIES, LICENSURE OR CERTIFICATION NECESSARY FOR THE SUCCESSFUL PERFORMANCE OF THE WORK OF THIS POSITION. NOTE: SINCE THERE ARE NOW SEVERAL OPTIONS OF SKILLS AND ABILITIES AND LICENSURE OR CERTIFICATION IDENTIFIED ON STANDARDS, THE PHRASE "SAME AS SPECIFICATION" CAN NO LONGER BE USED.

Requires licensure by the State of Illinois to practice law; requires five years professional experience in the practice of law; requires thorough knowledge of judicial and quasi-judicial procedures at all levels; requires thorough knowledge of common law, federal and State laws and regulations pertaining to the agency program; requires thorough knowledge of legal methods, practices and procedures in the assigned agency; requires working knowledge of principles of administration and management including organization, control and techniques used in dealing with management and procedural problems; requires working knowledge of Correctional and Civil Rights litigation.

Box 18 (Continued)
Public Service Administrator 37015-29-00-740-00-01   1

# CMS
### ILLINOIS DEPARTMENT OF
### CENTRAL MANAGEMENT SERVICES

## POSITION DESCRIPTION

| 1. POSITION TITLE | WORKING TITLE (IF ANY) | BILINGUAL CODE | POSITION TITLE OPTION | 2. POSITION NUMBER | | | | |
|---|---|---|---|---|---|---|---|---|
| Existing Position | | | | | | | | |
| New / Revised Position Sr. Public Service Adm. | | | 8L | 40070-29-00-700-30-01 | | | | |

| 3. AGENCY | 4. BUREAU / DIVISION | 5. EXMT CODE | 6. WORK COUNT | 7 A/I AUTH | 8. AUDIT | 9. OFFICE USE |
|---|---|---|---|---|---|---|
| Existing Position | | | 099 | | | |
| New / Revised Position Corrections | Director's Office | 5 | 016 | N | R | |

| 10. SECTION | 11. UNIT | 12. TRANSACTION CODE | 13. EFFECTIVE DATE |
|---|---|---|---|
| Existing Position | | | 03/01/2004 |
| New / Revised Position Legal Services | Special Litigation | | |

| | | | |
|---|---|---|---|
| ☐ | MA021 | ESTABLISH | |
| ☐ | MC022 | EXEMPT CODE CHANGE | |
| ☐ | MC024 | POSITION NO. CHANGE | |
| ☒ | MC026 | CLARIFY | |
| ☒ | MC027 | ADDITIONAL IDENTICAL CHANGE | |
| ☐ | MC028 | WORK COUNTY CHANGE | |
| ☐ | MD021 | ABOLISH | |
| ☐ | MC149 | DOWNLOAD REALLOCATION | |
| ☐ | MC150 | LATERAL REALLOCATION | |
| ☐ | MC158 | UPWARD REALLOCATION | |

| 14. WORK LOCATION | 15. BARGAINING / TERM CODE | |
|---|---|---|
| Existing Position Will County | | RUTAN EXEMP |
| New / Revised Position Cook County | T A-000 | |

| % OF TIME | 16. COMPLETE, CURRENT AND ACCURATE STATEMENT OF POSITION ESSENTIAL FUNCTIONS |
|---|---|
| | Subject to administrative approval of the Chief Legal Counsel (Sr. Public Service Admin.), directs Public Service Administrators and Technical Advisors in legal activities; offers advice and consultation with affects policies and procedures; develops and implements policies and procedures; monitors legal work; supervises staff. |
| 25% | 1. Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands; effectively recommends grievance resolutions; completes and signs performance evaluations; establishes annual goals and objectives; counsels staff on problems with productivity, quality of work and conduct; determines staffing needs to achieve program objectives; reviews activity reports. |
| 20% | 2. Assesses litigations to determine their affect on security and operations within the department; provides reports and guidance to the Director and Associate Director on litigation impact on operational policies and procedures and methods for reducing litigation risk; develops and implements policies and procedures. |
| 15% | 3. Manages agency response and the conduct of complex or high exposure pieces of litigation including coordination of efforts as assigned counsel, agency personnel, retained consultants and experts. |
| 10% | 4. Monitors the implementation of departmental committees to develop consistent rules and policies on a variety of operational issues and develops procedures to manage litigation risk. |
| 10% | 5. Develops and directs a strategy for coordinating state/national lobbying efforts for issues regarding prison security, resources, litigation and various topics of concern to correctional systems. |
| 10% | 6. Serves on the Settlement Review Committee reviewing settlement offers assessing litigation risks on non-personnel related litigation and making recommendations to the Director. |
| 05% | 7. Coordinates activities of staff attorneys involved in general litigation on personnel and programmatic matters particularly as those matters affect operations and security; provides legal advice, consultation and guidance requiring extensive program and legal experience. |

| DIRECTOR OF CMS SIGNATURE | IMMEDIATE SUPERVISOR SIGNATURE | AGENCY HEAD SIGNATURE | DATE |
|---|---|---|---|
| | | | |

CMS-104 (Rev. 10/94)  IL 401-0794

**16. (CONTINUED)**

| % OF TIME | |
|---|---|
| 05% | 8. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. |

**17. POSITION TITLE AND NUMBER OF IMMEDIATE SUPERVISOR (Responsible for assigning and reviewing work, preparing, conducting and signing performance evaluations; effectively recommending and imposing discipline and adjusting grievances for the incumbent of this position.)**

Sr. Public Service Adm. 40070-29-00-700-00-01

**WORKING TITLE (IF ANY)**

Chief Legal Counsel

**18. CHECK THE APPROPRIATE BOX IF THIS POSITION IS A:**

☒ SUPERVISOR    OR    ☐ LEAD WORKER

> **NOTE:  Supervisory or lead worker responsibilities must be described in a detailed duty statement(s) with a time percentages(s) allotted**

If a box was checked above, list position title, position number, and number of subordinate incumbents or authorized funded head count:

| Position Title | Position Number | No. of incumbents or Funded Vacancies |
|---|---|---|
| Technical Adv. I I | 45252-29-00-700-31-01 | 1 |
| Public Service Adm. | 37015-29-00-700-31-01 | 1 |
| Public Service Adm. | 37015-29-00-700-31-02 | 1 |
| Public Service Adm. | 37015-29-00-700-31-03 | 1 |
| | | |
| | | |
| | | |
| | | |

**19. SPECIALIZED KNOWLEDGES, SKILLS, ABILITIES, LICENSURE OR CERTIFICATION NECESSARY FOR THE SUCCESSFUL PERFORMANCE OF THE WORK OF THIS POSITION. NOTE: SINCE THERE ARE NOW SEVERAL OPTIONS OF SKILLS AND ABILITIES AND LICENSURE OR CERTIFICATION IDENTIFIED ON STANDARDS, THE PHRASE "SAME AS SPECIFICATION" CAN NO LONGER BE USED.**

Requires licensure by the State of Illinois to practice law; requires four years professional experience in the practice of law; requires thorough knowledge of judicial and quasi-judicial procedure at all levels; requires thorough knowledge of common law, federal and State laws and regulations pertaining to the agency program; requires thorough knowledge of legal methods, practices and procedures in the assigned agency; requires working knowledge of principles of administration and management including organization, control and techniques used in dealing with management and procedural problems; requires working knowledge of Correctional and Civil Rights litigation.

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
CENTRAL DIVISION

DAVID ARMATO,                        )
                                     )
        Plaintiff,                   )
                                     )
           -vs-                      )  NO. 11-CV-3023
                                     )
RANDY GROUNDS, MICHELE LITTLE-       )
JOHN, GLENN JACKSON and DION         )
DIXON, all in their individual       )
capacities,                          )
                                     )
        Defendants.                  )

DISCOVERY DEPOSITION OF RANDY GROUNDS
March 5, 2012

---------------------------------------------------

**Donna R. Maninfior, CSR, RPR**
**# 84-2991**
# MANINFIOR COURT REPORTING, P.C.
**Certified Shorthand Reporter**
**1612 Lafayette Avenue**
**P. O. Box 1036**
**Mattoon, IL 61938-1036**
**(217) 235-1127**



DEFENDANT'S
EXHIBIT
H

2

1                        STIPULATION

2

3           IT IS HEREBY STIPULATED AND AGREED by and

4    between the parties that the deposition of

5    **RANDY GROUNDS**, may be taken on March 5, 2012, at

6    the Robinson Correctional Center, 13423 E. 1150th

7    Avenue, Robinson, Illinois, pursuant to the Rules

8    of the Federal Court and the Rules of Federal

9    Procedure governing said depositions.

10

11           It is further stipulated that the

12   signature is waived.

13

14           It is further stipulated that the

15   necessity for calling the Court Reporter for

16   impeachment purposes is waived.

17

18

19

20

21

22

23

24

3

1  APPEARANCES:

2      DENNIS J. DeCARO
       Attorney at Law
3      Law Offices of Kupets & DeCaro, PC
       30 N. LaSalle Street, Suite 4020
4      Chicago, IL  60602
           On behalf of the Plaintiff.
5
       ROBERT FANNING
6      Assistant Attorney General
       500 S. Second Street
7      Springfield, IL  62706
           On behalf of the Defendants.
8

9

10

11

12

13

14

15                        INDEX

16  Examination by:                        Page

17      Mr. DeCaro                            4
        Mr. Fanning                          29
18

19  Exhibits:                              Page

20      Grounds Exhibit 1                     9
        Grounds Group Exhibit 2              12
21

22      (Grounds Exhibit 2 retained by counsel)

23

24

4

**RANDY GROUNDS,**

called as a witness herein, having been duly sworn

upon oath, testified as follows:

**DIRECT EXAMINATION**

BY:  DENNIS J. DeCARO

    Q    Warden, would you, please, state your full

name and spell your last name for the record.

    A    Randy E. Grounds, G-r-o-u-n-d-s.

    Q    Warden, have you ever given a deposition

before?

    A    Yes, sir.

    Q    Okay, so just as a reminder, you and I

will try not to speak over one another.  It's

difficult for the court reporter to take us both

speaking, and also you need to answer everything

verbally.  If you nod or shrug, the court reporter

takes you down nodding or shrugging.  When we read

this a year later, we won't know what you meant, so

typically your attorney or I will say did you mean

yes or no.  If you have any questions, let me know

if you don't understand my question, let me know,

and I will rephrase it.

    A    Okay.

    Q    As you know, this is regarding the

5

1    incarceration of David Armato.

2        **A**    Yes, sir.

3        **Q**    Are you aware of that?

4        **A**    Yes, sir.

5        **Q**    Did you review anything before your

6    deposition today?  Did you have a chance to look at

7    his file?

8        **A**    No, sir.

9        **Q**    I know from your interrogatory answers you

10   stated that you didn't know about this situation

11   until you received a copy of the complaint.  Is

12   that still true?

13       **A**    That's correct.

14       **Q**    Okay, how long have you been the Warden

15   here at Robinson Correctional Center?

16       **A**    August of '09.

17       **Q**    Instead of me just asking you then what

18   did you do, what did you do, why don't you just

19   give me a brief background of your employment

20   leading up to Warden here at Robinson.

21       **A**    For 25 years I was the Wabash County

22   sheriff, and I came to Corrections in November of

23   '03.  I have served as Warden.  I have served as

24   Assistant Warden, Deputy Director, Chief of

6

1    Operations, and Operations Security Coordinator

2    prior to coming back here as Warden.

3        Q    Okay, can you give me sort of a brief

4    understanding of what you do day-to-day as a

5    Warden.  Go ahead now, and I will ask you some

6    specific questions.

7        A    Just basically oversee the day-to-day

8    operation of the facility.

9        Q    Okay, are you the person with the most

10   authority at the facility?

11       A    Yes.

12       Q    And if you could tell me, I get from the

13   discovery we have had so far and the answers we

14   have had to discovery that you are not involved in

15   the day-to-day calculations of prisoners' release

16   dates.

17       A    That's correct.

18       Q    Are you ever involved in those situations?

19       A    No.

20       Q    Okay, I did see -- I am going to show

21   you some documents about you reviewing some

22   grievances.  Is that part of your job?

23       A    Yes, sir.

24       Q    Okay, and to what extent?  How does a

7

1    grievance get to you?  Do you review every

2    grievance?

3        A    Yes.

4        Q    Okay, and if you could just take it from

5    an inmate -- if you could tell me the grievance

6    procedure perhaps.

7        A    When an offender writes a grievance, he is

8    usually not agreeing with a procedure.

9        Q    Sure.

10        A    So this is his way of addressing the

11    issue.  The offender will write a grievance and

12    then it will go to a counselor.  The counselor will

13    review the allegations made by the offender and

14    then interview the appropriate individuals involved

15    in whatever the grievance issue might be, and then

16    the counselor will formulate an opinion as to

17    whether there is merit to the grievance or the

18    factual issues to the grievance, and then he will

19    write his summary and then submit it to me for my

20    review.  At that time I either agree with the

21    counselor's position or I have the right to, you

22    know, send it back for more review, or totally not

23    accept or find it.

24        Q    Okay, do you conduct any kind of

8

1    investigation once you get these grievances, or do

2    you rely solely on what the counselor has found?

3         A    I rely on what -- the information the

4    counselor provides.

5         Q    Is the counselor a Department of

6    Corrections employee or is it another inmate?  Who

7    is the counselor?

8         A    He is an employee.

9         Q    And is that their sole job, counseling?

10        A    Yes.

11        Q    Okay, would a grievance go to a specific

12   counselor?  Does each inmate have a counselor, or

13   could one grievance, like in this case, David

14   Armato was grieving that he should have been let

15   out, would all of those grievances go to the same

16   counselor, or perhaps if they are done a week apart

17   it might be a different counselor?

18        A    Not one counselor does all grievances.  I

19   think they are assigned by the Clinical Service

20   Supervisor.

21        Q    And let's talk about the specific

22   grievances.  Some of these, the Attorney General

23   gave me about 1200 pages of documents that were

24   Bates stamped, and instead of making these your

1    exhibit, we will just pick out some of those.  I am

2    going to show you -- we are going to mark this one,

3    which wasn't in that group, as Grounds Exhibit 1.

4                    (Whereupon Grounds Exhibit 1 was

5                    marked for identification.)

6        Q    Let's look at that one first.  Then we

7    will come back to these.  I am going to show you

8    what we have had marked as Grounds Exhibit 1.  That

9    one I didn't find in the Bates stamped materials.

10   That's why it doesn't have a Bates stamp, and you

11   received that prior to litigation, so I want to go

12   over this.  This is -- is this a typical document

13   you would receive from a counselor regarding an

14   offender's grievance?

15       A    Yes, this particular grievance is an

16   emergency grievance.  The counselors do not provide

17   any review.  These grievances come directly to me

18   from the -- not necessarily from the offender, but

19   it comes to the counselor.  Counselors do not take

20   any action.  They are forwarded directly to me on

21   the grievance, on an emergency, when the offender

22   is claiming an emergency grievance.

23       Q    Is that something the offender informs the

24   person they submitted this grievance to?  This is

1  an emergency, it shouldn't go to a counselor, or is

2  it a different form?

3      **A**   No, it's the form, but all these

4  grievances are placed in the offender grievance

5  box.  When they are collected, when there is an

6  emergency grievance, then those are provided

7  directly to me.

8      **Q**   Okay, but how -- by looking at this, can

9  we tell it's an emergency grievance somehow?

10     **A**   Yes, sir.

11     **Q**   How is that?

12     **A**   The area where the offender has signed his

13  name, dated it.  Then there is a checked box to

14  check only if this is an emergency grievance due to

15  serious risk of inmate, personal injury or serious

16  harm or --

17     **Q**   So this one doesn't go to the counselor.

18  It comes directly to you.

19     **A**   Yes, sir.

20     **Q**   This is dated March 9, 2010.  The offender

21  is David Armato.  His inmate number is N91995,

22  correct?

23     **A**   Yes.

24     **Q**   Okay, do you recall receiving this

11

emergency grievance?

    **A**   No, sir.

    **Q**   Okay, is that your signature there on the bottom dated March 11, 2010?

    **A**   Yes, sir.

    **Q**   Okay, so it's fair to assume that at some point you reviewed this and signed off on it?

    **A**   Yes, sir.

    **Q**   Okay, once you review this and sign off on it, what happens with this grievance?

    **A**   My understanding it would go back to the counselor, then to the offender, and it would reflect whether I -- basically my review of this. I am either saying, yes, expedite this grievance, or no, this is not an emergency.  Go ahead and handle through the normal grievance process.

    **Q**   Okay, in this particular one you found that this was not an emergency, correct?

    **A**   Yes, sir.

    **Q**   And then forgive me, because I hope you are not restating this over again.  No, this was not an emergency, so does this particular grievance then go back to a counselor?

    **A**   Yes.

12

1    Q    I guess the easiest way to do this, we are

2  going to mark documents I received from the

3  Attorney General which are Bates stamped 000724

4  through 001134 as Grounds Group Exhibit 2.

5         MR. FANNING:   I am going to put a

6  foundation objection on the record for it not being

7  a complete group exhibit.

8         MR. DeCARO:  Right, it's not a complete

9  group exhibit.  It's those specific pages that were

10  provided to us.

11               (Whereupon Grounds Group Exhibit 2

12                was marked for identification.)

13    Q    The only reason I am doing this is because

14  I thought Ms. Littlejohn was going to be first.  I

15  was going to ask her these questions but, Warden,

16  if you would look at pages 000781 and 782, 783, and

17  784.

18    A    I am sorry.

19    Q    Beginning at 781, 000781, through 784.

20    A    781.

21    Q    Yes, and then the next four pages, 781

22  through 784.

23    A    I am sorry.

24    Q    Okay, so the 781 and 782 is another

13

1  offender grievance by David Armato dated March 14,

2  2010, correct?

3      A    Yes.

4      Q    Okay, my question, for having you look at

5  these, and then the next one on 783 and 784, is a

6  response to a committed person's grievance dated

7  March 17, 2010, regarding David Armato, correct?

8      A    Yes, sir.

9      Q    Okay, your Exhibit 1 and these four pages,

10  does this constitute all one grievance?  You know

11  what I am saying, you saw this Grounds Exhibit 1

12  and you found it not to be an emergency.  Then does

13  this particular document, Exhibit 1, is that the

14  basis that the counselor -- that document goes to a

15  counselor, or are these subsequent documents that I

16  have shown you, 781 through 784, are they created

17  in response to Grounds Exhibit 1?

18      A    I could not answer that.

19      Q    Okay, all right, let me just go back to

20  Grounds Exhibit 1 again.  Once you sign off on

21  that, is that the extent of your involvement with

22  this particular grievance and Mr. Armato?

23      A    With this particular issue?

24      Q    Yes.

14

1      **A**    Yes.

2      **Q**    Okay, so there is no -- this particular

3   issue, I don't know if you had an opportunity to

4   read his grievance.  This was regarding --

5      **A**    You are talking about this (indicating)?

6      **Q**    Yes, Exhibit 1.

7      **A**    Yes.

8      **Q**    So he was saying he -- well, let me just

9   quickly read it.  "Illegal custody by IDOC," dash,

10  "a court order by Judge," and it's spelled

11  P-o-t-k-o-n-j-a-k "on February 18, 2010, ordered

12  above Defendant to be released from the Department

13  of Corrections without a term of mandatory

14  supervised release.  Note, see Defendant's mitimus

15  sentencing order in Defendant's records office

16  file.  However, when above Defendant's release date

17  of February 23, 2010, came I was not released as

18  ordered by the Judge.  I was told I was violated

19  because a supervisor in Springfield wanted IDOC's

20  legal department to review court order.  I have yet

21  to be released."  Immediately released from custody

22  by order of the Court.  Did you do any

23  investigation into whether what he said was

24  truthful or not?

15

1     A    No.

2     Q    Okay, who in this facility back in March

3    of 2010 as handling inmate release dates?

4     A    The records officer supervisor.

5     Q    Was that Ms. Littlejohn at that point?

6     A    Yes.

7     Q    And in here he refers to a supervisor in

8    Springfield, and I am assuming that's Glenn

9    Jackson?

10     A    I am not sure.

11     Q    Okay, do you know Glenn Jackson?

12     A    Yes.

13     Q    What is his relationship to this facility?

14     A    He is the chief records officer supervisor

15   for the state.

16     Q    From reading all of these documents,

17   Exhibit 1 and all the other documents I have been

18   provided, it seems as though Ms. Littlejohn and he

19   were communicating regarding Mr. Armato, whether to

20   release him or not, would that be the proper

21   protocol, as far as you know?

22     A    Yes.

23     Q    Okay, this gave you authority over Mr.

24   Jackson's decisions.  Let's see, Mr. Jackson said

1  release an inmate and you thought the inmate should

2  be kept here.  Do you have authority over him, or

3  vice versa?  Does he have authority over your

4  decisions?

5      A   I do not have any authority over Mr.

6  Jackson.

7      Q   Does he have any authority over you?

8      A   He is the chief records office supervisor

9  so, you know, if he gives direction on an offender,

10  whether they are to be released or not to be

11  released, that's the direction I would take.

12      Q   Okay, would it be fair to say that on

13  March 9, 2010, you were aware of this situation

14  with Mr. Armato by reviewing that grievance?

15      A   I am aware of the grievance, yes, the

16  documentation here.

17      Q   Okay, then the next document I have where

18  you signed is this March 17, 2010, document which

19  'is Bates stamped 00783 and 00784.

20      A   One thing is this is not my signature.  I

21  didn't review this grievance.  It was signed by my

22  Assistant Warden Tilka.

23      Q   Okay, and you know that from the

24  signature?

17

1      **A**    Yes.

2      **Q**    Okay, is that something you give him or

3  her authority to do?

4      **A**    As Assistant Warden she does have

5  signature authority.

6      **Q**    Okay, so this document is entitled a

7  little differently, this March 17.  This is

8  response to committed person's grievance, grievance

9  officer report.  What is the difference between

10  this March 17, 2010, document and this offender's

11  grievance?

12      **A**    Okay, this grievance is marked to look as

13  an emergency grievance.  The emergency grievance to

14  me is when an offender's personal injury type, it's

15  more health-related.  If I feel that it's adamant

16  that this health issue, or this issue be looked at

17  immediately, then I will say agree, yes, expedite

18  this grievance, so then the grievant counselor will

19  know to review this offender grievance immediately.

20  In looking at individuals that have questions about

21  their sentence or calculation, I do not deem those

22  to be an emergency grievance, so I mark this as no,

23  an emergency is not substantiated.  Then it goes

24  back to the offender.  He should submit this

18

1    grievance in the normal manner, and this form, this

2    000781 and 782 --

3        Q    Yes.

4        A    --  reflects a normal -- this grievance

5    was submitted by the offender in the normal

6    fashion.

7        Q    Okay, okay, and then the 783 and 784, is

8    that the counselor's report to your office?

9        A    Yes, sir.

10       Q    And my understanding, from what you just

11   told me, is the Assistant Warden reviewed this in

12   your stead, for whatever reason, the March 17

13   document?

14       A    The March 17 document was reviewed and

15   signed by Assistant Warden Tilka.

16       Q    Do you know why she -- it is a she,

17   correct?

18       A    Yes.

19       Q    She would have done this instead of you?

20       A    I am only assuming it's a day that I was

21   not present at work.

22       Q    Okay, does she then talk to you about

23   these or communicate that, or somehow tell you she

24   signed off on some things while you weren't there?

19

1    **A**   No, sir.

2    **Q**   What happens when these grievances are in

3  effect denied then?  What's the next step after the

4  denial of the grievance?

5    **A**   For me or --

6    **Q**   Well, I guess for the inmate.

7    **A**   If he does not agree with our finding,

8  then he has the right to forward to Springfield for

9  review there.

10    **Q**   To whom, if you know?

11    **A**   Actually it goes to the Director, but I

12  don't recall the name of the group that actually

13  reviews it on behalf of the Director.

14    **Q**   Is that sort of the way of an appeal?

15    **A**   Yes.

16    **Q**   So there is no hearing or anything done

17  internally, once the grievance procedure is done

18  with?

19    **A**   No, sir.

20    **Q**   Okay, and that was for the inmate, and you

21  raised a good point.  After you concur with the

22  counselor, or do not -- well, in this case you

23  concurred with the Assistant Warden, concurred with

24  the counselor in this particular case on March 17,

20

1    is that the end of the matter in your office?

2        A    Yes.

3        Q    What is the policy and procedure a records

4    person here follows when they are calculating an

5    out date and there is a problem?  What do they do

6    when there is a problem where they can't ascertain

7    the proper date?

8        A    Maybe if you could clarify that, if our

9    records office superintendent is having an issue of

10   calculating an out date.

11       Q    Well, in this particular case, I don't

12   know how much you know about this particular case.

13   In this case there was a problem, it looks like,

14   for two reasons.  One, Ms. Littlejohn didn't know

15   how much credit to give him prior to coming to the

16   institution, and, two, the Judge put no MSR on this

17   particular court order, and I guess that was

18   unusual and those were the two problems I believe

19   she had.  When that arises, what is the policy and

20   procedure here what to do, if you are not

21   comfortable releasing the inmate?

22       A    I don't know if there is a policy or

23   procedure, but any time there is an issue or

24   question when it comes to calculation in the

1   records office, then the records office supervisor

2   should contact the chief records officer supervisor

3   from the state to get direction from him how to

4   move forward with the calculation.

5       Q     Okay, and during this particular period,

6   was Glenn Jackson the supervisor?

7       A     It's my understanding, yes.

8       Q     Is he still the supervisor?

9       A     Yes.

10      Q.    Okay, are there any occasions where your

11  office would utilize the Attorney General's office

12  to go into court to do anything?

13          MR. FANNING:   Objection, foundation.

14      Q     You can answer.

15      A     I don't understand your question.

16      Q     Sure, is there ever a situation regarding

17  any court order possible, that your office utilizes

18  the Attorney General's office to go into court on

19  your behalf?

20          MR. FANNING:   Same objection.

21      Q     If you get a subpoena or something that --

22  let me back up.  If you have a legal question, is

23  the Attorney General your attorney for your office

24  pretty much, you know what I am saying, if you have

22

1    a legal question, do you ask an Attorney General?

2         A    No, sir.

3         Q    Who would you ask?  Do you have a legal

4    department?

5         A    Yes, sir.

6         Q    Is it in-house?

7         A    No, sir.

8         Q    Where is that?

9         A    It's by region.  We have a regional

10   attorney that they are assigned to facilities, so

11   we would have our regional representative or we

12   have a chief legal person in Springfield.

13        Q    Okay, are those attorneys part of the

14   Attorney General's office?  Are they titled

15   Attorney General or something else?

16        A    No, sir.

17        Q    Do you know back in February and March of

18   2010 who the regional attorney was?

19        A    Yes, I am trying to think of -- he is

20   stationed in Pinkneyville, Dave Tracy.

21        Q    How about the chief legal counsel, same

22   time period?

23        A    I believe Chief Rose was chief legal.  I

24   am not sure.  He is the chief legal now, and I

1    don't recall exactly his appointment date, but I

2    believe that it was Chief Rose.

3        Q    He is in Springfield?

4        A    Yes.

5        Q    One second, back in March and February of

6    2010, were you Ms. Littlejohn's supervisor?

7        A    Yes.

8        Q    Would she come to you with questions

9    regarding inmate out dates at all, or no?

10       A    No, could you clarify that?  I am not her

11   direct supervisor.

12       Q    Maybe you are her supervisor-supervisor

13   or --

14       A    Yes, but to answer your questions, she

15   would not come to me with questions.

16       Q    Who is her supervisor?

17       A    It would be the Assistant Warden of

18   Programs.

19       Q    Do you have an understanding of mandatory

20   supervised release, whether it is every inmate back

21   in February or March of 2010, every inmate had to

22   have a mandatory supervised release?

23       A    I am not sure, sir.

24       Q    And I got from your interrogatory answers,

24

1   other than these documents I showed you, Exhibit 1,

2   and then those four pages from Exhibit 2, did you

3   have any other interaction with this matter?

4       A    Not that I am aware of.

5       Q    Okay, did you ever see the court orders

6   that Mr. Armato was referring to in his grievances?

7       A    Not that I recall.

8       Q    When this inmate in this particular case,

9   Mr. Armato, went up to Lake County, Illinois, and

10  had a couple court orders entered in February 18,

11  2010, where do those court records go when they

12  come to this facility?

13      A    They go to the records office.

14      Q    Okay, and when he filed the grievance

15  regarding those orders, is that something you have

16  access to?

17      A    Not unless it's directed to me.

18      Q    What do you mean?

19      A    Well, to clarify your --

20      Q    Sure, sure, sure.  You received this

21  grievance March 9, 2010.  Would it have been

22  possible for you to go to the records office and

23  pull the orders that he referred to in this

24  grievance to see whether what he was saying was

25

1    truthful or not?

2        **A**   I would not.  I would not have done that.

3    I rely solely on the orders off the supervisor to

4    review and do the calculation.  I don't get

5    involved in calculations.

6        **Q**   Okay, is there -- what's in the records

7    office?  Is that what we call the master file?

8        **A**   That's correct.

9        **Q**   You have access to those files, though, if

10   you wanted to, I am assuming?

11       **A**   Yes, sir.

12       **Q**   Would it be fair to say that you are

13   responsible for enforcing all the policies and

14   procedures here at this facility?

15       **A**   Yes, sir.

16       **Q**   Other than the lawsuit and other than

17   these documents I showed you today, do you have any

18   information regarding this case?  Did you

19   investigate it at all once you received the

20   lawsuit, anything like that?

21       **A**   The only investigation, I inquired when we

22   received the lawsuit of clarification from the

23   records office what this was in reference to.

24       **Q**   Who did you ask, Ms. Littlejohn?

1      A    Yes.

2      Q    What did she tell you?

3      A    She explained to me it was over the
4  calculation of the release.  Actually, I think I
5  directed my question to DeeDee Brookheart.  She is
6  our legal litigation coordinator, and I would have
7  directed my question to her what this was in
8  reference to, not directly to Ms. Littlejohn.

9      Q    Just going back to a little bit about what
10  your deference to Mr. Jackson's decision regarding
11  when to release an inmate, do you have the
12  authority to release an inmate generally?

13      A    No, sir.

14      Q    Okay, and so who actually decides when to
15  release an inmate?

16      A    The records office coordinator supervisor
17  does all the calculations.

18      Q    And so because -- I don't know the system.
19  I am assuming they get the documents from the
20  Court.  They figure out the date to release the
21  person, and then based on that supervisor's
22  calculations, that is the document that allows them
23  to walk out of here?

24      A    Yes, sir.

1    Q    So if there is not a problem, they can do

2    that without any interaction with Mr. Jackson?

3    A    Yes, sir.

4    Q    In your interrogatory answer number 2, you

5    say Office Administrative Specialist Michele

6    Littlejohn was temporarily assigned as the

7    Executive 2/Records Office Supervisor during the

8    time frame affected by this lawsuit.  Who typically

9    was the supervisor?

10    A    The records office supervisor had been

11    temporarily assigned to another facility so --

12    Q    The person who was there before got

13    reassigned?

14    A    Yes, temporarily, so Ms. Littlejohn was

15    TA'd to the Records Office Supervisor position.

16    Q    What was Ms. Littlejohn's position before

17    that?

18    A    She had actually been the -- I believe the

19    coordinator, and then she got promoted to the Land

20    Administrative position, and then we placed her

21    back in as Records Office Supervisor.

22    Q    And my understanding, and there is some

23    documents to support that Ms. Littlejohn and Mr.

24    Jackson were sending, I guess, Outlook messages to

28

1    each other regarding this situation, did you ever

2    get copied on any e-mails or Outlook messages

3    regarding this situation?

4        **A**   No, sir.

5        **Q**   When somebody is violated at the door,

6    what does that mean?

7        **A**   Can you be more clear or --

8        **Q**   In response to your interrogatory number 4

9    there, the answer, it says "based on information

10    provided by Michele Littlejohn, for purposes of

11    responding to these interrogatories, it is my

12    understanding that on February 22, 2010, Chief

13    Records Officer Supervisor Glenn Jackson directed

14    the plaintiff David Armato, who on that date was in

15    Court writ at Stateville Correctional Center not to

16    be released, and that plaintiff David Armato be

17    violated at the door."

18        **A**   My understanding, in most cases these

19    individuals are sex offenders, and there has not

20    been any approved housing or location for them to

21    be released to, so they become violated at the door

22    is the terminology, and they are kept at the

23    institution.

24        **Q**   That they are violating their parole?

1      **A**    I can't speak to the exact purpose, but

2    it's my understanding that it has to do with no

3    approved housing as part of their release.

4      **Q**    Okay, and if they don't have mandatory

5    supervised release, and then they are not on

6    parole, whether they are sex offenders or not, can

7    they just walk out of here without any restrictions

8    on them?

9      **A**    I can't answer that.

10     **Q**    I think that's it.  Most of my questions

11   are for Ms. LittleJohn.  I appreciate your time.

12     **A**    Yes, sir.

13                    **CROSS EXAMINATION**

14   BY:  **ROBERT FANNING**

15     **Q**    I just have a couple I want to clarify.

16   We were talking about what's been listed as Exhibit

17   1, the grievance dated March 9, 2010.  I just want

18   to go through the grievance procedure quickly.  The

19   first step is that the individual offender is to

20   submit the grievance to his counselor, correct?

21     **A**    The offender, when they write a grievance

22   in the housing units there are mailboxes or wooden

23   boxes that the grievances are placed in, and then

24   the counselors retrieve those grievances on a daily

1   basis.

2        Q    Okay, the counselor will respond to the

3   grievance and then return it to the offender?

4        A    Depending on -- if it's an emergency, if

5   it's marked as an emergency grievance, then the

6   counselor will forward that grievance to me before

7   any involvement on the counselor's part.

8        Q    Let's say that it's not an emergency

9   grievance -- I think a step might have been skipped

10  in the previous testimony.  There is the counselor.

11  The counselor responds and then returns it to the

12  offender, correct?

13       A    That's correct.

14       Q    And this is all if it's not an emergency.

15       A    Yes.

16       Q    If he is unhappy with the counselor's

17  response, what is the offender's next step?  Does

18  he turn it in to the grievance officer?

19       A    For another review from the grievance

20  officer?

21       Q    Yes.

22       A    The grievance officer is the one that will

23  put the final review on the counselor's response.

24       Q    Okay, so if we look --

31

1  **A** Uh huh.

2  **Q** -- at document 781, this is a March 14,

3 2010, grievance.

4  **A** Yes.

5  **Q** It appears from document 781 that the

6 plaintiff turned it in to his counselor, is that

7 correct?  Can you tell by this document who his

8 counselor was?

9  **A** Yes, Ms. Neece.

10  **Q** And what's CC-2 mean?

11  **A** She is a Counselor 2, correctional

12 officer.  She is a counselor 2, yes.

13  **Q** Correctional Counselor 2?

14  **A** Yes.

15  **Q** And then it looks like at some point --

16 that was March 16, and at some point March 17, a

17 grievance officer received this.  Do you know who

18 the grievance officer is?

19  **A** Yes, Ron Sutton.

20  **Q** Okay, so if it's not an emergency, it's

21 the first time the Warden's office sees it and the

22 grievance officer reviews it?

23  **A** The Warden normally receives for his

24 concurrence or not concurrence, after the

32

1    recommendation is entered by the grievance officer.

2        Q    Okay, and on document 783, that was not

3    your signature?

4        A    No, sir.

5        Q    All right, and there is another type of

6    grievance procedure.  That's the emergency

7    grievance procedure, correct?

8        A    Correct.

9        Q    And who marks it as an emergency?

10       A    The offender.

11       Q    And the offender makes their own

12   determination that "I am sending this through the

13   emergency procedure"?

14       A    Yes, sir.

15       Q    Okay, and receives it directly from the

16   counselor?

17       A    Yes, sir.

18       Q    And then you have to make a determination

19   whether or not it's an emergency or not?

20       A    Correct.

21       Q    And what are the only factors you take

22   into account to determine if it is an emergency?

23       A    Myself, I basically restrict that to a

24   medical issue, if the offender is making

1   accusations that he is not getting certain care or

2   treatment that's going to have an adverse effect on

3   his quality of life.

4        Q   Okay, so if he has a medical issue, you

5   would substantiate it as an emergency?

6        A   In most situations.

7        Q   What about if his -- if he makes an

8   allegation that he is in immediate danger of harm?

9        A   Then that would be another situation that

10  I would err on the side of deeming it to be --

11  basically it's anything that has to do with the

12  health, injury, medical-type issues with the

13  offender.

14       Q   Physical injuries?

15       A   Yes.

16       Q   Okay, and so when you deny it as an

17  emergency grievance -- well, let's walk back.  When

18  you look at it as an emergency grievance, are you

19  looking -- are you required to take any sort of

20  steps to investigate the grievance, or do you just

21  look at the allegations made?

22       A   I just look at the allegations.

23       Q   Okay, then when you deny the emergency

24  grievances as you did in Exhibit 1, what happens?

34

1     **A**   It will go back, and my understanding -- I

2     think it goes to a counselor, but then they

3     instruct the offender that he needs to resubmit

4     through the normal process, that's it's been deemed

5     not to be an emergency. Then he would, of course,

6     get a copy of this, and then he would resubmit the

7     grievance in the fashion he did.

8         **Q**   Okay, and then if it goes through the

9     fashion that it receives a counselor response,

10    grievance officer response, and the Warden's office

11    has concurred or denied the grievance, there is a

12    final step, right?

13        **A**   Yes.

14        **Q**   And he can appeal it to, you said, the

15    director's office?

16        **A**   Yes.

17        **Q**   Is that what's referred to as the

18    Administrative Review?

19        **A**   Administrative Review, yes.

20        **Q**   Mr. Grounds, do you know how to calculate

21    an offender's sentence?

22        **A**   No, sir.

23        **Q**   Okay, so if you were to see a Court order

24    in a master file, you would not be capable of

35

1    calculating that individual sentence date?

2        **A**    No, sir.

3        **Q**    I don't have anything else.

4                    **REDIRECT EXAMINATION**

5    BY:  **DENNIS J. DeCARO**

6        **Q**    Let me just ask a couple, Warden.  The

7    documents that the Assistant Warden signed on March

8    17, she had authority to review those documents on

9    March 17, 2010?

10       **A**    Yes, sir.

11       **Q**    And she had the authority to sign your

12   name on those documents?

13       **A**    Yes, sir.

14       **Q**    Okay, counsel took you through the

15   process.  The inmate makes the grievance.  It

16   goes -- in this particular case went to a counselor

17   and then went to a grievance officer.  Do you know

18   if when it goes to a counselor whether the

19   counselor does any type of investigation beyond

20   reading the grievance?

21       **A**    I can't answer exactly every step that

22   they would take.

23       **Q**    How about the grievance officer?  You know

24   if they do any type of investigation?

36

**A**    I believe they try to substantiate what information that they have before them.

**Q**    Would they go to the master file and start reviewing documents?

**A**    I am not sure.

**Q**    And you talked about the standards that in your mind that were emergencies, medical issues, or danger to the inmate, correct?

**A**    Correct.

**Q**    Where did you get those standards?  Is there a state regulation, protocol, guideline that those are the only emergencies?

**A**    No, sir, it's just my day-to-day.

**Q**    Would it be fair to say, I mean you don't consider that if an inmate assumed this for this question, that the inmate should be released and days or weeks later he is filing an emergency grievance saying that "I should have been released weeks ago."  That's not an emergency in your mind?

**A**    Not in the dealings with the emergency grievance.

**Q**    It's also fair to say in that situation where a grievance involves a release date, there is no -- during any grievance procedure in this

1  facility, there is no procedure for a hearing

2  regarding that situation in this facility, without

3  going to Springfield and appealing it here.  There

4  is no hearings.  There is no evidence submitted.

5  You don't review documents in a hearing setting?

6      A    I really don't understand your question.

7      Q    Sure, I am sorry.  It probably got

8  confusing.  In a situation like this, where Mr.

9  Armato is grieving that his sentence is being

10  miscalculated, and that he should have been

11  released, in the process here before it goes to

12  Springfield, or anywhere outside these walls,

13  during this grievance procedure, at no point does

14  the inmate have an opportunity to have a hearing

15  where he can present evidence, where he can get

16  documents from his master file, things like that?

17      A    No, sir.

18      Q    Okay, that's all I have.

19          MR. FANNING:  Just want to clarify one

20  last thing.  You mentioned that -- are you sure

21  that there is no regulation as to the standards for

22  emergency grievance, or you are just unaware of any

23  of them?

24      A    I am unaware if there are any written

38

1    guidelines.

2            MR. FANNING:  Okay, no further questions.

3      A    Thank you.

4

5

6

7

8

9              (DEPOSITION CONCLUDED)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

39

## CERTIFIED SHORTHAND REPORTER'S CERTIFICATION

1

2          I, Donna R. Maninfior, Certified Shorthand
Reporter, Registered Professional Reporter and
3   Notary Public for the State of Illinois, DO HEREBY
CERTIFY that pursuant to agreement between Counsel
4   there appeared before me on March 5, 2012, at the
Robinson Correctional Center, 13423 East 1150th
5   Avenue, Robinson, Illinois, **RANDY GROUNDS**, who was
first duly sworn by me to testify to the whole
6   truth of his knowledge touching upon the matter in
controversy aforesaid so far as he could be
7   interrogated concerning the same; that I did take
stenographic notes of the questions propounded to
8   said witness and his answers thereto, and that said
notes were transcribed upon the computer under my
9   direction and supervision; that signature is waived
and said deposition is herewith returned.

10

          I do further certify that I am not related
11   in any way to any of the parties involved in this
action and have no interest in the outcome thereof.

12

          Dated at Mattoon, Illinois, this 20th day
13   of March, A.D., 2012, and given under my hand and
seal.

14

15

16            s/ Donna R. Maninfior
            _____
17            Donna R. Maninfior, CSR, RPR
                    Notary Public

18

19

20

21

22

23

24

**RANDY GROUNDS**     CondenseIt™     # - decisions

**# [1]** 1:21
**'03 [1]** 5:23
**'09 [1]** 5:16
**-vs [1]** 1:7
**000724 [1]** 12:3
**000781 [3]** 12:16
12:19 18:2
**001134 [1]** 12:4
**00783 [1]** 16:19
**00784 [1]** 16:19
**1 [14]** 3:20 9:3
9:4 9:8 13:9
13:11 13:13 13:17
13:20 14:6 15:17
24:1 29:17 33:24
**1036 [1]** 1:23
**11 [1]** 11:4
**11-CV-3023 [1]**
1:7
**1150th [2]** 2:6
39:4
**12 [1]** 3:20
**1200 [1]** 8:23
**13423 [2]** 2:6
39:4
**14 [2]** 13:1 31:2
**16 [1]** 31:16
**1612 [1]** 1:22
**17 [10]** 13:7 16:18
17:7 17:10 18:12
18:14 19:24 31:16
35:8 35:9
**18 [2]** 14:11 24:10
**2 [9]** 3:20 3:22
12:4 12:11 24:2
27:4 31:11 31:12
31:13
**2/Records [1]** 27:7
**2010 [19]** 10:20
11:4 13:2 13:7
14:11 14:17 15:3
16:13 16:18 17:10
22:18 23:6 23:21
24:11 24:21 28:12
29:17 31:3 35:9
**2012 [4]** 1:15 2:5
39:4 39:13
**20th [1]** 39:12
**217 [1]** 1:24
**22 [1]** 28:12
**23 [1]** 14:17
**235-1127 [1]** 1:24
**25 [1]** 5:21
**29 [1]** 3:17
**30 [1]** 3:3
**4 [2]** 3:17 28:8
**4020 [1]** 3:3
**5 [3]** 1:15 2:5
39:4
**500 [1]** 3:6
**60602 [1]** 3:4
**61938-1036 [1]**
1:23
**62706 [1]** 3:7

**781 [7]** 12:19 12:20
12:21 12:24 13:16
31:2 31:5
**782 [3]** 12:16 12:24
18:2
**783 [4]** 12:16 13:5
18:7 32:2
**784 [6]** 12:17 12:19
12:22 13:5 13:16
18:7
**84-2991 [1]** 1:21
**9 [5]** 3:20 10:20
16:13 24:21 29:17
**A.D [1]** 39:13
**above [2]** 14:12
14:16
**accept [1]** 7:23
**access [2]** 24:16
25:9
**account [1]** 32:22
**accusations [1]** 33:1
**action [2]** 9:20
39:11
**adamant [1]** 17:15
**addressing [1]** 7:10
**Administrative [4]**
27:5 27:20 34:18
34:19
**adverse [1]** 33:2
**affected [1]** 27:8
**aforesaid [1]** 39:6
**agreeing [1]** 7:8
**agreement [1]** 39:3
**allegation [1]** 33:8
**allegations [3]** 7:13
33:21 33:22
**allows [1]** 26:22
**answer [8]** 4:15
13:18 21:14 23:14
27:4 28:21 29:9
35:21
**answers [4]** 5:9
6:13 23:24 39:8
**apart [1]** 8:16
**appeal [2]** 19:14
34:14
**appealing [1]** 37:3
**APPEARANCES [1]**
3:1
**appeared [1]** 39:4
**appointment [1]**
23:1
**appreciate [1]** 29:11
**appropriate [1]** 7:14
**approved [2]** 28:20
29:3
**area [1]** 10:12
**arises [1]** 20:19
**Armato [14]** 1:5
5:1 8:14 10:21
13:1 13:7 13:22
15:19 16:14 24:6
24:9 28:14 28:16
37:9

**ascertain [1]** 20:6
**assigned [4]** 8:19
22:10 27:6 27:11
**Assistant [9]** 3:6
5:24 16:22 17:4
18:11 18:15 19:23
23:17 35:7
**assume [1]** 11:6
**assumed [1]** 36:15
**assuming [4]** 15:8
18:20 25:10 26:19
**attorney [14]** 3:2
3:6 4:19 8:22
12:3 21:11 21:18
21:23 21:23 22:1
22:10 22:14 22:15
22:18
**attorneys [1]** 22:13
**August [1]** 5:16
**authority [11]** 6:10
15:23 16:2 16:3
16:5 16:7 17:3
17:5 26:12 35:8
35:11
**Avenue [3]** 1:22
2:7 39:5
**aware [4]** 5:3
16:13 16:15 24:4
**background [1]** 5:19
**based [2]** 26:21
28:9
**basis [2]** 13:14 30:1
**Bates [5]** 8:24
9:9 9:10 12:3
16:19
**become [1]** 28:21
**Beginning [1]** 12:19
**bit [1]** 26:9
**bottom [1]** 11:4
**box [3]** 1:23 10:5
10:13
**boxes [1]** 29:23
**brief [5]** 5:19 6:3
**Brookheart [1]** 26:5
**C [1]** 1:21
**calculate [1]** 34:20
**calculating [3]** 20:4
20:10 35:1
**calculation [17]** 7:21
20:24 21:4 25:4
26:4
**calculations [2]**
6:15 25:5 26:17
26:22
**capable [1]** 34:24
**capacities [1]** 1:9
**care [1]** 33:1
**cases [1]** 28:18
**CC-2 [1]** 31:10
**Center [4]** 2:6
5:15 28:15 39:4
**CENTRAL [1]** 2:6
**certain [1]** 33:1
**CERTIFICATION [1]**
39:1

**Certified [3]** 1:22
39:1 39:2
**certify [2]** 39:3
39:10
**chance [1]** 5:6
**check [1]** 10:14
**checked [1]** 10:13
**Chicago [1]** 3:4
**chief [11]** 5:24
15:14 16:8 21:2
22:12 22:15 22:23
22:23 22:24 23:2
28:12
**claiming [1]** 9:22
**clarification [1]**
25:22
**clarify [5]** 20:8
23:10 24:19 29:15
37:19
**clear [1]** 28:7
**Clinical [1]** 8:19
**collected [1]** 10:5
**comfortable [1]** 20:21
17:8
**committed [2]** 13:6
**communicate [1]**
18:23
**communicating [1]**
15:19
**complaint [1]** 5:11
**complete [2]** 12:7
12:8
**computer [1]** 39:8
**concerning [1]** 39:7
**CONCLUDED [1]**
38:9
**concur [1]** 19:21
**concurred [3]** 19:23
19:23 34:11
**concurrence [2]** 31:24
31:24
**conduct [1]** 7:24
**confusing [1]** 37:8
**consider [1]** 36:15
**constitute [1]** 13:10
**contact [1]** 21:2
**controversy [1]** 39:6
**coordinator [4]** 6:1
26:6 26:16 27:19
**copied [1]** 28:2
**copy [2]** 5:11 34:6
**correct [5]** 5:13
6:17 10:22 11:18
13:2 13:3 17:10
25:8 29:20 30:12
30:13 31:7 32:4
32:8 32:20 36:8
36:9
**correctional [6]** 2:6
5:15 28:15 31:11
31:13 39:4
**Corrections [3]** 5:22
8:6 14:13
**counsel [4]** 3:22
22:21 35:14 39:3

**counseling [1]** 8:9
**counselor [7]** 7:12
7:12 7:16 8:2
8:4 8:5 8:7
8:12 8:12 8:16
8:17 8:18 9:13
9:19 10:1 10:17
11:12 11:23 13:14
13:15 17:18 19:22
19:24 29:20 30:2
30:6 30:10 30:11
31:6 31:8 31:11
31:12 31:13 32:16
34:2 34:9 35:16
35:18 35:19
**counselor's [5]** 7:21
18:8 30:7 30:16
30:23
**counselors [3]** 9:16
9:19 29:24
**County [2]** 5:21
24:9
**couple [3]** 24:10
29:15 35:6
**course [1]** 34:5
**court [18]** 1:1
2:8 2:15 4:14
4:16 14:10 14:20
14:22 20:17 21:12
21:17 21:18 24:5
24:10 24:11 26:20
28:15 34:23
**created [1]** 13:16
**credit [1]** 20:15
**CROSS [1]** 29:13
**CSR [2]** 1:20 39:17
**custody [1]** 14:9
14:21
**daily [1]** 29:24
**danger [2]** 33:8
36:8
**dash [1]** 14:9
**date [14]** 14:16 20:5
20:7 20:10 23:1
26:20 28:14 35:1
36:23
**dated [7]** 10:13
10:20 11:4 13:1
13:6 29:17 39:12
**dates [3]** 6:16 15:3
23:9
**Dave [1]** 39:12
**David [8]** 1:5
5:1 8:13 10:21
13:1 13:7 28:14
28:16
**day-to-day [4]** 6:4
6:7 6:15 36:13
**days [1]** 36:17
**dealings [1]** 36:20
**DeCaro [6]** 3:2
3:3 3:17 4:5
12:8 35:5
**decides [1]** 26:14
**decision [1]** 26:10
**decisions [2]** 15:24
16:4

**RANDY GROUNDS**                    CondenseIt™                         DeeDee - litigation

DeeDee [1]         26:5
deem [1] 17:21
deemed [1]         34:4
deeming [1]        33:10
Defendant [1]      14:12
Defendant's [3]
   14:14   14:15   14:16
Defendants [1] 1:10
   3:7
deference [1]      26:10
denial [1]         19:4
denied [2]         19:3
   34:11
DENNIS [3]         3:2
   4:5    35:5
deny [2] 33:16  33:23
department [4] 8:5
   14:12   14:20   22:4
Depending [1]      30:4
deposition [6]     1:15
   2:4     4:9     5:6
   38:9   39:9
depositions [1] 2:9
Deputy [1]         5:24
determination [2]
   32:12  32:18
determine [1]      32:22
difference [1]     17:9
different [2]      8:17
   10:2
differently [1]    17:7
difficult [1]      4:14
DION [1]
direct [2]         4:4
   23:11
directed [4]       24:17
   26:5    26:7    28:13
direction [4]      16:9
   16:11   21:3    39:9
directly [6]       9:17
   9:20   10:7    10:18
   26:8   32:15
Director [3]       5:24
   19:11  19:13
director's [1]  34:15
discovery [3]      1:15
   6:13   6:14
DISTRICT [2] 1:1
   1:1
DIVISION [1] 1:2
DIXON [1]          1:9
document [14]  9:12
   13:13  13:14  16:17
   16:18  17:6   17:10
   18:13  18:14  26:22
   31:2   31:5   31:7
   32:2
documentation [1]
   16:16
documents [16] 6:21
   8:23   12:2   13:15
   15:16  15:17  24:1
   25:17  26:19  27:23
   35:7   35:8   35:12
   36:4   37:5   37:16

Donna [3]          1:20
   39:2   39:17
door [3] 28:5    28:17
   28:21
due [1]   10:14
during [1]         21:5
   27:7   36:24  37:13
E [3]    1:21    2:6
   4:8
e-mails [1]        28:2
easiest [1]        12:1
East [1] 39:4
effect [2]         19:3
   33:2
either [2]         7:20
   11:14
emergencies [2]
   36:7   36:12
emergency [35] 9:16
   9:21   9:22   10:1
   10:6   10:9   10:14
   11:1   11:15  11:18
   11:22  13:12  17:13
   17:13  17:22  17:23
   30:4   30:5   30:8
   30:14  31:20  32:6
   32:9   32:13  32:19
   32:22  33:5   33:17
   33:18  33:23  34:5
   36:17  36:19  36:20
   37:22
employee [2]       8:6
   8:8
employment [1]
   5:19
end [1]   20:1
enforcing [1]      25:13
entered [2]        24:10
   32:1
entitled [1]       17:6
err [1]   33:10
evidence [2]       37:4
   37:15
Examination [4]
   3:16   4:4    29:13
   35:4
Executive [1]  27:7
exhibit [22]       3:20
   3:20   3:22   9:1
   9:3    9:4    9:8
   12:4   12:7   12:9
   12:11  13:9   13:11
   13:13  13:17  13:20
   14:6   15:17  24:1
   24:2   29:16  33:24
Exhibits [1]       3:19
expedite [2]    11:14
   17:17
explained [1]   26:3
extent [2]         6:24
   13:21
F [1]    1:21
facilities [1]     22:10
facility [9]       6:8
   6:10   15:2   15:13
   24:12  25:14  27:11
   37:1   37:2

factors [1]        32:21
factual [1]        7:18
Fanning [8]        3:5
   3:17   12:5   21:13
   21:20  29:14  37:19
   38:2
fashion [3]        18:6
   34:7   34:9
February [7]       14:11
   14:17  22:17  23:5
   23:21  24:10  28:12
Federal [2]        2:8
   2:8
figure [1]         26:20
file [6]   7:5    14:16
   25:7   34:24  36:3
   37:16
filed [1] 24:14
files [1] 25:9
filing [1]         36:17
finding [1]        19:7
forgive [1]        11:20
formulate [1]      7:16
forwarded [1]      9:20
foundation [2]  12:6
   21:13
four [3]  12:21   13:9
   24:2
frame [1]          27:8
G [1]    1:21
G-r-o-u-n-d-s [1]
   4:8
General [1]        3:6
   8:22   12:3   21:23
   22:1   22:15
General's [3]   21:11
   21:18  22:14
generally [1]      26:12
Glenn [5]          1:8
   15:8   15:11  21:6
   28:13
governing [1]      2:9
grievance [83] 7:1
   7:2    7:5    7:7
   7:11   7:15   7:17
   7:18   8:11   8:13
   9:14   9:15   9:16
   9:21   9:22   9:24
   10:4   10:6   10:9
   10:14  11:1   11:10
   11:14  11:16  11:22
   13:1   13:6   13:10
   13:22  14:4   16:14
   16:15  16:21  17:8
   17:8   17:11  17:12
   17:13  17:13  17:18
   17:19  17:22  18:1
   18:4   19:4   19:17
   24:14  24:21  24:24
   29:17  29:18  29:20
   29:21  30:3   30:5
   30:6   30:9   30:18
   30:19  30:22  31:3
   31:17  31:18  31:22
   32:1   32:6   32:7
   33:17  33:18  33:20
   34:7   34:10  34:11
   35:15  35:17  35:20

35:23   36:18   36:21
36:23   36:24   37:13
37:22
grievances [12]  6:22
   8:1    8:15   8:18
   8:22   9:17   10:4
   19:2   24:6   29:23
   29:24  33:24
grievant [1]       17:18
grieving [1]       8:14
37:9
Grounds [18]       1:8
   1:15   2:5    3:20
   3:20   3:22   4:1
   4:8    9:3    9:4
   9:8    12:4   12:11
   13:11  13:17  13:20
   34:20  39:5
group [7]          3:20
   9:3    12:4   12:7
   12:9   12:11  19:12
guideline [1]      36:11
guidelines [1]  38:1
hand [1] 39:13
handle [1]         11:16
handling [1]       15:3
harm [2] 10:16  33:8
health [2]         17:16
   33:12
health-related [1]
   17:15
hearing [4]        19:16
   37:1   37:5   37:14
hearings [1]       37:4
HEREBY [2]         2:3
   39:3
housing [3]        28:20
   29:3   29:22
identification [2]
   9:5    12:12
IDOC [1]           14:9
IDOC's [1]         14:19
IL [3]    1:23    3:4
   3:7
Illegal [1]        14:9
Illinois [6]       1:1
   2:7    24:9    39:3
   39:5   39:12
immediate [1]   33:8
immediately [3]
   14:21  17:17  17:19
impeachment [1]
   2:16
in-house [1]       22:6
incarceration [1]
   5:1
INDEX [1]          3:15
indicating [1]  14:5
individual [1]  1:9
   29:19  35:1
individuals [7] 7:14
   17:20  28:19
information [4] 8:3
   25:18  28:9   36:2
informs [1]        9:23

injuries [1]       33:14
injury [3]         10:15
   17:14  33:12
inmate [23]        7:5
   8:6    8:12   10:15
   10:21  15:3   16:1
   16:1   19:6   19:20
   20:21  23:9   23:20
   23:21  24:8   26:11
   26:12  26:15  35:15
   36:8   36:15  36:16
   37:14
inquired [1]       25:21
instead [3]        5:17
   8:24   18:19
institution [1]  20:16
   28:23
instruct [1]       34:3
interaction [1]  24:3
   27:2
internally [1]  19:17
interrogated [1] 39:7
interrogatories [1]
   28:11
interrogatory [4]
   5:9    23:24  27:4
   28:8
interview [1]   7:14
investigate [2]  25:19
   33:20
investigation [5]
   8:1    14:23  25:21
   35:19  35:24
involvement [2]
   13:21  30:7
involves [1]       36:23
J [3]    3:2    4:5
   35:5
Jackson [9]        1:8
   15:9   15:11  15:24
   16:6   21:6   27:2
   27:24  28:13
Jackson's [2]   15:24
   26:10
JOHN [1]           1:8
Judge [2]          14:10
   14:18  20:16
knowledge [1]  39:6
Kupets [1]         3:3
Lafayette [1]   1:22
Lake [1] 24:9
Land [1] 27:19
LaSalle [1]        3:3
last [2]  4:7    37:20
Law [2]  3:2    3:3
lawsuit [4]        25:16
   25:20  25:22  27:8
leading [1]        5:20
legal [9] 14:20  21:22
   22:1   22:3   22:12
   22:21  22:23  22:24
   26:6
life [1]  33:3
listed [1]         29:16
litigation [2]  9:11

**MANINFIOR COURT REPORTING SERVICE, P.C.**                    Index Page 2

**RANDY GROUNDS**  CondenseIt™  **Littlejohn - sending**

26:6
Littlejohn [11]  12:14
15:5   15:18   20:14
25:24   26:8   27:6
27:14   27:23   28:10
29:11
Littlejohn's [2] 23:6
27:16
location [1]   28:20
M [1]   1:21
mailboxes [1]  29:22
mandatory [4]  14:13
23:19   23:22   29:4
Maninfior [3]  1:20
39:2   39:17
manner [1]   18:1
March [26]   1:15
2:5   10:20   11:4
13:1   13:7   15:2
16:13   16:18   17:7
17:10   18:12   18:14
19:24   22:17   23:5
23:21   24:21   29:17
31:2   31:16   31:16
35:7   35:9   39:4
39:13
master [4]   25:7
34:24   36:3   37:16
materials [1]   9:9
Mattoon [2]   1:23
39:12
meant [1]   4:18
medical [3]   32:24
33:4   36:7
medical-type [1]
33:12
merit [1] 7:17
messages [2]   27:24
28:2
Michele [3]   1:8
27:5   28:10
miscalculated [1]
37:10
mitimus [1]   14:14
Ms [12]   12:14   15:5
15:18   20:14   23:6
25:24   26:8   27:14
27:16   27:23   29:11
31:9
MSR [1] 20:16
N [4]   1:21   1:21
1:21   3:3
N91995 [1]   10:21
name [5] 4:7   4:7
10:13   19:12   35:12
necessity [1]   2:15
Neece [1]   31:9
nod [1]   4:16
normal [5]   11:16
18:1   18:4   18:5
34:4
normally [1]   31:23
Notary [1]   39:3
39:17
Note [1] 14:14
notes [2] 39:7   39:8

November [1]   5:22
number [3]   10:21
27:4   28:8
O [4]   1:21   1:21
1:21   1:23
oath [1]   4:3
objection [3]   12:6
21:13   21:20
occasions [1]   21:10
offender [24]   7:7
7:11   7:13   9:18
9:21   9:23   10:4
10:12   10:20   11:12
13:1   16:9   17:19
17:24   18:5   29:19
29:21   30:3   30:12
32:10   32:11   32:24
33:13   34:3
offender's [5]   9:14
17:10   17:14   30:17
34:21
offenders [2]   28:19
29:6
office [26]   14:15
16:8   18:8   20:1
20:9   21:1   21:1
21:11   21:11   21:17
21:18   21:23   22:4
24:13   24:22   25:7
25:23   26:16   27:5
27:7   27:10   27:15
27:21   31:21   34:10
34:15
officer [16]   15:4
15:14   17:9   21:2
28:13   30:18   30:20
30:22   31:12   31:17
31:18   31:22   32:1
34:10   35:17   35:23
Offices [1]   3:3
operation [1]   6:8
Operations [2]   6:1
6:1
opinion [1]   7:16
opportunity [2] 14:3
37:14
orders [5]   24:5
24:10   24:15   24:23
25:3
outcome [1]   39:11
Outlook [2]   27:24
28:2
outside [1]   37:12
oversee [1]   6:7
own [1]   32:11
P [2]   1:21   1:23
P-o-t-k-o-n-j-a-k [1]
14:11
P.C [1]   1:21
pages [6]   8:23
12:9   12:16   12:21
13:9   24:2
parole [2]   28:24
29:6
PC [1]   3:3
period [2]   21:5
22:22

person [6]   6:9
9:24   20:4   22:12
26:21   27:12
person's [2]   13:6
17:8
personal [2]   10:15
17:14
Physical [1]   33:14
pick [1] 9:1
Pinkneyville [1]
22:20
plaintiff [5]   1:6
3:4   28:14   28:16
31:6
point [6] 11:7   15:5
19:21   31:15   31:16
37:13
policies [1]   25:13
policy [3]   20:3
20:19   20:22
position [4]   7:21
27:15   27:16   27:20
possible [2]   21:17
24:22
previous [1]   30:10
prisoners' [1]   6:15
problem [4]   20:5
20:6   20:13   27:1
problems [1]   20:18
procedure [14]   2:9
7:6   7:8   19:17
20:3   20:20   20:23
29:18   32:6   32:7
32:13   36:24   37:1
37:13
procedures [1]   25:14
process [4]   11:16
34:4   35:15   37:11
Professional [1]
39:2
Programs [1]   23:18
promoted [1]   27:19
proper [2]   15:20
20:7
propounded [1] 39:7
protocol [2]   15:21
36:11
provide [1]   9:16
provided [4]   10:6
12:10   15:18   28:10
provides [1]   8:4
Public [2]   39:3
39:17
pull [1] 24:23
purpose [1]   29:1
purposes [2]   2:16
28:10
pursuant [2]   2:7
39:3
quality [1]   33:3
questions [10]   4:20
6:6   12:15   17:20
23:8   23:14   23:15
29:10   38:2   39:7
R [7]   1:20   1:21

1:21   1:21   1:21
39:2   39:17
raised [1]   19:21
Randy [1]   1:8
1:15   2:5   4:1
4:8   39:5
read [3]   4:17   14:4
14:9
reading [2]   15:16
35:20
reason [2]   12:13
18:12
reasons [1]   20:14
reassigned [1]   27:13
receive [1]   9:13
received [7]   5:11
9:11   12:2   24:20
25:19   25:22   31:17
receives [1]   31:23
32:15   34:9
receiving [1]   10:24
recommendation [1]
32:1
record [2]   4:7
12:6
records [19]   14:15
15:4   15:14   16:8
20:3   20:9   21:1
21:1   21:2   24:11
24:13   24:22   25:6
25:23   26:16   27:10
27:15   27:21   28:13
REDIRECT [1] 35:4
reference [1]   25:23
26:8
referred [2]   24:23
34:17
referring [1]   24:6
refers [1]   15:7
reflect [1]   11:13
reflects [1]   18:4
regarding [13]   4:24
9:13   13:7   14:4
15:19   21:16   23:9
24:15   25:18   26:10
28:1   28:3   37:2
region [1]   22:9
regional [3]   22:9
22:11   22:18
Registered [1]   39:2
regulation [2]   36:11
37:21
related [1]   39:10
relationship [1] 15:13
release [16]   6:15
14:14   14:16   15:3
15:20   16:1   23:20
23:22   26:4   26:11
26:12   26:15   26:20
29:3   29:5   36:23
released [11]   14:12
14:17   14:21   14:21
16:10   16:11   28:16
28:21   36:16   36:18
37:11
releasing [1]   20:21

rely [3]   8:2   8:3
25:3
reminder [1]   4:12
rephrase [1]   4:22
report [2]   17:9
18:8
reporter [6]   1:22
2:15   4:14   4:16
39:2   39:2
REPORTER'S [1]
39:1
representative [1]
22:11
required [1]   33:19
respond [1]   30:2
responding [1]  28:11
responds [1]   30:11
response [2]   13:6
13:17   17:8   28:8
30:17   30:23   34:9
34:10
responsible [1] 25:13
restating [1]   11:21
restrict [1]   32:23
restrictions [1]   29:7
resubmit [2]   34:3
34:6
retained [1]   3:22
retrieve [1]   29:24
return [1]   30:3
returned [1]   39:9
returns [1]   30:11
review [19]   5:5
7:1   7:13   7:20
7:22   9:17   11:9
11:13   14:20   16:21
17:19   19:9   25:4
30:19   30:23   34:18
34:19   35:8   37:5
reviewed [1]   11:7
18:11   18:14
reviewing [3]   6:21
16:14   36:4
reviews [1]   19:13
31:22
risk [1]   10:15
ROBERT [2]   3:5
29:14
Robinson [6]   2:6
2:7   5:15   5:20
39:4   39:5
Ron [1]   13:9
Rose [2] 22:23   23:2
RPR [2]   1:20   39:17
Rules [2]   2:7
2:8
S [1]   3:6
seal [1]   39:13
second [2]   3:6
23:9
Security [1]   6:1
sees [1]   31:21
send [1]   7:22
sending [1]   27:24

**MANINFIOR COURT REPORTING SERVICE, P.C.**

**RANDY GROUNDS**                    **CondenseIt™**                    **sentence - years**

32:12

sentence [4]    17:21
34:21    35:1    37:9

sentencing [1]    14:15

serious [2]    10:15
10:15

served [2]    5:23
5:23

Service [1]    8:19

setting [1]    37:5

sex [2]    28:19    29:6

sheriff [1]    5:22

Shorthand [3]    1:22
39:1    39:2

show [3] 6:20    9:2
9:7

showed [2]    24:1
25:17

shown [1]    13:16

shrug [1]    4:16

shrugging [1]    4:17

side [1]    33:10

sign [3]    11:9    13:20
35:11

signature [7]    2:12
11:3    16:20    16:24
17:5    32:3    39:9

signed [7]    10:12
11:7    16:18    16:21
18:15    18:24    35:7

situation [9]    5:10
16:13    21:16    28:1
28:3    33:9    36:22
37:2    37:8

situations [2]    6:18
33:6

skipped [1]    30:9

sole [1]    8:9

solely [2]    8:2
25:3

sorry [3] 12:18    12:23
37:7

sort [3]    6:3    19:14
33:19

SOUTHERN [1]
1:1

speak [2]    4:13
29:1

speaking [1]    4:15

Specialist [1]    27:5

specific [4]    6:6
8:11    8:21    12:9

spell [1] 4:7

spelled [1]    14:10

Springfield [8]    3:7
14:19    15:8    19:8
22:12    23:3    37:3
37:12

stamp [1]    9:10

stamped [4]    8:24
9:9    12:3    16:19

standards [3]    36:6
36:10    37:21

start [1] 36:3

state [5]    4:6    15:15
21:3    36:11    39:3

STATES [1]    1:1

Stateville [1]    28:15

stationed [1]    22:20

stead [1] 18:12

stenographic [1]
39:7

step [6]    19:3    29:19
30:9    30:17    34:12
35:21

steps [1] 33:20

stipulated [3]    2:3
2:11    2:14

STIPULATION [1]
2:1

Street [2]    3:3
3:6

submit [3]    7:19
17:24    29:20

submitted [3]    9:24
18:5    37:4

subpoena [1]    21:21

subsequent [1] 13:15

substantiate [2] 33:5
36:1

substantiated [1]
17:23

Suite [1] 3:3

summary [1]    7:19

superintendent [1]
20:9

supervised [4]    14:14
23:20    23:22    29:5

supervision [1] 39:9

supervisor [21] 8:20
14:19    15:4    15:7
15:14    16:8    21:1
21:2    21:6    21:8
23:6    23:11    23:16
25:3    26:16    27:7
27:9    27:10    27:15
27:21    28:13

supervisor's [1]
26:21

supervisor-supervisor
[1]    23:12

support [1]    27:23

Sutton [1]    31:19

sworn [2]    4:2
39:5

system [1]    26:18

T [2]    1:21    1:21

TA'd [1]    27:15

takes [1] 4:17

temporarily [3] 27:6
27:11    27:14

term [1]    14:13

terminology [1] 28:22

testified [1]    4:3

testify [1]    39:5

testimony [1]    30:10

Thank [1]    38:3

thereof [1]    39:11

thereto [1]    39:8

Tilka [2]    16:22
18:15

titled [1]    22:14

totally [1]    7:22

touching [1]    39:6

Tracy [1]    22:20

transcribed [1]    39:8

treatment [1]    33:2

truthful [2]    14:24
25:1

two [3]    20:14    20:16
20:18

type [4]    17:14    32:5
35:19    35:24

typical [1]    9:12

typically [2]    4:19
27:8

U [1]    1:21

unaware [2]    37:22
37:24

unhappy [1]    30:16

UNITED [1]    1:1

units [1] 29:22

usually [1]    7:8

utilize [1]    21:11

utilizes [1]    21:17

verbally [1]    4:16

versa [1] 16:3

vice [1]    16:3

violated [4]    14:18
28:5    28:17    28:21

violating [1]    28:24

Wabash [1]    5:21

waived [3]    2:12
2:16    39:9

walk [3] 26:23    29:7
33:17

walls [1]    37:12

Warden [18]    4:6
4:9    5:14    5:20
6:5    12:15    16:22
17:4    18:11    18:15
19:23    23:17    31:23
35:6    35:7

Warden's [2]    31:21
34:10

week [1] 8:16

weeks [2]    36:17
36:19

whole [1]    39:5

without [4]    14:13
27:2    29:7    37:2

witness [1]    4:2
39:8

wooden [1]    29:22

writ [1]    28:15

write [3] 7:11    7:19
29:21

writes [1]    7:7

written [1]    37:24

year [1]    4:18

years [1] 5:21

**MANINFIOR COURT REPORTING SERVICE, P.C.**

ILLINOIS DEPARTMENT OF CORRECTIONS
## OFFENDER'S GRIEVANCE

| Date: 3-9-10 | Offender: (Please Print) David Armato | ID#: N91995 |

| Present Facility: Robinson | Facility where grievance Issue occurred: Robinson |

**NATURE OF GRIEVANCE:**

- ☐ Personal Property
- ☐ Staff Conduct
- ☐ Transfer Denial by Facility
- ☐ Mail Handling
- ☐ Dietary
- ☐ Transfer Denial by Transfer Coordinator
- ☐ Restoration of Good Time
- ☐ Medical Treatment
- ☐ Disability
- ☐ HIPAA
- ☑ Other (specify): Illegal Custody

- ☐ Disciplinary Report: ____ / ____ / ____
  Date of Report       Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: Illegal custody by IDOC - A court order by Judge Potkonjak on Feb 18 2010 ordered above defendant To be released From The Department of Corrections without a Term of Mandatory supervised Release. Note see Defendants Mittimus sentencing order in Defendants Records office File. However when above Defendants release date of Feb 23 2010 came I was not released as ordered by The Judge. I was Told I was violated because a supervisor in Springfield wanted IDOC Legal department To review court order I have yet To be released

Relief Requested: Immediately Released From custody by order of The Court!

☑ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| s/David Armato | N91995 | 3, 9, 10 |
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

---

| **Counselor's Response (if applicable)** | | |

Date Received: ____ / ____ / ____    ☐ Send directly to Grievance Officer    ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

GROUNDS
EXHIBIT NO. 1
D. MARINIFIOR

| Print Counselor's Name | Counselor's Signature | Date of Response |

---

| **EMERGENCY REVIEW** | | |

Date Received: 3 /11 /10    Is this determined to be of an emergency nature?    ☐ Yes; expedite emergency grievance
☑ No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

| s/ Randy Grounds | 3 /11 /10 |
| Chief Administrative Officer's Signature | Date |