

E-FILED
Friday, 09 November, 2012 05:13:04 PM
Tuesday, 17 April, 2012 05:19:04 PM
Clerk, U.S. District Court, ILCD
Clerk, U.S. District Court, ILCD

**IN THE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**CENTRAL DIVISION**

DAVID ARMATO,      )
      )
      Plaintiff,      )
      )
      v.      )      **Court No.: 11 cv 3023**
      )
RANDY GROUNDS, MICHELE LITTLEJOHN,      )
GLENN JACKSON, DION DIXON, and      )
EDWARD HUNTLEY, all in their individual      )
capacities,      )
      )
      Defendants.      )

## AMENDED COMPLAINT

### Introduction

1.    This is an action brought pursuant to the United States Constitution, the Eighth Amendment, the Fourteenth Amendment, 42 U.S.C. § 1983 and state laws to recover damages for the wrongful detention and false imprisonment of David Armato in the Robinson Correctional Center.

2.    Mr. Armato was wrongfully detained and imprisoned by the defendants for 269 days. On February 18, 2010, the Circuit Court of Lake County, Illinois clarified, in part, Mr. Armato's credits for time served and specifically provided in the Court Order that Mr. Armato was to be released from the Department of Corrections without a term of Mandatory Supervised Release. Based on the February 18th Court Order, Mr. Armato should have been released on August 29, 2009. Mr. Armato was not released from the Robinson Correctional Center until May 21, 2010 despite defendants actual knowledge of the Court Order requiring his August 29,

1


PLAINTIFF'S
EXHIBIT
A
Blumberg No. 5113

2009 release.

## Jurisdiction and Venue

3.      The jurisdiction of the Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983 et seq., 1985, 1986 and 1988; the Judicial Code, 28 U.S.C. § 1331, and 1343(a); the Constitution of the United States and it amendments. The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper because a substantial portion of the events giving rise to the claims occurred in this judicial district.

## Parties

5.      Plaintiff, David Armato, resides in Cook County, Illinois. Plaintiff was wrongfully detained and/or falsely imprisoned in the Robinson Correctional Center, Robinson, Illinois which is operated by the Illinois Department of Corrections. Mr. Armato was falsely imprisoned and wrongfully detained at the Robinson Correctional Center from August 29, 2009 to May 21, 2010.

6.      Defendant Grounds was the Warden of the Robinson Correctional Center at all relevant times of the events referenced in this Complaint and had the power and authority to release the plaintiff from the Robinson Correctional Center. On information and belief, Mr. Grounds is an Illinois resident.

7.      Defendant, Glenn Jackson, was at all relevant times the Chief Records Officer for the Illinois Department of Corrections located in Springfield, Illinois and had the power and authority to release the plaintiff from the Robinson Correctional Center. On information and belief, Mr. Jackson is a resident of Springfield, Illinois.

2

8.      Defendant, Michele Littlejohn, was at all relevant times the Office Administrative Specialist at the Robinson Correctional Center responsible for calculating Mr. Armato's release date and had the power and authority to release the plaintiff from the Robinson Correctional Center.  On information and belief, Ms. Littlejohn is an Illinois resident.

9.      Defendant, Dion Dixon, was at all relevant times a Parole Supervisor for the Robinson Correctional Center and had the power and authority to release the plaintiff from the Robinson Correctional Center.   On information and belief, Mr. Dixon is an Illinois resident.

10.      Defendant, Edward Huntley, was at all relevant times an attorney for the Illinois Department of Corrections and had the power and authority to release the plaintiff from the Robinson Correctional Center.   On information and belief, Mr. Huntley is an Illinois resident.

**Factual Allegations**

11.      On September 24, 2005 Mr. Armato plead guilty to a theft offense and received a sentence of 24 months of intensive probation (05CF1661).  On December 20, 2005, Mr. Armato was charged with another theft offense and violating his probation (05CF5015).  On March 6, 2006, Mr. Armato was sentenced to 10 years for the second theft arrest, 05CF5015, to run concurrent with his prior charge 05CF1661.

12.      The March 6, 2006 Court Order also required that Mr. Armato was to receive credit for time served in the Lake County Jail and while awaiting transport to the Department of Corrections.  Mr. Armato was to serve his 10 years in the Illinois Department of Corrections.

13.      The March 6, 2006, Court Order did not state the exact number of days that Mr. Armato was to receive good time credit for.

14.      Mr. Armato served the majority of his imprisonment at the Robinson Correctional

3

Center.  At various times, employees of the correctional center calculated the date of Mr.

Armato's release from prison.  As of September 24, 2009, Michele Littlejohn had calculated Mr.

Armato's release date as November 9, 2009.

15.      Prior to February 18, 2010, none of the employees of the correctional center could

determine the correct amount of "time served" that Mr. Armato was to receive when they

calculated his date of release.

16.      All of the release dates calculated by the Robinson employees, prior to February

18, 2010, were incorrect and resulted in detaining Mr. Armato longer than his correct release

date.

17.      During Mr. Armato's confinement at the Robinson Correctional Center the

correctional center did not have an effective policy, custom or practice for determining an

inmate's time served in a county jail,  and/or while waiting for transport to the Department of

Corrections if the specific number of days was not specified by Court Order.  Further, the

defendants failed to conduct an investigation regarding Mr. Armato's claims that he was being

wrongfully imprisoned until it was too late, resulting in his wrongful imprisonment.

18.      When Mr. Armato learned that his release date from the Robinson Correctional

Center did not, and would not, include any time he served in the Lake County Jail or time served

while waiting for transport to the Department of Corrections, he complained to the defendants

without success and then he filed a *pro se* Motion with the Lake County Circuit Court to

determine his county jail credits.

19.      On February 18, 2010, Lake County Judge Potkonjak entered two Orders

clarifying Mr. Armato's dates of confinement with the express language that "It is Further

4

Ordered that with credit for 373 days served in the Lake County Jail - credit for time awaiting transport to the Department of Corrections - good time credit as administered by the Department of Corrections - def to be released from the Department of Corrections without a term of Mandatory Supervised Release."

20.    On or about February 22, 2010, Michele Littlejohn received the corrected February 18, 2010 Lake County Court Orders.  Littlejohn knew that based upon the Court Orders, and her own calculations, that the correct release date for Mr. Armato was August 29, 2009.

21.    On February 22, 2010, Michele Littlejohn informed defendant Glenn Jackson that based upon the February 18, 2010 Lake County Court Order that Mr. Armato should have been released from the Robinson Correctional Center on August 29, 2009.  Jackson subsequently informed Huntley of the situation.

22.    All of the Defendants became aware of the February 18, 2010 Court Orders, and the fact that based upon its express language and Ms. Littlejohn's calculations that Mr. Armato should have been released from prison in August 2009.

23.    Despite the knowledge of the February 18, 2010 Court Orders and the correct release date, Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn wilfully and with deliberate indifference continued to wrongfully detain and falsely imprisoned Mr. Armato by repeatedly having his parole violated, having warrants issued detaining Mr. Armato, by having grievances regarding detention denied, and by refusing to release him contrary to the express language of the Court Orders.

24.    Despite the knowledge of the February 18, 2010 Court Orders and the correct

5

release date, Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn wilfully and with

deliberate indifference continued to wrongfully detain and falsely imprisoned Mr. Armato

repeatedly until he was released from prison on May 21, 2010.

25.     On March 9, 2010, Defendant Grounds denied Mr. Armato's Emergency

Grievance in contravention of the controlling Court Orders.  On March 17, 2010, Grounds denied

Mr. Armato's grievance seeking immediate release in contravention of the controlling Court

Orders.  On April 7, 2010 the Prisoner Review Board found that Mr. Armato was not a parole

violator, but Mr. Armato's incarceration continued.

26.     It took the defendants at least 89 days to release Mr. Armato despite the court

orders which required his immediate release without a period mandatory supervised release.

Plaintiff's constitutional rights were violated each day he was illegally imprisoned.

27.     On May 21, 2010, Mr. Armato was released from the Robinson Correctional

Center without a term of Mandatory Supervised Release or parole.

28.     At all relevant times, Defendants Grounds, Dixon, Jackson, Huntley and

Littlejohn were acting under the color of law when they took the actions or omissions described

in this Complaint.  All of the defendants are being sued in their individual capacities.

**Count I: 42 U.S.C. § 1983**
**8th Amendment Violation**

29.     Plaintiff restates and incorporates paragraphs 1 through 28 of this Complaint as

his paragraph 29 as if fully restated here.

30.     Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn had actual

knowledge that the Circuit Court Orders had provided Mr. Armato with credit for time served,

6

good time and that he was to be release without a term of mandatory supervised release.

31.     Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn after acquiring this knowledge acted with deliberate indifference under the circumstances.

32.     Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn acts and/or omissions directly resulted in the continued wrongful detention and false imprisonment of Mr. Armato in violation of his Eighth Amendment rights.

33.      Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn maliciously and willfully, repeatedly and continuously disregarded and violated Mr. Armato's constitutional rights.

34.     Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn acted under the color of law when they took the actions or omissions described in this Complaint.

35.     Mr. Armato suffered damages as a result of this violation of his constitutional rights.

36.     Pursuant to 42 U.S.C. § 1983, Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn are liable to Mr. Armato for their violation of his constitutional rights.

Wherefore, Plaintiff, David Armato, requests entry of judgment in his favor and against the Defendants, Grounds, Dixon, Jackson, Huntley and Littlejohn , individually and/or collectively,  awarding compensatory damages, punitive damages, costs, attorney's fees and whatever other relief this Court deems proper.

## Count II: 42 U.S.C. § 1983
## 14th Amendment Violation

37.     Plaintiff restates and incorporates paragraphs 1 through 28 of this Complaint as
his paragraph 37 as if fully restated here.

38.     Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn failed to have a
policy, custom or procedure in place to determine the time served by Mr. Armato prior to him
arriving at the Robinson Correctional Center.

39.     The defendants failed to have a policy or procedure in place to release Mr. Armato
on the correct date.

40.     The defendants failed to have a policy or procedure in place to release Mr. Armato
on the correct date based upon the February 18, 2010 Court Orders.

41.     Despite knowing that Mr. Armato should have been released, the defendants
refused to release Mr. Armato, and continued to detain and imprison him without cause or an
opportunity to a meaningful hearing before his continued detention and imprisonment.

42.     Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn acts and/or
omissions directly resulted in the continued wrongful detention and false imprisonment of Mr.
Armato in violation of his Fourteenth Amendment rights.

43.     Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn acted maliciously,
willfully, and with deliberate indifference in disregard of Mr. Armato's constitutional rights.

44.     Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn acted under the
color of law when they took the actions or omissions described in this Complaint.

45.     Mr. Armato suffered damages as a result of this violation of his constitutional

8

3:11-cv-03023-RM-BGC  # 14  Page 9 of 11

rights.

46.     Pursuant to 42 U.S.C. § 1983, Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn are liable to Mr. Armato for their violation of his constitutional rights.

Wherefore, Plaintiff, David Armato, requests entry of judgment in his favor and against the Defendants, Grounds, Dixon, Jackson, Huntley and Littlejohn , individually and/or collectively,  awarding compensatory damages, punitive damages, costs, attorney's fees and whatever other relief this Court deems proper.

### Count III: 42 U.S.C. § 1983
### Deliberate Indifference Against Defendant Grounds

47.     Plaintiff restates and incorporates paragraphs 1 through 46 as this Complaint as his paragraph 47 as if fully restated here.

48.     Defendant Grounds was responsible for enforcing a custom, practice and/or policy of violating inmates' constitutional rights.

49.     In the taking the actions described in this Complaint, Defendant Grounds acted under the color of law.

50.     Defendant Grounds enforced and/or condoned a custom, practice and/or policy of continuing the imprisonment of Mr. Armato in contravention of the controlling Court Orders, and in contravention a Prisoner Review Board Order that provided for his immediate release.

51.     Defendant Grounds enforcement of the above customs, practices and/or policies of violating inmates' constitutional rights directly resulted in the continued wrongful detention and false imprisonment of Mr. Armato.

52.     Defendant Grounds acted maliciously, willfully and with deliberate indifference

in disregard of Mr. Armato's constitutional rights.

53.     Defendant Grounds acted under the color of law when he took the actions or omissions described in this Complaint.

54.     Mr. Armato suffered damages as a result of this violation of his constitutional rights.

55.     Pursuant to 42 U.S.C. § 1983, Defendant Grounds is liable to Mr. Armato for this violation of his constitutional rights.

Wherefore, Plaintiff, David Armato, requests entry of judgment in his favor and against the Defendant, Grounds, individually awarding compensatory damages, punitive damages, costs, attorney's fees and whatever other relief this Court deems proper.

### Count IV: State Law - False Imprisonment

56.     Plaintiff restates and incorporates paragraphs 1 through 55 of this Complaint as his paragraph 56 as if fully restated here.

57.     The acts by Defendants Grounds, Dixon, Jackson, Huntley and Littlejohn described in this Complaint caused the detention, imprisonment and/or the arrest of the plaintiff.

58.     The above defendants caused said detention, imprisonment and/or arrest of the plaintiff without having reasonable grounds to believe that the plaintiff had committed an offense requiring his detention, imprisonment or arrest.

59.     Mr. Armato suffered damages as a result of the false arrest, wrongful detention and false imprisonment.

Wherefore, Plaintiff, David Armato, requests entry of judgment in his favor and against the Defendants, Grounds, Dixon, Jackson, Huntley and Littlejohn , individually and/or

10

collectively,  awarding compensatory damages, punitive damages, costs, attorney's fees and

whatever other relief this Court deems proper.

### Jury Demand

Plaintiff, David Armato, demands a trial by jury on all issues so triable.

s/ **Dennis J. DeCaro**
DeCaro Illinois Bar Number: 6230675
Kupets & DeCaro, P.C.
30 N. LaSalle Street, Suite 4020
Chicago, Illinois 60602
Telephone: 312-372-4444
Fax: 312-726-7347
E-mail: djd0089@aol.com

2 cases

# IN THE CIRCUIT COURT OF NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

vs.

David Armato
_____ Defendant

MAR 08 2006        05CF5015

Date of Sentence _____ March 6, 2006
Date of Birth _____ 4/3/65
(Defendant)

Date of Birth _____
(Victim)

## JUDGMENT - SENTENCE _Keep Guilty_ Cir.Clk ILLINOIS DEPARTMENT OF CORRECTIONS

N 41995

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | | | MSR |
|---|---|---|---|---|---|---|---|---|
| 1 | 12/30/2005 | Theft | 720 ILCS 5/19-1(a) | 3 | 10 Yrs | Mo | Yr | |

and said sentence shall run (☒ concurrent with)(☐ consecutive to) the sentence imposed on: _____ 05CF1661

_____  and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ Yrs ___ Mo ___ Yr

_____  and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ Yrs ___ Mo ___ Yr

_____  and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ Yrs ___ Mo ___ Yr

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a **Class X** offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the defendant is entitled to receive credit for time actually served in custody (of _____ days as of the date of this order) from (specify dates) _____

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in **great bodily harm** to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the **Impact incarceration** program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program. Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve   ☐ 85%   ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☒ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☒ IT IS FURTHER ORDERED that Defendant shall receive credit for time served in the Lake County Jail and while awaiting transport to the Department of Corrections - Defendant shall receive good time credit as administered by the Department of Corrections

_____

This order is (☒ effective immediately) (☐ stayed until _____ ).

DATE: _____ March 6, 2006

ENTER: _____

James K. Booras

(PLEASE PRINT JUDGE'S NAME HERE)

Form approved by the Conference of Chief Judges
Effective March 18, 2005

PLAINTIFF'S EXHIBIT B
Blumberg No. 5113

171-39C4 (04/05)

STATE OF ILLINOIS          )
                           )  SS.
LAKE COUNTY                )

The undersigned Clerk of the Circuit Court of the above named Court does hereby certify the above to be a true and complete copy of an order entered of record in said Court in the case of

THE PEOPLE OF THE STATE OF ILLINOIS versus _____ David Armato _____

Signed and sealed before me

(Official Seal Affixed)

March 8                    20 06

_Sally D. Coffelt_

(Clerk of the Circuit Court)



RECEIVED
MAR 8 2006
NORTHERN RECEPTION CENTER
RECORD OFFICE

Form approved by the Conference of Chief Judges
Effective March 18, 2005

171-39C4 (04/05)

000778

**IN THE CIRCUIT COURT OF NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS

vs.

David Armato

Defendant

Date of Sentence    March 6, 2006
Date of Birth    4/3/85
(Defendant)

05CF1661

Date of Birth _____

(Victim)

# JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | | MSR |
|-------|-----------------|-------------------|----------|-------|----------|----|-----|
| 1 | 5/7/2005 | Theft | 720 5/16-1(a)(1)(A) | 3 | 10 Yrs ___ Mo | | ___ Yr |

and said sentence shall run (☒ concurrent with)(☐ consecutive to) the sentence imposed on: _____ 05CF5015

| | | | | | ___ Yrs ___ Mo | | ___ Yr |

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____

| | | | | | ___ Yrs ___ Mo | | ___ Yr |

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____

| | | | | | ___ Yrs ___ Mo | | ___ Yr |

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a **Class X** offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the defendant is entitled to receive credit for time actually served in custody (of _____ days as of the date of this order) from (specify dates) _____

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in **great bodily harm** to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the **Impact Incarceration** program.  If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program.  Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve   ☐ 85%   ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☒ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☒ IT IS FURTHER ORDERED that Defendant shall receive credit for time served in the Lake County Jail and while awaiting transport to the Department of Corrections - Defendant shall receive good time credit as administered by the Department of Corrections

This order is (☒ effective immediately) (☐ stayed until _____).

DATE: _____ March 6, 2006

ENTER: _____

James K. Booras

(PLEASE PRINT JUDGE'S NAME HERE)

STATE OF ILLINOIS )
                 )    SS.
LAKE COUNTY )

        The undersigned Clerk of the Circuit Court of the above named Court does hereby certify the above to be a true and complete copy of an order entered of record in said Court in the case of
THE PEOPLE OF THE STATE OF ILLINOIS versus _____ David Armato _____

                           Signed and sealed before me

(Official Seal Affixed)              _____ March 8 _____ 20 06

                          _Sally D. Coffelt_
                              (Clerk of the Circuit Court)



FILED

MAR 0 6 2006

CIRCUIT CLERK

Form approved by the Conference of Chief Judges
Effective March 18, 2005

171-39C4 (04/05)

000780

1      IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2                  CENTRAL DIVISION

3

4

5   DAVID ARMATO,                    )
                                     )
6            Plaintiff,              )
                                     )
7            -vs-                    ) NO. 11-CV-3023
                                     )
8   RANDY GROUNDS, MICHELE LITTLE-   )
    JOHN, GLENN JACKSON, and DION    )
9   DIXON, all in their individual   )
    capacities,                      )
10                                   )
             Defendants.             )
11

12

13

14

15      DISCOVERY DEPOSITION OF MICHELE LITTLEJOHN
                   March 5, 2012

16

17

18

19

20   --------------------------------------------------
              Donna R. Maninfior, CSR, RPR
21                    # 84-2991
     MANINFIOR  COURT  REPORTING, P.C.
22            Certified Shorthand Reporter
                 1612 Lafayette Avenue
23                  P. O. Box 1036
               Mattoon, IL 61938-1036
24                  (217) 235-1127

PLAINTIFF'S
EXHIBIT
C

STIPULATION


IT IS HEREBY STIPULATED AND AGREED by and between the parties that the deposition of **MICHELE LITTLEJOHN**, may be taken on March 5, 2012, at the Robinson Correctional Center, 13423 East 1150th Avenue, Robinson, Illinois, pursuant to the Rules of the Federal Court and the Rules of Federal Procedure governing said depositions.


It is further stipulated that the signature is waived.


It is further stipulated that the necessity for calling the Court Reporter for impeachment purposes is waived.

1   APPEARANCES:

2       DENNIS J. DeCARO
       Attorney at Law
3      Law Offices of Kupets & DeCaro, PC
       30 N. LaSalle Street, Suite 4020
4      Chicago, IL  60602
          On behalf of the Plaintiff.
5

6      ROBERT FANNING
       Attorney at Law
       Illinois Assistant Attorney General
7      500 S. Second Street
       Springfield, IL  62706
8        On behalf of the  Defendants.

9

10

11

12

13                  INDEX

14  Examination by:             Page

15     Mr. DeCaro          4, 56
     Mr. Fanning          50
16

17     Exhibits:           Page

18     Littlejohn Exhibit 1     9
     Littlejohn Exhibit 2    15
19    Littlejohn Exhibit 3    17
     Littlejohn Exhibit 4    18
20    Littlejohn Exhibit 5    31

21

22       (Exhibit 2 retained by counsel)

23

24

**MICHELE LITTLEJOHN,**

called as a witness herein, having been duly sworn

upon oath, testified as follows:

**DIRECT EXAMINATION**

BY: DENNIS J. DeCARO

    Q   Will you please state your full name and

spell your last name for the court reporter.

    A   Michele, and that's with one L, R.,

Littlejohn, L-i-t-t-l-e-j-o-h-n.

    Q   Okay, Ms. Littlejohn, have you ever given

a deposition before?

    A   No.

    Q   Okay, so all it is, the four of us in the

room here -- I represent David Armato.  I am going

to ask you some questions regarding -- I am sure

you are aware of the situation, his release date,

and the no MSR, and confusion that that may or may

not have caused.  The court reporter is going to

take everything down.  A few things when we are

doing a deposition, let me get my full question

out, because I may ask some similar questions with

different endings, so don't start speaking until I

am done.  It's hard for the reporter to take two

people down speaking at the same time; and, second,

1  you need to answer everything orally, verbally.

2  You can nod or shrug, but the court reporter can

3  put down nodding, but when we read it six months

4  from now, we don't know if you nodded yes or no.

5      A    Okay.

6      Q    Typically one of us will say something if

7  that starts occurring.  What I am going to do is

8  ask you some background questions, very briefly,

9  and then we are going to talk about David Armato.

10  Do you live in the area?

11      A    Yes.

12      Q    What town?

13          MR. FANNING:   Uh --

14      Q    Just the town, I am not going to ask her

15  her address.

16      A    Well, it's a very small town.

17      Q    Okay, let me ask you this.

18      A    It wouldn't be hard to find me.

19      Q    So if you were to leave here to move, just

20  assure me that you will stay in touch with Mr.

21  Fanning, so if we go to trial we can find you?

22      A    Oh, yes, yes.

23      Q    How about your date of birth?

24      A    4/3/67.

Q    Okay, any plans on moving?

A    No.

Q    Okay, what is your highest level of education?

A    High school.

Q    You are currently employed at the Robinson Correctional Center, correct?

A    Yes.

Q    When did you start here?

A    February 5, 1992.

Q    All right, why don't you just tell me in your own words what position you were hired for and then where you are at now.

A    I was hired as an office assistant in the records office, and do you want all the different positions I have been promoted to or just where I am now?

Q    Well, the office assistant, what -- is that secretarial?  Is that filing?  What is office assistant in records?

A    There is a lot of different aspects to it in the records office.  You are not just a secretary.

Q    Were you calculating out dates?

1    A    Yes.

2    Q    Okay, so that started as far back as 1992.

3    Who trained you on how to do that?

4    A    My supervisor at the time, Vicky Bennett.

5    Q    Is she still here?

6    A    No, she is retired.

7    Q    And then after -- from when to when were

8    you the assistant office assistant?

9    A    I don't remember the exact date, but in

10   the records office I was office assistant, then

11   promoted to office associate, and then promoted to

12   office coordinator.

13   Q    And why don't you just tell me generally

14   what the difference of those three positions was.

15   A    Basically just more responsibility, that

16   you are more in charge when the supervisor is gone

17   as the office coordinator.  Then I was temporarily

18   assigned as the Executive II which is the records

19   office supervisor.

20   Q    Was that during the time when David Armato

21   was here?

22   A    Yes.

23   Q    So we will be talking about February

24   through May of 2010?

1    **A**    Yes.  I just recently about six months ago

2    took my promotion as Office Administrative

3    Specialist which is now out of records, so I was in

4    records the whole time during my career until

5    August of 2011.

6    **Q**    Okay, what do you do now?

7    **A**    I am now over the computer system in terms

8    of the system at this institution.

9    **Q**    Okay, great!  Can you tell me generally

10   when a new inmate gets here, as far as in the

11   records department, what occurs there in the

12   records department?  Where I am going with that is

13   when a new inmate gets here, and you get their

14   documents for their file, is that when you

15   calculate their out date?

16   **A**    That's at one point, but, of course, it's

17   already been calculated before he gets here, but

18   then you double-check the calculation at that time.

19   **Q**    Who initially calculates it?  You say it

20   was done before he gets here.  Who does that?

21   **A**    Like when they were brought in to the

22   reception center throughout the state, it's

23   calculated there, and then each time the offender

24   transfers it's to be recalculated.

1    Q    So we will talk about David Armato.  Once

2    he got here, I want to say March of 2006, the

3    specific date we will find out, his out date is

4    recalculated?

5        A    It should have been.

6        Q    And then if he gets some good time while

7    he is here, it's recalculated again?

8        A    Right.

9        Q    So prisoners' out dates can be

10   recalculated many times?

11       A    Yes, sir.

12       Q    Okay, do you happen to know from your

13   documents what date David Armato arrived here?

14       A    I will have to check -- November 28, 2007,

15   is when he arrived at Robinson.

16       Q    Does it show where he was before then?

17       A    Some institutions don't list it.  The last

18   one listed here was Logan.  They received him March

19   28, 2006.

20       Q    Okay, let me show you what we will mark as

21   Littlejohn Exhibit 1.

22           (Whereupon Littlejohn Exhibit 1 was

23            marked for identification.)

24       Q    I am handing you what we have marked as

1    Littlejohn Exhibit 1.  That is a document that

2    calculates the out dates, correct?

3        A    Yes.

4        Q    What do we call this document?

5        A    Calculation sheet.

6        Q    Okay, can you tell from this sheet where

7    this calculation was done, by any chance?

8        A    The only reason I am guessing it would

9    have been done at Logan is because of the date.

10   Well, no, I guess I take that back.  That's March

11   20, 2006.  He didn't arrive at Logan until March

12   28, 2006, so I would think that would have been

13   done at the reception center.

14       Q    Okay, and this gives him the out date of

15   May 9, 2010, right?

16       A    Yes.

17       Q    Okay, and this does not have any credit

18   for time served or any good time, correct?

19       A    I think the credit for time served is

20   included in the calculation sheet.

21       Q    Okay, where at?

22       A    Where it says new custody date here, it

23   lists jail credit sheet which indicates to me that

24   they are taking this from the jail, from the jail

1  certification from the sheriff.

2       Q    Okay, so they are using May 5 -- sorry,

3  they are using May 9, 2005 --

4       A    Yes.

5       Q    -- as his custody date?

6       A    Yes.

7       Q    And my understanding from reading all this

8  stuff, that was sort of a problem here.  Between

9  you and Mr. Jackson, you didn't know whether to use

10  that May 5, 2005, date, or the March 6, 2006, date

11  as the starting date, correct?

12       A    Well, we knew the May 9, 2005, was

13  incorrect, so we knew we couldn't use it.

14       Q    Okay, so just so we are all on the same

15  page, my understanding from reading your e-mails

16  and things like that is the reason why you knew

17  that wasn't -- the May 9, 2005, date wasn't correct

18  was because he was charged with another crime in

19  December of 2009, correct?

20       A    Yes.

21       Q    And then there was some talk about

22  periodic imprisonment, but there wasn't any clear

23  documentation regarding that.

24       A    Correct.

Q    Okay, we will get to that, though.  It looks like from your e-mails, though, that it was pretty clear.  You have got confirmation from a couple places that he was remanded back to the county sheriff each time after December 31, 2009, it looks like?

A    Yes.

Q    Did you ever use that date as a beginning calculation date?

A    No, because I was informed from Glenn Jackson that we don't -- basically things that we have gotten from court dockets we can't use as jail verification.  We use sentencing orders or we use jail verifications from the sheriff.

Q    So in this case you didn't have the jail verification?

A    Correct.  We had the incorrect jail verification is the only one.

Q    The only thing you had for sure were those two orders from February 18, 2010, which gave him 373 days of credit and they also said specifically no MSR.

A    Correct.

Q    But even with those he wasn't let out.

1        A     Correct.

2        Q     Why in your opinion was that?  Why

3   couldn't you use those orders to do a calculation

4   and let him out?

5        A     I was following orders from my supervisor

6   in Springfield, Glenn Jackson, who was in contact

7   with legal, that from my understanding they were

8   going to pursue the no MSR term on the sentencing

9   order.

10       Q     That never was pursued, though, was it?

11       A     I can't answer that.  I don't know.

12       Q     When he ultimately was let out here on May

13   21, 2010, it was without an MSR, correct?

14       A     Correct.

15       Q     And do you have any information that

16   anybody went after him and has changed that since

17   he has been released in May?

18       A     No.

19       Q     Okay, between -- I think you received

20   those February 18, 2010, orders on February 22,

21   2010, or around there, and between February 22,

22   2010, and May 21, 2010, are you aware of any

23   investigations that anybody did, Mr. Jackson,

24   legal, or anything into this situation other than

1    communication between you and Mr. Jackson?

2         A    I am not aware of anything.  I was not

3    given that information.  I just would contact Mr.

4    Jackson on the status and that's the only part I

5    know.

6         Q    So you were never called to Springfield

7    for a hearing, or anything like that?

8         A    No.

9         Q    Were you ever contacted by anybody from

10   legal?

11        A    No.

12        Q    Did you forward any documents from the

13   master file to Glenn Jackson regarding this case?

14        A    That I don't recall.  He may have had

15   me -- I know back when we were dealing with the

16   jail credit, he had me send him some information on

17   that, but as far as the new sentencing orders, I

18   believe I probably faxed him copies of the new

19   sentencing orders, but other than that that was

20   just back when we received them.

21        Q    Would that be part of the file if you

22   faxed something to him?

23        A    Could be.

24        Q    Okay, maybe later we can look for that.

1    Do you have an independent recollection of faxing

2    him those orders?

3        A    I don't exactly remember doing it, but any

4    time we get in sentencing orders that's kind of out

5    of the ordinary, he will have us fax some copies.

6        Q    Other than -- let's put Mr. Jackson aside.

7    Did you ever fax or e-mail or send any person from

8    any legal department for the state, or anyone that

9    Mr. Jackson told you to, any documents from Mr.

10   Armato's file?

11       A    No, I don't believe so.

12       Q    All right, I am going to hand you -- I am

13   going to show you some documents that I don't think

14   were Bates stamped that I had, that I just want to

15   ask you about.

16                   (Whereupon Littlejohn Exhibit 2 was

17                   marked for identification.)

18       Q    I have handed you what we have marked as

19   Littlejohn Exhibit 2.  Can you tell me what this

20   document is?

21       A    It is a good time calculation sheet where

22   he received 90 days of good time.

23       Q    Okay, can we tell from this document where

24   this would have been from, which facility?

1    A    Doesn't say a facility.  It was calculated
2  May 11, 2007.
3    Q    Right, so he wouldn't have been here yet,
4  though, right?
5    A    No.
6    Q    This document somehow gets forwarded --
7  this stays with his file, though, I am assuming?
8    A    Yes.
9    Q    So you would have had this.  Do you know
10  when you were calculating his out date back in
11  February of 2010, were you giving him six months
12  good time?
13    A    I would have to refer to the file.  At
14  this point he only received three months, but he
15  maybe later received another three months.
16    Q    That's the next one I am going to show
17  you, so this is basically from whatever facility he
18  was in, on May 11, 2007, he was given 90 days time
19  off of his sentence for -- which they called good
20  time?
21    A    Correct.
22    Q    Why does somebody receive good time?  Is
23  there a variety of reasons?
24    A    Basically if they haven't been in lots of

1    trouble, they will give it to them.  Of course, if

2    they are in lots of trouble, from here they are

3    going to transfer them.

4         Q    So this adjusted projected out date as of

5    May 11, 2007, was February 9, 2010, correct?

6         A    Correct.

7         Q    And I am assuming someone in a similar

8    position at whatever facility Mr. Armato was at in

9    May of '07 filled this out?

10        A    Yes.

11        Q    Similar position that you were here?

12        A    Yes.

13        Q    Great!  I am going to mark this as

14   Littlejohn Exhibit 3.

15                  (Whereupon Littlejohn Exhibit 3 was

16                   marked for identification.)

17        Q    I am going to show you what's marked as

18   Littlejohn Exhibit 3, and this is similarly another

19   recalculation adding in some good time?

20        A    Yes.

21        Q    Okay, and this one would have been done

22   here, I am assuming, because it's August 15, '08?

23        A    Yes, sir.

24        Q    Do you know whose signature it looks like?

1    It says "VB"?

2        A    Yes, that's Vicky Bennett.

3        Q    So someone here would have figured this

4    out, correct?

5        A    Yes.

6             And so in addition to the 90 days he

7    received at the other location for good time, he

8    received another -- I am assuming this is three

9    months good time?

10       A    Yes.

11       Q    Okay, so based on Fickle's calculation on

12   August 15, 2008, his good time is adjusted, and

13   projected out date as of August of '08 was November

14   9, 2009, correct?

15       A    Yes.

16       Q    These documents are kept in the master

17   file so that when you are calculating the final out

18   date you can review these and use them?

19       A    Right.

20       Q    Okay, all right, I am going to hand you

21   what we will mark as Littlejohn Exhibit 4.

22            (Whereupon Littlejohn Exhibit 4 was

23              marked for identification.)

24       Q    I am handing you what we have marked as

1    Littlejohn Exhibit 4.  Is that your initials on the

2    bottom here for calculated by?

3        A    Yes.

4        Q    So you would have calculated this

5    document?

6        A    Right.

7        Q    Okay, so this is a February 22, 2010,

8    document.  This is his calculation sheet for his

9    out date?

10       A    Right.

11       Q    And at that time you had received -- well,

12   let me ask you.  I don't want to be testifying for

13   you.  Did you prepare this document after you

14   received the two February 8, 2010, court orders?

15       A    Yes.

16       Q    Is there anything on this document,

17   putting aside the MSR, is this document still

18   accurate?

19       A    Yes.

20       Q    Okay.

21       A    As far as the calculation figures.

22       Q    So based on the most recent court orders

23   regarding David Armato's sentencing in this case,

24   his out -- projected out date should have been

1    August 23, 2009?

2         A    Correct.

3         Q    Okay, what I am saying, after you received

4    those two court orders in February of 2010, was the

5    reason he wasn't let out immediately or shortly

6    thereafter, was it solely the MSR problem?

7         A    My understanding, yes.

8         Q    So in your mind it wasn't they had

9    miscalculated the credit or the good time or

10   anything like that?

11        A    No.

12        Q    So had the Judge not put on that order no

13   MSR, would Mr. Armato have been let out sometime in

14   February of 2010 with mandatory supervised release?

15        A    I believe so.

16        Q    Okay.

17        A    If he had the approved host site.  There

18   are other conditions for a sex offender, registered

19   offender to be released.

20        Q    Even if he doesn't have mandatory --

21   that's why I am a little confused, so I hope

22   you can explain it to me.  If he can -- he is a sex

23   offender.

24        A    Correct.

1   Q   So if the Judge puts No Mandatory

2   Supervised Release, and if that was allowable, can

3   he just walk out of here without a host site or

4   anything?

5   A   No.

6   Q   So even if he met all the qualifications

7   for walking out after you got those orders, he

8   still couldn't have gone because he didn't have a

9   host site?

10   A   Correct.

11   Q   Explain to me what that is, the host site.

12   A   Well, there is certain requirements, which

13   I don't work in that area, but finding a host site,

14   a sex offender can be more difficult to find an

15   approved host site for, because they can't live in

16   certain areas, and they have electronic monitoring.

17   There is just very few places in the state that are

18   approved for that, so then we do what they call

19   violate them at the door, where they stay until

20   they can find them an approved host site or their

21   discharge date comes.

22   Q   So when he left on May 21, 2010, did he

23   have an approved host site?

24   A   No, because we discharged him so he didn't

1    have to have an approved host site.

2         Q    That's where I am confused.  If you can

3    straighten that out for me.

4         A    Okay.

5         Q    From what you had answered previously, it

6    sounds like it -- maybe here's the easier way.  Why

7    didn't he need the host site in May?

8         A    Because they then told us to discharge him

9    with no MSR term.  If you have an MSR term, then

10   you have to have an approved host site.

11        Q    That's where we got the confusion, I

12   think, so if no one questioned those May 18, 2010,

13   orders, and you did this calculation and you found

14   his release date with this new credit time, I

15   understand you didn't have this credit time until

16   May 18, 2010, is that right?

17        A    Until February 22.

18        Q    February, you are right, February 22,

19   2010.  That's the first time you knew he had 373

20   days of credit.

21        A    Yes.

22        Q    Had you followed those orders, he

23   certainly could have gotten out, because based on

24   your calculations, he should have gotten out in

1    August of 2009?

2        A    Correct.

3        Q    And if you followed those orders and did

4    not question the MSR, and the Judge said no MSR,

5    then he could have just walked out.  He didn't need

6    the host site, correct?

7        A    Correct.

8        Q    That's all I wanted to get out.  Okay, so

9    the problem really was the no MSR.

10       A    Correct.

11       Q    Mr. Jackson never questioned your

12   calculations?

13       A    No.

14       Q    Okay, all right, what -- in your own

15   words, what was the problem with the no MSR, as far

16   as you understood it?

17       A    To my understanding, by Illinois statute,

18   you are supposed to have an MSR term, so it was

19   basically against the law to not have an MSR term.

20       Q    Had that in your years since -- would you

21   know when that became the law?

22       A    No.  As long as I have worked here

23   everyone has had the MSR term.

24       Q    Has that ever come up before, someone

1  having no MSR?

2      A    Not to my knowledge.

3      Q    Okay, you have never experienced that

4  before?

5      A    No.

6      Q    You have never seen an order like that?

7      A    No.

8      Q    Do you have any training regarding if an

9  order comes in with no MSR what to do?

10     A    No, other than we always -- if we have

11 something out of the ordinary, we have to contact

12 our supervisor Glenn Jackson.

13     Q    Is that the protocol?

14     A    Yes.

15     Q    If that order didn't say no MSR, and Mr.

16 Armato had a host site, you probably would have let

17 him go and never contacted Mr. Jackson?

18     A    No, any time you get an order that's going

19 to release an inmate immediately, and there is a

20 drastic change such as that, we still have to

21 verify through Glenn Jackson that it's okay to

22 release him.

23     Q    Do you have any understanding -- does Mr.

24 Jackson then make these decisions on his own, or

1  does he have to go through the committee, or does

2  he contact legal, if you know?

3      A    I don't know.

4      Q    In your years here, has there ever been

5  any problems with people's release date or is this

6  the first one?

7      A    This is the first one.

8      Q    Really?

9      A    Yes.

10      Q    I thought for sure you were going to say

11  "No, we have them all the time".

12      A    No.

13      Q    Was the problem -- let me ask you this:  I

14  see from your e-mails that in about September of

15  2009 you started contacting the Lake County

16  sheriff, the Lake County state's attorney's office

17  trying to figure out his credits?

18      A    Correct.

19      Q    Why?  What was the delay?  Why when he got

20  here in November of '07 wasn't that determined?

21      A    Just because human error.  At that time in

22  September I was doing what we call approving

23  checklists, basically verifying everything in the

24  file including the calculations and out date, and I

1   noticed that the jail verification was incorrect

2   where before we had been relying on the jail

3   verification.

4        Q    Okay, is that the norm?  Once they get

5   here you do the calculation and then you might do

6   the recalculation if they have good time, but then

7   you are not really looking at their out date until

8   you are doing the pre-release paperwork?

9        A    Correct.

10       Q    We have been talking about these February

11   18 orders.  I just want to make sure that we are

12   all talking about the same thing.  They are in

13   Grounds Exhibit 2 there, that large exhibit

14   starting with page 724, I believe.  If you look at

15   pages 785 and 786, I want to make sure that those

16   were the two February 18, 2010, court orders we

17   have been talking about.

18       A    Yes.

19       Q    Okay, those are for his two cases,

20   05-CF-1661 and 05-CF-5015, correct?

21       A    Yes.

22       Q    And are these the actual documents that

23   you get from the Court that you used then to

24   prepare his out dates?

1          A    The sheets, yes.

2          Q    And any other documents you rely on

3    typically?

4          A    No.

5          Q    Okay, any others you relied on in this

6    case?

7          A    No.

8          Q    If you look at that Grounds Exhibit 2, I

9    just want to verify this is your handwriting, pages

10   840 and 841.  There is two pages there with some

11   handwriting and some narrative at specific dates.

12   Is that your handwriting?

13         A    Yes, all except the December 8, '09.

14         Q    You know whose handwriting that might be?

15         A    "RB" initials is Robin Bergen.

16         Q    So we don't need to -- if you want to read

17   through there, you can, if you don't have a

18   recollection of these events, but from my reading

19   they are basically what I had asked you about

20   before, that when you were preparing his release

21   documents the credit -- it became a credit issue,

22   and you started contacting Lake County sheriff,

23   Lake County state's attorney's office and these are

24   your notes from those conversations and things that

1       you did.

2            A      Correct.

3            Q      Okay, one thing I don't know is, from your

4       perspective anyway, one of these out dates was

5       November of '09, and I am assuming that that's the

6       one you were working with when you started in

7       September of '09 to start figuring out these

8       credits.

9            A      Yes.

10           Q      Why wasn't he out in November of '09?  Why

11      wasn't he released then?

12           A      Because I knew the jail verification was

13      incorrect.  I called, made all these calls trying

14      to get the correct jail verification, but they did

15      not agree, so my boss Glenn Jackson advised me to

16      use the date of sentencing, since we knew that the

17      jail credit was incorrect.

18           Q      And then -- I may have a document using

19      that date of sentence.  Do you know when he would

20      have been released using the day of sentence?

21           A      I can check the master file and see what

22      calculation that was.

23           Q      Sure.

24           A      October 19, 2009, I recalculated it.  The

1    out date became September 6, 2010.

2        Q    Okay, so I am sorry, what date did you

3    recalculate that on?

4        A    October 19, 2009.

5        Q    Okay, would it be fair to say that prior

6    to February 18, 2010, you were not able to

7    determine what credit to give Mr. Armato?

8        A    Correct.

9        Q    Is that why he filed his own motion?

10       A    Yes.

11       Q    So from my understanding, you were trying

12   to work with him --

13       A    Yes.

14       Q    -- to figure this out?

15       A    Yes.

16       Q    Okay, all right, if you look at page 838

17   of Grounds Exhibit 2, that is a calculation that

18   you performed on February 23, 2010, correct?

19       A    Per release check list where we also do

20   the calculation.

21       Q    So it's the release check list that was

22   performed on February 23, 2010?

23       A    Yes.

24       Q    And you also came up with a projected

1    release date on that day of August 23, 2009?

2         A     Yes.

3         Q     Okay, and if you look, the calculation's

4    there on the side, correct?

5         A     Yes.

6         Q     And there you started with the March 6,

7    2006, date?

8         A     Yes.

9         Q     Okay, and then you took into consideration

10   his 373 days of credit?

11        A     Yes, sir.

12        Q     Then you cut the sentence in half?

13        A     Yes.

14        Q     Okay, then you gave him his six months of

15   good time?

16        A     Yes.

17        Q     Okay, that's how you came to August 23,

18   2009?

19        A     Correct.

20        Q     And then this release check list, what is

21   the purpose of this document?

22        A     To double-check everything in the file

23   including the calculation to make sure that

24   everything is correct.

1      Q    Okay, let me show you something.  This was

2    one section of the document that was earlier -- we

3    will mark this as Littlejohn Exhibit 5.

4                 (Whereupon Littlejohn Exhibit 5 was

5                 marked for identification.)

6      Q    It's basically -- have you ever seen this

7    document before, the record office training manual,

8    Johnson decision?

9      A    Yes.

10      Q    Okay, and this Exhibit 5 is page 105 and

11    106, and it talks about U.S. versus Johnson

12    decision regarding mandatory supervised release,

13    and Step 3 there talks about record office staff

14    will comply with all Court orders.  If the Court

15    order states to discharge with no MSR, staff will

16    contact the chief record officer, and that's what

17    you did in this case?

18      A    Yes.

19      Q    Okay, I know you said that that has never

20    occurred in your career, but somebody had

21    contemplated that you might get an order that says

22    no MSR, it's telling you what to do.

23      A    Correct.

24      Q    Were you trained with these materials?

1       A    When I was initially trained we didn't

2  have these manuals yet, but they were created

3  during my career here.

4       Q    Who did the training, do you know?

5       A    We would just read through the manual.

6       Q    Do you ever have any occasion from '92 to

7  the present when there is a problem regarding

8  someone's out time, or credit, things like that, do

9  you ever talk to the Warden about it?

10      A    Very rarely, just because we have always

11 been instructed to contact Glenn Jackson, and he

12 makes the decision whether to release or not to

13 release.

14      Q    Okay, and the way you said that, very

15 rarely, sounds like there is one or two occasions

16 over the years.

17      A    If the offender maybe had written a

18 question specific to the Warden and they called and

19 asked me about it, then I would discuss it with

20 him.

21      Q    Have you only been working here with

22 Warden Grounds?

23      A    No, there has been several wardens.

24      Q    Has Warden Grounds, say, if there was an

1    emergency grievance regarding someone's out date

2    that you saw, has he ever called you and asked you

3    about it?

4         A    I am sure that he has.

5         Q    Did he ever contact you regarding David

6    Armato's situation?

7         A    No.

8         Q    Did he ever come down to the records

9    office to try and investigate what was going on

10   with Mr. Armato?

11        A    No.

12        Q    Did anyone ever come to the records office

13   investigating what was going on with Mr. Armato?

14        A    No, I spoke with his counselor at the

15   time, Ron Sutton, several times, just to keep him

16   updated, because I saw Mr. Armato more than he did.

17        Q    Okay, if you look at -- I am not going to

18   ask you about all these e-mails, but I do want to

19   verify that they were yours.  They are sort of in

20   reverse order, but if you look at pages 865 through

21   871, and they start with the latest date of October

22   28, '09, and as you go further into the pages, they

23   go back beginning on September 24, '09, so if you

24   sort of look at them backwards, it's more helpful,

1    so first of all, are those e-mails or are those --

2    I saw somewhere Outlook messages?

3         A    Well, our program that we use for e-mail

4    is Outlook, but it's an e-mail message.

5         Q    So these -- that's what we have at our

6    office.  We send e-mails through Outlook.  I would

7    consider this an e-mail, so September 24, 2009, you

8    wrote an e-mail and then you had sent it, and you

9    were sending it to Glenn Jackson?

10        A    Yeah.

11        Q    Okay, so is it fair to say, if you want to

12   look through these if you haven't already, on these

13   six pages, these are basically regarding the

14   situation we talked about before when you are

15   telling Mr. Jackson you can't determine Mr.

16   Armato's credit and these are the things you have

17   done to determine his credit?

18        A    Correct.

19        Q    Okay, it seems like Lake County sheriff,

20   or somebody up there, the state's attorney had

21   changed their computer program and they lost his

22   information?

23        A    Yes.

24        Q    In that situation, what do you do when you

1  can't determine somebody's credit?

2      A    Well, then that's why Glenn advised for us

3  to take the date of sentence because we didn't know

4  the correct jail credit.

5      Q    Just ask you a little bit about that.

6  What was it -- it seemed to me that you were pretty

7  clear in your mind.  If you look at October 16,

8  2009, it's on page 868, if you look at your e-mails

9  on October 16, 2009, there in the middle of the

10  page, it looks like you got confirmation.  I don't

11  know if it was orally or written, but from -- I

12  don't know if Rebecca is the court clerk.  Looks to

13  me there somebody verified that as of 12/31/05 he

14  kept being remanded back to the county lockup until

15  March 6, '06.

16      A    Yes, according to the court records he was

17  remanded back but we have never taken that to use

18  as a jail credit.

19      Q    Okay, and then if you look at the e-mail

20  at the top of 867, said "I received paperwork now

21  from the clerk's office and the state's attorney's

22  office showing the case was filed on 12/31/05, and

23  each time he appeared in court it shows remand

24  through the sentence of 3/6/06," so there you

1 received verification from the clerk and the

2 state's attorney, but that wasn't sufficient?

3     **A**    Right, since we have always used jail

4 verification or a sentencing order, Glenn was not

5 comfortable using the docket sheet since we had no

6 way to prove that the sheriff didn't release him

7 after he was taken back to their custody.

8     **Q**    All right, so these are your e-mails.  Do

9 they also show -- and they also show some e-mails

10 from Glenn Jackson to you during this same time

11 period, correct?

12     **A**    Yes.

13     **Q**    Is that primarily how you and Mr. Jackson

14 communicated?

15     **A**    Yes.

16     **Q**    Okay, if you had faxed him or had an

17 attachment to an e-mail, would you put it somewhere

18 in the narrative of your e-mail, like "see the

19 attachment," or "I faxed you something yesterday"?

20     **A**    I could have mentioned it, or if there was

21 an attachment it would show on there that there was

22 an attachment.

23     **Q**    Okay, let me just ask you quickly, page

24 1134, it might be the last page there.  What is

1    this document?

2         A    It's basically a movement chart from our

3    computer screen.

4         Q    This is a document created here at

5    Robinson regarding Mr. Armato that somebody puts

6    this information into the computer?

7         A    Correct, when they are dropped from count

8    for some reason, returned to count, it

9    automatically puts this on the computer screen.

10        Q    And both you and the Warden explained to

11   me what VAD is, violated at the door.  What I don't

12   know is why it was actually occurring.  I see on

13   February 23, 2010, Mr. Armato was violated at the

14   door, and then on April 29, 2010, he again is

15   violated at the door.  Why is someone who we know

16   is not going to be released, why can they be

17   violated at the door?

18        A    Basically the initial time is because they

19   don't have an approved host site, so we violate

20   them at the door.  Then once they have been

21   violated at the door, that's considered a parole

22   violation.  Then the prison review board comes down

23   here monthly to hear all the violators, so they in

24   turn hear these violators and then find them not to

1    be violated, but we can't release them because they

2    still don't have a host site, so we have to violate

3    them again.

4        Q    Okay, so I guess the part I don't

5    understand is why do you violate them, and what the

6    significance of that is?

7        A    Basically because in our computer system

8    it shows that they should have already been

9    released, because their out date is past, but if

10   there is a reason for some reason that we can't,

11   then we have to have them heard by the prison

12   review board, and the computer program, we have to

13   have dropped them again from count and add them

14   back on.

15       Q    So is it the person actually walks up to

16   the door like he is leaving and they say no, or

17   just a computer thing and a paperwork thing?

18       A    Just paperwork and computer entries.

19       Q    Okay, and if you look at a couple pages

20   before here, 1131, this is another inmate -- it's

21   entitled inmate overview, same kind of computer

22   printout, correct?

23       A    Yes.

24       Q    This one has him being discharged on

1    August 23, '09, and this was printed out, it looks

2    like, October 21, 2011, correct?

3        A   No, actually August 23, 2009, is just the

4    date that calculated his MSR date.   The actual

5    court order discharge date is shown on the left

6    side as 2/18/10 as the effective date.

7        Q   Okay, but does it have anywhere on here --

8    it does have 5/21/10 down here.   Is that the actual

9    day they discharge you or what?

10        A   Yes.

11        Q   Okay, what is this document used for?

12        A   Basically it's just for information

13    purposes.

14        Q   Okay, here at the facility?

15        A   Yes.

16        Q   Okay, all right, let me ask you on page

17    929, sheriff -- or Warden Grounds, Exhibit 2 there.

18    Do you know what this document is?

19        A   It's a jail verification from the Lake

20    County sheriff.

21        Q   What are these used for?

22        A   Typically used to calculate the sentence

23    for an offender if it's not ordered on the

24    sentencing order.

1    Q    Okay, so this is something -- this

2    actually might be the document that sort of got you

3    curious as to what was going on, because you knew

4    he was arrested in December, 2005?

5    A    Yes.

6    Q    Okay, so you knew this document could not

7    be correct.

8    A    Right.

9    Q    Okay, what was the -- did you ever find

10   out the deal with this periodic imprisonment?

11   Could anybody ever explain that to you?

12   A    No one could ever give me the dates.

13   Q    That was -- I know it's in your document

14   somewhere -- who had changed the computer system,

15   the county sheriff?

16   A    Yes.

17   Q    And they had destroyed their prior

18   records, was that your understanding?

19   A    That's my understanding, because they told

20   me they weren't able to locate that information.

21   Q    Okay, now if you look at pages 1059

22   through 1064, and page 1070, so you have 1059

23   through 1064, plus page 1070?

24   A    Okay.

1      Q    Let me tell you the order we need to put

2  them in, though, so this makes sense, 1063 first.

3  Then 1062, 1061, 1060, 1059, then 1064, and then

4  1070, and then they should be in chronological

5  order, so the first one you are looking at is 1063?

6      A    Okay.

7      Q    Okay, so these are again e-mails between

8  you and Glenn Jackson?

9      A    Yes.

10     Q    And they start from you on February 22,

11 2010, on page 1063, correct?

12     A    Yes.

13     Q    Okay, and then the last one I have, the

14 last one I wanted to talk to you about anyway is

15 May 21, 2010, on page 1070, that one is from Edward

16 Huntley to Glenn Jackson just saying basically

17 release Mr. Armato, correct?

18     A    Yes.

19     Q    Is that an e-mail that you received also?

20     A    Mr. Jackson forwarded me the e-mail.  I

21 don't remember this last e-mail at the top.

22     Q    Which one are you talking about, the one

23 that says, "Has the AG's office given you a

24 decision on the case yet"?

1       **A**    No, the last one from Mr. Huntley to

2   Glenn.  I don't remember that wording, but I could

3   have received it.

4       **Q**    Let me ask you:  Do you have an

5   independent recollection of how you found out we

6   should let David out?

7       **A**    Yes, I remember Glenn Jackson forwarded

8   me a note that said, "see below," but I don't

9   remember exactly who that was from, Mr. Huntley or

10  someone else.

11      **Q**    Who is Mr. Huntley?

12      **A**    He is over the legal department, chief

13  legal.

14      **Q**    Okay, I think -- I forget if I asked you

15  this or Warden Grounds.  If I asked you just let me

16  know, I won't ask you again.  Are you aware of any

17  investigation that Mr. Jackson did once you gave

18  him the information?

19      **A**    I believe you asked me that but, no, I am

20  not.

21      **Q**    Okay, I did.  If we go back to page 1063,

22  it talks about on Monday, February 22, 2010, at

23  2:13 p.m. you wrote an e-mail to Glenn Jackson

24  saying that you had spoken to Assistant State's

1    Attorney Eric Kalata, K-a-l-a-t-a, and he was

2    telling you the Judge's intent for no MSR term,

3    correct?

4        A    Yes.

5        Q    Was there anything you were going to be

6    able to do on your own or your investigation that

7    was going to convince Mr. Jackson to let David out,

8    or was that something legal was going to have to

9    figure out?

10       A    That was something he was going to have to

11   hear from legal.

12       Q    Okay.

13       A    We are just supposed to verify the court

14   orders which is what I was doing at that point.

15       Q    Okay, and then the next e-mail down there,

16   same date, February 22, at 12:33, the third to last

17   line of the e-mail, "if I calc'd it this way, this

18   would have released him August '09 with no MSR

19   term."  Is that the August date we have been

20   talking about?

21       A    Correct.

22       Q    Okay, did Mr. Jackson ever talk to you,

23   either through e-mails or call you with that August

24   date?  Did he ever have a problem with the August

1   '09 date?

2        A    No.

3        Q    It seems like you were pretty diligent in

4   e-mailing Mr. Jackson to find out if he ever made a

5   decision, or if legal made a decision?

6        A    Yes, I just kept wanting to remind them we

7   were waiting on an answer.

8        Q    If you look at page 1061, the March 19,

9   2010, e-mail at 8:20 a.m.

10       A    Which one?

11       Q    The March 19 at 8:28, said "a reminder on

12  this, and I wanted to let you know the inmate is

13  filing a grievance on this that will be sent to the

14  ARB."   What is the ARB?

15       A    Administrative Review Board, the ARB.

16       Q    Is that here?

17       A    No, it's in Springfield.

18       Q    Okay, and what authority do they have?

19  Let me ask you this:  Let's say it went to the

20  Administrative Review Board, and they said let Mr.

21  Armato out.  Would you have, or would Glenn Jackson

22  still have to say, "Let Mr. Armato out"?

23       A    It would still have to be Glenn Jackson.

24       Q    So really the grievance procedure that Mr.

1   Armato was following, even if it was successful,

2   wasn't going to gain his release, was it?

3       A   Not unless someone from the Administrative

4   Review Board contacted Glenn.  I am not sure how

5   that part works, you know, if they make contact

6   with him or not.

7       Q   Okay, if you look at the April 8, 2010,

8   e-mail you sent to Glenn on page 1060, that is the

9   Parole Review Board?

10      A   Prisoner Review Board.

11      Q   So they heard this and found him not to be

12  a violator.  That's what you said happens anyway.

13      A   Yes.

14      Q   But this last line here, it said "the

15  PROBE said to find him not a violator, and let DOC

16  handle it, but they thought Armato had a lawsuit."

17  Who told you that, or how did that come up?

18      A   I believe it was Mr. Althoff from the

19  Prison Review Board called me that day when he was

20  hearing Mr. Armato to find out the details of what

21  was happening with his case.

22      Q   And did he think he had a lawsuit because

23  you weren't letting him out?

24      A   He didn't explain that to me.  That's just

1    his comments that he had made.

2        Q    And on April 23, on 1059 here, April 23,

3    2010, you say yourself to Glenn, "I know there will

4    be a lawsuit coming on it." Did you at some point

5    figure that if they don't let this guy out at some

6    point he was going to sue us?

7        A    I know he was unhappy with being held, and

8    I had kept in correspondence with him and with his

9    counselor, and in contact, so I knew he was unhappy

10   with being held.

11       Q    Yeah, I know your protocol is you have to

12   contact Mr. Jackson and he does whatever he does.

13   Does Mr. Jackson have greater authority over

14   releasing someone here than the Warden does?

15       A    Yes.

16       Q    Okay, and does Mr. Jackson have that same

17   authority at other --

18       A    Yes, every prison in the state.

19       Q    So regarding overseeing the release of

20   prisoners, Mr. Jackson is the man?

21       A    Yes.

22       Q    Even above the Warden?

23       A    Correct.

24       Q    Okay, after this has occurred, it's been a

1    couple years now, have you ever gotten another

2    order with no MSR?

3        A    No, I have not been in records for six

4    months but, no, I didn't as long as I was there.

5        Q    And your recollection prior to this one

6    with Mr. Armato, this is the first and only one?

7        A    As far as I know at this institution.

8        Q    While I am looking through here, maybe you

9    could look to verify one way or the other whether

10   you sent any documents to Mr. Jackson during this

11   period from February 22, 2010, to May 21, 2010.

12       A    My note in the note sheet, February 22, I

13   just made a note where the chief records officer

14   supervisor said, "Fax order to him and wait to hear

15   from him.  Do not release today".

16       Q    So according to your note, you would have

17   faxed the two February 8, 2010, orders to Mr.

18   Jackson?

19       A    Yes, on February 22.

20       Q    February 22, and anything else other than

21   those orders?

22       A    I haven't seen anything yet.

23       Q    Really, those are the basis of your

24   calculations anyway, correct?

1      A    Yes.   That's the only thing I see, other

2   than the faxed order also to Tim Clevinger at

3   Northern RFC at Stateville, because they were

4   actually the ones doing the first violation out the

5   door, so I had to have a copy of them.

6      Q    Is there a final document when Mr. Armato

7   walks out that is prepared?  Is that another

8   release checklist?

9      A    Yeah, I have to do another checklist.

10     Q    Have we looked at that one yet?  Did I

11  give you that as an exhibit?

12     A    I don't believe so.

13     Q    Do you have it here?

14     A    Yes.

15     Q    Can I take a quick look, make sure I have

16  seen it.  Yes, I have seen this.

17         MR. FANNING:  What page was that on?

18     Q    It is 757.  We might as well look at it,

19  so this is the final release checklist for Mr.

20  Armato that was prepared on May 21, 2010?

21     A    Yes.

22     Q    Okay, are there any other discharge

23  documents that you prepared?

24     A    Not in my department.  Field services just

1    has a couple of release papers that they sign, but

2    I mean just basic ones that all discharges sign.

3        Q    So let me just look at this real quick.

4    So basically what ultimately -- after several

5    months they basically -- Mr. Armato was released

6    with Mr. Jackson's approval in compliance with

7    those February 18, 2010, orders, correct?

8        A    Yes.

9        Q    Do you get involved at all with the

10   grievance procedures?

11       A    No, that's through the counselors and

12   Clinical Services.

13       Q    Do those documents ultimately come to the

14   records department, though?

15       A    Just for filing in the master file.

16       Q    Okay, so you would have no involvement at

17   all, unless you saw them?

18       A    Only if the counselor asked me about their

19   calculations and their response to the grievance.

20       Q    Did that occur in this case?

21       A    I would have to look at the grievance.  I

22   don't remember.

23       Q    Okay, we have showed them to the Warden,

24   so we have them handy.  This is Warden Exhibit 1,

1    and then there were pages --

2              MR. FANNING:   781 through 784.

3        A    Yes, she did say she spoke with Michele

4    Littlejohn, at the records office supervisor, so

5    she did refer.

6        Q    That's all I have.  The only thing I would

7    ask is if I could look through the master file when

8    we are done just to make sure I have seen

9    everything.

10                   **CROSS EXAMINATION**

11   BY:  **ROBERT FANNING**

12       Q    Just a couple, so when was he originally

13   set to be released that started the pre-checkout

14   list?

15       A    The first one when I changed the

16   calculations?

17       Q    Yes.

18       A    According to the master file, it was

19   November 9, 2009.

20       Q    So in September of 2009 you started the

21   checklist?

22       A    Yes.

23       Q    And that's the pre-release checklist?

24       A    Yes.

1    Q    And that's when you noticed there was an

2    issue with his jail time credit?

3    A    Correct.

4    Q    What was the issue specifically?

5    A    The jail verification included times that

6    he was in custody when he committed his second

7    offense, so I knew that it was incorrect, because

8    they were showing that he was in custody when he

9    was not.

10    Q    Okay, and as a result, you contacted Glenn

11    Jackson?

12    A    Yes.

13    Q    Why did you contact him at that time?

14    A    Just because it's in our procedure.  In

15    doing the pre-checklist, if you are going to change

16    someone's out date by a substantial amount of time,

17    you need to contact Glenn to go through this office

18    to get it approved.

19    Q    Did you speak to the plaintiff, Mr.

20    Armato, before you changed -- let's take that back.

21    You used the sentence date instead?

22    A    Correct.

23    Q    Okay, and that pushed him back almost a

24    year for his out date, right?

1          A     Yes.

2          Q     And then did you speak to Mr. Armato in

3     between the time that you determined his jail

4     credits were incorrect and the recalculation that

5     pushed back the out dates?

6          A     Whenever I changed inmate calculation by

7     that amount of time, I called them up to our

8     control area and met with them and explained to

9     them what's happening and why.

10         Q     Do you recall that conversation with Mr.

11    Armato?

12         A     Yes, and I recall telling him that if he

13    got a correct sentencing order that we would then

14    give him his jail credit, but I couldn't verify it

15    through the sheriff's department.

16         Q     Do you recall anything that he said to you

17    in that particular meeting?

18         A     No.

19         Q     Anything specific?

20         A     No, I don't recall anything specific.

21         Q     Okay, do you recall how he reacted to his

22    information?

23         A     Well, he was upset with it, he still felt

24    like he had an avenue, you know, to try to get a

1   corrected order.

2       Q   So you instructed him he should go back to

3   the circuit court?

4       A   I told him that that was an option that he

5   had was to contact the county and try to get a

6   corrected order.

7       Q   Do you know if that was how -- is that

8   what led to the order they eventually received on

9   February 18?

10      A   I believe so, because when he went on the

11  court writ we got a sentencing order in the mail.

12      Q   Okay, and after you received the

13  sentencing order, you did the calculation again,

14  correct?

15      A   Right.

16      Q   And then as a result you were required to

17  call Glenn Jackson?

18      A   Right.

19      Q   Did you stay in touch with Mr. Jackson

20  periodically?  Weekly?

21      A   I tried to weekly.  I am not sure if it

22  was every week, but to just send a reminder note.

23      Q   Is it fair to say that your communications

24  with Mr. Jackson are documented by e-mails, or

1    would you have had phone conversations also?

2         A    If there were phone conversations, they

3    were very few.  It was mainly by e-mail.

4         Q    Okay.

5         A    There is a note sheet on here that if we

6    had have a conversation, if it was important I

7    would have noted it on the note sheet.

8         Q    So the note sheet would also indicate any

9    phone calls you may have had?

10        A    Yes.

11        Q    And then is there any other steps that you

12   took other than -- other than speaking with Mr.

13   Jackson regarding this scenario?

14        A    No.

15        Q    Mr. Jackson is your supervisor?

16        A    Yes.

17        Q    Do you have the authority to overrule Mr.

18   Jackson's decision?

19        A    No.

20        Q    Where did the previous records office

21   supervisor go?

22        A    She was temporarily assigned as Assistant

23   Warden at Lawrence Correctional Center at the time.

24        Q    That's Vicky Bennett?

1     **A**     No, that was Jeannie Campanella.

2     **Q**     Okay, who was "VB"?

3     **A**     Initially when I began my career, and she

4     trained me, my supervisor was Vicky Bennett, but at

5     the time of all of this, Jeannie Campanella would

6     have been the records office supervisor, but I was

7     temporarily assigned in her position because she

8     was temporarily assigned as Assistant Warden at

9     Lawrence Correctional Center.

10    **Q**     Okay, there was one question about whether

11    or not you have ever spoken to Warden Grounds about

12    sentence calculations as a result of an emergency

13    grievance filed.  Do you, as you sit here today,

14    recall speaking to Mr. Grounds about sentence

15    calculations as they relate to grievances?

16    **A**     He has called me in the past, but on this

17    case I did not speak to Mr. Grounds.

18    **Q**     Do you know the difference between an

19    emergency grievance or a regular grievance?

20    **A**     All I know is what I have heard the

21    counselors discuss, that they are different.  I am

22    not sure what the circumstances can be to make them

23    different.

24    **Q**     Would you know which type of grievance Mr.

1  Grounds would have called you on?

2      A    No, I don't have anything.

3                    **REDIRECT EXAMINATION**

4  BY:  DENNIS J. DeCARO

5      Q    I just have a couple of quick follow-ups.

6  We talked about Mr. Jackson making the decisions

7  about the using the March 6, 2006, date, because he

8  wasn't satisfied with the information you provided

9  about the jail credit.

10     A    Correct.

11     Q    Okay, and you said what is it he wanted?

12  He wanted records from the jail?

13     A    Correct.

14     Q    Okay, is that -- is that a policy that you

15  can show me the prisons follow or a guideline or a

16  regulation, or is that just something Glenn Jackson

17  decided that's what he wants in this particular

18  situation?

19     A    Well, I am guessing it may be in the

20  record office manual, or I am not sure, but either

21  we have to take it from a court document, it either

22  has to be a sentencing order or jail verification

23  to give them the jail credit.

24     Q    Okay, because you couldn't get the jail

1    verification, you suggested to David that he go

2    back and get the court document amended?

3        A    Correct.

4        Q    Okay, you are not sure where you get those

5    requirements from?  I can understand the court

6    order, but you are not sure where you get the jail

7    verification requirement from?

8        A    Correct, I mean that's how we have always

9    calculated it.  That's how I was trained.  Either

10   you use the sentencing order, unless it doesn't

11   give you the jail credit, then you can use the jail

12   verification.

13       Q    Okay, and had you had the jail

14   verification, or if Mr. Jackson allowed you to use

15   the information given to you by the Lake County

16   clerk and the Lake County state's attorney's

17   office, Mr. Armato would have been released on

18   November 9, 2009, with an MSR if he had a host

19   site?

20       A    The November 9 date was previous to

21   discovering that the jail verification was

22   incorrect.

23       Q    Right, part of my question is if you had a

24   jail verification, if you had everything you needed

1    before November 9, '09, he would have been released

2    November 9 with an MSR if he had a host site, and

3    if you had the jail verification.  I am not saying

4    you did.  I am just saying assume that for -- this

5    is a hypothetical.

6         A    It wouldn't have been November 9, because

7    we know that was incorrect.  Had I been able to use

8    the date that I could verify, his custody date

9    would have been in December instead of whatever

10   initial date we were using, because we could verify

11   December Of '05.

12        Q    So using the December -- let's say he was

13   in custody December 31, '05, to March 6, '06, his

14   out date would have been what?

15        A    I have never calculated it.  I can if you

16   would like me to.

17        Q    Sure.

18        A    Was that December 30th or the 31st?

19        Q    I think ultimately it was the 31st.

20        A    Of '95?

21        Q    Of '05.

22        A    And then he would have been in jail -- I

23   think what the state's attorney's office and the

24   clerk were saying, he was remanded each time from

1    that day, December 31, through March 6, '06, so

2    whatever that credit is, so with the custody date

3    of December 31, 2005, his MSR date would have been

4    June 30, 2010.

5         Q    Okay, so let me take a quick look.

6         A    With half of his sentence minus his six

7    months of jail good time that he had received.

8         Q    So the November 9, 2009, date, how did we

9    calculate that?

10        A    That was from the jail verification.  It

11   was incorrect.

12        Q    This was with 303 days or whatever?  Here

13   I will show you.  This is page 950, I think, is the

14   November 9.

15        A    Okay.

16        Q    So how did you -- there is some -- there

17   is an explanation on some of your calculations.

18   Can you make that out?

19        A    Yes, this is from the jail verification.

20   I think he came in for one day on May 9, 2005, and

21   then they are showing that he came back in on May

22   10, 2005, so --

23        Q    I see, so you were using -- you were still

24   using the May 2005 --

1        A     2005.

2        Q     -- 2005 date.  That's why that was off so

3   much.

4        A     Right.

5        Q     Okay, that's all I wanted to know.

6   Thanks.

7        A     I also have a request slip that Mr. Armato

8   had sent me from the master file, if you are

9   interested, where he was thanking me for my

10  assistance.

11       Q     And he was very grateful to you.  He said

12  you were very helpful.  You were very nice to him.

13       A     Okay.

14            MR. FANNING:  We will waive signature, and

15  I don't think we said it on the previous one.  We

16  will waive signature for that one.  I will take a

17  regular-sized with index, and I am going to print

18  my own of these off.

19            MR. DeCARO:  Yeah, it's on the disk you

20  gave me, so why don't we give her these and not

21  give her Exhibit 2.

22            MR. FANNING:  That sounds good.

23

24                (DEPOSITION CONCLUDED)

```
1        CERTIFIED SHORTHAND REPORTER'S CERTIFICATION

2              I, Donna R. Maninfior, Certified Shorthand
    Reporter, Registered Professional Reporter and
3   Notary Public for the State of Illinois, DO HEREBY
    CERTIFY that pursuant to agreement between Counsel
4   there appeared before me on March 5, 2012, at the
    Robinson Correctional Center, 13423 E. 1150th
5   Avenue, Robinson, Illinois, MICHELE LITTLEJOHN, who
    was first duly sworn by me to testify to the whole
6   truth of her knowledge touching upon the matter in
    controversy aforesaid so far as she could be
7   interrogated concerning the same; that I did take
    stenographic notes of the questions propounded to
8   said witness and her answers thereto, and that said
    notes were transcribed upon the computer under my
9   direction and supervision; that signature is waived
    and said deposition is herewith returned.

10             I do further certify that I am not related
11  in any way to any of the parties involved in this
    action and have no interest in the outcome thereof.

12             Dated at Mattoon, Illinois, this 19th day
13  of March, A.D., 2012, and given under my hand and
    seal.

14

15

16

17            _____
              Donna R. Maninfior, CSR, RPR
18                  Notary Public

19

20

21

22

23

24
```

MANINFIOR COURT REPORTING, P.C.
1-800-346-2986

 



EXHIBIT NO. 1

D. MANINFIOR

DC-1321

**SINGLE OR CONCURRENT DETERMINATE SENTENCES UNDER 1978 LAW AND JAIL CREDIT**

NAME _David Armato_     NUMBER _N91995_     DATE _3-20-06_

**(STEP 1) (A)**

Yr.  Mo.  Day

|   |   |   |
|---|---|---|
| - |   | (Rel. on Bond, Etc.) |
|   |   | (Arrest Date) |
|   |   | (Jail Credits) |
| + | 1 | (Add 1 Day) |
|   |   | (Jail Credit) |

**(STEP 1) (B)**

Yr.  Mo.  Day

|   |   |   |
|---|---|---|
| - |   | (Rel. on Bond, Etc.) |
|   |   | (Arrest Date) |
|   |   | (Jail Credits) |
| + | 1 | (Add 1 Day) |
|   |   | (Jail Credits) |

**(STEP 1) (C)**

Yr.  Mo.  Day

|   |   |   |
|---|---|---|
| - |   | (Rel. on Bond, Etc.) |
|   |   | (Arrest Date) |
|   |   | (Jail Credits) |
| + | 1 | (Add 1 Day) |
|   |   | (Jail Credits) |

**(STEP 1) (D)**

Yr.  Mo.  Day

|   |   |   |
|---|---|---|
| - |   | (Rel. on Bond, Etc.) |
|   |   | (Arrest Date) |
|   |   | (Jail Credits) |
| + | 1 | (Add 1 Day) |
|   |   | (Jail Credits) |

**(STEP 2)**

Yr.  Mo.  Day     _10 Yrs_

|   |   |   |
|---|---|---|
| + |   | (Jail Credits-A) |
| + |   | (Jail Credits-B) |
| + |   | (Jail Credits-C) |
| + |   | (Jail Credits-D) |
|   |   | (Total Jail Credits) |

**(STEP 3)**

Yr.  Mo.  Day

|   |   |   |
|---|---|---|
|   |   | (Old Custody/ Sentence Date) |
| - |   | (Total Jail Credits) |
|   |   | (New Custody Date) |

_OSCF5015_

**(STEP 4)** MITTIMUS NO. _OSCF1661_

PROJECTED OUT DATE

Yr.  Mo.  Day     _Jail credit sheet_

|   |   |   |   |
|---|---|---|---|
|   | 05 | 5 | 9 | (New Custody Date) |
| + | 5 |   |   | (Sentence Less GCC) |
| 2010 | 5 | 9 |   | (Projected Out Date) |
| + or - |   |   |   | (Previous Time Lost/Awarded) |
|   |   |   |   | (Adj.Proj.Out Date) |

**(STEP 5)**

MANDATORY OUT DATE

Yr.  Mo.  Day

|   |   |   |   |
|---|---|---|---|
|   | 05 | 5 | 9 | (New Custody Date) |
| + | 10 |   |   | (Sentence) |
| 2015 | 5 | 9 |   | (Mandatory OutDate) |

Adj. Proj. Out Date _5-9-2010_          Terminal Operator _____

Mandatory Out Date _5-9-2015_          Date Entered _3/21/06_

Calculated By _M. M._

DC 1321 (Rev 10/96 )
IL 426-00521

 

ILLINOIS DEPARTMENT of CORRECTIONS
**MERITORIOUS GOOD TIME WORKSHEET**

*10-N-17*

**MERITORIOUS GOOD TIME WHEN SENTENCE IS DETERMINATE UNDER 1978 LAW**

NAME _Amato, David_ NUMBER _N91995_ DATE _5-11-07_

### STEP 1

YR. MO. DAY

_90 mgt_ (MERITORIOUS GOOD TIME AWARDED
BY THE DIRECTOR ON _5-10-07_)

_Little John_
EXHIBIT NO. _2_
D. MANINFIOR

### STEP 2 (MITTIMUS NUMBER _05CF1661_
_05CF5015_
~~05CF~~ )

PROJECTED OUT DATE

| YR. | MO. | DAY | |
|-----|-----|-----|---|
| 05 | 5 | 9 | (CUSTODY DATE) |
| 5 | | | (SENTENCE LESS G.C.C.) |
| 10 | 5 | 9 | (PROJECTED OUT DATE or PRB PROJECTED OUT DATE) |
| | — | | (PREVIOUS TIME LOST/AWARDED) |
| 10 | 3̶ 3 | 9 | (PROJECTED OUT DATE) (MERITORIOUS GOOD TIME) |
| 10 | 2 | 9 | (ADJUSTED PROJECTED OUT DATE) |

### NOTATION

YR. MO. DAY

| | | | |
|--|--|--|--|
| | | | (RECUSTODY DATE) |
| | | | (BOND, ESCAPE,ETC.) |
| | | | (TIME LOST) |

ADJ. PROJECTED OUT DATE _2-9-10_ TERMINAL OPERATOR _fe_

CALCULATED BY _fe_ DATE ENTERED _5-11-07_

DC 1329 (Rev. 12/02)
IL 426-00529

 

## MERITORIOUS GOOD TIME WHEN SENTENCE IS DETERMINATE UNDER 1978 LAW

**NAME** *Daniel Armato*  **NUMBER** N 91995  **DATE** 8·15·08

### (STEP 1)

Yr. Mo. Day           S msT

_____ 3 _____   (Meritorious Good Time Awarded
                By The Director On   8·14·08   )

### (STEP 2) (MITTIMUS NUMBER _____05CJ 1661_____ )

PROJECTED OUT DATE   05CJ 5015

| Yr. | Mo. | Day | |
|-----|-----|-----|---|
| 05 | 5 | 9 | (Custody Date) |
| + 5 | | | (Sentence Less G.C.C.) |
| 2010 | 5 | 9 | (Projected Out Date or PRB Projected out Date) |
| +or- | 3 | | (Previous Time – Lost/Awarded) |
| 2010 | 2 | 9 | (Projected Out Date) |
| - | 3 | | (Meritorious Good Time |
| 09 | 11 | 9 | (Adjusted Projected Out Date) |

### (NOTATION)

Yr. Mo. Day

- _____   (Recustody Date)
                 (Bond, Escape, Etc.)
                 (Time Lost)

Adj. Proj. Out Date _____11·9·09_____     Terminal Operator _____RB_____
Calculated By _____            Date Entered _____ 8/15/08 _____

DC 1329 (Rev. 10/96)
IL 426-00529

EXHIBIT NO. 3
D. MANINFIOR

 

**SINGLE OR CONCURRENT DETERMINATE SENTENCES UNDER 1978 LAW AND JAIL CREDIT**

NAME _David Armato_   NUMBER _N91995_   DATE _2-22-10_

**(STEP 1) (A)**

Yr. Mo. Day

| - | | | (Rel. on Bond, Etc.) |
| | | | (Arrest Date) |
| | | | (Jail Credits) |
| + | 1 | | (Add 1 Day) |
| | | | (Jail Credits) |

**STEP 1) (B)**

Yr. Mo. Day

| - | | | (Rel. on Bond, Etc.) |
| | | | (Arrest Date) |
| | | | (Jail Credits) |
| + | 1 | | (Add 1 Day) |
| | | | (Jail Credits) |

**(STEP 1) (C)**

Yr. Mo. Day

| - | | | (Rel. on Bond, Etc.) |
| | | | (Arrest Date) |
| | | | (Jail Credits) |
| + | 1 | | (Add 1 Day) |
| | | | (Jail Credits) |

**(STEP 1) (D)**

Yr. Mo. Day

| - | | | (Rel. on Bond, Etc.) |
| | | | (Arrest Date) |
| | | | (Jail Credits) |
| + | 1 | | (Add 1 Day) |
| | | | (Jail Credits) |

_received corrected orders_

**(STEP 2)**

Yr. Mo. Day

| + | | | (Jail Credits-A) |
| + | | | (Jail Credits-B) |
| + | | | (Jail Credits-C) |
| + | | | (Jail Credits-D) |
| | | | (Total Jail Credits) |

**(STEP 3)**          373 dayp

Yr. Mo. Day

| 06 | 3 | 6 | (Old Custody/ Sentence Date) |
| - | 1 | 13 | (Total Jail Credits) |
| 05 | 2 | 23 | (New Custody Date) |

**(STEP 4)** MITTIMUS NO. _05CF1661_

PROJECTED OUT DATE _05CF5015_

Yr. Mo. Day

| 05 | 2 | 23 | (New Custody Date) |
| + | 5 | | (Sentence Less GCC) |
| 10 | 2 | 23 | (Projected Out Date) |
| + or - | 6 | | (Previous Time Lost/Awarded) |
| 09 | 8 | 23 | (Adj.Proj.Out Date) |

**(STEP 5)**

MANDATORY OUT DATE

Yr. Mo. Day

| 05 | 2 | 23 | (New Custody Date) |
| + | 10 | | (Sentence) |
| 15 | 2 | 23 | (Mandatory Out Date) |

---

Adj. Proj. Out Date _8-23-09_
Mandatory Out Date _2-23-15_   Terminal Operator _____
Calculated By _____   Date Entered _2-22-10_

DO

DC 1321 (Rev 10/96 )
IL 426-00521

_Littlejohn_

EXHIBIT NO. _4_

D. MANINFIOR

# Record Office Training Manual

## Johnson Decision

| | |
|---|---|
| **Last Revision Date:** October, 2006 | **Reference: U.S VS. JOHNSON** 120 S. CT. 1114 |
| **Necessary Forms:** | **Volume IA** |

**Subject Area: Johnson Decision**

The U.S. Supreme Court in U.S. vs. Johnson issued a ruling that parole terms for offenders released on parole/mandatory supervised release (MSR) begins upon the actual release date from prison. Therefore, effective March 1, 2001, the Illinois Department of Corrections will follow this ruling by ensuring that offender's parole/MSR term begins the date of release from the institution or transition center.

**Steps:**

1. An offender with Earned Good Conduct Credits will only be awarded the number of days that result in his release on parole/MSR. Restoration of Good Conduct Credits will be awarded in full. A date over entry will be required.

2. When awarding Meritorious Good Time and Supplemental Meritorious Good Time the amount of days that would result in an immediate release on parole/MSR is all that will be awarded. In circumstances where the violation term holds longer than the new case no Meritorious Good Time or Supplemental Meritorious Good Time is to be awarded to the new sentence.

3. Record office staff will comply with all court orders. If the court order states to discharge with no MSR, staff will contact the Chief Record Officer.

4. Those individuals who are received in Reception and Classification Centers and whose calculation results in an immediate release, the MSR term will begin immediately.

5. The same procedure will be used for offenders who are released on court writs and return from court with a reduced sentence, which results in an immediate release.

6. In those instances where the violation term sentence holds for release from custody and there is a new sentence that has already been satisfied, staff will discharge the violation term on the applicable day and start the MSR period on the actual date of release from custody.

Page 1 of 5

EXHIBIT NO. 5

D. MANINFIOR

**000105**

7. When the release date falls on a Saturday, Sunday, or a holiday, the MSR term will remain as calculated.  (see example)

8. Effective with releases on or after March 1, 2001, the record office will record the actual release date on the face sheet in the lower left hand corner under the parole/MSR period. This will be of assistance if the offender returns as a parole/MSR violator.

9. A **DATEOVER** transaction must be done on OTS when an offender's release date calculates out to a date in the past, due to the following circumstances.

   a) Offender receives additional jail credit
   b) Offender receives sentence reduction
   c) Offender receives mandate for time considered served
   d) Offender receives GCC restoration which calculates out to a date in the past.
   e) R&C turnarounds, which are Offenders that are received at an R&C and have enough jail credit that they are an immediate release.
   f) Offenders back jacket (violation sentence) holds him/her in the institution longer than the front jacket (new sentence).
   g) Offenders who have a non-controlling sentence with a longer MSR term than the controlling sentence for which they are held in the institution. Example: Controlling sentence in the institution is a Class 4, and non-holding sentence is a Class 2.
   h) Offender receives a court ordered discharge on the controlling sentence and the non-controlling sentence becomes the controlling, resulting in an immediate release.
   i) Offender is bonded out on the controlling sentence and the non-controlling sentence becomes the controlling, resulting in an immediate release.

10. If the offender's non-controlling sentence controls for their MSR term, the user needs to change the non-controlling sentence to be the controlling sentence in the Offender Tracking System.

11. Once the appropriate changes have been made, a sentence calculation must be done in the Offender Tracking System to make sure the inmate's out dates on OTS match the dates on the paper calculation sheet.  It is imperative that this is done, as it is a double check to make sure the paper calculation is correct.

> *Note:  If the offender receives Jail Credit and the MSR date is in the past, the user needs to change the custody date in the Offender Tracking System to the new custody date.*
>
> *Note:  If the offender receives a reduction in sentence and after calculation the MSR date is in the past, the user needs to change the sentence length in the Offender Tracking System.*

000106