Page 1

1                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF ILLINOIS

2                         CENTRAL DIVISION

3

4    DAVID ARMATO,                        )

                                          )

5          Plaintiff,                     )

                                          )

6          vs.                            ) No. 11 cv 3023

                                          )

7    RANDY GROUNDS, MICHELE LITTLEJOHN,   )

     GLENN JACKSON, and DION DIXON,       )

8    all in their individual capacities,  )

                                          )

9          Defendants.                    )

10

11

12

13

14             DEPOSITION OF GLENN JACKSON

15          TAKEN ON BEHALF OF THE PLAINTIFF

16                    APRIL 3, 2012

17

18

19

20

21

22

23

24



PLAINTIFF'S
EXHIBIT
D

GLENN JACKSON 4/3/2012

Page 2

1                              I N D E X

                                                              PAGE

2    Examination by Mr. DeCaro                                  5

3

4

5

6

7

                        (NO EXHIBITS MARKED)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

GLENN JACKSON  4/3/2012

1                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF ILLINOIS

2                      CENTRAL DIVISION

3

4    DAVID ARMATO,                        )

                                          )

5          Plaintiff,                      )

                                          )

6          vs.                            ) No. 11 cv 3023

                                          )

7    RANDY GROUNDS, MICHELE LITTLEJOHN,    )

     GLENN JACKSON, and DION DIXON,        )

8    all in their individual capacities,   )

                                          )

9          Defendants.                     )

10              DEPOSITION OF GLENN JACKSON, produced,

11   sworn and examined on APRIL 3, 2012, between the hours

12   of 9:00 o'clock in the forenoon and 10:10 o'clock in

13   the forenoon of that day, at the Illinois Department

14   of Corrections, 1301 Concordia Court, Conkle Hall,

15   Springfield, Illinois 62794, before Rhonda Rhodes

16   Bentley, a Certified Shorthand Reporter (IL),

17   Certified Court Reporter (MO), Registered Professional

18   Reporter, in a certain cause now pending in the United

19   States District Court, Northern District of Illinois,

20   Central Division, between David Armato, Plaintiff, vs.

21   Randy Grounds, Michele Littlejohn, Glenn Jackson, and

22   Dion Dixon, all in their individual capacities,

23   Defendants; on behalf of the Plaintiff.

24

GLENN JACKSON  4/3/2012

```
 1      .                A P P E A R A N C E S

 2

               For the Plaintiff: (Via videoconference)
 3

                    Mr. Dennis J. DeCaro
 4                  Law Offices of Kupets & DeCaro, P.C.
                     30 N. LaSalle Street, Suite 4020
 5                  Chicago, IL 60602
                     (312)372-4444
 6                  ddecaro@kupetsdecaro.com

 7             For the Defendants:

 8                  Mr. Robert Fanning
                    Illinois Assistant Attorney General
 9                   500 Sound Second Street
                    Springfield, IL 62706
10                   (217)782-9029

11

12

13
        Court Reporter:
14      Rhonda Rhodes Bentley, CSR/CCR/RPR
        Illinois CSR #084-002706
15      Missouri CCR #1313
        Midwest Litigation Services
16      711 North Eleventh Street
        St. Louis, Missouri 63101
17      (314) 644-2191
        1-800-280-3376

18

19

20

21

22

23

24
```

Page 5

```
 1                IT IS HEREBY STIPULATED AND AGREED by and

 2    between counsel for the Plaintiff and counsel for the

 3    Defendants that this deposition may be taken in

 4    shorthand by Rhonda Rhodes Bentley, CSR/CCR/RPR, a

 5    Certified Shorthand Reporter, Certified Court

 6    Reporter, and Registered Professional Reporter, and

 7    afterwards transcribed into typewriting; and the

 8    signature of the witness is expressly waived.

 9                    *    *    *    *    *

10                    GLENN JACKSON,

11    of lawful age, produced, sworn and examined on behalf

12    of the PLAINTIFF, deposes and says:

13        (Starting time of the deposition:  9:00 a.m.)

14                    EXAMINATION

15    QUESTIONS BY MR. DeCARO:

16        Q.   Mr. Jackson -- I'm assuming, Robert, you've

17    got Grounds Exhibit 2 there?

18            MR. FANNING:  Yes.

19    BY MR. DeCARO:

20        Q.   Okay.  Great.  I'm going to be referring to

21    some of those e-mails between yourself and Ms.

22    Littlejohn, and I'll give you the page numbers.

23    They're all Bates stamped, but before we do that, Mr.

24    Jackson, I'd like to ask you a little background
```

GLENN JACKSON 4/3/2012

Page 6

1    information.  What'S your highest level of education?

2          A.    Bachelor's degree in science.

3          Q.    All right.  Okay.  Where was that from?

4          A.    Illinois State University.

5          Q.    And when did you get that?

6          A.    1989.

7          Q.    Okay.  And I'd like to talk a little bit

8    about your employment history working backwards.  What

9    is your current position?

10         A.    I'm the Chief Record Officer for the

11   Illinois Department of Corrections.

12         Q.    Okay.  When did you start that position?

13         A.    Oh, 2004.

14         Q.    Okay.  What -- Can you tell me what you do

15   on a daily basis?  Just give me a little bit of a job

16   description.

17         A.    Basically on a daily basis I handle

18   inquiries from the courts, state's attorney's,

19   attorneys, the staff that we have throughout the 27

20   adult institutions and six juvenile institutions.

21   Kind of serve as a liaison between us and the courts

22   and work with my legal staff to deal with sentence

23   computation issues and Record Office matters.

24         Q.    Okay.  Prior to 2004 what did you do for

Page 7

1  employment?

2      A.  2004 back to 2003 I was the warden at

3  Lincoln Correctional Center.

4      Q.  Okay.  And prior to 2003?

5      A.  From 1999 to 2003 I was the assistant

6  director of the Senate Appropriations Committee.

7      Q.  Okay.  And what did that entail?

8      A.  Basically analyzing, you know,

9  appropriations bill for the Senate, and providing

10  budget analysis for the Senate members.

11      Q.  Okay.  And why don't you generally tell me

12  what you did before 1999?

13      A.  In generic form I was -- from 1999 back to

14  1992, I was an administrative assistant to the warden

15  and a correctional counselor and an officer for the

16  Department of Corrections.

17      Q.  Okay.  When you were assistant

18  administrator to the warden, did you have to do

19  sentencing calculations?

20      A.  No.

21      Q.  Okay.  When you were the warden at Lincoln

22  Correctional, did you have to do any type of

23  sentencing calculations?

24      A.  No.

GLENN JACKSON 4/3/2012

Page 8

1        Q.   Okay.  Tell me generally how you learned --

2   You know, you were the warden up to '04, and then '04

3   you became the Chief Records Officer, tell me about

4   that transition of how you gained your expertise in

5   this sentencing area.

6        A.   Okay.  I mean when you date back and you

7   take me back to my time as a counselor, one of the

8   things that as a counselor you have to be familiar

9   with the sentence calculation and understand how the

10  sentence calculation process work.  So from -- let me

11  see -- trying to remember the dates from 1992.  1993

12  to 1997 or so, as a counselor I dealt with sentence

13  calculations and dealt with issues that would relate

14  to the sentence structure for offenders, knowing what

15  they would be eligible for as far as earned good

16  conduct credits and meritorious and supplemental

17  meritorious times.

18       Q.   Okay.  And just so we're all on the same

19  page, in this case, Mr. Armato, when he thought he was

20  being held too long, he filed a grievance, and then

21  that grievance goes to a counselor?

22       A.   Yes.

23       Q.   Is that the type of counselor we're talking

24  about?

GLENN JACKSON 4/3/2012

Page 9

```
 1        A.    Yes.
 2        Q.    Okay.   I forget Ms. Littlejohn's exact
 3   title during this period, but were you ever in a
 4   position where you actually did the prisoner's
 5   calculations before becoming the Chief Records
 6   Officer?
 7        A.    No.
 8        Q.    Do you have -- When you became the Chief
 9   Records Officer, did you receive any legal training
10   from any source?
11        A.    Well, I mean I served in various
12   capacities.   When I was the administrative assistant
13   at Dwight, I was the litigation coordinator.   I almost
14   have to think back to that.   Yes, I was the litigation
15   coordinator at Dwight Correctional Center.
16        Q.    Okay.
17        A.    And we had training allotted for us for
18   various different issues.
19        Q.    Okay.   And are you familiar -- I'm assuming
20   you spoke with your attorney about this situation, and
21   I don't know if you have an independent recollection
22   of Mr. Armato's situation.   Are you familiar with --
23   Do you recall what happened here in this situation?
24        A.    I have a general idea of what happened,
```

GLENN JACKSON 4/3/2012

Page 10

1    yes.

2         Q.   Okay.  Are there -- In your position when

3    there are calculation problems or problems with an

4    order, is there a policy or manual or procedure manual

5    that you refer to about each situation, or is it just

6    you investigating trying to find the right thing to

7    do?

8         A.   Well, we do have a training manual that has

9    been established for our overall operation.  Each one

10   of our facilities have a copy of it as well as it is

11   on our share point site for our staff to utilize as a

12   training tool and a familiarization of our policies

13   and procedure.

14        Q.   Okay.  Does that -- I'm assuming -- Ms.

15   Littlejohn told us that her procedure is when she has

16   a problem like this is to call you or e-mail you?

17        A.   Okay.

18        Q.   When you -- Let's talk about this specific

19   problem.  My understanding of this specific problem

20   was there was no MSR in Mr. Armato's two court orders

21   from February 18, 2010; is that your recollection?

22        A.   Yes.

23        Q.   Okay.  When that occurs, is there a

24   document -- and I'm just trying to find out if we

1   should be looking at some documents, or if you make

2   these decisions unilaterally when that situation

3   occurs, and Ms. Littlejohn said it's not a common

4   situation.  Is there a document that you would refer

5   to for an order that has no MSR, or is that something

6   you have to figure out what to do with?

7           A.   No, I mean in situations where something

8   violates the statute or it doesn't meet the statutory

9   requirement, my automatic response is for staff -- is

10  to inform me so that I can advise our legal staff so

11  that they can give us guidance as to what to do.  That

12  is similar to what this situation is.  Ms. Littlejohn

13  contacted me, I immediately contacted our -- I believe

14  at the time he was our chief legal counsel and advised

15  him for guidance as to how to handle the situation,

16  and that was basically due to the sentence not meeting

17  statutory requirement to have an MSR term.

18          Q.   Okay.  And is that -- and it sounds like

19  that's something that is unwritten, that's just your

20  internal policy --

21          A.   Well --

22          Q.   -- or is that written somewhere?

23          A.   Well, we have it as part of our Inmate

24  Record Office Training Manual.  It's a notation in

1    there that say -- and I can't remember off the top of

2    my head exactly what it says, but it says to contact

3    our office if an MSR term is not given to an offender,

4    something similar to that.

5         Q.    Right.  And once that occurs, is there

6    additional instruction in the training manual as to

7    what you would do at that point?

8         A.    I mean like I indicated before, to advise

9    Legal because --

10        Q.    Okay.

11        A.    -- the past practice has been to refer

12   those matters over to the AG's office to review, and

13   from that point it's out of my hands.

14        Q.    Okay.  And I don't want to belabor the

15   point, but it sounds like that what you do is not a

16   written policy, that's something you just decide to do

17   to call Legal?  There's no document that says once

18   Chief Record Officer gets this problem, he calls

19   Legal, or is there?

20        A.    Well, I mean that is my protocol because

21   I'm not an attorney, and to seek legal guidance is one

22   of the things that I do on all -- on things that are

23   -- particularly has to be handled from a legal

24   standpoint.

GLENN JACKSON  4/3/2012

Page 13

1          Q.    Okay.  I got you.  So again there's no

2    written policy that says to do that, or is there?

3          A.    No, I guess there's no legal -- I mean no

4    written policy to say for me to call Legal if that's

5    what you're looking for.

6          Q.    Yeah.  Yeah.  And when you say Legal, is

7    that the Attorney General's office?

8          A.    No, the Department of Corrections have

9    their own set of legal counsel, which I work closely

10   with to make determinations on matters that relate to

11   the Record Office.

12         Q.    Okay.  And I saw in the e-mails that you

13   e-mailed an Ed Huntley --

14         A.    That would be correct.

15         Q.    -- at some point?

16         A.    Yes.

17         Q.    What is his position?

18         A.    At this point I don't know what his

19   official title.  I just know that he's a Department of

20   Corrections attorney.  At that particular time and --

21   excuse me -- I think he was our chief legal counsel,

22   which --

23         Q.    Okay.

24         A.    -- that would have been the direct person I

GLENN JACKSON 4/3/2012

Page 14

1    would have contacted for such issues.

2         Q.    Okay.  And also there was a Joel Diers, is

3    it?

4         A.    Diers.

5         Q.    Diers.  D -- let's see -- D-i-e-r-s?

6         A.    That is correct.

7         Q.    Who is he or back then?

8         A.    Back then and he is still our -- he's our

9    direct legal counsel for Inmate Records.

10        Q.    Okay.  And then you also contacted Alyssa

11   Williams-Schafer at some point.  Who is she?

12        A.    She is -- She's a -- I don't want to say a

13   sex expert.  She is our sex offender manager that

14   deals with sex offenders, and determining their

15   placement, whether it's going to be sexually violent

16   or sexually dangerous person.  So she's the person

17   that heads up that area.

18        Q.    Okay.  And when I -- Strike that.  Just a

19   few things I want to get off of my mind before we move

20   on.  When I spoke to Warden Grounds at Robinson, he

21   was saying that he -- in a situation like this, he

22   would wait to hear what your decision was, and he

23   would rely on your decision, and he wouldn't release

24   an inmate in this situation until you gave him a

Page 15

1   decision.  Is that your understanding that you -- when

2   an issue like this comes up regarding prisoner

3   calculations, that your authority supersedes the

4   warden's authority at a given facility when there's a

5   problem regarding a release date?

6          A.    That would be correct.

7          Q.    Okay.  Are you the ultimate decision maker

8   in this situation?

9          A.    No.

10         Q.    If -- Go ahead.

11         A.    No, I'll let you finish.

12         Q.    Yeah.  Sure.  When you received this

13   information from Ms. Littlejohn, could you have

14   decided to release Mr. Armato without going to Legal?

15         A.    In this case I would not have rendered a

16   decision without the express opinion of our legal

17   staff as to what to do with it.

18         Q.    Could you have though?  I mean would that

19   have been an abuse of your authority or something you

20   would have gotten in trouble for doing that, or is

21   that something you could have done?  I understand you

22   didn't.  I understand what you did.  I'm just

23   wondering if you have the authority to do that.

24         A.    I have -- In matters where there is some

GLENN JACKSON 4/3/2012

Page 16

1  legal interpretation to be decided on, I am to refer

2  and have my legal counsel give me directions as to how

3  to proceed.  So therefore I would not have rendered a

4  decision without having the legal support of my staff

5  and perhaps even the AG's office before I rendered the

6  decision or given directions.

7        Q.    Okay.  How long would you reasonably wait

8  for a decision?  In this case we waited from February

9  until May 21st, but let's say it was February of 2011.

10  At some point do you make a decision, or do you just

11  keep waiting for the legal decision?

12        A.    I am going to wait until our legal counsel

13  give us clarification as to how to properly respond to

14  situations such as that.

15        Q.    Okay.  In this case --

16        A.    Now --

17        Q.    Go ahead.  I'm sorry.

18        A.    I mean I will continuously contact them to

19  let them know that this is ongoing, so that it doesn't

20  appear that we're not doing everything possible to

21  properly release or hold a person to their proper term

22  of incarceration, but I am going to constantly seek

23  legal counsel to find out what guidance we -- I mean

24  what direction we should take in these proceedings.

Page 17

1        Q.    Okay.  And who is the ultimate -- who would

2   you -- Back in 2010, during these relevant months, who

3   would you have accepted the opinion from?  Who was

4   your decision maker?  You know, you were seeking from

5   Ed Huntley and Joel Diers.  If Joel Diers said release

6   him, would you have released him?  If Ed said release

7   him, would you have released him?  Who were you

8   waiting for an opinion from specifically?

9        A.    Ed Huntley.

10        Q.    Okay.  Okay.  Was there anything that Mr.

11   Armato could have done administratively through the

12   procedures at Robinson that would have gained his

13   release before Ed Huntley gave you an opinion to

14   release him?

15        A.    I don't know.  Administratively besides

16   having the sentencing order state the MSR, no, I don't

17   believe there would have been anything he could have

18   done, and that was the reason why we wanted to seek

19   legal clarification as to how to proceed with this

20   particular sentencing order because, if I remember

21   correctly, the fact was that it did not have an

22   MSR term, and we were referring to state statute

23   saying that all felony convictions must have an

24   MSR term.

GLENN JACKSON 4/3/2012

Page 18

1      Q.   Okay.  And is that still your understanding

2  that every felony conviction must have an MSR term?

3      A.   Yes.

4      Q.   Okay.  And what is the problem -- Well, are

5  you violating state statute by releasing someone

6  without an MSR term?

7      A.   Well, yes, I mean looking at the sentence

8  and then knowing that a person is supposed to serve a

9  set MSR term based on the class of offense that they

10  have, it would show that we had no supervision of that

11  offender doing his time of not being -- being outside

12  the walls of the institution.

13      Q.   Okay.  And in this case they released him

14  without an MSR term?

15      A.   Yes, eventually they did.

16      Q.   Okay.  Right.  Was one of the alternatives

17  for an attorney to go into court and seek

18  clarification regarding these orders?

19      A.   I believe that was the direct -- I mean

20  that was at least from my side asking Mr. Huntley as

21  to how, you know, would they seek clarification with

22  the AG's office as to whether or not they would go to

23  court to see if they can see how the court was making

24  their decision as far as the MSR term.

Page 19

1      Q.   Okay.  Okay.  Thank you.  I'm going to --

2  We'll go through a few e-mails.  I'm going to start on

3  the Bates stamp of 1063 and we'll just go.  I just

4  want to get a timeline with these e-mails, and just

5  let me know when you find that page.

6      A.   Okay.

7      Q.   Okay.  I believe from speaking with Ms.

8  Littlejohn this February 22nd, 2010, e-mail at 12:33

9  p.m., from her to you, would have been your first

10  notice that Mr. Armato came back to Robinson with

11  these new February 18th orders.  You want to take a

12  second and read that and let me know if that's

13  accurate.

14     A.   Okay.

15     Q.   Okay.  Is that -- Is that your recollection

16  that that was the first e-mail you received regarding

17  this situation from Ms. Littlejohn?

18     A.   I mean I couldn't tell you if -- if this

19  was the first e-mail, but it might be probably the

20  earliest that I can recall.

21     Q.   Okay.  Great.  And in that e-mail she tells

22  you if we follow the court's orders, he should have

23  been released in August of '09 with no MSR term,

24  correct?

Page 20

```
 1        A.   Yes, I mean that's what she states in the

 2   e-mail.

 3        Q.   Okay.  Now, I mean I understand your

 4   position and your job and everything, but if you could

 5   explain to me the -- if you had a legal basis back on

 6   February 22nd, 2010, when an order is -- a sentencing

 7   order is given and it's clear and unambiguous on its

 8   face, is there any legal authority that prevents you

 9   from releasing the prisoner?  Do you understand what

10   I'm asking?  Do you have a legal basis when you fail

11   to release him?

12             MR. FANNING:  I'm going to object on

13   foundational purposes, but go ahead and answer.

14        A.   Okay.  I mean basically when we're looking

15   at an order, I mean I always tell my staff that we are

16   to -- to follow the order, count based on the order,

17   but also if it's something that appears to be wrong

18   with the order, we need to let -- they need to let me

19   know so that I can advise Legal to see exactly how we

20   can address the issue.  Our ultimate goal and our

21   purpose is to insure public safety, and that's why we

22   are constantly seeking legal guidance as to how to

23   proceed with certain orders that are questionable.

24
```

Page 21

```
 1   BY MR. DeCARO:

 2        Q.   Okay.

 3        A.   Because judges do make mistakes as well.

 4        Q.   Right.  Right.  Would you agree with me

 5   though the most prudent thing to have done in this

 6   case would have been to as quickly as possible go back

 7   to court and try and address it with the judge?

 8        MR. FANNING:  I'll again place an objection

 9   for speculation.

10        A.   Do I answer?

11        MR. FANNING:  Yes.

12        A.   I mean in this case it looks like from the

13   e-mail from Michelle, she's saying that she's been in

14   contact with Lake County and she's waiting for a

15   response from them.  So we are still in communication

16   with Lake County.

17   BY MR. DeCARO:

18        Q.   Okay.  Was one option -- and you may have

19   answered this earlier, but after Michelle e-mails you

20   this and provides you with the order, is it your

21   recollection that at some point she faxed you over one

22   or both of the February 18 orders?

23        A.   I really couldn't tell you that.  I don't

24   know.
```

Page 22

1        Q.    Okay.  Okay.  I think somewhere down

2   further down the e-mails it addresses that, but was

3   one option that you had at this point, once you had

4   this information, could you have said okay, let's

5   follow the order and release Mr. Armato?

6        A.    In this case, I believe I stated before,

7   that since there was no MSR term, we were looking to

8   see -- get clarification and then also seek whether or

9   not the AG's office would take this case up.

10       Q.    Okay.  And what type of clarification would

11  you have needed to make a decision?

12       A.    I think the e-mail points out that I was

13  seeking clarification from Ed Huntley.

14       Q.    Okay.  But if we look at the next e-mail

15  from Ms. Littlejohn to you, the one right above that

16  at -- on February 22nd, 2010, at 2:13 p.m., she had

17  talked to the Assistant State's Attorney, Eric Kalata,

18  K-a-l-a-t-a, and he told her what the intent of the

19  court was.  She put, "The judge said there was no

20  mention of an MSR term given to him previously, so

21  there will be no MSR term, and they were not clear on

22  the days served, so they gave him all his credit.  The

23  judge didn't want to appeal the case -- didn't want

24  him to appeal the case and then have to go through it

Page 23

1   all over again per ASA."  And then she asks, "Is it

2   okay to release him as a discharge?"  So am I correct

3   that she informed you on that date and time as to the

4   intent of the judge according to this state's

5   attorney?

6           A.   Okay.  Yes.  According to this e-mail, yes.

7           Q.   Okay.  And then -- And then you, I believe,

8   respond to her saying, "Give me a call in the morning

9   to discuss"?

10          A.   Correct.

11          Q.   Do you see that at the top?

12          A.   Yes, I do.

13          Q.   Okay.  Okay.  And if we jump -- I'm going

14  to jump a little bit around because these e-mails move

15  around.  All of your e-mails are on different pages

16  than Ms. Littlejohn's, so they're sort of cut and

17  pasted.  So if you go to page 1124, I think that is an

18  e-mail at the top there from you to Ed Huntley and

19  Joel Diers.  If you look at 1124 and 1123, 24's got

20  the body of the e-mail and 23 has the caption.

21          A.   Okay.

22          Q.   Okay.  Would that be your first contact

23  with Ed Huntley and Joel Diers and you CC Alyssa

24  Williams-Schafer at 4:11 p.m. on February 22nd.  Would

Page 24

1  that be your first forwarding of this information to

2  them?

3         A.    By e-mail?

4         Q.    Yeah.

5         A.    I take it that would have been.  I'm not

6  exactly sure, but --

7         Q.    Sure.  And I understand you're only looking

8  at these that I'm directing you to, but do you recall

9  calling Mr. Huntley prior to e-mailing him regarding

10  this?

11         A.    I can't tell you I did.  I don't know.

12         Q.    Okay.  So let me just read the e-mail.  I

13  have a few questions.  It says, "I think this is one

14  we need to have a look at before discharging.  Our

15  Record Office just received the order today.  Alyssa,

16  please check to see -- check to see if eligible for

17  SPV review."  What does SPV review mean?

18         A.    Sexually violent person.

19         Q.    Okay.  Then it goes on, "He had two prior

20  offenses for ag crim assault.  I have a copy -- I have

21  a fax copy of the order for your review.  Thanks."  So

22  from the statement I have a fax copy of the order for

23  your review, I'm assuming that Ms. Littlejohn faxed a

24  copy of the order to you and that you -- you were able

Page 25

1   to fax it on to Ed and Joel?

2        A.   I take it that was the case, yes.

3        Q.   Okay.  And then if you look at page 1123,

4   at 4:14 p.m., about three minutes later on February

5   22nd, Alyssa Williams-Schafer e-mails you, Mr. Diers,

6   and Mr. Huntley, "The SVP offenses have discharged and

7   do not run consecutively or concurrently with another

8   offense or parole term."  What does that mean?

9        A.   I can't speak to exactly what she was

10  speaking to at that point.  So I'm not sure if I had a

11  latter conversation with her that -- to get

12  clarification as to her statement.

13       Q.   Okay.  But if the SVP offenses had been

14  discharged, was that -- Well, strike that.  If the SVP

15  offenses had not been discharged, is that another

16  basis for not discharging him on February 22nd?  Is

17  that an independent basis other than no MSR?

18       A.   Okay.  I mean if -- if I'm looking at

19  Alyssa's statement, the two subsequent offenses he's

20  probably -- and if I'm thinking this out through her

21  part, if those two particular offenses were already

22  discharged, then she would not have been able to go

23  back and do an SVP review.  So therefore that would

24  have been a moot issue.  So that would not have been

Page 26

1   something that we could have done to turn him over to

2   Rushville as a possible sexually violent person.

3       Q.  Okay.  All right.  Then at 4:19, the next

4   -- the next e-mail up from Mr. Diers to you at 4:19

5   p.m., on February 22nd, 2010, it says, "Glenn, the

6   court in my opinion cannot legally sentence this

7   offender without a term of MSR.  Unless we challenge

8   the order through the AG's office, I think we are

9   bound to follow the order."  Do you remember getting

10  that e-mail?

11      A.  I remember this e-mail.  I don't remember

12  getting it.

13      Q.  Right.

14      A.  But no, I see the e-mail, and I recall the

15  e-mail.

16      Q.  Yes.  You know, I'm just going through

17  these e-mails.  If we look up on the next e-mail at

18  4:33 p.m., it's got your e-mail as

19  glenn.jackson@doc.illinois.gov.  Was that your e-mail

20  address back in February of 2010?

21      A.  Yes.

22      Q.  Okay.  So I was given these documents from

23  your counsel.  So I'm assuming that these are e-mails

24  that you've sent and received during this relevant

Page 27

1    time period.  Is that a fair assumption for me to

2    make?

3            A.   Oh, yes.

4            Q.   Okay.  Okay.  Okay.  On February 22nd at

5    4:19, Mr. Diers says, "We need the AG's office to take

6    a look at this."  Is that something that you have

7    control over?  Do you contact the Attorney General's

8    office, and ask them to look at it, or is this

9    something Mr. Diers does, is it something Mr. Huntley

10   does?

11           A.   Okay.  I mean it's almost a chain of

12   command sort of, you know, process.  I make contact

13   with Joel Diers, Joel Diers in turn would make contact

14   with Ed Huntley as to how they will proceed with this,

15   and Ed Huntley would have been the ultimate person to

16   get in contact with the AG's office to determine

17   whether or not they were going to follow through with

18   that.

19           Q.   Okay.  Do you -- During this period do you

20   recall ever having any conversations or e-mails with

21   anyone from the Attorney General's office --

22           A.   Not.

23           Q.   -- regarding Mr. Armato?

24           A.   Not I.  No.

Page 28

1      Q.   Okay.  So your contact was either Mr. Diers

2   or Mr. Huntley?

3      A.   Yes.

4      Q.   Okay.  And then if we look at the next

5   e-mail up at 4:33 p.m. on February 22nd, this is from

6   you to Mr. Diers, Ms. Williams-Schafer, and Mr.

7   Huntley.  It says, "After speaking with Ken Dupy,

8   D-u-p-y, the PRB Legal, he thinks this case should be

9   challenged too.  Thanks."  Who is Ken Dupy?

10     A.   Tupy.

11     Q.   Tupy.  Sorry.

12     A.   Ken Tupy is the Prisoner Review Board legal

13  counsel.

14     Q.   Okay.  Why was he contacted?

15     A.   Because this was related to the MSR term,

16  and the Prisoner Review Board are the ones to make the

17  determination as to the conditions of parole term.

18     Q.   Okay.  But he wasn't in a position to

19  challenge this, it's still -- when he's saying that he

20  thinks the case should be challenged, does that mean

21  the Attorney General's office should challenge it?

22     A.   I take it as that was the case, yes.

23     Q.   Okay.  And I have no idea, is the Attorney

24  General's attorneys, are they to your understanding

GLENN JACKSON 4/3/2012

Page 29

1  the appropriate attorneys who would go into court when

2  there is a sentencing order that needs to be

3  challenged, or is there another set of attorneys that

4  can possibly do that?

5          MR. FANNING:  I'm going to object on

6  foundation, but go ahead.

7  BY MR. DeCARO:

8          Q.  If you know.

9          A.  Well, it's my understanding that any

10  matters outside of the AG -- I mean out of the Records

11  Office -- I mean out of the Department of Corrections

12  will be represented by the Attorney General's office.

13          Q.  Okay.  Are you aware or has Mr. Huntley or

14  an Attorney General or anyone informed you that there

15  is some legal authority that allows you not to follow

16  a court order?

17          A.  I don't know.

18          Q.  And just so I fully understand the

19  situation, the sentencing orders are the very basis of

20  what allows the State to hold the inmate; is that

21  correct?  Is that what you go off of to hold the

22  inmate?

23          MR. FANNING:  Object on foundation.

24  BY MR. DeCARO:

GLENN JACKSON 4/3/2012

Page 30

1      Q.   Well, let me ask it a different way.   An

2   inmate comes to a prison in Illinois.  What document

3   do the prisons look to to determine whether this

4   person should be in jail or not?

5      A.   The mittimus.

6      Q.   Yes.  So those are the documents you look

7   to to hold the person, correct?

8      A.   That is correct.

9      Q.   Okay.  And those are also the documents you

10  look to to release the person?

11     A.   Yes.

12     Q.   Okay.  One of the problems, I take it, in

13  this situation was that Ms. Littlejohn came across

14  what she believed to be an error in the credit days

15  when she was starting to prepare for Mr. Armato's

16  release; is that your understanding?

17     A.   Yes, according to the e-mails, yes.

18     Q.   Okay.  Is that the procedure at all of the

19  penitentiaries that you review the credit time close

20  in time to the prisoner's release, or is that --

21  Strike that.  Is that the policy that a month or two

22  or three before the prisoner's about to be released

23  we're going to review the mittimus?

24     A.   Well, no.  There are several stages of when

Page 31

1    the sentencing order is reviewed.  If an inmate is

2    transferred from one institution to another, the

3    intaking institution or facility will review the

4    calculation to make sure that it's accurate and

5    correct.  So there's a review of the calculation

6    there.  There is a review of the calculation

7    approximately 30 days prior to the person's scheduled

8    MSR discharge, and that is what they're supposed to do

9    as well, but there is several different layers in

10   which the calculation is constantly reviewed for

11   accuracy.

12        Q.   Do you have an opinion one way or another

13   that if in May of 2010, if Mr. Huntley had called you

14   and said don't release Mr. Armato, continue to hold

15   him, would the order have at some point -- if you were

16   going to continue to hold Mr. Armato in the

17   penitentiary, would the 2/18/2010 orders have to have

18   been amended at some point if you were going to

19   continue to hold him?

20        MR. FANNING:  I'm going to object to the

21   form of the question.  Go ahead.

22        A.   Well, I mean I would imagine that

23   eventually they would have had to have gotten

24   something to -- for us to continue to hold him, and

GLENN JACKSON 4/3/2012

Page 32

1    that is the reason why I was consistently trying to

2    get the directions from Legal as to how to proceed

3    with his term, you know, holding him in our custody.

4    BY MR. DeCARO:

5         Q.    Right.  And if -- if the order -- the last

6    sentencing order that he had, that said no MSR, if

7    that order were followed, he didn't need a host family

8    when he was released, correct?

9         A.    That is correct.

10        Q.    All right.  And what -- what, if you have

11   an independent basis, if that order were followed,

12   what was the basis for holding him after February

13   22nd, 2010, when you found out about this, and if you

14   were to have followed that order, he had to be

15   released, what was the basis if there was a legal

16   basis, what was your basis in your mind for holding

17   him beyond that date?

18        A.    I think I mentioned earlier, that according

19   to the statute, that all offenses, all DOC offenders

20   are to have an MSR term, and based on that, that was

21   the rationale behind questioning the order as it was

22   given -- as it was written in this particular case.

23        Q.    Okay .  I think we left off -- Go back to

24   the e-mails.  We left off at February 22nd, 2010, at

GLENN JACKSON 4/3/2012

Page 33

1    4:33 p.m.  We skipped ahead by three minutes.  If you

2    could look at page 1125, the top e-mail there.

3          A.   All right.

4          Q.   That is an e-mail from you at 4:30 p.m. on

5    February 22nd, to Alyssa Williams-Schafer.  It says,

6    "I know but for some reason I feel I have to CYA,

7    thanks."  What is CYA?

8          A.   For lack of better words, cover my butt.

9          Q.   Okay.  Okay.  And when you say "I know," is

10   that in response to her e-mail talking about the SVP

11   offenses --

12         A.   Yes.

13         Q.   -- have discharged?

14         A.   Right.

15         Q.   Okay.  All right.  Then on page 1118, I

16   think is the next e-mail up on the top there, have it?

17   It's from you on February 23rd, 2010, at 9:47, to Mr.

18   Huntley.  It says, "The below offender is to be

19   released today.  I need directions as to MSR him or

20   discharge per the mittimus.  If your directions are to

21   MSR him, he will have -- he will be a VAD."  Is that

22   violated at the door?

23         A.   That's correct.

24         Q.   Okay.  "Since he has no host site.  If we

GLENN JACKSON 4/3/2012

Page 34

1  follow the order, he will discharge today.  Your

2  prompt response to this matter will be greatly

3  appreciated.  He is not SVP eligible, but he is a sex

4  offender.  Thanks."  I'm a little -- if you could just

5  explain to me one more time.  I'm still unclear as to

6  what the SVP eligible.  So the fact that he is not

7  SVP eligible means what?

8          A.   That he is not eligible to go over to the

9  civil commitment, which is sexually violent person,

10  meaning that he is not eligible to be -- to be shipped

11  or transferred over to Rushville.

12          Q.   Okay.  Okay.  You told me that.  Thank you.

13  And so in your -- in your words on this day, if you

14  follow that February 18, 2010 -- and there were two

15  orders.  If you follow those orders, Mr. Armato should

16  have been released on February 23rd, 2010?

17          A.   I believe whatever date that was, yes,

18  whatever the date that she gave.

19          Q.   Well, in your e-mail, it says, "If we

20  follow the order, he will be discharged today."

21          A.   Right.

22          Q.   So maybe that was the first day he could

23  have been discharged?

24          A.   I'm not exactly if that would have been the

GLENN JACKSON 4/3/2012

Page 35

1    first day, but according to the e-mail it's saying he

2    will discharge today, yes.

3         Q.    Okay.  The e-mail we just talked about

4    February 23rd at 9:47.  If you look at page 1062,

5    there's several e-mails from Ms. Littlejohn to you,

6    and I just want to --

7         A.    Oh, 10 --

8         Q.    1062, yeah.

9         A.    Okay.

10        Q.    Okay.  So is February 23rd now, you had

11   some e-mails with Mr. Huntley and Diers on February

12   22nd.  Do you recall having any phone conversations

13   with them, or was the majority of your contact with

14   them regarding this matter through e-mail?

15        A.    I can't tell you exactly, you know, dates

16   and times that I would have had conversations, but I

17   know with Mr. Diers, since his office is right around

18   the, you know, corridor from me, I would have had --

19   had some conversations with him as I always do.

20        Q.    Okay.  Okay.  And so if you look at 1062,

21   it looks like Ms. Littlejohn e-mailed you on February

22   23rd a couple times at 8:30, 9, and at 2:08, just

23   checking on the matter.  Then she e-mailed you

24   February 26th at 9:47 asking if you're still waiting

Page 36

1   on Legal, and then you responded, the time is on page

2   1061, on February 26 at 10:02 a.m., informing her,

3   "Yes, I'm still waiting for a response from Legal."

4   And is that what you were doing during those days

5   after being informed about this situation, basically

6   waiting to hear from Legal as to what to do?

7          A.   Yes.

8          Q.   Then we go to -- if you're still on page

9   1062, on March 5th, 2010, at 8:48, Ms. Littlejohn

10  e-mails you and says, "Just a reminder on this.

11  Thanks."  And I'm assuming she's referring to the

12  subject line, possible release of David Armato, then

13  the next e-mail that I found was on page 1112, if you

14  want to take a look at that, it's one from you to Mr.

15  Huntley.  The top.

16         A.   Yes.

17         Q.   Okay.  So that is on March 5th also at

18  9:12, you e-mailed Mr. Huntley, stating, "This is the

19  case I called, e-mailed, and provided you the mittimus

20  on.  Thanks."  Was that e-mail prompted by a call from

21  him saying, you know, what is the Armato case about,

22  or why did you e-mail him that?

23         A.   I don't know.  I mean I can't tell you

24  exactly why I sent him that particular e-mail, but --

GLENN JACKSON  4/3/2012

Page 37

```
 1   but perhaps, you know, looking -- Let me see how many

 2   -- almost -- well, yeah, two years later, as a

 3   reminder to him, that we needed a response to it, and

 4   I think if you look at some of the subsequent e-mails

 5   even with the response that I gave to Michelle as to

 6   still waiting for a legal response, I put high

 7   importance on those particular e-mails.

 8         Q.   Right.

 9         A.   So again this is a reminder.

10         Q.   And so that is on March 5th, and then if

11   you look back at page 1061, seven days later, on March

12   12th at 8 a.m., Ms. Littlejohn e-mails you again

13   checking on the case again, correct, on page 1061?

14         A.   Okay.

15         Q.   Okay.  March 12 at 8 a.m., and then if you

16   look at -- I'm sorry to go back and forth, but these

17   weren't in order, but after you received that e-mail,

18   if you look at page 1109 on the top there at 8:42 a.m.

19   on March 12, you again e-mail Ed Huntley saying, "Mr.

20   Huntley, this is the case I called and e-mailed you

21   on.  As mentioned before, Joel and Ken (PRB) suggested

22   that the case be referred to AG's office.  Please let

23   me know how you wish to proceed.  Please let me --

24   please let me how you wish for us to proceed."
```

GLENN JACKSON  4/3/2012

Page 38

1      A.    Yeah, I know.

2      Q.    Period.  Thanks.  Strike that.  So as of

3  March 12th had Mr. Huntley contacted the AG's office

4  yet, had he e-mailed you or called you and said I've

5  spoken to the AG, I'm going to forward this to the AG,

6  or was this case still in limbo?

7      A.    As far as my recollection, I was always

8  under the impression that this was something -- as

9  through my e-mails, that this is something that was

10 being referred to or being dealt with through the AG's

11 office.  Did I have any personal contact with that?

12 No.

13     Q.    Is there anyone -- At that time was there

14 anybody over Mr. Huntley that you could speak to, or

15 he was the highest authority you could go to regarding

16 this matter?

17     A.    As far as I can go to, the highest

18 authority I can go to was my chief legal counsel.

19     Q.    And that was Mr. Huntley?

20     A.    Yes.

21     Q.    Okay.  What is Mr. Huntley doing today?  Is

22 he your chief legal counsel?

23     A.    No.

24     Q.    Do you know where he's employed now?

Page 39

```
 1        A.   Yes, he's with the Illinois Department of

 2   Corrections.

 3        Q.   In what capacity?

 4        A.   He's DOC Legal, he's attorney.  He's not in

 5   the capacity of the chief legal counsel.

 6        Q.   Okay.  Okay.  All right.  Then if you look

 7   back on page 1061, Ms. Littlejohn e-mails you a

 8   reminder on March 19th, and then you -- at 8:28, you

 9   e-mail her back at 10 a.m. saying, "The AG's office

10   has been contacted, and we're waiting for a response."

11             Then if we look at page 1060, the next

12   e-mail from Ms. Littlejohn is on March 26th at 8:07.

13   Do you have that page?

14        A.   Uh-huh.

15        Q.   Okay.  And she tells you at that time that

16   the Prisoner Review Board will be seeing him on his

17   violation on April 7 when they are here.  What is the

18   significance of him being seen by the Prisoner Review

19   Board, if any?

20        A.   Well, I mean basically it would be just

21   saying that he's going through the proceeding of the

22   Prisoner Review Board to determine his parole

23   violation status.

24        Q.   Okay.  And does their opinion -- Ultimately
```

Page 40

1    he's found not to be a violator, do you recall that?

2         A.   No, I don't recall that.

3         Q.   It will come up later in the e-mails, but

4    that has no bearing on whether he's going to be

5    released or not, did it?

6         A.   No.

7         Q.   All right.  Then the next e-mail from Ms.

8    Littlejohn is April 2nd at 8:04, another reminder.

9    Then the next e-mail I have from you to Mr. Huntley is

10   on page 1101 up at the top.

11        A.   Yes.

12        Q.   Okay.  It says to Mr. Huntley, "Offender

13   Armato is scheduled to be heard by the PRB on April 7.

14   This is the case where the judge ordered no MSR term,

15   and you referred it to the AG's office.  The PRB could

16   decline to hear his case because he has no MSR."  That

17   last sentence there that the PRB could decline to hear

18   the case, is that of any significance in this

19   scenario?  I mean what is the purpose of informing Mr.

20   Huntley of that?

21        A.   Basically that the hearing date was coming

22   up, and because there's no set MSR term, the PRB may

23   decline to hear the case.  So I just wanted him to

24   know all the facts to the situation.

Page 41

1        Q.    Okay.  And basically that they could say,

2   you know, he's not on parole, we don't really need to

3   hear a case for a guy who is not on parole because we

4   have jurisdiction over guys on parole?

5        A.    Yes.

6        Q.    Okay.  All right.  Then back on page 1060,

7   April 8, 2010, 8:36, Ms. Littlejohn tells you that,

8   "PRB heard the case.  Mr. Altoff called me about his

9   situation while he was hearing him.  He then called

10  the PRB's attorney to see what to do.  The PRB said to

11  find him not a violator and to let DOC handle it, but

12  they thought Mr. Armato had a lawsuit."  So when they

13  say let DOC handle it, that would be you and Mr.

14  Huntley, you would be -- Well, strike that.  It's a

15  bad question.  You probably don't know what Mr. Altoff

16  was thinking.  But Mr. Althoff, I'm assuming, is one

17  of the PRB people?

18       A.    Yes.

19       Q.    And again the fact that they found him not

20  to be a violator didn't come into play in your

21  decision making at all or whether to release him?

22       A.    As I've stated before, once I turned it

23  over into the hands of our legal staff, our legal

24  counsel, I was following the directions by them and

Page 42

```
1    was seeking clarification and directions as to how to

2    proceed with this, and from throughout I think you see

3    my chain of e-mails is constantly saying -- asking him

4    how we're going to deal with this matter, we see the

5    question at hand, and I'm thinking that this is in the

6    AG's office, you know, to contest the particular order

7    that was written.

8         Q.   Okay.  And that's fair enough.  Let me just

9    ask you some specific questions about some specific

10   e-mails.  If you look at page 1076.  In the middle

11   e-mail there is April 23rd at 11:08 a.m., to Ed, I'm

12   assuming that's Ed Huntley?

13        A.   Yes.

14        Q.   Okay.  And also it was to Joel Diers and

15   cc'd Joseph Rose.  Who is Joseph Rose?

16        A.   And I'm not exactly sure how this timeline

17   -- I mean, you know, the timeline goes with this.  I

18   believe at this particular point Joe Rose was coming

19   in as the interim chief legal counsel, and so now I am

20   including him in this chain of e-mails.

21        Q.   And this one is addressed Ed, you're asking

22   him, "Has a decision been made on how to proceed with

23   this situation?  Michelle is sending me weekly

24   reminders dating back to February."  By Michelle, you
```

Page 43

1    mean Michelle Littlejohn, right?

2         A.   Yes.

3         Q.   Okay.  And it says, "Not to mention, she is

4    documenting all her contacts in the master file."

5    What did you mean by that?

6         A.   Okay.  As I tell all the staff, that when

7    we have issues going on, we need to document it and

8    send to the master file.  So she was directed to

9    document all of her conversations, all the different

10   contacts she's made with me, and, you know, my

11   different responses.  So she was documenting it, and I

12   wanted the legal staff to know that everything is

13   being documented.

14        Q.   And why was it important for them to know

15   that?

16        A.   Well, I wanted them to know so that we

17   can -- I guess maybe I was looking to expedite an

18   answer.

19        Q.   Okay.  Now, you've been the Chief Records

20   Officer for the last eight years or so.  Is this the

21   first time you've come across an order where the judge

22   ordered no MSR?

23        A.   I don't think so.  No, I believe that we

24   had one before.

Page 44

1       Q.    Okay.  Prior to Mr. Armato?

2       A.    Yes.

3       Q.    And what did you do in that situation?

4       A.    We referred it to the AG's office, I

5  believe.

6       Q.    Okay.  And what -- do you recall what they

7  did?

8       A.    If I recall -- and I can't remember a

9  particular case or anything -- but I believe that they

10 were able to get it, you know, the order rewritten or

11 however.  I can't remember the exact details.  And it

12 might have been right at the point that I was stepping

13 into the position where something like that would have

14 happened with my Assistant Chief Record Officer.

15      Q.    Okay.  Thanks.  Then if we look at page

16 1070, the top e-mail there on Friday, May 21st at

17 12:05 p.m. from Mr. Huntley to you.  Basically --

18 Well, let me read it.  "Glenn, the AG's office has

19 declined to pursue a request to the court that the

20 sentencing orders be modified or otherwise move for

21 leave to intervene on behalf of the Department in this

22 case.  That being so, I believe we have exhausted the

23 potential alternatives and will have to let Mr. --

24 will have to let Armato go as a discharge.  I suppose

Page 45

1    we should show it as a court-ordered discharge as that

2    is exactly what it is.  Let me know if you need

3    anything further."  So that was the information you

4    were waiting for from Mr. Huntley to say let him go?

5         A.   I mean not just let him go.  Just to give

6    us an answer as to what to do, whether it was let him

7    go or that they had gone to court and gotten a

8    different remedy.

9         Q.   Okay.  So they basically said we are not

10   going to go to court so our only alternative is follow

11   the order and let him out?

12        A.   That's correct.

13        Q.   Okay.  And when he says, "I suppose we

14   should show it as a court-ordered discharge as that is

15   exactly what it is," what does that mean, show it as

16   in the computer or what?

17        A.   Yes.

18        Q.   Okay.  And then he was discharged -- Mr.

19   Armato was discharged with no MSR, correct?

20        A.   Yes.

21        Q.   Okay.  And then I'm assuming, I did not see

22   an e-mail and Ms. Littlejohn didn't recall, do you

23   recall whether you called her or e-mailed her and said

24   discharge Mr. Armato?  I didn't find an e-mail.

Page 46

```
 1              A.   No, I probably would have called her.

 2              Q.   Okay.  Give me one second.  I want to read

 3    over a few notes.  As this incident -- situation

 4    arisen and Chief Grounds got -- Chief Grounds --

 5    Warden Grounds got involved, does the warden have the

 6    authority to release a prisoner without contacting you

 7    when there's a dispute regarding calculations?

 8              A.   Does a warden have the discretion to

 9    release an offender when there's questionable issues?

10              Q.   Yes.

11              A.   I mean if he does, then I would say that

12    most wardens would not take that liberty because they

13    don't know the process of dealing with sentence

14    calculations.  So I don't believe most or any of the

15    wardens would take that liberty, and they refer to

16    different people based on their job experience and

17    their knowledge of the particular area or function of

18    the area.

19              Q.   Does the warden -- I guess that was a bad

20    question.  Does the warden have the statutory

21    authority to do that to release a prisoner?

22              A.   I don't know what the statutory

23    requirements are for the wardens.  I haven't looked

24    that up as far as the statutory requirements.
```

Page 47

1       Q.    Sure.  And the fact that he may or may not

2    defer to your office, is there any policy, procedure,

3    or statute that would tell us that your office has

4    authority over the warden or vice-versa, or is that

5    just unwritten?

6       A.    I -- It was probably unwritten, but --

7       Q.    It's just --

8       A.    It's just like the chain of command in any

9    other organization.  You set up departments, and all

10   departments based on their experience and expertise in

11   certain areas, and you refer to those areas to get

12   recommendations and directions as to how to work.

13      Q.    Okay.  And I know you said that this MSR

14   problem came up one other time.  I'm assuming there

15   are other calculations that come up.  I know in this

16   situation Ms. Littlejohn was having a problem getting

17   the verification of his credit because the jail had

18   switched over their computer system and lost some

19   data, I believe.  I'm assuming that occurs.  Since

20   this incident with Mr. Armato, have you changed in

21   your department any policies or procedures on how you

22   would handle another situation like this?

23      A.    No.

24      Q.    Or if this occurred today, you would follow

Page 48

1    the same chain, you called Mr. Huntley and so on?

2          A.    No, it would not be the same chain.  The

3    chain has changed.

4          Q.    Right.  Mr. Huntley is gone, right?

5          A.    He's still with our agency, but he's not in

6    my chain of command any longer.

7          Q.    Okay.  But with changing the name of the

8    attorney, you'd follow the same procedure?

9          A.    Yes.

10         Q.    I know you told me earlier that you had

11   left it up to Mr. Huntley in this particular situation

12   to give you a legal opinion, but back in February of

13   2010, based on your job description and your

14   experience, would you have been -- would you have had

15   the authority to tell Ms. Littlejohn whether to

16   release Mr. Armato or not on February 22nd once she

17   provided you with the court orders?

18         A.    Well, I mean I certainly could have

19   probably given her an answer, but without -- I think

20   it would have been negligence on my part to not seek

21   legal clarification because if in some way someone

22   would have came back and said that he should have been

23   serving an MSR term and I did not seek legal guidance

24   on this, then it would have come back on me.

GLENN JACKSON  4/3/2012

Page 49

1        Q.    Okay.  So it sounds like you're saying you

2   have the authority to make those decisions, but you

3   needed more information before making the decision?

4        A.    I have authority to make calculations --

5   Let me see.  Let me correct that.  I have the

6   authority to say the person is set to release today,

7   but once I took it to Legal to get clarification, then

8   they supersede my authority as to the release, and

9   apparently in this case Mr. Huntley had directed me to

10  hold on the release of this offender until we get

11  legal clarification, and that was the directions that

12  I was following.

13       Q.    Okay.  Now, I didn't see -- I didn't see

14  any e-mails where Mr. Huntley -- and correct me if I'm

15  wrong -- you look at those e-mails where Mr. Huntley

16  e-mailed you back, saying don't discharge this

17  individual until we give you an opinion; is that

18  something he told you over the phone?

19       A.    It would have been something that would

20  have come over the telephone or -- and I -- like I

21  said, I can't remember particular dates and times that

22  I would have had personal conversations with either

23  Joel Diers or Mr. Huntley, but the directions came

24  from there -- from them or one of the two as to how to

GLENN JACKSON 4/3/2012

Page 50

1  deal with this situation, and I think that's why you

2  find in my e-mails I'm constantly asking them how to

3  proceed based on what they had already told me.

4          MR. DeCARO:  That's all I have.  Thank you.

5          THE WITNESS:  All right.  Thank you.

6          MR. FANNING:  I don't have anything.  We'll

7  waive signature.  I'll take a regular size with an

8  index.

9          THE COURT REPORTER:  Are you ordering, Mr.

10  DeCaro?

11          MR. DeCARO:  Yeah, an e-mail -- Just give

12  me a mini with a word index.

13      (WHEREIN, the deposition was concluded at 10:10

14  a.m.)

15

16

17

18

19

20

21

22

23

24

GLENN JACKSON  4/3/2012

Page 51

```
1                        CERTIFICATE OF REPORTER

2

     STATE OF ILLINOIS   )

3                        )

     COUNTY OF SANGAMON  )

4

5              I, Rhonda Rhodes Bentley, CSR, CCR, RPR, a

6    Certified Shorthand Reporter (IL), Certified Court

7    Reporter (MO), Registered Professional Reporter, do

8    hereby certify that the witness whose testimony

9    appears in the foregoing deposition was duly sworn by

10   me; that the testimony of said witness was taken by me

11   to the best of my ability and thereafter reduced to

12   typewriting under my direction; that I am neither

13   counsel for, related to, nor employed by any of the

14   parties to the action in which this deposition was

15   taken, and further that I am not a relative or

16   employee of any attorney or counsel employed by the

17   parties thereto, nor financially or otherwise

18   interested in the outcome of the action.

19                     Rhonda Rhodes Bentley

20              _____

                Rhonda Rhodes Bentley, CSR, CCR, RPR

21              CSR# 084-002706, CCR# 1313

22

23

24
```

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID ARMATO,
    Plaintiff,
    vs.        No. 11 CV 3023
RANDY GROUNDS, MICHELE LITTLEJOHN,
GLENN JACKSON, and DION DIXON,
all in their individual capacities,
    Defendants.

      The deposition of EDWARD W. HUNTLEY, called for
examination pursuant to the Rules of Civil Procedure
for the United States District Courts pertaining to the
taking of depositions, taken before Kristin M.
Ashenhurst, Certified Shorthand Reporter for the State
of Illinois, at 3000 Montvale Drive, Springfield,
Illinois, on September 24th, 2012, at the hour of 1:51
p.m.

REPORTED BY:  Kristin M. Ashenhurst, CSR, RDR, CRR
LICENSE NO:  084-002090
JOB NO.:  2729

---

**Page 2**

1  APPEARANCES:
2
    KUPETS & DeCARO, by
3    MR. DENNIS DeCARO
    77 W. Washington Street
4    20th Floor
    Chicago, Illinois 60602
5    (312) 372-4444
    ddecaro@kupetsdecaro.com
6
      Representing the Plaintiff;
7
8  OFFICE OF THE ATTORNEY GENERAL, by
    MR. ROBERT FANNING
9    ASSISTANT ATTORNEY GENERAL
    500 S. Second
10    Springfield, Illinois 62706-1771
    (217) 782-7955
11
      Representing the Defendants.
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 3**

1             INDEX
2  WITNESS             EXAMINATION
3  EDWARD W. HUNTLEY        3
4    Direct Examination
5
6
7
8
9             EXHIBITS
10  NUMBER            MARKED FOR ID
11  Exhibit B     Order        12
12  Exhibit C     Order        12
13  Group Exhibit D    Group of E-Mails    27
14  Group Exhibit E    Chief Legal Counsel   4
          Job Description; and
15          Special Litigation
          Counsel Job Description
16  PREVIOUSLY MARKED      FIRST REFERRED TO
17
18
19
20
21
22
23
24

---

**Page 4**

1      (Witness administered an oath.)
2      EDWARD HUNTLEY,
3  having been first administered an oath, was examined
4  and testified as follows:
5      DIRECT EXAMINATION
6  BY MR. DeCARO:
7    Q.  Would you please state your full name and
8  spell your last name for the court reporter.
9    A.  Edward W. Huntley, H-u-n-t-l-e-y.
10    Q.  Mr. Huntley, I am just going to ask you a few
11  background questions and then we will get into the meat
12  of the matter.  I saw you brought your job description
13  back -- looks like prior to February of 2010, which
14  would have been the position that you were hired at
15  during that time -- what was your position during that
16  period of time?
17    A.  I was the Chief Legal Counsel for the Illinois
18  Department of Corrections.
19    Q.  And it looks -- I just quickly looked at it.
20  It looks like there is two job descriptions that you
21  brought pursuant to my Rider?
22    A.  Two -- I am sorry.
23    Q.  Go ahead.
24    A.  Two position descriptions from the Department

---





PLAINTIFF'S
EXHIBIT
E
Blumberg No. 5119

Huntley

Page 5

1    of Central Management Services, yes.
2                (Whereupon, Huntley Group
3                Exhibit E was marked for
4                identification.)
5    BY MR. DeCARO:
6        Q.   Were either one of these the position you were
7    holding between February 2010 and May of 2010 -- and we
8    have marked it as Huntley Group Exhibit E if you want
9    to take a look at that?
10       A.   I was in both of these positions at varying
11   points during that period of time.
12       Q.   During -- between February and May of 2010?
13       A.   Yes.
14       Q.   And so these job descriptions would cover both
15   of the positions you were in during that time?
16       A.   Correct.
17       Q.   Which position were you in first?
18       A.   Chief Legal Counsel.
19       Q.   And then what did you go to?
20       A.   Special Litigation Counsel.
21       Q.   When did you make that transition?
22       A.   I think the official date was April 1st of
23   2010.
24       Q.   What's your date of birth?

Page 6

1        A.   October 24, 1951.
2        Q.   Have you reviewed any documents prior to the
3    deposition today in preparation for the deposition?
4        A.   Yes.
5        Q.   Could you tell me what those were?
6        A.   I looked at the two position descriptions we
7    were just talking about.  I have looked at the amended
8    complaint which was filed, I think, in the spring of
9    this year.  I looked at a series of E-mails that were
10   exchanged among different employees of the Department
11   of Corrections.  I glanced at a couple orders -- I
12   think it was two orders that were entered, I believe,
13   in February of 2010.  I may have looked -- I don't
14   remember looking at an earlier Sentencing Order, but I
15   may have.  Oh -- and I looked at the transcript of the
16   deposition of Glenn Jackson.
17       Q.   And that's really why you are sitting here
18   today.  Mr. Jackson's testimony to me was a little
19   unclear as to who had the ultimate authority in
20   releasing or detaining Mr. Armato.  At some point it
21   reads as though he had asked you for some guidance and
22   directions, and then at other points he said you were
23   the ultimate decision maker.  So that's what I really
24   want to ask you about.

Page 7

1                But before we get to those questions, what's
2    your highest level of education?
3        A.   My law degree.
4        Q.   Where did you get that?
5        A.   University of Pennsylvania.
6        Q.   What year?
7        A.   1976.
8        Q.   Any other postgraduate degrees?
9        A.   No.
10       Q.   What is your current position -- employment?
11       A.   Special Litigation Counsel for the Illinois
12   Department of Corrections.
13       Q.   That's the same job you started April 1st of
14   2010?
15       A.   Correct, yes.
16       Q.   And you want to tell me just generally what
17   you do day to day?
18       A.   I try to supervise the litigation that's
19   pending against the Department and its employees, most
20   of which is handled -- at least in court -- by various
21   lawyers with the Attorney General's office.
22       Q.   So are you employed by the Illinois Department
23   of Corrections?
24       A.   Yes.

Page 8

1        Q.   But you do have some supervisory control over
2    the attorney general attorneys?
3        A.   Not over the lawyers themselves I would say,
4    so much as the way that the cases are being handled.  I
5    think -- and I can't speak for them -- but it's my
6    impression that they think of me oftentimes as the
7    client or the representative of the client.  I fill
8    that role for them.
9        Q.   Back in -- well, when you had these two
10   positions either as Chief Legal Counsel or Special
11   Litigation -- is it Special Litigation Counsel?
12       A.   That's the title on the position description,
13   so that's what we've been using, yes.
14       Q.   Did Glenn Jackson report to you under either
15   of those titles?
16       A.   There were points while I was Chief Legal
17   Counsel when, according to the Department's
18   organizational chart, Glenn reported to me.  I believe
19   there were other points when he had a different chain
20   of command.
21       Q.   Would -- you know, in my business I sort of
22   may have a different view of how the relationship
23   between a client and the attorney is from the public
24   sector.  What I am trying to determine here today is

Huntley

Page 9

1  during the period when Mr. Armato was going through
2  this dispute over his out-date, which began with the
3  February 18th, 2010 orders, and ended approximately
4  May 21st, 2010, during that period were you advising
5  Mr. Jackson on whether to release Mr. Armato or was it
6  your decision to release him or keep him incarcerated?
7      A.  Frankly, I don't know that we make fine
8  distinctions of that nature.  The client was, and
9  always is and has been, the Illinois Department of
10  Corrections.  We were trying to do, I think, what we
11  thought was in the best interests of our client, the
12  Illinois Department of Corrections.  From reading
13  Glenn's deposition transcript, I know that there was
14  conversation about this topic during his deposition,
15  and I think what he was trying to say was that his
16  office would look to legal services -- and to me as the
17  Chief Legal Counsel -- for direction, if I can put it
18  that way, as to how to handle this particular
19  situation.
20      Q.  Right.  And that's what I got throughout most
21  of -- re-reading most of his deposition.  So would that
22  be your understanding, that you were giving him legal
23  advice on Mr. Armato's situation?
24      A.  Again, I don't know that I -- well, clearly I

Page 10

1  was giving him legal advice.
2      Q.  Let me ask you this:  As part of your job back
3  then, either as Chief Legal Counsel or Special
4  Litigation Counsel, were you making determinations
5  whether to -- whether to release certain prisoners or
6  to keep them detained?  Was that part of your job?
7          If there was a dispute, say the prison would
8  call you -- the records office -- and say, "We've got
9  this problem," and would you personally determine
10  whether someone remained incarcerated or released?  Or
11  would you review the situation and give legal advice to
12  those people making those decisions?
13      A.  I guess I would say I thought I was giving
14  legal advice.  They may have taken it as a decision.  I
15  don't know, again, that we were breaking it down quite
16  so finely in terms of making that distinction, so much
17  as we were trying to address a question or an issue
18  that had been presented to us as, you know, for
19  example, the order in this case.
20      Q.  Sure, and we will get to that, but I jumped
21  off your employment history for a little bit.  So you
22  ceased being Chief Legal Counsel March 31st of 2010.
23  When did you start doing that?
24      A.  Middle of April of 2005.

Page 11

1      Q.  And what were your duties as Chief Legal
2  Counsel as contrasted with special litigation?
3      A.  They included a fair amount of what I am doing
4  now as Special Litigation Counsel, but over and above
5  that I spent time advising the director, personally, in
6  his capacity as the director, and a number of other
7  senior staff members of the department.  I guess you
8  could say that I was a member of the senior management
9  team may be the easiest way to explain that.
10      Q.  Prior to mid-April of '05, what was your
11  position?
12      A.  I had spent about 25-and-a-half years in
13  private practice before joining the Department.
14      Q.  Doing what type of litigation?
15      A.  Mostly civil trial work.
16      Q.  Plaintiffs?  Defendants?
17      A.  Mostly defense, although there were some
18  plaintiff's cases as well.
19      Q.  Did you handle civil rights defense?
20      A.  No -- well, I take that back.  I probably had
21  a smattering of -- a handful of civil rights cases over
22  the years.
23      Q.  Were you employed by any municipalities during
24  those years?

Page 12

1      A.  Not other than -- not on a regular basis.  I
2  handled some cases.  Again, primarily it would have
3  been through insurance carriers to represent
4  municipalities on occasion.
5      Q.  And I am going to ask you your e-mail address
6  during February 22nd, 2010 to May 21st, 2010, and we
7  can go off the record if you want or -- if you mind
8  whether your e-mail address is on the record?
9      A.  I think it's -- no, it doesn't matter to me.
10  It's -- I believe it's the same as it is -- it was the
11  same as it is now, which is Edward.Huntley@doc.Illinois
12  -- spelled out in full -- .gov.
13      Q.  Okay.
14      A.  It has changed during my tenure at the
15  Department, but I think that change preceded this
16  period of time.
17      Q.  You told me what you reviewed today.  Do you
18  have an independent recollection of this situation, and
19  by situation, do you understand what I am talking
20  about?
21      A.  Yes.  You are talking about the David Armato
22  situation with respect to the orders that we received
23  sometime in February of 2010.
24      Q.  Right.

Huntley

Page 13

1    A.  And his ultimate discharge from the Department
2  about three months later.
3    Q.  Do you have independent recollection what was
4  going on?
5    A.  Yes, I have an independent recollection, yes.
6    Q.  Great.  Here's my understanding, and tell me
7  if this is yours.  My understanding is that perhaps the
8  sole reason he wasn't discharged was that the two
9  February 18, 2010 orders specifically stated that he
10  was to be released with no mandatory supervised release
11  period; is that your understanding?
12    A.  That was the primary problem, yes.
13          (Plaintiff's Exhibits B and C
14          were marked for
15          identification.)
16    Q.  Since I have marked these exhibits, we might
17  as well use them.  I have marked the two orders that
18  we'll be talking about as Huntley Exhibit B and Exhibit
19  C.
20    Do you have your copy?  Here's a copy.
21    MR. FANNING:  Thanks.
22  BY MR. DeCARO:
23    Q.  So are those the two orders that you recall
24  being the points of dispute?

Page 14

1    A.  They appear to be.
2    Q.  And my reading of the E-mails that were going
3  back between Michele Littlejohn, Glenn Jackson and
4  yourself, somewhere in there Mr. Jackson, I believe,
5  states that he had forwarded those orders to you?
6    A.  I don't recall if I got them from Glenn or I
7  got them from Joel Diers, but I did have copies of at
8  least one of them.  I mean, if you had asked me last
9  week how many orders there were, I probably would have
10  said there was an order, but it appears there were two.
11    Q.  So other than the MSR problem, was there any
12  other problems with these orders that either your
13  office or the Attorney General's office was having a
14  problem with?
15    A.  Not with the orders themselves, that I recall.
16    Q.  And I am not a criminal defense attorney and
17  Mr. Jackson called it the mittimus, but are these the
18  documents -- these two orders, B and C, basically the
19  documents that the Illinois Department of Correction
20  relies upon in determining a prisoner's release date?
21    A.  Generally, yes.  I mean, these would be,
22  certainly, among the important documents that the
23  Department would rely upon.
24    Q.  And here is -- here's my -- the thing I don't

Page 15

1  understand.  Reading the E-mails -- to me the only
2  options, if there was a problem with these orders,
3  would have been to go back to the Circuit Court of Lake
4  County and try and modify these orders, correct?
5    A.  That's certainly one of the options, yes.
6    Q.  I mean, the Illinois Department of Corrections
7  or the Attorney General's office could not just
8  unilaterally disregard these orders, could they?
9    A.  It would not be a good idea to do that.
10    Q.  And that was never done.  Am I correct that no
11  attorney for either the Illinois Department of
12  Corrections or the Attorney General's office ever went
13  to go modify these orders?
14    A.  That's -- it's correct in the sense that no
15  one went to court to modify them.
16    Q.  Okay.
17    A.  It implies that we didn't take any steps in
18  that direction, which is not correct.
19    Q.  That's another area I wanted to ask you about.
20  Why don't you tell me what steps your office took or
21  the Attorney General's office?
22    A.  Well, we had a process, which I think was
23  alluded to in Glenn Jackson's deposition, and probably
24  came out -- I didn't read the transcript of Michelle

Page 16

1  Littlejohn's dep, but may well have come out in her's
2  as well. and I recall Glenn referencing the records
3  office training manual at one point.
4    When an order that is out of the ordinary in
5  its terms -- such as these -- would come in, the
6  records office personnel at the local facility would
7  certainly bring it to the attention of either
8  Mr. Jackson or -- or he had an assistant chief records
9  officer at the time -- bring it to their attention.
10    They also would reach out to -- generally the
11  local prosecutor -- to find out if it was simply an
12  oversight, a mistake, something of that nature, or was
13  it actually what had been intended by the parties, and
14  regardless of the answer to that question would then
15  ask if there was some willingness to modify the order
16  in a fashion that, you know, to our view would bring it
17  into compliance with the statutes.
18    My understanding -- my recollection and my
19  understanding from reviewing the E-mails was that
20  Michelle did that; that is, she reached out to an
21  Assistant State's Attorney and I think one of her
22  E-mails summarizes her conversation with -- I think it
23  was a him --- the gist of which, as I recall, was this
24  is what the judge intended to do.  He is concerned

Huntley

Page 17

1  about an appeal.  He doesn't want this guy taking the
2  appeal.  He doesn't want, basically, there having to be
3  a retrial if, in fact, it's discovered that he was not
4  initially admonished as to an MSR term.
5        The next step would then be that which Glenn
6  took, which was sort of to bring the matter to my
7  attention for purposes of saying, okay, is it something
8  that, you know, we want to seek representation from the
9  Attorney General on, or is it something that, you know,
10  we're just at that point going to say, okay, let's
11  just -- we'll -- we'll implement the Judge's Order
12  and -- go ahead.
13     Q.  I didn't want to interrupt you.  Is that the
14  extent of the procedure?
15     A.  No, because then we would, you know, if we
16  decided internally that it was something that merited
17  going to the Attorney General's office, then we would
18  reach out to them and ask them to review the matter and
19  let us know if they were willing to file some pleading
20  seeking either -- again, depending upon the terms of
21  the order -- either have an order vacated or modified,
22  or in some fashion changed, so that, again, it
23  would -- to our view it would comply with the State
24  statutes governing sentencing.

Page 18

1     Q.  And that appears from the E-mails that that's
2  what took place here?
3     A.  Yes, we followed the process here.
4     Q.  What -- why did it take so long, I guess I am
5  concerned with?  It took -- it looks as though Michelle
6  Littlejohn found out that information -- the initial
7  information -- in February of 2010, but there wasn't a
8  decision by the Attorney General's office not to
9  proceed with attempting to modify the order until May.
10  So what takes approximately 90 days to make this
11  decision, if you know?
12     A.  I can't say that I know.  My recollection is
13  that there were a number of conversations with the
14  Attorney General's office about what their thoughts
15  were and my effort to persuade them to agree to file
16  something on behalf of the Department.  We were finally
17  informed, sometime shortly before the E-mail that I
18  sent to Glenn Jackson in the middle of May, that they
19  weren't going to do that.  And I made my suggestion to
20  him as to how we ought to -- advice -- however you want
21  to phrase it.
22     Q.  Sure.  Sure.
23        Now, I received approximately 1200 pages of
24  documents, and I don't know if I received the records

Page 19

1  of training -- the training manual from the records
2  office -- but is it your understanding that the process
3  that you just told me about is a process that is
4  written down somewhere in the training manual?
5     A.  Part of it.  My understanding is the part that
6  would involve the records office, or certainly the
7  local employees of the records office, is in the
8  manual; that is, if you get an irregular order, an
9  order that doesn't include an MSR term or that says
10  that there's to be no -- we love our acronyms; it
11  stands for mandatory supervised release -- that there's
12  to be no MSR term, then they're to alert, again, as I
13  recall, either Mr. Jackson or his assistant chief
14  records officer.
15     Q.  And then as far as what happens after that,
16  discussing it with you and discussing with the Attorney
17  General's office, is that any form of written policy?
18     A.  I don't think so.  I think that's just been
19  the practice.  Certainly it had been for the five years
20  that I had been the Chief Legal Counsel up to that
21  point.
22     Q.  Is there anything written on how long this
23  procedure can go?  I mean, could this have gone on for
24  six or eight or twelve months?  Or is there a policy as

Page 20

1  to we've got to make a determination in 120 days or
2  something like that?
3     A.  There's no definite end period of time that
4  I'm aware of.
5     Q.  The order -- was it your opinion that the
6  order -- the February 18th orders with specific
7  language allowing for the release of Mr. Armato without
8  a term of mandatory supervised release -- did that
9  violate state law, that language?
10     A.  It's contrary to state law, yes.
11     Q.  And the state law being that every felon must
12  have a period of mandatory supervised release?
13     A.  The sentence is to include as though written
14  therein, I think, a term of mandatory supervised
15  release; that's in the Illinois Sentencing Code.
16     Q.  There's no exceptions?
17     A.  Well, it says, "shall."  I will leave it to
18  the Illinois Supreme Court to tell us what "shall"
19  means in those circumstances, but I don't believe there
20  are any exceptions.
21     Q.  And he was released based upon the language
22  contained in this order, ultimately?
23     A.  He was.  And I guess I left out -- and I
24  apologize for doing that -- that I was describing for

Huntley

Page 21

1  you the process that we go through, and that
2  was -- that was one of the results of that process;
3  that is, you know, if the State's Attorney says to us
4  when he or she's contacted, "Look it was a mistake.
5  We'll go back and get this corrected." They get a
6  corrected order. It ends there, obviously.
7      If they say, as they did in this instance,
8  "No, that was really what everyone intended," then we
9  move on to the next step. If the Attorney General says
10  "yes," we'll go to court and we'll ask the judge to
11  modify the order, or depending, again, upon what it
12  says here, it would have been modified, but if it says
13  something different it could be vacated. If they go to
14  court and the decision -- well, I am sorry. Let me
15  finish. If they don't go to court, then, you know, the
16  end of our process would be okay, we have exhausted the
17  options that are available to us to challenge the court
18  order. Our position at that point was we will abide by
19  the order. It doesn't change our opinion of the order,
20  but we will abide by it. Obviously if the AG goes to
21  court and the judge agrees to modify the order then
22  we're pleased with that result.
23      Q.  Right. Right. During this process, and I'll
24  just say during this time period -- when I say that,

Page 22

1  I'm referring to February 18th of 2010 to May 21st,
2  2010. Were you ever made aware of when Mr. Armato's
3  out-date was? I mean, did you have an understanding,
4  well, we have got time, this guys not going to be let
5  out, or did you have an understanding he should be out,
6  we have got to move this?
7      A.  At some point, probably fairly early on -- and
8  I don't know, it may even be captured in the E-mail
9  exchange -- I recall that, you know, with this -- with
10  other information that was contained in the order that
11  we recalculated an out-date. And my recollection is it
12  preceded February 18th or whatever the -- February 18th
13  by about 6 months.
14      Q.  Thankfully with your answers we are going to
15  go the short route instead of the long route.
16      Is this the first time you have ever come
17  across a court order saying no MSR?
18      A.  No.
19      Q.  And what have you done in the past?
20      A.  Followed the same process that I described for
21  you earlier.
22      Q.  In any of those cases has the Attorney General
23  chosen to go in and attempt to modify the order?
24      A.  I believe so, but understand that there --

Page 23

1  when I say that, it -- there are many different sorts
2  of out-of-the-ordinary orders, or many conditions that
3  could be in an order that we would find unusual. You
4  know, your idea was so you are required to allow this
5  inmate to serve his sentence at X prison. You're
6  ordered to do any number of different things --
7      Q.  Mm-huh.
8      A.  -- and so it's sometimes difficult for me to
9  distinguish the varying conditions in the order that we
10  were going to court on to ask that they be modified.
11      I can tell you in general that the Attorney
12  General has gone to court a number of times and
13  successfully gotten judges to change conditions of the
14  order. I don't have a specific recollection as to
15  whether any of those was in a case in which a judge had
16  ordered that somebody serve no MSR term.
17      Q.  And, believe me, I -- I understand the
18  reasoning behind what we're talking about, so don't
19  take offense with some of these questions, but is
20  there -- I understand the process you've described to
21  me, but is there legal authority that allows the
22  Illinois Department of Corrections to hold a prisoner
23  beyond its out-date when there is a concern about the
24  order? I understand your process, and the manual, and

Page 24

1  then after that your process, but is there any legal
2  authority that allows for that?
3      A.  You know, I have not had occasion to research
4  the issue of void court orders. I would say I think
5  that if -- if I had felt we weren't on sound legal
6  footing doing what we doing, that I would not have
7  suggested that we engage in that process, but... I
8  think this may be the first instance in which that
9  question has come up, at least that I can recall right
10  now.
11      Q.  Did you ever speak with Michele Littlejohn
12  regarding this issue?
13      A.  I don't think so. It's possible that I did,
14  but I don't recall talking with Michelle directly.
15      Q.  How about Gordon Grounds?
16      A.  No.
17      Q.  Have you ever spoken to David Armato?
18      A.  No, not to my knowledge.
19      Q.  Would it be fair to say the
20  only -- well -- strike that.
21      From the E-mails, apparently you spoke with
22  Glenn Jackson directly about it?
23      A.  Yes.
24      Q.  Anyone else from his office?

Page 25

1    A.  No, not that I recall.
2    Q.  Who did you deal with at the Attorney
3  General's office?
4    A.  Kevin Lovellette.  L-o-v-e-l-l-e-t-t-e.
5    Q.  Who is he?
6    A.  He's the supervisor of the Prisoner Litigation
7  Unit in the Attorney General's office in Chicago.
8    Q.  And did he ultimately call you and tell you,
9  "We're not going to pursue modification or
10  intervention?"
11    A.  He did tell me that over the phone, whether
12  Kevin called me or I called him, I don't recall.  He
13  and I are frequently on the phone with one another.
14    Q.  When you were the Chief Legal Counsel, were
15  you the top of the food chain -- you know, top of the
16  corporate structure in the Law Department?
17    A.  Yes.
18    Q.  And as your position today as Supervisor of
19  Litigation, is Chief Legal Counsel your superior?
20    A.  Yes, he is my supervisor, yes.
21    MR. DeCARO:  Can we take a break for just two
22  minutes.  I will be right back.
23    THE WITNESS:  Of course.
24    (Whereupon a recess was taken.)

Page 26

1    MR. DeCARO:  So we will go back on the record.
2  It just struck me.
3  BY MR. DeCARO:
4    Q.  So in your position today, are you the one
5  determining how to deal with this case and the civil
6  situation?
7    A.  The Attorney General, I think, is determining
8  how to -- how to deal with it.
9    Q.  Did -- during the time period you were talking
10  about, did any Illinois Department of Correction
11  departments, other than the Legal Department, report to
12  you directly?
13    A.  Yes.
14    Q.  Who were they?
15    A.  Well, as I said earlier, there were -- you
16  know, and I can't recall what Glenn Jackson's reporting
17  structure was at this point in time.  The Office Of
18  Inmate Issues had reported again to the Chief Legal
19  Counsel at one point or another.  You have to
20  understand that changes were being made in reporting
21  structures with the coming on board of a new director
22  in June of 2009.  So it's a little bit difficult to
23  remember exactly when things changed.  You may have
24  noticed that the position description, I think, is

Page 27

1  dated early August of '09, so that had even been
2  changed for the Chief Legal Counsel.
3    The one that I -- my recollection is
4  throughout the time I had served as Chief Legal
5  reported to me -- the other unit, that is -- was the
6  Sex Offender Unit.
7    Q.  If there is -- if there wasn't a dispute with
8  an order or a mittimus or an out-date with a prisoner
9  during the time period we've been talking about, Glenn
10  Jackson could make those decisions whether to release a
11  prisoner or not without consulting with you?
12    A.  Sure.  We release 20,000 inmates a year,
13  approximately.  And, actually, the records office
14  that's in those facilities would be making those
15  determinations, unless there was, again, something
16  irregular to their way of viewing it that would cause
17  them to bring it to his attention.
18    Q.  Again, I don't want to belabor the point, but
19  could Glenn have made the decision -- Mr. Jackson made
20  the decision to proceed with this matter without
21  consulting with you?
22    A.  I'm sure he could have.  Obviously, he chose
23  not to.  I wouldn't have known about the situation
24  unless he brought it to my attention.

Page 28

1    Q.  Right.
2    A.  He wouldn't have known about it unless
3  Michelle had brought it to his attention.  But they
4  both did exactly what they should have done, to my way
5  of thinking, in terms of bringing an unusual situation
6  to somebody higher up in the chain of command.
7    (Whereupon, Huntley Group
8    Exhibit D was marked for
9    identification.)
10    Q.  Let's just look at the E-mails.  I have marked
11  them as Huntley Group Exhibit D.
12    These are a group of E-mails which I have
13  taken out of Grounds Group Exhibit 2, which consisted
14  of hundreds of pages, and I have highlighted for you,
15  starting on February 22nd, E-mails that you either
16  received or sent.  If you want to just take a minute to
17  look through these, and let me know your recollection
18  of receiving these and sending these E-mails.
19    A.  I have looked at them.
20    Q.  Do you -- I mean, I don't know if
21  these are -- if these E-mails exhaust all of the
22  E-mails that you would have been involved with or sent
23  or received during this time period.  I only found,
24  going through these records, these E-mails, which were:

Page 29

1  February 22nd, 2010, E-mail from Glenn Jackson to you
2  and Joel Diers, D-i-e-r-s, at 4:11 p.m., and that's
3  Bates-stamped 01119.  And then there's some other
4  E-mails that I found.  February 22nd, 2010, there are
5  several E-mails Bates-stamped 01123; a February 23rd
6  E-mail from Glenn Jackson to you, which is
7  Bates-stamped 01118.  Then there's a little break in
8  the E-mails.  The next E-mail I found was March 5th
9  from Glenn Jackson to you -- strike that -- strike
10  that.
11      There was a February 26th, 2010, 10:02 a.m.
12  E-mail from Glenn Jackson to Michelle Littlejohn where
13  she cc'd you and Mr. Diers.  That's at Bates stamp
14  01112.  Then there's that March 5th E-mail on that same
15  Bates-stamped page.  There's a March 12th E-mail from
16  Glenn Jackson to you on Bates stamp 01109.  An
17  April 2nd, 2010, E-mail from Glenn Jackson to you on
18  Bates stamp 01101.  An April 8th E-mail from Glenn
19  Jackson to you and Mr. Diers, Bates-stamped 01097.
20  Then there's a April 27th, 2010, E-mail from
21  Mr. Jackson -- strike that.  There's an April 26, 2010,
22  E-mail from you to Mr. Jackson, at Bates stamp 01076,
23  and then a return E-mail it looks like on April 27th,
24  from Mr. Jackson to you -- same Bates stamp.

Page 30

1  April 29th an E-mail from Glenn Jackson to you and
2  Mr. Diers at the Bates stamp 01059.  And then I have
3  got a May 21, 2010, E-mail from Mr. Jackson to
4  you -- May 21, 2010, 11:31 a.m., at Bates stamp 01064.
5  And, then, finally, May 21, 2010, an E-mail from you to
6  Mr. Jackson at Bates stamp 01070.
7      This might be a bad question, but do those
8  appear to be all of the E-mails you think you were
9  involved in?
10     A.  I have no idea.
11     Q.  Do you recall getting E-mails from Mr. Jackson
12  during this time period?
13     A.  Absolutely.
14     Q.  And you recall E-mailing him some responses?
15     A.  Yes, I do.
16     Q.  Let's look at the last E-mail, the May 21,
17  2010, which is the last page there.  And I would just
18  like you to explain your thoughts here.
19      The second to the last line before the,
20  "thanks."
21      "I suppose we should show it as a
22  court-ordered discharge, as that is exactly what it
23  is."
24      What do you mean by that?  What does that

Page 31

1  mean?
2      A.  We have a computer system -- it's called the
3  offender tracking system known, of course, by its
4  initials OTS, and it's my understanding that that is a
5  description acceptable to OTS as to why someone was
6  discharged; that is, by court order.
7      Q.  Okay.
8      A.  And that was just a comment to Glenn, not that
9  he had asked the question even, and not that he
10  wouldn't have known, because he would.  I guess I was
11  just thinking out loud.  "I suppose we should show it
12  as a court-ordered discharge as that's exactly what it
13  is."
14     Q.  Okay.
15     A.  And that's my recollection that that's how it
16  was entered into the system.
17     Q.  And here in this E-mail you are advising him
18  that the Attorney General's office has declined to
19  pursue either modifying the order or moving for leave
20  to intervene on behalf of the Department of
21  Corrections; correct?
22     A.  Right.
23     Q.  And that's what he was waiting on for that
24  type of decision before he decided whether to release

Page 32

1  Mr. Armato?
2      A.  Well, again, I can't tell you what Glenn was
3  waiting for.  I can't get inside his head and tell you
4  that.  You know, I -- the next sentence, I think,
5  indicates what I thought ought to happen, whether you
6  want to view that as advice or direction.  How Glenn
7  took it, I don't know.  But as I say here, "We have
8  exhausted the potential alternatives."  We had reached
9  the end in our process and without having a
10  favorable -- I don't want to say decision -- but we had
11  nowhere else to go, I don't think, other than to either
12  keep him or let him go.  And as I described the process
13  to you earlier, when all of the alternatives are
14  exhausted without any favorable action to our way of
15  thinking, then we're going to obey the judge's order.
16     Q.  Let me ask you this:  What would have
17  been -- strike that.
18      How would Mr. Armato have been released
19  differently if the order provided for MSR, as opposed
20  to when it provides for no MSR?  And where I'm going
21  with that is, was there ever an alternative of
22  releasing him while you decided on what to do with
23  these orders?  Was that an option?
24     A.  In fact, on paper he was released -- not

Huntley

Page 33

1   physically -- but on paper.  The problem with his
2   release to MSR, is that as a sex offender required to
3   register as a sex offender, he has to have electronic
4   monitoring.  And in order to have electronic monitoring
5   he has to have an acceptable host-site that can
6   maintain the electronic monitoring.  And it's my
7   understanding that he didn't, and, hence, we went
8   through the process of what variously is referred to
9   as, you know, "violation at the door" or "cyclical
10  incarceration" or "turnaround," whatever phrase you
11  want to use for it.  But there was a parole violation
12  report written and a warrant issued, and he was kept in
13  our custody.
14          The goal here, obviously, was to have
15  Mr. Armato serve a term of mandatory supervised
16  release.  I am told by those who know much more than I
17  do, that if there's a group that can benefit from the
18  supervision that's provided during a parole term more
19  than any other group in general, it's sex offenders.
20  And, you know, one of the -- one of the missions, if
21  you will, of the Department is to protect the public.
22  Obviously, one of the groups of people we want to
23  protect the public from is sex offenders, so we wanted
24  him serving a term of mandatory supervised release to

Page 34

1   assist in reintegrating him into free society.
2       Q.   That's something I didn't know.  I thought
3   from the prior deps and from these E-mails that
4   he -- he -- his sex offenses had been discharged
5   somehow and he didn't have to have an ankle bracelet or
6   things like that.  And I got some of that from the
7   first page of the E-mails where Alyssa Williams-Schafer
8   was looking into that, and I thought that they had been
9   discharged and did not run concurrently or --
10  consecutively or concurrently with the other offense or
11  parole term?
12      A.   Her reference was to offenses that might have
13  made him eligible for review and referral as a sexually
14  violent person for commitment -- civil commitment -- as
15  a sexually violent person.  That's something separate
16  and apart from the fact that he still has, I believe,
17  an obligation to register as a sex offender.  And, you
18  know, prior to the release of a person with an
19  obligation to register as a sex offender, the Prisoner
20  Review Board in my experience orders that they be
21  electronically monitored.  And, again, as I said a
22  minute ago, to be electronically monitored you have to
23  have a host-site that can support that electronic
24  monitoring, and it is and was my understanding that he

Page 35

1   didn't have a host-site of that nature.
2       Q.   If he is released with no MSR and is a prior
3   sex offender, do you still have to have the host-site?
4       A.   No we -- that would be a condition --
5       Q.   I am sorry.
6       A.   -- ordered by the Prisoner Revie Board of his
7   mandatory supervised release term.  So if he had no
8   mandatory supervised release term, there would be no
9   one to have put him on electronic monitoring.
10      Q.   And when he was released, he wasn't put on
11  electronic monitoring as far as you know, because he
12  wouldn't have to?
13      A.   I don't believe he was.
14      Q.   But he still has to register as a sex
15  offender?
16      A.   That's a separate legal obligation that he
17  has, yes, based upon his earlier convictions.
18      Q.   All right.  A few more.
19          Was there anything while your Department and
20  the Attorney General's Department was determining what
21  to do in this situation, was there anything Mr. Armato
22  could have done through the grievance procedure to gain
23  his release?
24      A.   Not through the grievance procedure, but if

Page 36

1   he'd had a host-site, I believe would have been release
2   on MSR.
3       Q.   What -- when you say host-site, is that a
4   home?
5       A.   A place to go.  It could be a private home.
6   It could be a group home, yes.
7       Q.   So if he had that, you would have perhaps
8   released him with MSR, while you were determining what
9   to do?
10      A.   Yes, I believe that to be the case.
11      Q.   We didn't look at Exhibit A., which was the
12  notice of dep with the rider.  I believe we looked at B,
13  C, D and E.
14          MR. DeCARO:  And that's all I have.  Thank
15  you.
16          MR. FANNING:  No questions.
17          MR. DeCARO:  Thank you.
18          MR. FANNING:  We're going to reserve.  Is that
19  all right with you?
20          THE WITNESS:  Yes.  Meaning no offense.
21          (Whereupon, the proceedings
22              concluded at 2:40 p.m.)
23
24

Huntley

Page 37

```
1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3
4    DAVID ARMATO,
5         Plaintiff,
6       vs.            No. 11 CV 3023
7    RANDY GROUNDS, MICHELE LITTLEJOHN,
     GLENN JACKSON, and DION DIXON,
8    all in their individual capacities,
9         Defendants.
10
11
12        I, EDWARD W. HUNTLEY, being first administered an
13   oath, say that I am the deponent in the aforesaid
14   deposition taken on September 24, 2012; that I have
15   read the foregoing transcript of my deposition, and
16   affix my signature to same.
17
18   _____
19              EDWARD W. HUNTLEY
20
     Subscribed and sworn to
21   before me this ____ day
     of _____, 2012.
22
23
24   _____
     Notary Public
```

Page 38

```
1    STATE OF ILLINOIS
          SS:
2    COUNTY OF COOK
3        I, Kristin M. Ashenhurst, a Certified
4    Shorthand Reporter within and for the State of
5    Illinois, do hereby certify that heretofore, to-wit, on
6    September 24, 2012, personally appeared before me,
7    at 3000 Montvale Drive, Springfield, Illinois,
8    EDWARD W. HUNTLEY, in a cause now pending and
9    undetermined in the United States District Court,
10   Northern District of Illinois, Eastern Division,
11   wherein DAVID ARMATO is the Plaintiff, and RANDY
12   GROUNDS, MICHELLE LITTLEJOHN, GLENN JACKSON, and DION
13   DIXON, are the Defendants.
14       I further certify that the said
15   EDWARD W. HUNTLEY was first administered an oath to
16   testify the truth, the whole truth and nothing
17   but the truth in the cause aforesaid; that the
18   testimony then given by said witness was
19   reported stenographically by me in the presence
20   of the said witness, and afterwards reduced to
21   typewriting by Computer-Aided Transcription, and
22   the foregoing is a true and correct transcript
23   of the testimony so given by said witness as
24   aforesaid.
```

Page 39

```
1        I further certify that the signature to
2    the foregoing deposition was reserved by
3    the witness and that there were present at the
4    deposition the attorneys hereinbefore mentioned.
5        I further certify that I am not counsel
6    for nor in any way related to the parties to
7    this suit, nor am I in any way interested in the
8    outcome thereof.
9        IN TESTIMONY WHEREOF:  I certify to the
10   above facts this 1st day of October, 2012.
11
12
13
14
15
16   Kristin M. Ashenhurst, CSR, RDR
17   LICENSE NO.: 084-002090
18
19
20
21
22
23
24
```

DX 10/4/12
ORIGINAL

David Armato

vs.

Grounds, Littlejohn, Jackson & Dixon

Deponent:   Edward Huntley
Date:   September 24, 2012

# Exhibits Only

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

FEB 18 2010

PEOPLE OF THE STATE OF ILLINOIS )
)
vs. ) Case No. 05CF1661
)
David Armato N91995 )
)
Defendant )

Date of Sentence March 6, 2006
Date of Birth 04/03/65
_____ (Defendant)
Year of Birth _____
_____ (Victim)

_(signature)_ CIRCUIT CLERK

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | MSR |
|-------|-----------------|-------------------|----------|-------|----------|-----|
| 1 | 05/07/05 | Theft | 720 5/16-1-(a)(1)(A) | 3 | 10 Yrs __ Mo __ Yr | |

and said sentence shall run (☒ concurrent with)(☐ consecutive to) the sentence imposed on: _____ 05CF5015 _____

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ ___Yrs ___Mo ___Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ ___Yrs ___Mo ___Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ ___Yrs ___Mo ___Yr

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a **Class X** offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☒ The Court finds that the defendant is entitled to receive credit for time actually served in custody from _____373 days_____ [specify date(s)] to _____ from _____ to _____ from _____ to _____ .

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the **impact incarceration** program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program. Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve   ☐ 75%   ☐ 85%   ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☒ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☒ IT IS FURTHER ORDERED that With credit for 373 days served in the Lake County Jail - credit for time awaiting transport to the Department of Corrections - good time credit as administered by the Department of Corrections - def to be released from the Department of Corrections without a term of Mandatory Supervised Release.

This order is (☒ effective immediately) (☐ stayed until _____ ).

DATE: February 18, 2010

ENTER: _(signature)_

Theodore S. Potkonjak
(PLEASE PRINT JUDGE'S NAME HERE)

Form approved by the Conference of Chief Judges
Effective January 18, 2008

Δ π EXHIBIT _B_
Deponent _Huntley_
Date _9/24/12_ Rptr. _LMA_
WWW.DEPOBOOK.COM

171-39C4 (R01/08)

000785

IN THE ___ IT COURT OF THE NINETEENTH ___ CIAL CIRCUIT
LAKE COUNTY, ILLINOIS

N91995

PEOPLE OF THE STATE OF ILLINOIS )
)
vs. )
) Case No. 05CF5015
David  Armato N91995 )
)
Defendant )

FEB 18 2010

Date of Sentence March 6, 2006
Date of Birth 04/03/65
(Defendant)
_____ ar of Birth _____
(Victim)

CIRCUIT CLERK

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above - named defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | DATE OF OFFENSE | STATUTORY OFFENSE | CITATION | CLASS | SENTENCE | MSR |
|---|---|---|---|---|---|---|
| 1 | 12/30/05 | Theft | 720 5/16-1(a)(1)(A) | 3 | 10 Yrs __ Mo | __ Yr |

and said sentence shall run (☑ concurrent with)(☐ consecutive to) the sentence imposed on: _____ 05CF1661 ____.

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ ___Yrs __Mo __Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ ___Yrs __Mo __Yr

and said sentence shall run (☐ concurrent with)(☐ consecutive to) the sentence imposed on: _____ ___Yrs __Mo __Yr

The Court finds that the defendant is:

☐ Convicted of a class _____ offense but sentenced as a **Class X** offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☑ The Court finds that the defendant is entitled to receive credit for time actually served in custody from ___ 373 days ___ [specify date(s)] to _____ from _____ to _____ from _____ to _____.

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great **bodily harm** to the victim. (730 ILCS 5/3-6-3(a)(2)(iii)).

☐ The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the Impact **Incarceration** program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program.  Written consent is attached.

☐ The Court further finds that offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐ IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (☐ concurrent with) (☐ consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

☐ IT IS FURTHER ORDERED that the defendant serve   ☐ 75%   ☐ 85%   ☐ 100% of said sentence.
IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☑ IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

☑ IT IS FURTHER ORDERED that With credit for 373 days served in the Lake County Jail - credit for time awaiting transport to the Department of Corrections - good time credit as administered by the Department of Corrections - def to be released from the Department of Corrections without a term of Mandatory Supervised Release.

This order is (☑ effective immediately) (☐ stayed until _____).

DATE: February 18, 2010 _____

ENTER: _____

Theodore S. Potkonjak
(PLEASE PRINT JUDGE'S NAME HERE)

Form approved by the Conference of Chief Judges
Effective January 18, 2008


Δ π EXHIBIT C
Deponent Huntley
Date 9/24/12 Rptr K.W.S.
WWW.DEPOBOOK.COM

171-39C4 (R01/08)

000786

**Sent:** Monday, February 22, 2010 4:14 PM
**To:** Jackson, Glenn; Diers, Joel M.; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato

The SVP offenses have discharged and did not run consecutively or concurrently with another offense or parole term.

```
Alyssa Williams-Schafer
Coordinator for Sex Offender Services
Illinois Department of Corrections
1301 Concordia Court
Springfield, IL  62794
217) 558-2200 ext. 6512
```

---

**From:** Jackson, Glenn
**Sent:** Monday, February 22, 2010 4:11 PM
**To:** Diers, Joel M.; Huntley, Edward
**Cc:** Williams-Schafer, Alyssa
**Subject:** FW: Possible Release N91995 David Armato
**Importance:** High

Ed/Joel,

I think this is one we need to have a look at before discharging. Our record office just received the order today. Alyssa, please check to see if eligible for SVP review. He has two prior offenses for Agg Crim Asslt. I have a fax copy of the order for your review. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Monday, February 22, 2010 2:13 PM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato
**Importance:** High

Update:  I talked with ASA Eric Kalata.  He said it was the intent of the court.  The judge said there was no mention of an msr term given to him previously so there will be no msr term and they were not clear on the days served so they gave him all of this credit.  The judge didn't want him to appeal the case and then have to go through it all over again per ASA. Is it okay to release him as a discharge – he is sex offender registry?  Should we wait until tomorrow?  He is still at NRC after his writ.  Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Monday, February 22, 2010 12:33 PM
**To:** Jackson, Glenn
**Subject:** Possible Release N91995 David Armato
**Importance:** High

2

Δ π  GROUP
EXHIBIT  D
Deponent Huntley
Date 9/4/12 Rptr. KniA
WWW.DEPOBOOK.COM

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Monday, February 22, 2010 4:33 PM |
| **To:** | Diers, Joel M.; Williams-Schafer, Alyssa; Huntley, Edward |
| **Subject:** | RE: Possible Release N91995 David Armato |

**Importance:** High

After speaking with Ken Tupy, PRB Legal, he thinks this case should be challenged too. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

**From:** Diers, Joel M.
**Sent:** Monday, February 22, 2010 4:19 PM
**To:** Williams-Schafer, Alyssa; Jackson, Glenn; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato

Glenn,

The Court in my opinion cannot legally sentence this offender without a term of MSR. Unless we challenge the Order through the AG's office I think we are bound to follow the Order.

Thanks

Joel M. Diers
Legal Services
Concordia
217-558-2200, x 4110

**From:** Williams-Schafer, Alyssa
**Sent:** Monday, February 22, 2010 4:14 PM
**To:** Jackson, Glenn; Diers, Joel M.; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato

The SVP offenses have discharged and did not run consecutively or concurrently with another offense or parole term.

Alyssa Williams-Schafer
Coordinator for Sex Offender Services
Illinois Department of Corrections
1301 Concordia Court
Springfield, IL  62794
217) 558-2200 ext. 6512

**From:** Jackson, Glenn
**Sent:** Monday, February 22, 2010 4:11 PM
**To:** Diers, Joel M.; Huntley, Edward
**Cc:** Williams-Schafer, Alyssa
**Subject:** FW: Possible Release N91995 David Armato
**Importance:** High

1

: 01123

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Tuesday, February 23, 2010 9:47 AM |
| **To:** | Huntley, Edward |
| **Subject:** | FW: Possible Release N91995 David Armato |

**Importance:** High

Mr. Huntley,

The below offender is to be released today. I need directions as to msr him or discharge per the mittimus. If your directions are to msr him, he will be a VAD, since he has no host site. If we follow the order, he will discharge today. Your prompt response to this matter would be greatly appreciated. He is not SVP eligible, but he is a sex offender. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Jackson, Glenn
**Sent:** Monday, February 22, 2010 4:33 PM
**To:** Diers, Joel M.; Williams-Schafer, Alyssa; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato
**Importance:** High

After speaking with Ken Tupy, PRB Legal, he thinks this case should be challenged too. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Diers, Joel M.
**Sent:** Monday, February 22, 2010 4:19 PM
**To:** Williams-Schafer, Alyssa; Jackson, Glenn; Huntley, Edward
**Subject:** RE: Possible Release N91995 David Armato

Glenn,

The Court in my opinion cannot legally sentence this offender without a term of MSR. Unless we challenge the Order through the AG's office I think we are bound to follow the Order.

Thanks

Joel M. Diers
Legal Services
Concordia
217-558-2200, x 4110

---

**From:** Williams-Schafer, Alyssa

1

: Ø1118

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Friday, March 05, 2010 9:12 AM |
| **To:** | Huntley, Edward |
| **Cc:** | Diers, Joel M. |
| **Subject:** | FW: Possible Release N91995 David Armato |

Mr. Huntley,

This is the case I called, emailed and provided you the mittimus on. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, March 05, 2010 8:48 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Hi Glenn:

Just a reminder on this - Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

---

**From:** Jackson, Glenn
**Sent:** Friday, February 26, 2010 10:02 AM
**To:** Littlejohn, Michele
**Cc:** Huntley, Edward; Diers, Joel M.
**Subject:** RE: Possible Release N91995 David Armato
**Importance:** High

M,

I am still waiting for a response from legal. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, February 26, 2010 9:47 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

1

: 01112

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Friday, March 12, 2010 8:42 AM |
| **To:** | Huntley, Edward |
| **Cc:** | Diers, Joel M. |
| **Subject:** | FW: Possible Release N91995 David Armato |

Mr. Huntley,

This is the case I called and emailed you on. As mentioned before, Joel and Ken (PRB) suggested that the case be referred to the AG's office. Please let me how you wish for us to proceed. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, March 12, 2010 8:05 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Just checking on this one again.  Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Friday, March 05, 2010 8:48 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Hi Glenn:

Just a reminder on this - Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Jackson, Glenn
**Sent:** Friday, February 26, 2010 10:02 AM
**To:** Littlejohn, Michele
**Cc:** Huntley, Edward; Diers, Joel M.
**Subject:** RE: Possible Release N91995 David Armato
**Importance:** High

M,

1

: 01109

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Friday, April 02, 2010 11:22 AM |
| **To:** | Huntley, Edward |
| **Cc:** | Rose, Joseph W.; Diers, Joel M. |
| **Subject:** | FW: Possible Release N91995 David Armato |

Mr. Huntley,

Offender Armato is scheduled to be heard by the PRB on April 7. This is the case where the judge ordered no msr term and you referred it to the AG's Office. The PRB could decline to here his case because he has no msr. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, April 02, 2010 8:04 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Just a reminder.  Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Friday, March 26, 2010 8:07 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Also on this, the Prisoner Review Board will be seeing him on his violation on April 7 when they are here.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Jackson, Glenn
**Sent:** Friday, March 19, 2010 10:00 AM
**To:** Littlejohn, Michele
**Subject:** RE: Possible Release N91995 David Armato

The AG's Office has been contacted and we are waiting for a response. Thanks

Glenn M. Jackson
Chief Record Officer

1

: 01101

## Fanning, Robert

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Thursday, April 08, 2010 8:44 AM |
| **To:** | Huntley, Edward; Diers, Joel M. |
| **Cc:** | Rose, Joseph W. |
| **Subject:** | FW: Possible Release N91995 David Armato |

FYI

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

**From:** Littlejohn, Michele
**Sent:** Thursday, April 08, 2010 8:36 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Just a reminder on this.  The PRB heard him this week.  Mr. Altoff called me about his situation while he was hearing him.  He then called the PRB's attorney to see what to do.  The PRB said to find him not a violator and let DOC handle it but that they thought Armato had a lawsuit.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

**From:** Littlejohn, Michele
**Sent:** Friday, April 02, 2010 8:04 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Just a reminder.  Thanks

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

**From:** Littlejohn, Michele
**Sent:** Friday, March 26, 2010 8:07 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Also on this, the Prisoner Review Board will be seeing him on his violation on April 7 when they are here.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone: 618-546-5659

1

: 01097

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Tuesday, April 27, 2010 9:09 AM |
| **To:** | Huntley, Edward |
| **Subject:** | RE: Possible Release N91995 David Armato |

Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

-----Original Message-----
From: Huntley, Edward
Sent: Monday, April 26, 2010 9:49 AM
To: Jackson, Glenn
Subject: RE: Possible Release N91995 David Armato

Glenn, let me touch base with the AG again.  It has been a while since I have heard from them on this one.  I will keep you posted. Thanks.

Ed

-----Original Message-----
From: "Jackson, Glenn" <GLENN.JACKSON@doc.illinois.gov>
To: "Huntley, Edward" <EDWARD.HUNTLEY@doc.illinois.gov>; "Diers, Joel M." <JOEL.DIERS@doc.illinois.gov>
Cc: "Rose, Joseph W." <JOSEPH.W.ROSE@doc.illinois.gov>
Sent: 4/23/2010 11:08 AM
Subject: FW: Possible Release N91995 David Armato

Ed,

Has a decision been made on how to proceed with this situation? Michele is sending me weekly reminders dating back to February. Not to mention, she is documenting all her contacts in the master file. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

_____
From: Littlejohn, Michele
Sent: Friday, April 23, 2010 7:55 AM
To: Jackson, Glenn
Subject: FW: Possible Release N91995 David Armato

Is the AG's office still working on this one?  I know there will be a lawsuit coming on it.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center

1

: 01076

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Thursday, April 29, 2010 9:06 AM |
| **To:** | Huntley, Edward; Diers, Joel M. |
| **Cc:** | Rose, Joseph W. |
| **Subject:** | FW: Possible Release N91995 David Armato |
| **Importance:** | High |

*FYI*

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Thursday, April 29, 2010 8:06 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Just an update – we received the board order on him – found not a violator.  We will violate him at the door again today.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Jackson, Glenn
**Sent:** Friday, April 23, 2010 9:54 AM
**To:** Littlejohn, Michele
**Subject:** RE: Possible Release N91995 David Armato
**Importance:** High

Michele,

It's my understanding the AG's Office is reviewing the matter. I will contact you when I get a decision. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, April 23, 2010 7:55 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Is the AG's office still working on this one?  I know there will be a lawsuit coming on it.

Michele Littlejohn

1

: 01059

**Fanning, Robert**

| | |
|---|---|
| **From:** | Jackson, Glenn [GLENN.JACKSON@doc.illinois.gov] |
| **Sent:** | Friday, May 21, 2010 11:31 AM |
| **To:** | Huntley, Edward |
| **Cc:** | Rose, Joseph W.; Diers, Joel M. |
| **Subject:** | FW: Possible Release N91995 David Armato |

Mr. Huntley,

Has the AG's Office given you a decision on this case yet? This is dating back to February. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

**From:** Littlejohn, Michele
**Sent:** Friday, May 21, 2010 8:19 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Checking on this one

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

**From:** Littlejohn, Michele
**Sent:** Thursday, May 13, 2010 1:49 PM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

**From:** Littlejohn, Michele
**Sent:** Thursday, April 29, 2010 8:06 AM
**To:** Jackson, Glenn
**Subject:** RE: Possible Release N91995 David Armato

Just an update – we received the board order on him – found not a violator.  We will violate him at the door again today.

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

1

: 01064

**Fanning, Robert**

| | |
|---|---|
| **From:** | Huntley, Edward [EDWARD.HUNTLEY@doc.illinois.gov] |
| **Sent:** | Friday, May 21, 2010 12:05 PM |
| **To:** | Jackson, Glenn |
| **Cc:** | Rose, Joseph W.; Williams-Schafer, Alyssa; Diers, Joel M. |
| **Subject:** | RE: Possible Release N91995 David Armato |

Glenn, the AG's Office has declined to pursue a request to the court that the sentencing orders be modified or otherwise move for leave to intervene on behalf of the Department in this case. That being so, I believe we have exhausted the potential alternatives and will have to let Armato go as a discharge. I suppose we should show it as a court-ordered discharge as that is exactly what it is. Let me know if you need anything further. Thanks.

Ed

---

**From:** Jackson, Glenn
**Sent:** Friday, May 21, 2010 11:31 AM
**To:** Huntley, Edward
**Cc:** Rose, Joseph W.; Diers, Joel M.
**Subject:** FW: Possible Release N91995 David Armato

Mr. Huntley,

Has the AG's Office given you a decision on this case yet? This is dating back to February. Thanks

Glenn M. Jackson
Chief Record Officer
Concordia Court
(217) 558-2200 ext. 3020

---

**From:** Littlejohn, Michele
**Sent:** Friday, May 21, 2010 8:19 AM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Checking on this one

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center
Phone:  618-546-5659

---

**From:** Littlejohn, Michele
**Sent:** Thursday, May 13, 2010 1:49 PM
**To:** Jackson, Glenn
**Subject:** FW: Possible Release N91995 David Armato

Michele Littlejohn
Office Administrative Specialist
Robinson Correctional Center

1

: 01070



Illinois Department of
CENTRAL MANAGEMENT SERVICES

POSITION DESCRIPTION

| 1. POSITION TITLE | WORKING TITLE (IF ANY) | Bilingual Code | Position Title Option Code | 2. POSITION NUMBER |
|---|---|---|---|---|
| Existing Position | | | | |
| New/Revised Position **Senior Public Service Admin.** | Chief Legal Counsel | | 8L | 40070-29-00-700-00-01 |

| 3. AGENCY | 4. BUREAU/ DIVISION | 5. EXMT CODE | 6. WORK COUNTY | 7. An AUTH | 8.AUDIT | 9 OFFICE USE |
|---|---|---|---|---|---|---|
| Existing Position | Director's Office | | | | | |
| New/Revised Position **Corrections** | Legal Services | 3 | 084 | N | R | |

| 10. SECTION | 11. UNIT | 12. TRANSACTION CODE | 13. EFFECTIVE DATE |
|---|---|---|---|
| Existing Position | | | 8-1-09 |
| New/Revised Position **Administration** | | | |

☐ MA021  ESTABLISH
☐ MC022  EXEMPT CODE CHANGE
☐ MC024  POSITION NUMBER CHANGE
☒ MC026  CLARIFY
☐ MC027  ADDITIONAL IDENTICAL CHANGE
☐ MC028  WORK COUNTY CHANGE
☐ MD021  ABOLISH
☐ MC149  DOWNWARD REALLOCATION
☐ MC150  LATERAL REALLOCATION
☐ MC158  UPWARD REALLOCATION

| 14. WORK LOCATION | 15. BARGAINING/TERM CODE | Rutan Exempt |
|---|---|---|
| Existing Position | | Y |
| New/Revised Position **Sangamon County** | EX-000 | Y |

**16. COMPLETE, CURRENT AND ACCURATE STATEMENT OF POSITION ESSENTIAL FUNCTIONS**

| % OF TIME | |
|---|---|
| | Subject to management approval of the Assistant Director, plans, organizes and manages the Department of Corrections Legal Services Division; develops and implements policies and procedures; develops and maintains ongoing communications with private and public organizations, officials of other departments, legislature, State and Federal government; monitors activities of all Units; supervises staff. |
| 20% | 1. Plans, organizes, manages and supervises the Department's Legal Services Division; develops and implements policies and procedures; directs and supervises attorneys and paraprofessional staff; communicates with Judges, Attorneys, employees and legal groups; advises agency administrative officials on legal matters. |
| 15% | 2. Provides professional consultation and recommendations regarding State and Federal laws, Department policies, rules, regulations and procedures; provides advice regarding State and Federal legislation which would impact on the Department. |
| 15% | 3. Serves as legal representative for the Department at Ill. State Legislative hearings, inter-agency and intra-agency committees, Governor's Office, etc.; recommends legislative and policy changes; represents the Department in conferences with representatives of other government or private organizations. |
| 10% | 4. Serves as full line supervisor; assigns and reviews work; provides guidance and training to assigned staff; counsels staff regarding work performance; reassigns staff to meet day-to-day operating needs; establishes annual goals and objectives; approves time off; adjusts first level grievances; effectively recommends and imposes discipline, up to and including discharge; prepares and signs performance evaluations; determines and recommends staffing needs; reviews activity reports. |
| 10% | 5. Directs the research and drafting of proposed legislation, administrative rules and regulations, contracts, agreements and other legal documents for the Department. |
| 10% | 6. Coordinates staff engaged in processing and monitoring health and special litigation; serves as the Agency's Chief Ethics Officer. |

| DIRECTOR OF CMS SIGNATURE | IMMEDIATE SUPERVISOR SIGNATURE | AGENCY HEAD SIGNATURE | DATE |
|---|---|---|---|
| *[signature]* | *[signature]* | Michael P Rahl | 8-27-09 |

CMS-104 (Rev. 10/94) IL 401-0794

Δ π EXHIBIT E
Deponent Huntley
Date 9/24/12 Rptr. KMS
WWW.DEPOBOOK.COM

| % OF TIME | |
|---|---|
| 05% | 7. Serves as Chairperson of the Settlement Review Committee; reviews settlement offers, assessing litigation risks and making recommendations to the Director. |
| 05% | 8. Monitors the research and investigations of the Criminal Code Unit in their research functions gathering and reviewing Criminal Code information for the State of Illinois which impacts the Department of Corrections. |
| 05% | 9. Directs and monitors the activities of the Office of Inmate Issues, Sex Offender Services and Inmate Records; confirms inmate records are kept according to agency policy and procedures. |
| 05% | 10. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. |

17. POSITION TITLE AND NUMBER OF IMMEDIATE SUPERVISOR (Responsible for assigning and reviewing work, preparing, conducting and signing performance evaluations; effectively recommending and imposing disciplinary action and adjusting grievances for the incumbent of this position.)

Assistant Director

WORKING TITLE (IF ANY)

18. CHECK THE APPROPRIATE BOX IF THIS POSITION IS A:

☒ SUPERVISOR  OR  ☐ LEAD WORKER

NOTE:  Supervisory or lead worker responsibilities <u>must</u> be described in a detailed duty statement(s) with a time percentage(s) allotted.

If a box was checked above, list position title, position number, and number of subordinate incumbents or authorized funded headcount:

| Position Title | Position Number | No. of Incumbent or Funded Vacancies |
|---|---|---|
| Public Admin. Intern | 35700-29-00-700-00-01 | 1 |
| Administrative Assistant I | 00501-29-00-700-01-02 | |
| Administrative Assistant II | 00502-29-00-700-01-01 | 1 |
| Office Admin. Specialist | 29990-29-00-700-01-01 | 1 |
| Paralegal Assistant | 30860-29-00-700-01-01 | 1 |
| Executive Secretary II | 14032-29-00-700-05-01 | 1 |
| Senior Public Service Administrator | 40070-29-00-700-10-01 | 1 |
| Senior Public Service Administrator | 40070-29-00-700-20-01 | 1 |
| Senior Public Service Administrator | 40070-29-00-700-30-01 | 1 |
| Senior Public Service Administrator | 40070-29-00-700-40-01 | 1 |
| Public Service Administrator | 37015-29-00-720-00-01 | 1 |
| Public Service Administrator | 37015-29-00-730-00-01 | 1 |

19.  SPECIALIZED KNOWLEDGES, SKILLS, ABILITIES, LICENSURE OR CERTIFICATION NECESSARY FOR THE SUCCESSFUL PERFORMANCE OF THE WORK OF THIS POSITION.  NOTE: SINCE THERE ARE NOW SEVERAL OPTIONS OF SKILLS AND ABILITIES AND LICENSURE OR CERTIFICATION IDENTIFIED ON STANDARDS, THE PHRASE "SAME AS SPECIFICATION" CAN NO LONGER BE USED.

Requires licensure by the State of Illinois to practice law; requires five years professional experience in the practice of law; requires thorough knowledge of judicial and quasi-judicial procedures at all levels; requires thorough knowledge of common law, federal and State laws and regulations pertaining to the agency program; requires thorough knowledge of legal methods, practices and procedures in the assigned agency; requires working knowledge of principles of administration and management including organization, control and techniques used in dealing with management and procedural problems; requires working knowledge of Correctional and Civil Rights litigation.

Box 18 (Continued)
Public Service Administrator 37015-29-00-740-00-01   1



ILLINOIS DEPARTMENT OF
CENTRAL MANAGEMENT SERVICES

# POSITION DESCRIPTION

| 1. POSITION TITLE | WORKING TITLE (IF ANY) | BILINGUAL CODE | POSITION TITLE OPTION | 2. POSITION NUMBER | | | | |
|---|---|---|---|---|---|---|---|---|
| Existing Position | | | | | | | | |
| New / Revised Position Sr. Public Service Adm. | | | 8L | 40070-29-00-700-30-01 | | | | |
| **3. AGENCY** | **4. BUREAU / DIVISION** | | | 5.EXMT CODE | 6. WORK COUNT | 7 A/I AUTH | 8. AUDIT | 9. OFFICE USE |
| Existing Position | | | | | 099 | | | |
| New / Revised Position Corrections | Director's Office | | | 5 | 016 | N | R | |
| **10. SECTION** | **11. UNIT** | | | **12. TRANSACTION CODE** | | | **13. EFFECTIVE DATE** | |
| Existing Position | | | | | | | 03/01/2004 | |
| New / Revised Position Legal Services | Special Litigation | | | | | | | |

| 14. WORK LOCATION | 15. BARGAINING / TERM CODE | RUTAN EXEMP |
|---|---|---|
| Existing Position Will County | | |
| New / Revised Position Cook County | T A-000 | |

| | | |
|---|---|---|
| ☐ | MA021 | ESTABLISH |
| ☐ | MC022 | EXEMPT CODE CHANGE |
| ☐ | MC024 | POSITION NO. CHANGE |
| ☒ | MC026 | CLARIFY |
| ☐ | MC027 | ADDITIONAL IDENTICAL CHANGE |
| ☒ | MC028 | WORK COUNTY CHANGE |
| ☐ | MD021 | ABOLISH |
| ☐ | MC149 | DOWNLOAD REALLOCATION |
| ☐ | MC150 | LATERAL REALLOCATION |
| ☐ | MC158 | UPWARD REALLOCATION |

| % OF TIME | 16. COMPLETE, CURRENT AND ACCURATE STATEMENT OF POSITION ESSENTIAL FUNCTIONS |
|---|---|
| | Subject to administrative approval of the Chief Legal Counsel (Sr. Public Service Admin.), directs Public Service Administrators and Technical Advisors in legal activities; offers advice and consultation with affects policies and procedures; develops and implements policies and procedures; monitors legal work; supervises staff. |
| 25% | 1. Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands; effectively recommends grievance resolutions; completes and signs performance evaluations; establishes annual goals and objectives; counsels staff on problems with productivity, quality of work and conduct; determines staffing needs to achieve program objectives; reviews activity reports. |
| 20% | 2. Assesses litigations to determine their affect on security and operations within the department; provides reports and guidance to the Director and Associate Director on litigation impact on operational policies and procedures and methods for reducing litigation risk; develops and implements policies and procedures. |
| 15% | 3. Manages agency response and the conduct of complex or high exposure pieces of litigation including coordination of efforts as assigned counsel, agency personnel, retained consultants and experts. |
| 10% | 4. Monitors the implementation of departmental committees to develop consistent rules and policies on a variety of operational issues and develops procedures to manage litigation risk. |
| 10% | 5. Develops and directs a strategy for coordinating state/national lobbying efforts for issues regarding prison security, resources, litigation and various topics of concern to correctional systems. |
| 10% | 6. Serves on the Settlement Review Committee reviewing settlement offers assessing litigation risks on non-personnel related litigation and making recommendations to the Director. |
| 05% | 7. Coordinates activities of staff attorneys involved in general litigation on personnel and programmatic matters particularly as those matters affect operations and security; provides legal advice, consultation and guidance requiring extensive program and legal experience. |

| DIRECTOR OF CMS SIGNATURE | IMMEDIATE SUPERVISOR SIGNATURE | AGENCY HEAD SIGNATURE | DATE |
|---|---|---|---|
| | | | |

CMS–104 (Rev. 10/94)   IL 401–0794

**16. (CONTINUED)**

| % OF TIME | |
|---|---|
| 05% | 8. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. |

**17. POSITION TITLE AND NUMBER OF IMMEDIATE SUPERVISOR** (Responsible for assigning and reviewing work, preparing, conducting and signing performance evaluations; effectively recommending and imposing discipline and adjusting grievances for the incumbent of this position.)

Sr. Public Service Adm. 40070-29-00-700-00-01

**WORKING TITLE (IF ANY)**

Chief Legal Counsel

**18. CHECK THE APPROPRIATE BOX IF THIS POSITION IS A:**
☒ **SUPERVISOR**      OR      ☐ **LEAD WORKER**

> **NOTE:** Supervisory or lead worker responsibilities must be described in a detailed duty statement(s) with a time percentages(s) allotted

If a box was checked above, list position title, position number, and number of subordinate incumbents or authorized funded head count:

| Position Title | Position Number | No. of incumbents or Funded Vacancies |
|---|---|---|
| Technical Adv. I I | 45252-29-00-700-31-01 | 1 |
| Public Service Adm. | 37015-29-00-700-31-01 | 1 |
| Public Service Adm. | 37015-29-00-700-31-02 | 1 |
| Public Service Adm. | 37015-29-00-700-31-03 | 1 |
| | | |
| | | |
| | | |

**19. SPECIALIZED KNOWLEDGES, SKILLS, ABILITIES, LICENSURE OR CERTIFICATION NECESSARY FOR THE SUCCESSFUL PERFORMANCE OF THE WORK OF THIS POSITION. NOTE: SINCE THERE ARE NOW SEVERAL OPTIONS OF SKILLS AND ABILITIES AND LICENSURE OR CERTIFICATION IDENTIFIED ON STANDARDS, THE PHRASE "SAME AS SPECIFICATION" CAN NO LONGER BE USED.**

Requires licensure by the State of Illinois to practice law; requires four years professional experience in the practice of law; requires thorough knowledge of judicial and quasi-judicial procedure at all levels; requires thorough knowledge of common law, federal and State laws and regulations pertaining to the agency program; requires thorough knowledge of legal methods, practices and procedures in the assigned agency; requires working knowledge of principles of administration and management including organization, control and techniques used in dealing with management and procedural problems; requires working knowledge of Correctional and Civil Rights litigation.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
CENTRAL DIVISION

DAVID ARMATO,                         )
                                      )
          Plaintiff,                  )
                                      )
            -vs-                      ) NO. 11-CV-3023
                                      )
RANDY GROUNDS, MICHELE LITTLE-        )
JOHN, GLENN JACKSON and DION          )
DIXON, all in their individual        )
capacities,                           )
                                      )
          Defendants.                 )

DISCOVERY DEPOSITION OF RANDY GROUNDS
March 5, 2012

----------------------------------------------------
**Donna R. Maninfior, CSR, RPR**
**# 84-2991**
# MANINFIOR COURT REPORTING, P.C.
**Certified Shorthand Reporter**
**1612 Lafayette Avenue**
**P. O. Box 1036**
**Mattoon, IL 61938-1036**
**(217) 235-1127**



1                          STIPULATION

2

3          IT IS HEREBY STIPULATED AND AGREED by and

4    between the parties that the deposition of

5    **RANDY GROUNDS**, may be taken on March 5, 2012, at

6    the Robinson Correctional Center, 13423 E. 1150th

7    Avenue, Robinson, Illinois, pursuant to the Rules

8    of the Federal Court and the Rules of Federal

9    Procedure governing said depositions.

10

11         It is further stipulated that the

12   signature is waived.

13

14         It is further stipulated that the

15   necessity for calling the Court Reporter for

16   impeachment purposes is waived.

17

18

19

20

21

22

23

24

1    APPEARANCES:

2         DENNIS J. DeCARO
          Attorney at Law
3         Law Offices of Kupets & DeCaro, PC
          30 N. LaSalle Street, Suite 4020
4         Chicago, IL  60602
               On behalf of the Plaintiff.
5
          ROBERT FANNING
6         Assistant Attorney General
          500 S. Second Street
7         Springfield, IL  62706
               On behalf of the Defendants.
8

9

10

11

12

13

14

15                          INDEX

16   Examination by:                        Page

17        Mr. DeCaro                          4
          Mr. Fanning                        29
18

19   Exhibits:                               Page

20        Grounds Exhibit 1                   9
          Grounds Group Exhibit 2            12
21

22        (Grounds Exhibit 2 retained by counsel)

23

24

**RANDY GROUNDS,**

called as a witness herein, having been duly sworn

upon oath, testified as follows:

**DIRECT EXAMINATION**

BY:  **DENNIS J. DeCARO**

  Q Warden, would you, please, state your full

name and spell your last name for the record.

  A Randy E. Grounds, G-r-o-u-n-d-s.

  Q Warden, have you ever given a deposition

before?

  A Yes, sir.

  Q Okay, so just as a reminder, you and I

will try not to speak over one another.  It's

difficult for the court reporter to take us both

speaking, and also you need to answer everything

verbally.  If you nod or shrug, the court reporter

takes you down nodding or shrugging.  When we read

this a year later, we won't know what you meant, so

typically your attorney or I will say did you mean

yes or no.  If you have any questions, let me know

if you don't understand my question, let me know,

and I will rephrase it.

  A Okay.

  Q As you know, this is regarding the

1    incarceration of David Armato.

2         A    Yes, sir.

3         Q    Are you aware of that?

4         A    Yes, sir.

5         Q    Did you review anything before your

6    deposition today?  Did you have a chance to look at

7    his file?

8         A    No, sir.

9         Q    I know from your interrogatory answers you

10   stated that you didn't know about this situation

11   until you received a copy of the complaint.  Is

12   that still true?

13        A    That's correct.

14        Q    Okay, how long have you been the Warden

15   here at Robinson Correctional Center?

16        A    August of '09.

17        Q    Instead of me just asking you then what

18   did you do, what did you do, why don't you just

19   give me a brief background of your employment

20   leading up to Warden here at Robinson.

21        A    For 25 years I was the Wabash County

22   sheriff, and I came to Corrections in November of

23   '03.  I have served as Warden.  I have served as

24   Assistant Warden, Deputy Director, Chief of

1   Operations, and Operations Security Coordinator

2   prior to coming back here as Warden.

3        Q    Okay, can you give me sort of a brief

4   understanding of what you do day-to-day as a

5   Warden.  Go ahead now, and I will ask you some

6   specific questions.

7        A    Just basically oversee the day-to-day

8   operation of the facility.

9        Q    Okay, are you the person with the most

10  authority at the facility?

11       A    Yes.

12       Q    And if you could tell me, I get from the

13  discovery we have had so far and the answers we

14  have had to discovery that you are not involved in

15  the day-to-day calculations of prisoners' release

16  dates.

17       A    That's correct.

18       Q    Are you ever involved in those situations?

19       A    No.

20       Q    Okay, I did see -- I am going to show

21  you some documents about you reviewing some

22  grievances.  Is that part of your job?

23       A    Yes, sir.

24       Q    Okay, and to what extent?  How does a

1  grievance get to you?  Do you review every

2  grievance?

3      **A**    Yes.

4      **Q**    Okay, and if you could just take it from

5  an inmate -- if you could tell me the grievance

6  procedure perhaps.

7      **A**    When an offender writes a grievance, he is

8  usually not agreeing with a procedure.

9      Q    Sure.

10     **A**    So this is his way of addressing the

11 issue.  The offender will write a grievance and

12 then it will go to a counselor.  The counselor will

13 review the allegations made by the offender and

14 then interview the appropriate individuals involved

15 in whatever the grievance issue might be, and then

16 the counselor will formulate an opinion as to

17 whether there is merit to the grievance or the

18 factual issues to the grievance, and then he will

19 write his summary and then submit it to me for my

20 review.  At that time I either agree with the

21 counselor's position or I have the right to, you

22 know, send it back for more review, or totally not

23 accept or find it.

24     **Q**    Okay, do you conduct any kind of

1  investigation once you get these grievances, or do

2  you rely solely on what the counselor has found?

3      A    I rely on what -- the information the

4  counselor provides.

5      Q    Is the counselor a Department of

6  Corrections employee or is it another inmate?  Who

7  is the counselor?

8      A    He is an employee.

9      Q    And is that their sole job, counseling?

10     A    Yes.

11     Q    Okay, would a grievance go to a specific

12 counselor?  Does each inmate have a counselor, or

13 could one grievance, like in this case, David

14 Armato was grieving that he should have been let

15 out, would all of those grievances go to the same

16 counselor, or perhaps if they are done a week apart

17 it might be a different counselor?

18     A    Not one counselor does all grievances.  I

19 think they are assigned by the Clinical Service

20 Supervisor.

21     Q    And let's talk about the specific

22 grievances.  Some of these, the Attorney General

23 gave me about 1200 pages of documents that were

24 Bates stamped, and instead of making these your

1    exhibit, we will just pick out some of those.  I am

2    going to show you -- we are going to mark this one,

3    which wasn't in that group, as Grounds Exhibit 1.

4                   (Whereupon Grounds Exhibit 1 was

5                   marked for identification.)

6       Q    Let's look at that one first.  Then we

7    will come back to these.  I am going to show you

8    what we have had marked as Grounds Exhibit 1.  That

9    one I didn't find in the Bates stamped materials.

10   That's why it doesn't have a Bates stamp, and you

11   received that prior to litigation, so I want to go

12   over this.  This is -- is this a typical document

13   you would receive from a counselor regarding an

14   offender's grievance?

15      A    Yes, this particular grievance is an

16   emergency grievance.  The counselors do not provide

17   any review.  These grievances come directly to me

18   from the -- not necessarily from the offender, but

19   it comes to the counselor.  Counselors do not take

20   any action.  They are forwarded directly to me on

21   the grievance, on an emergency, when the offender

22   is claiming an emergency grievance.

23      Q    Is that something the offender informs the

24   person they submitted this grievance to?  This is

1   an emergency, it shouldn't go to a counselor, or is

2   it a different form?

3       A    No, it's the form, but all these

4   grievances are placed in the offender grievance

5   box.  When they are collected, when there is an

6   emergency grievance, then those are provided

7   directly to me.

8       Q    Okay, but how -- by looking at this, can

9   we tell it's an emergency grievance somehow?

10      A    Yes, sir.

11      Q    How is that?

12      A    The area where the offender has signed his

13  name, dated it.  Then there is a checked box to

14  check only if this is an emergency grievance due to

15  serious risk of inmate, personal injury or serious

16  harm or --

17      Q    So this one doesn't go to the counselor.

18  It comes directly to you.

19      A    Yes, sir.

20      Q    This is dated March 9, 2010.  The offender

21  is David Armato.  His inmate number is N91995,

22  correct?

23      A    Yes.

24      Q    Okay, do you recall receiving this

1   emergency grievance?

2       **A**   No, sir.

3       **Q**   Okay, is that your signature there on the

4   bottom dated March 11, 2010?

5       **A**   Yes, sir.

6       **Q**   Okay, so it's fair to assume that at some

7   point you reviewed this and signed off on it?

8       **A**   Yes, sir.

9       **Q**   Okay, once you review this and sign off on

10   it, what happens with this grievance?

11       **A**   My understanding it would go back to the

12   counselor, then to the offender, and it would

13   reflect whether I -- basically my review of this.

14   I am either saying, yes, expedite this grievance,

15   or no, this is not an emergency.  Go ahead and

16   handle through the normal grievance process.

17       **Q**   Okay, in this particular one you found

18   that this was not an emergency, correct?

19       **A**   Yes, sir.

20       **Q**   And then forgive me, because I hope you

21   are not restating this over again.  No, this was

22   not an emergency, so does this particular grievance

23   then go back to a counselor?

24       **A**   Yes.

1    Q    I guess the easiest way to do this, we are

2  going to mark documents I received from the

3  Attorney General which are Bates stamped 000724

4  through 001134 as Grounds Group Exhibit 2.

5        MR. FANNING:  I am going to put a

6  foundation objection on the record for it not being

7  a complete group exhibit.

8        MR. DeCARO:  Right, it's not a complete

9  group exhibit.  It's those specific pages that were

10  provided to us.

11              (Whereupon Grounds Group Exhibit 2

12                was marked for identification.)

13    Q    The only reason I am doing this is because

14  I thought Ms. Littlejohn was going to be first.  I

15  was going to ask her these questions but, Warden,

16  if you would look at pages 000781 and 782, 783, and

17  784.

18    A    I am sorry.

19    Q    Beginning at 781, 000781, through 784.

20    A    781.

21    Q    Yes, and then the next four pages, 781

22  through 784.

23    A    I am sorry.

24    Q    Okay, so the 781 and 782 is another

1    offender grievance by David Armato dated March 14,

2    2010, correct?

3        A    Yes.

4        Q    Okay, my question, for having you look at

5    these, and then the next one on 783 and 784, is a

6    response to a committed person's grievance dated

7    March 17, 2010, regarding David Armato, correct?

8        A    Yes, sir.

9        Q    Okay, your Exhibit 1 and these four pages,

10   does this constitute all one grievance?  You know

11   what I am saying, you saw this Grounds Exhibit 1

12   and you found it not to be an emergency.  Then does

13   this particular document, Exhibit 1, is that the

14   basis that the counselor -- that document goes to a

15   counselor, or are these subsequent documents that I

16   have shown you, 781 through 784, are they created

17   in response to Grounds Exhibit 1?

18       A    I could not answer that.

19       Q    Okay, all right, let me just go back to

20   Grounds Exhibit 1 again.  Once you sign off on

21   that, is that the extent of your involvement with

22   this particular grievance and Mr. Armato?

23       A    With this particular issue?

24       Q    Yes.

1      A    Yes.

2      Q    Okay, so there is no -- this particular

3  issue, I don't know if you had an opportunity to

4  read his grievance.  This was regarding --

5      A    You are talking about this (indicating)?

6      Q    Yes, Exhibit 1.

7      A    Yes.

8      Q    So he was saying he -- well, let me just

9  quickly read it.  "Illegal custody by IDOC," dash,

10  "a court order by Judge," and it's spelled

11  P-o-t-k-o-n-j-a-k "on February 18, 2010, ordered

12  above Defendant to be released from the Department

13  of Corrections without a term of mandatory

14  supervised release.  Note, see Defendant's mitimus

15  sentencing order in Defendant's records office

16  file.  However, when above Defendant's release date

17  of February 23, 2010, came I was not released as

18  ordered by the Judge.  I was told I was violated

19  because a supervisor in Springfield wanted IDOC's

20  legal department to review court order.  I have yet

21  to be released."  Immediately released from custody

22  by order of the Court.  Did you do any

23  investigation into whether what he said was

24  truthful or not?

1      **A**    No.

2      **Q**    Okay, who in this facility back in March

3  of 2010 as handling inmate release dates?

4      **A**    The records officer supervisor.

5      **Q**    Was that Ms. Littlejohn at that point?

6      **A**    Yes.

7      **Q**    And in here he refers to a supervisor in

8  Springfield, and I am assuming that's Glenn

9  Jackson?

10      **A**    I am not sure.

11      **Q**    Okay, do you know Glenn Jackson?

12      **A**    Yes.

13      **Q**    What is his relationship to this facility?

14      **A**    He is the chief records officer supervisor

15  for the state.

16      **Q**    From reading all of these documents,

17  Exhibit 1 and all the other documents I have been

18  provided, it seems as though Ms. Littlejohn and he

19  were communicating regarding Mr. Armato, whether to

20  release him or not, would that be the proper

21  protocol, as far as you know?

22      **A**    Yes.

23      **Q**    Okay, this gave you authority over Mr.

24  Jackson's decisions.  Let's see, Mr. Jackson said

1  release an inmate and you thought the inmate should

2  be kept here.  Do you have authority over him, or

3  vice versa?  Does he have authority over your

4  decisions?

5      A    I do not have any authority over Mr.

6  Jackson.

7      Q    Does he have any authority over you?

8      A    He is the chief records office supervisor

9  so, you know, if he gives direction on an offender,

10  whether they are to be released or not to be

11  released, that's the direction I would take.

12      Q    Okay, would it be fair to say that on

13  March 9, 2010, you were aware of this situation

14  with Mr. Armato by reviewing that grievance?

15      A    I am aware of the grievance, yes, the

16  documentation here.

17      Q    Okay, then the next document I have where

18  you signed is this March 17, 2010, document which

19  is Bates stamped 00783 and 00784.

20      A    One thing is this is not my signature.  I

21  didn't review this grievance.  It was signed by my

22  Assistant Warden Tilka.

23      Q    Okay, and you know that from the

24  signature?

1      **A**    Yes.

2      **Q**    Okay, is that something you give him or

3   her authority to do?

4      **A**    As Assistant Warden she does have

5   signature authority.

6      **Q**    Okay, so this document is entitled a

7   little differently, this March 17.  This is

8   response to committed person's grievance, grievance

9   officer report.  What is the difference between

10  this March 17, 2010, document and this offender's

11  grievance?

12     **A**    Okay, this grievance is marked to look as

13  an emergency grievance.  The emergency grievance to

14  me is when an offender's personal injury type, it's

15  more health-related.  If I feel that it's adamant

16  that this health issue, or this issue be looked at

17  immediately, then I will say agree, yes, expedite

18  this grievance, so then the grievant counselor will

19  know to review this offender grievance immediately.

20  In looking at individuals that have questions about

21  their sentence or calculation, I do not deem those

22  to be an emergency grievance, so I mark this as no,

23  an emergency is not substantiated.  Then it goes

24  back to the offender.  He should submit this

1  grievance in the normal manner, and this form, this

2  000781 and 782 --

3      Q   Yes.

4      A   -- reflects a normal -- this grievance

5  was submitted by the offender in the normal

6  fashion.

7      Q   Okay, okay, and then the 783 and 784, is

8  that the counselor's report to your office?

9      A   Yes, sir.

10     Q   And my understanding, from what you just

11  told me, is the Assistant Warden reviewed this in

12  your stead, for whatever reason, the March 17

13  document?

14     A   The March 17 document was reviewed and

15  signed by Assistant Warden Tilka.

16     Q   Do you know why she -- it is a she,

17  correct?

18     A   Yes.

19     Q   She would have done this instead of you?

20     A   I am only assuming it's a day that I was

21  not present at work.

22     Q   Okay, does she then talk to you about

23  these or communicate that, or somehow tell you she

24  signed off on some things while you weren't there?

1      A    No, sir.

2      Q    What happens when these grievances are in

3  effect denied then?  What's the next step after the

4  denial of the grievance?

5      A    For me or --

6      Q    Well, I guess for the inmate.

7      A    If he does not agree with our finding,

8  then he has the right to forward to Springfield for

9  review there.

10     Q    To whom, if you know?

11     A    Actually it goes to the Director, but I

12  don't recall the name of the group that actually

13  reviews it on behalf of the Director.

14     Q    Is that sort of the way of an appeal?

15     A    Yes.

16     Q    So there is no hearing or anything done

17  internally, once the grievance procedure is done

18  with?

19     A    No, sir.

20     Q    Okay, and that was for the inmate, and you

21  raised a good point.  After you concur with the

22  counselor, or do not -- well, in this case you

23  concurred with the Assistant Warden, concurred with

24  the counselor in this particular case on March 17,

1    is that the end of the matter in your office?

2        **A**    Yes.

3        **Q**    What is the policy and procedure a records

4    person here follows when they are calculating an

5    out date and there is a problem?  What do they do

6    when there is a problem where they can't ascertain

7    the proper date?

8        **A**    Maybe if you could clarify that, if our

9    records office superintendent is having an issue of

10   calculating an out date.

11       **Q**    Well, in this particular case, I don't

12   know how much you know about this particular case.

13   In this case there was a problem, it looks like,

14   for two reasons.  One, Ms. Littlejohn didn't know

15   how much credit to give him prior to coming to the

16   institution, and, two, the Judge put no MSR on this

17   particular court order, and I guess that was

18   unusual and those were the two problems I believe

19   she had.  When that arises, what is the policy and

20   procedure here what to do, if you are not

21   comfortable releasing the inmate?

22       **A**    I don't know if there is a policy or

23   procedure, but any time there is an issue or

24   question when it comes to calculation in the

1    records office, then the records office supervisor

2    should contact the chief records officer supervisor

3    from the state to get direction from him how to

4    move forward with the calculation.

5        Q    Okay, and during this particular period,

6    was Glenn Jackson the supervisor?

7        A    It's my understanding, yes.

8        Q    Is he still the supervisor?

9        A    Yes.

10       Q    Okay, are there any occasions where your

11   office would utilize the Attorney General's office

12   to go into court to do anything?

13            MR. FANNING:  Objection, foundation.

14       Q    You can answer.

15       A    I don't understand your question.

16       Q    Sure, is there ever a situation regarding

17   any court order possible, that your office utilizes

18   the Attorney General's office to go into court on

19   your behalf?

20            MR. FANNING:  Same objection.

21       Q    If you get a subpoena or something that --

22   let me back up.  If you have a legal question, is

23   the Attorney General your attorney for your office

24   pretty much, you know what I am saying, if you have

1    a legal question, do you ask an Attorney General?

2         A    No, sir.

3         Q    Who would you ask?  Do you have a legal

4    department?

5         A    Yes, sir.

6         Q    Is it in-house?

7         A    No, sir.

8         Q    Where is that?

9         A    It's by region.  We have a regional

10   attorney that they are assigned to facilities, so

11   we would have our regional representative or we

12   have a chief legal person in Springfield.

13        Q    Okay, are those attorneys part of the

14   Attorney General's office?  Are they titled

15   Attorney General or something else?

16        A    No, sir.

17        Q    Do you know back in February and March of

18   2010 who the regional attorney was?

19        A    Yes, I am trying to think of -- he is

20   stationed in Pinkneyville, Dave Tracy.

21        Q    How about the chief legal counsel, same

22   time period?

23        A    I believe Chief Rose was chief legal.  I

24   am not sure.  He is the chief legal now, and I

1      don't recall exactly his appointment date, but I

2      believe that it was Chief Rose.

3          Q    He is in Springfield?

4          A    Yes.

5          Q    One second, back in March and February of

6      2010, were you Ms. Littlejohn's supervisor?

7          A    Yes.

8          Q    Would she come to you with questions

9      regarding inmate out dates at all, or no?

10         A    No, could you clarify that?  I am not her

11     direct supervisor.

12         Q    Maybe you are her supervisor-supervisor

13     or --

14         A    Yes, but to answer your questions, she

15     would not come to me with questions.

16         Q    Who is her supervisor?

17         A    It would be the Assistant Warden of

18     Programs.

19         Q    Do you have an understanding of mandatory

20     supervised release, whether it is every inmate back

21     in February or March of 2010, every inmate had to

22     have a mandatory supervised release?

23         A    I am not sure, sir.

24         Q    And I got from your interrogatory answers,

1    other than these documents I showed you, Exhibit 1,

2    and then those four pages from Exhibit 2, did you

3    have any other interaction with this matter?

4        A    Not that I am aware of.

5        Q    Okay, did you ever see the court orders

6    that Mr. Armato was referring to in his grievances?

7        A    Not that I recall.

8        Q    When this inmate in this particular case,

9    Mr. Armato, went up to Lake County, Illinois, and

10    had a couple court orders entered in February 18,

11    2010, where do those court records go when they

12    come to this facility?

13        A    They go to the records office.

14        Q    Okay, and when he filed the grievance

15    regarding those orders, is that something you have

16    access to?

17        A    Not unless it's directed to me.

18        Q    What do you mean?

19        A    Well, to clarify your --

20        Q    Sure, sure, sure.  You received this

21    grievance March 9, 2010.  Would it have been

22    possible for you to go to the records office and

23    pull the orders that he referred to in this

24    grievance to see whether what he was saying was

1    truthful or not?

2          A     I would not.  I would not have done that.

3    I rely solely on the orders off the supervisor to

4    review and do the calculation.  I don't get

5    involved in calculations.

6          Q     Okay, is there -- what's in the records

7    office?  Is that what we call the master file?

8          A     That's correct.

9          Q     You have access to those files, though, if

10   you wanted to, I am assuming?

11         A     Yes, sir.

12         Q     Would it be fair to say that you are

13   responsible for enforcing all the policies and

14   procedures here at this facility?

15         A     Yes, sir.

16         Q     Other than the lawsuit and other than

17   these documents I showed you today, do you have any

18   information regarding this case?  Did you

19   investigate it at all once you received the

20   lawsuit, anything like that?

21         A     The only investigation, I inquired when we

22   received the lawsuit of clarification from the

23   records office what this was in reference to.

24         Q     Who did you ask, Ms. Littlejohn?

1     **A**    Yes.

2     **Q**    What did she tell you?

3     **A**    She explained to me it was over the

4 calculation of the release.  Actually, I think I

5 directed my question to DeeDee Brookheart.  She is

6 our legal litigation coordinator, and I would have

7 directed my question to her what this was in

8 reference to, not directly to Ms. Littlejohn.

9     **Q**    Just going back to a little bit about what

10 your deference to Mr. Jackson's decision regarding

11 when to release an inmate, do you have the

12 authority to release an inmate generally?

13     **A**    No, sir.

14     **Q**    Okay, and so who actually decides when to

15 release an inmate?

16     **A**    The records office coordinator supervisor

17 does all the calculations.

18     **Q**    And so because -- I don't know the system.

19 I am assuming they get the documents from the

20 Court.  They figure out the date to release the

21 person, and then based on that supervisor's

22 calculations, that is the document that allows them

23 to walk out of here?

24     **A**    Yes, sir.

1     **Q**    So if there is not a problem, they can do

2 that without any interaction with Mr. Jackson?

3     **A**    Yes, sir.

4     **Q**    In your interrogatory answer number 2, you

5 say Office Administrative Specialist Michele

6 Littlejohn was temporarily assigned as the

7 Executive 2/Records Office Supervisor during the

8 time frame affected by this lawsuit.  Who typically

9 was the supervisor?

10     **A**    The records office supervisor had been

11 temporarily assigned to another facility so --

12     **Q**    The person who was there before got

13 reassigned?

14     **A**    Yes, temporarily, so Ms. Littlejohn was

15 TA'd to the Records Office Supervisor position.

16     **Q**    What was Ms. Littlejohn's position before

17 that?

18     **A**    She had actually been the -- I believe the

19 coordinator, and then she got promoted to the Land

20 Administrative position, and then we placed her

21 back in as Records Office Supervisor.

22     **Q**    And my understanding, and there is some

23 documents to support that Ms. Littlejohn and Mr.

24 Jackson were sending, I guess, Outlook messages to

1    each other regarding this situation, did you ever

2    get copied on any e-mails or Outlook messages

3    regarding this situation?

4         A    No, sir.

5         Q    When somebody is violated at the door,

6    what does that mean?

7         A    Can you be more clear or --

8         Q    In response to your interrogatory number 4

9    there, the answer, it says "based on information

10   provided by Michele Littlejohn, for purposes of

11   responding to these interrogatories, it is my

12   understanding that on February 22, 2010, Chief

13   Records Officer Supervisor Glenn Jackson directed

14   the plaintiff David Armato, who on that date was in

15   Court writ at Stateville Correctional Center not to

16   be released, and that plaintiff David Armato be

17   violated at the door."

18        A    My understanding, in most cases these

19   individuals are sex offenders, and there has not

20   been any approved housing or location for them to

21   be released to, so they become violated at the door

22   is the terminology, and they are kept at the

23   institution.

24        Q    That they are violating their parole?

1       **A**    I can't speak to the exact purpose, but

2   it's my understanding that it has to do with no

3   approved housing as part of their release.

4       **Q**    Okay, and if they don't have mandatory

5   supervised release, and then they are not on

6   parole, whether they are sex offenders or not, can

7   they just walk out of here without any restrictions

8   on them?

9       **A**    I can't answer that.

10      **Q**    I think that's it.  Most of my questions

11  are for Ms. LittleJohn.  I appreciate your time.

12      **A**    Yes, sir.

13                     **CROSS EXAMINATION**

14  **BY:  ROBERT FANNING**

15      **Q**    I just have a couple I want to clarify.

16  We were talking about what's been listed as Exhibit

17  1, the grievance dated March 9, 2010.  I just want

18  to go through the grievance procedure quickly.  The

19  first step is that the individual offender is to

20  submit the grievance to his counselor, correct?

21      **A**    The offender, when they write a grievance

22  in the housing units there are mailboxes or wooden

23  boxes that the grievances are placed in, and then

24  the counselors retrieve those grievances on a daily

1    basis.

2        Q    Okay, the counselor will respond to the

3    grievance and then return it to the offender?

4        A    Depending on -- if it's an emergency, if

5    it's marked as an emergency grievance, then the

6    counselor will forward that grievance to me before

7    any involvement on the counselor's part.

8        Q    Let's say that it's not an emergency

9    grievance -- I think a step might have been skipped

10   in the previous testimony.  There is the counselor.

11   The counselor responds and then returns it to the

12   offender, correct?

13       A    That's correct.

14       Q    And this is all if it's not an emergency.

15       A    Yes.

16       Q    If he is unhappy with the counselor's

17   response, what is the offender's next step?  Does

18   he turn it in to the grievance officer?

19       A    For another review from the grievance

20   officer?

21       Q    Yes.

22       A    The grievance officer is the one that will

23   put the final review on the counselor's response.

24       Q    Okay, so if we look --

1       A    Uh huh.

2       Q    -- at document 781, this is a March 14,

3  2010, grievance.

4       A    Yes.

5       Q    It appears from document 781 that the

6  plaintiff turned it in to his counselor, is that

7  correct?  Can you tell by this document who his

8  counselor was?

9       A    Yes, Ms. Neece.

10       Q    And what's CC-2 mean?

11       A    She is a Counselor 2, correctional

12  officer.  She is a counselor 2, yes.

13       Q    Correctional Counselor 2?

14       A    Yes.

15       Q    And then it looks like at some point --

16  that was March 16, and at some point March 17, a

17  grievance officer received this.  Do you know who

18  the grievance officer is?

19       A    Yes, Ron Sutton.

20       Q    Okay, so if it's not an emergency, it's

21  the first time the Warden's office sees it and the

22  grievance officer reviews it?

23       A    The Warden normally receives for his

24  concurrence or not concurrence, after the

1    recommendation is entered by the grievance officer.

2        Q    Okay, and on document 783, that was not

3    your signature?

4        A    No, sir.

5        Q    All right, and there is another type of

6    grievance procedure.  That's the emergency

7    grievance procedure, correct?

8        A    Correct.

9        Q    And who marks it as an emergency?

10       A    The offender.

11       Q    And the offender makes their own

12   determination that "I am sending this through the

13   emergency procedure"?

14       A    Yes, sir.

15       Q    Okay, and receives it directly from the

16   counselor?

17       A    Yes, sir.

18       Q    And then you have to make a determination

19   whether or not it's an emergency or not?

20       A    Correct.

21       Q    And what are the only factors you take

22   into account to determine if it is an emergency?

23       A    Myself, I basically restrict that to a

24   medical issue, if the offender is making

1    accusations that he is not getting certain care or

2    treatment that's going to have an adverse effect on

3    his quality of life.

4         Q    Okay, so if he has a medical issue, you

5    would substantiate it as an emergency?

6         A    In most situations.

7         Q    What about if his -- if he makes an

8    allegation that he is in immediate danger of harm?

9         A    Then that would be another situation that

10    I would err on the side of deeming it to be --

11    basically it's anything that has to do with the

12    health, injury, medical-type issues with the

13    offender.

14         Q    Physical injuries?

15         A    Yes.

16         Q    Okay, and so when you deny it as an

17    emergency grievance -- well, let's walk back.  When

18    you look at it as an emergency grievance, are you

19    looking -- are you required to take any sort of

20    steps to investigate the grievance, or do you just

21    look at the allegations made?

22         A    I just look at the allegations.

23         Q    Okay, then when you deny the emergency

24    grievances as you did in Exhibit 1, what happens?

1    **A**    It will go back, and my understanding -- I

2    think it goes to a counselor, but then they

3    instruct the offender that he needs to resubmit

4    through the normal process, that's it's been deemed

5    not to be an emergency.  Then he would, of course,

6    get a copy of this, and then he would resubmit the

7    grievance in the fashion he did.

8    **Q**    Okay, and then if it goes through the

9    fashion that it receives a counselor response,

10   grievance officer response, and the Warden's office

11   has concurred or denied the grievance, there is a

12   final step, right?

13   **A**    Yes.

14   **Q**    And he can appeal it to, you said, the

15   director's office?

16   **A**    Yes.

17   **Q**    Is that what's referred to as the

18   Administrative Review?

19   **A**    Administrative Review, yes.

20   **Q**    Mr. Grounds, do you know how to calculate

21   an offender's sentence?

22   **A**    No, sir.

23   **Q**    Okay, so if you were to see a Court order

24   in a master file, you would not be capable of

1    calculating that individual sentence date?

2        A    No, sir.

3        Q    I don't have anything else.

### REDIRECT EXAMINATION

BY:  DENNIS J. DeCARO

6        Q    Let me just ask a couple, Warden.  The

7    documents that the Assistant Warden signed on March

8    17, she had authority to review those documents on

9    March 17, 2010?

10       A    Yes, sir.

11       Q    And she had the authority to sign your

12   name on those documents?

13       A    Yes, sir.

14       Q    Okay, counsel took you through the

15   process.  The inmate makes the grievance.  It

16   goes -- in this particular case went to a counselor

17   and then went to a grievance officer.  Do you know

18   if when it goes to a counselor whether the

19   counselor does any type of investigation beyond

20   reading the grievance?

21       A    I can't answer exactly every step that

22   they would take.

23       Q    How about the grievance officer?  You know

24   if they do any type of investigation?

1    A    I believe they try to substantiate what

2    information that they have before them.

3    Q    Would they go to the master file and start

4    reviewing documents?

5    A    I am not sure.

6    Q    And you talked about the standards that in

7    your mind that were emergencies, medical issues, or

8    danger to the inmate, correct?

9    A    Correct.

10   Q    Where did you get those standards?  Is

11   there a state regulation, protocol, guideline that

12   those are the only emergencies?

13   A    No, sir, it's just my day-to-day.

14   Q    Would it be fair to say, I mean you don't

15   consider that if an inmate assumed this for this

16   question, that the inmate should be released and

17   days or weeks later he is filing an emergency

18   grievance saying that "I should have been released

19   weeks ago."  That's not an emergency in your mind?

20   A    Not in the dealings with the emergency

21   grievance.

22   Q    It's also fair to say in that situation

23   where a grievance involves a release date, there is

24   no -- during any grievance procedure in this

1  facility, there is no procedure for a hearing

2  regarding that situation in this facility, without

3  going to Springfield and appealing it here.  There

4  is no hearings.  There is no evidence submitted.

5  You don't review documents in a hearing setting?

6      A    I really don't understand your question.

7      Q    Sure, I am sorry.  It probably got

8  confusing.  In a situation like this, where Mr.

9  Armato is grieving that his sentence is being

10  miscalculated, and that he should have been

11  released, in the process here before it goes to

12  Springfield, or anywhere outside these walls,

13  during this grievance procedure, at no point does

14  the inmate have an opportunity to have a hearing

15  where he can present evidence, where he can get

16  documents from his master file, things like that?

17      A    No, sir.

18      Q    Okay, that's all I have.

19          MR. FANNING:  Just want to clarify one

20  last thing.  You mentioned that -- are you sure

21  that there is no regulation as to the standards for

22  emergency grievance, or you are just unaware of any

23  of them?

24      A    I am unaware if there are any written

1    guidelines.

2              MR. FANNING:   Okay, no further questions.

3         **A**    Thank you.

4

5

6

7

8

9                   (DEPOSITION CONCLUDED)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1       CERTIFIED SHORTHAND REPORTER'S CERTIFICATION

2           I, Donna R. Maninfior, Certified Shorthand
Reporter, Registered Professional Reporter and
3   Notary Public for the State of Illinois, DO HEREBY
CERTIFY that pursuant to agreement between Counsel
4   there appeared before me on March 5, 2012, at the
Robinson Correctional Center, 13423 East 1150th
5   Avenue, Robinson, Illinois, **RANDY GROUNDS**, who was
first duly sworn by me to testify to the whole
6   truth of his knowledge touching upon the matter in
controversy aforesaid so far as he could be
7   interrogated concerning the same; that I did take
stenographic notes of the questions propounded to
8   said witness and his answers thereto, and that said
notes were transcribed upon the computer under my
9   direction and supervision; that signature is waived
and said deposition is herewith returned.

10
          I do further certify that I am not related
11  in any way to any of the parties involved in this
action and have no interest in the outcome thereof.

12
          Dated at Mattoon, Illinois, this 20th day
13  of March, A.D., 2012, and given under my hand and
seal.

14

15

16

17                     Donna R. Maninfior, CSR, RPR
                            Notary Public

18

19

20

21

22

23

24

**OFFENDER'S GRIEVANCE**

| Date: 3-9-10 | Offender: (Please Print) David Armato | ID#: N91995 |
|---|---|---|

| Present Facility: Robinson | Facility where grievance issue occurred: Robinson |
|---|---|

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [ ] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [x] Other (specify): Illegal custody

- [ ] Disciplinary Report: _____ / _____ / _____
  Date of Report _____  Facility where issued _____

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
**Counselor,** unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
**Grievance Officer,** only if the issue involves discipline at the present facility or issue not resolved by Counselor.
**Chief Administrative Officer,** only if EMERGENCY grievance.
**Administrative Review Board,** only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** Illegal custody by IDOC - A court order by Judge Potkonjak on Feb 18 2010 ordered above defendant to be released from the Department of Corrections without a term of mandatory supervised release. Note see defendants mittimus sentencing order in defendants recorded office file. However when above defendants release date of Feb 23 2010 came I was not released as ordered by the judge. I was told I was violated because a supervisor in Springfield wanted IDOC legal department to review court order I have yet to be released

**Relief Requested:** Immediately released from custody by order of the court!

[x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| David Armato | N91995 | 3, 9, 10 |
|---|---|---|
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: _____ / _____ / _____
- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL  62794-9277

Response: _____

GROUNDS
EXHIBIT NO. 1
D. MANINFIOR

| | | |
|---|---|---|
| Print Counselor's Name | Counselor's Signature | Date of Response |

---

**EMERGENCY REVIEW**

Date Received: 3 / 11 / 10

Is this determined to be an emergency nature?
- [ ] Yes; expedite emergency grievance
- [x] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

| | |
|---|---|
| Chief Administrative Officer's Signature | 3 / 11 / 10  Date |

Distribution: Master File; Offender          Page 1          DOC 0046 (Rev. 3/2005)

## GROUNDS DEPOSITION EXHIBIT 2

(Ground Dep Exhibit 2 consists of bate stamped documents from 724 to1134, therefore, we did not attach the entire exhibit, but attached and referenced various bate stamped pages throughout this Response)